**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

COMMUNITY ASSOCIATIONS INSTITUTE *et al.*,

*Plaintiffs-Appellants*,

*v.*

U.S. DEPARTMENT OF THE TREASURY *et al.*,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Case No. 1:24-CV-01597-MSN-LRV

**JOINT APPENDIX**

Brendan P. Bunn
CHADWICK, WASHINGTON
MORIARTY, ELMORE & BUNN, P.C.
3201 Jermantown Road, Suite 600
Fairfax, VA 22030
Tel: (703) 352-1900
bpbunn@chadwickwashington.com

*Counsel for Appellants Canterbury
Crossing Condominium Trust,
Townhouse Green Cooperative Inc.,
Terraces on Memorial Homeowners
Association, Farrcroft Homeowners
Association, Regency at Ashburn Greenbrier
Condominium Association*

Damon W.D. Wright
Clair E. Wischusen
GORDON REES SCULLY
MANSUKHANI LLP
277 S. Washington Street, Ste. 550
Alexandria, VA 22314
(703) 650-7030
dwright@grsm.com
cwischusen@grsm.com

*Counsel for Appellant
Community Associations Institute*

# TABLE OF CONTENTS

**Page**

District Court Docket ............................................................................JA1

Complaint ...........................................................................................JA9

Declaration of Senya Ehrstein ..........................................................JA52

Declaration of Nancy Wiegand ..........................................................JA57

Declaration of Nick Kornuta...............................................................JA61

Declaration of Cheri Heaton ..............................................................JA64

Declaration of Kathi Robinson ...........................................................JA67

Declaration of Thomas M. Skiba ........................................................JA71

Declaration of James Martinelli..........................................................JA77

     Ex. A – December 28, 2023 CAI Letter ................................JA84

     Ex. B – July 25, 2024 FinCEN Letter ..................................JA88

Transcript of Motion Hearing, October 11, 2024 ...............................JA90

Opinion and Order, dated October 24, 2025....................................JA131

Notice of Appeal ..............................................................................JA151

APPEAL,STAYED

# U.S. District Court
## Eastern District of Virginia - (Alexandria)
## CIVIL DOCKET FOR CASE #: 1:24-cv-01597-MSN-LRV

Community Associations Institute et al v. U.S. Department of the Treasury et al

Assigned to: District Judge Michael S Nachmanoff
Referred to: Magistrate Judge Lindsey R. Vaala
Demand: $0
Case in other court:  4CCA, case manager Anisha Walker,, 24-02118
Cause: 28:2201 Declaratory Judgment

Date Filed: 09/10/2024
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: U.S. Government Defendant

### Plaintiff

**Community Associations Institute**                     represented by     **Clair Wischusen**
Gordon & Rees
277 S. Washington St
Ste 550
Alexandria, VA 22314
202-399-1009
Fax: 202-800-2999
Email: cwischusen@grsm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gretchen Harris Sperry**
Gordon Rees Scully Mansukhani LLP (IL-NA)
One North Wacker Drive
Suite 1600
Chicago, IL 60606
**NA**
312-565-1400
Email: gsperry@grsm.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Josephine Goers**
Gordon Rees Scully Mansukhani LLP (IL-NA)
One North Wacker Drive
Suite 1600
Chicago, IL 60606
**NA**
312-565-1400
Fax: 312-565-6511
Email: mgoers@grsm.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

JA1

**Damon William Wright**
Gordon & Rees, LLP
277 S. Washington St.
Ste 550
Alexandria, VA 22314
703-650-7016
Fax: 202-800-2999
Email: dwright@grsm.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Canterbury Crossing Condominium Trust**          represented by   **Clair Wischusen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brendan Bunn**
Chadwick Washington Moriarty Elmore &
Bunn, PC
3201 Jermantown Rd.
Suite 600
Fairfax, VA 22030
703-352-1900
Email: bpbunn@chadwickwashington.com
*ATTORNEY TO BE NOTICED*

**Edmund Arthur Allcock**
Allcock & Marcus, LLC
10 Forbes Road
Suite 400
Braintree, MA 02184
**NA**
781-884-1660
Email: ed@amcondolaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Damon William Wright**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Townhouse Green Cooperative**          represented by   **Brendan Bunn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Damon William Wright**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Terraces on Memorial Homeowners Association**          represented by   **Brendan Bunn**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA2

**Damon William Wright**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Regency at Ashburn Greenbrier**          represented by   **Brendan Bunn**
**Condominium Association**                                  (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Damon William Wright**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Farrcroft Homeowners Association, Inc.**   represented by   **Brendan Bunn**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Damon William Wright**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. Department of the Treasury**          represented by   **Peter B. Baumhart**
                                                            DOJ-USAO
                                                            United States Attorney's Office
                                                            Eastern District of Virginia
                                                            2100 Jamieson Avenue
                                                            Alexandria, VA 22314
                                                            703-299-3700
                                                            Email: peter.baumhart@usdoj.gov
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Kirstin O'Connor**
                                                            DOJ-USAO
                                                            2100 Jamieson Ave.
                                                            Alexandria, VA 22314
                                                            703-299-3799
                                                            Email: kirstin.o'connor@usdoj.gov
                                                            *ATTORNEY TO BE NOTICED*

**Defendant**

**Janet Yellen**                             represented by   **Peter B. Baumhart**
*in her official capacity as the Secretary of*               (See above for address)
*the United States Department of the*                        *LEAD ATTORNEY*
*Treasury*                                                   *ATTORNEY TO BE NOTICED*

                                                            **Kirstin O'Connor**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Defendant**

JA3

**Andrea Gacki**
*in her official capacity as Director of*
*Financial Crimes Enforcement Network*

represented by **Peter B. Baumhart**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kirstin O'Connor**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/10/2024 | 1 | Complaint ( Filing fee $ 405, receipt number AVAEDC-9732378.), filed by Farrcroft Homeowners Association, Inc., Townhouse Green Cooperative, Canterbury Crossing Condominium Trust, Community Associations Institute, Terraces on Memorial Homeowners Association, Regency at Ashburn Greenbrier Condominium Association. (Attachments: # 1 Civil Cover Sheet)(Wright, Damon) (Entered: 09/10/2024) |
| 09/10/2024 | 2 | Proposed Summons re 1 Complaint, by Canterbury Crossing Condominium Trust, Community Associations Institute, Farrcroft Homeowners Association, Inc., Regency at Ashburn Greenbrier Condominium Association, Terraces on Memorial Homeowners Association, Townhouse Green Cooperative (Wright, Damon) (Entered: 09/10/2024) |
| 09/10/2024 | 3 | Proposed Summons re 1 Complaint, by Canterbury Crossing Condominium Trust, Community Associations Institute, Farrcroft Homeowners Association, Inc., Regency at Ashburn Greenbrier Condominium Association, Terraces on Memorial Homeowners Association, Townhouse Green Cooperative (Wright, Damon) (Entered: 09/10/2024) |
| 09/10/2024 | 4 | Proposed Summons re 1 Complaint, by Canterbury Crossing Condominium Trust, Community Associations Institute, Farrcroft Homeowners Association, Inc., Regency at Ashburn Greenbrier Condominium Association, Terraces on Memorial Homeowners Association, Townhouse Green Cooperative (Wright, Damon) (Entered: 09/10/2024) |
| 09/10/2024 | 5 | Proposed Summons re 1 Complaint, by Canterbury Crossing Condominium Trust, Community Associations Institute, Farrcroft Homeowners Association, Inc., Regency at Ashburn Greenbrier Condominium Association, Terraces on Memorial Homeowners Association, Townhouse Green Cooperative (Wright, Damon) (Entered: 09/10/2024) |
| 09/10/2024 | 6 | Corporate Disclosure Statement by Canterbury Crossing Condominium Trust. (Wright, Damon) (Entered: 09/10/2024) |
| 09/10/2024 | 7 | Corporate Disclosure Statement by Farrcroft Homeowners Association, Inc.. (Wright, Damon) (Entered: 09/10/2024) |
| 09/10/2024 | 8 | Corporate Disclosure Statement by Regency at Ashburn Greenbrier Condominium Association. (Wright, Damon) (Entered: 09/10/2024) |
| 09/10/2024 | 9 | Corporate Disclosure Statement by Terraces on Memorial Homeowners Association. (Wright, Damon) (Entered: 09/10/2024) |
| 09/10/2024 | 10 | Corporate Disclosure Statement by Townhouse Green Cooperative. (Wright, Damon) (Entered: 09/10/2024) |
| 09/10/2024 | 11 | Corporate Disclosure Statement by Community Associations Institute. (Wright, Damon) (Entered: 09/10/2024) |
| 09/10/2024 | 12 | MOTION for Leave to File Excess Pages by Canterbury Crossing Condominium Trust, Community Associations Institute, Farrcroft Homeowners Association, Inc., Regency at Ashburn Greenbrier Condominium Association, Terraces on Memorial Homeowners |

JA4

| | | |
|---|---|---|
| | | Association, Townhouse Green Cooperative. (Attachments: # 1 Proposed Order)(Wright, Damon) (Entered: 09/10/2024) |
| 09/10/2024 | 13 | MOTION for Preliminary Injunction by Canterbury Crossing Condominium Trust, Community Associations Institute, Farrcroft Homeowners Association, Inc., Regency at Ashburn Greenbrier Condominium Association, Terraces on Memorial Homeowners Association, Townhouse Green Cooperative. (Wright, Damon) (Entered: 09/10/2024) |
| 09/10/2024 | 14 | Memorandum in Support re 13 MOTION for Preliminary Injunction filed by Canterbury Crossing Condominium Trust, Community Associations Institute, Farrcroft Homeowners Association, Inc., Regency at Ashburn Greenbrier Condominium Association, Terraces on Memorial Homeowners Association, Townhouse Green Cooperative. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Wright, Damon) (Entered: 09/10/2024) |
| 09/10/2024 | 15 | Notice of Hearing Date re 13 MOTION for Preliminary Injunction (Wright, Damon) (Entered: 09/10/2024) |
| 09/10/2024 | 16 | Motion to appear Pro Hac Vice by Mary Josephine Goers and Certification of Local Counsel Damon W.D. Wright Filing fee $ 75, receipt number AVAEDC-9732404. by Canterbury Crossing Condominium Trust, Community Associations Institute, Farrcroft Homeowners Association, Inc., Regency at Ashburn Greenbrier Condominium Association, Terraces on Memorial Homeowners Association, Townhouse Green Cooperative. (Wright, Damon) (Entered: 09/10/2024) |
| 09/10/2024 | 17 | Motion to appear Pro Hac Vice by Gretchen Harris Sperry and Certification of Local Counsel Damon W.D. Wright Filing fee $ 75, receipt number AVAEDC-9732406. by Canterbury Crossing Condominium Trust, Community Associations Institute, Farrcroft Homeowners Association, Inc., Regency at Ashburn Greenbrier Condominium Association, Terraces on Memorial Homeowners Association, Townhouse Green Cooperative. (Wright, Damon) (Entered: 09/10/2024) |
| 09/10/2024 | 18 | EXHIBIT *B (corrected) to Memorandum of Law in Support of Motion for Preliminary Injunction* by Canterbury Crossing Condominium Trust, Community Associations Institute, Farrcroft Homeowners Association, Inc., Regency at Ashburn Greenbrier Condominium Association, Terraces on Memorial Homeowners Association, Townhouse Green Cooperative.. (Wright, Damon) (Entered: 09/10/2024) |
| 09/10/2024 | | Initial Case Assignment to District Judge Michael S Nachmanoff and Magistrate Judge Lindsey R. Vaala. (Cwel) (Entered: 09/11/2024) |
| 09/11/2024 | 19 | Summons Issued as to Andrea Gacki, U.S. Department of the Treasury, Janet Yellen, U.S. Attorney and U.S. Attorney General NOTICE TO ATTORNEY: Please remove the headers and print two duplexed copies of the electronically issued summons for each Defendant. Please serve one copy of the summons and a copy of the Complaint upon each Defendant. Please ensure that your process server returns the service copy (executed or unexecuted) to your attention and electronically file it using the filing events, Summons Returned Executed as to USA or Summons Returned Unexecuted as to USA. (Attachments: # 1 Notice to Attorney)(Cwel) (Entered: 09/11/2024) |
| 09/13/2024 | | Set Deadline as to 13 MOTION for Preliminary Injunction. Motion Hearing set for 10/11/2024 at 10:00 AM in Alexandria Courtroom 600 before District Judge Michael S Nachmanoff. (wgar, ) (Entered: 09/13/2024) |
| 09/13/2024 | | Notice of Correction: The filing user has been notified to file a Notice of Hearing Date or a Notice of Waiver of Oral Argument in re 12 MOTION for Leave to File Excess Pages. (wgar, ) (Entered: 09/13/2024) |

JA5

| 09/13/2024 | 20 | ORDER granting 16 Motion for Pro hac vice Appointed Mary Josephine Goers for Community Associations Institute. Signed by District Judge Michael S Nachmanoff on 9/13/2024. (swil) (Entered: 09/13/2024) |
| 09/13/2024 | 21 | ORDER granting 17 Motion for Pro hac vice Appointed Gretchen Harris Sperry for Community Associations Institute. Signed by District Judge Michael S Nachmanoff on 9/13/2024. (swil) (Entered: 09/13/2024) |
| 09/13/2024 | 22 | NOTICE of Appearance by Kirstin O'Connor on behalf of Andrea Gacki, U.S. Department of the Treasury, Janet Yellen (O'Connor, Kirstin) (Entered: 09/13/2024) |
| 09/13/2024 | 23 | Consent MOTION for Extension of Time to File Response/Reply as to 13 MOTION for Preliminary Injunction by Andrea Gacki, U.S. Department of the Treasury, Janet Yellen. (Attachments: # 1 Proposed Order)(O'Connor, Kirstin) (Entered: 09/13/2024) |
| 09/13/2024 | 24 | Waiver of re 23 Consent MOTION for Extension of Time to File Response/Reply as to 13 MOTION for Preliminary Injunction *Waiver of Hearing* by Andrea Gacki, U.S. Department of the Treasury, Janet Yellen (O'Connor, Kirstin) (Entered: 09/13/2024) |
| 09/16/2024 | 25 | ORDERED that Plaintiff's Motion for Leave (ECF 12) is GRANTED; and it is further ORDERED that Defendants' Consent Motion for an Extension (ECF 23) is GRANTED; and it is further ORDERED that Defendants shall file a response brief of up to 45 pages to Plaintiffs' Motion for a Preliminary Injunction on or before October 2, 2024. Signed by District Judge Michael S Nachmanoff on 09/16/2024. (dvanm) (Entered: 09/16/2024) |
| 09/16/2024 | 26 | NOTICE of Appearance by Clair Wischusen on behalf of Community Associations Institute (Wischusen, Clair) (Entered: 09/16/2024) |
| 09/18/2024 | 27 | Motion to appear Pro Hac Vice by Edmund Arthur Allcock and Certification of Local Counsel Clair Wischusen Filing fee $ 75, receipt number AVAEDC-9745812. by Canterbury Crossing Condominium Trust. (Wischusen, Clair) (Entered: 09/18/2024) |
| 09/25/2024 | 28 | NOTICE of Appearance by Brendan Bunn on behalf of Farrcroft Homeowners Association, Inc. (Bunn, Brendan) (Entered: 09/25/2024) |
| 09/25/2024 | 29 | NOTICE of Appearance by Brendan Bunn on behalf of Regency at Ashburn Greenbrier Condominium Association (Bunn, Brendan) (Entered: 09/25/2024) |
| 09/25/2024 | 30 | NOTICE of Appearance by Brendan Bunn on behalf of Terraces on Memorial Homeowners Association (Bunn, Brendan) (Entered: 09/25/2024) |
| 09/25/2024 | 31 | NOTICE of Appearance by Brendan Bunn on behalf of Townhouse Green Cooperative (Bunn, Brendan) (Entered: 09/25/2024) |
| 09/25/2024 | 32 | NOTICE of Appearance by Brendan Bunn on behalf of Canterbury Crossing Condominium Trust (Bunn, Brendan) (Entered: 09/25/2024) |
| 09/25/2024 | 33 | Motion to appear Pro Hac Vice by Edmund Arthur Allcock and Certification of Local Counsel Brendan P. Bunn by Canterbury Crossing Condominium Trust. (Bunn, Brendan) (Entered: 09/25/2024) |
| 10/02/2024 | 34 | NOTICE of Appearance by Peter B. Baumhart on behalf of Andrea Gacki, U.S. Department of the Treasury, Janet Yellen (Baumhart, Peter) (Entered: 10/02/2024) |
| 10/02/2024 | 35 | Memorandum in Opposition re 13 MOTION for Preliminary Injunction filed by Andrea Gacki, U.S. Department of the Treasury, Janet Yellen. (Attachments: # 1 Exhibit, # 2 Exhibit)(Baumhart, Peter) (Entered: 10/02/2024) |
| 10/04/2024 | | Set/Reset Deadlines as to 13 MOTION for Preliminary Injunction . Motion Hearing set for 10/11/2024 at 09:00 AM in Alexandria Courtroom 600 before District Judge Michael S |

JA6

| | | Nachmanoff. (lcre, ) (Entered: 10/04/2024) |
|---|---|---|
| 10/04/2024 | 36 | ORDER granting 27 Motion for Pro hac vice Appointed Edmund Arthur Allcock for Canterbury Crossing Condominium Trust. Signed by District Judge Michael S Nachmanoff on 10/4/2024. (swil) (Entered: 10/04/2024) |
| 10/04/2024 | 37 | ORDER granting 33 Motion for Pro hac vice Appointed Edmund Arthur Allcock for Canterbury Crossing Condominium Trust. Signed by District Judge Michael S Nachmanoff on 10/4/2024. (swil) (Entered: 10/04/2024) |
| 10/07/2024 | 38 | REPLY to Response to Motion re 13 MOTION for Preliminary Injunction filed by Canterbury Crossing Condominium Trust, Community Associations Institute, Farrcroft Homeowners Association, Inc., Regency at Ashburn Greenbrier Condominium Association, Terraces on Memorial Homeowners Association, Townhouse Green Cooperative. (Wischusen, Clair) (Entered: 10/07/2024) |
| 10/11/2024 | 39 | Minute Entry for proceedings held before District Judge Michael S Nachmanoff: Motion Hearing held on 10/11/2024. Plaintiffs appeared through Damon Wright, Edmund Allcock, Brendan Bunn, and Clair Wischusen. Defendants appeared through Peter Baumhart and Kirstin O'Connor. MOTION for Preliminary Injunction re 13 argued and TAKEN UNDER ADVISEMENT. Order to follow. (Court Reporter T. Harris.)(lcre, ) (Entered: 10/11/2024) |
| 10/24/2024 | 40 | MEMORANDUM OPINION AND ORDER Denying Plaintiffs' Motion for Preliminary Injunction (ECF 13). Signed by District Judge Michael S Nachmanoff on 10/24/2024. (dvanm) (Entered: 10/24/2024) |
| 11/04/2024 | 41 | NOTICE OF APPEAL as to 40 Memorandum Opinion by Canterbury Crossing Condominium Trust, Community Associations Institute, Farrcroft Homeowners Association, Inc., Regency at Ashburn Greenbrier Condominium Association, Terraces on Memorial Homeowners Association, Townhouse Green Cooperative. Filing fee $ 605, receipt number AVAEDC-9829882. (Wright, Damon) (Entered: 11/04/2024) |
| 11/05/2024 | 42 | Transmission of Notice of Appeal to US Court of Appeals re 41 Notice of Appeal, (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov). (dvanm) (Entered: 11/05/2024) |
| 11/06/2024 | 43 | Joint MOTION to Stay by Andrea Gacki, U.S. Department of the Treasury, Janet Yellen. (Attachments: # 1 Proposed Order)(Baumhart, Peter) (Entered: 11/06/2024) |
| 11/07/2024 | 44 | USCA Case Number 24-2118 4CCA, case manager Anisha Walker, for 41 Notice of Appeal, filed by Regency at Ashburn Greenbrier Condominium Association, Farrcroft Homeowners Association, Inc., Canterbury Crossing Condominium Trust, Community Associations Institute, Terraces on Memorial Homeowners Association, Townhouse Green Cooperative. (dvanm) (Entered: 11/07/2024) |
| 11/07/2024 | 45 | TRANSCRIPT of proceedings for dates of 10/11/2024, before Judge M. Nachmanoff, re 41 Notice of Appeal, Court Reporter/Transcriber Tonia Harris, Telephone number 703-646-1438. **NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov** *Does this satisfy all appellate orders for this reporter? y* **Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 12/9/2024. Redacted Transcript Deadline set for 1/7/2025. Release of Transcript Restriction set for 2/5/2025.(harris, tonia) (Entered: 11/07/2024)** |

JA7

| 11/07/2024 | 46 | ORDERED that the parties' motion 43 is GRANTED; and it is hereby ORDERED that the instant action is STAYED until further order of this Court. Signed by District Judge Michael S Nachmanoff on 11/07/2024. (dvanm) (Entered: 11/07/2024) |
|---|---|---|

### PACER Service Center

#### Transaction Receipt

11/08/2024 16:09:29

| PACER Login: | dwright11 | Client Code: | firm-99999 |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 1:24-cv-01597-MSN-LRV |
| Billable Pages: | 7 | Cost: | 0.70 |

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Community Associations Institute et al.; see attached

**DEFENDANTS**

U.S. Dept. of Treasury, Janet Yellen, Secretary; U.S. Dept. of Treasury; FinCEN, Andrea Gacki, Director

**(b)** County of Residence of First Listed Plaintiff   Fairfax
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See attached

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☒ 2 | U.S. Government Defendant | ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| | | | | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| | | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer |
| | | | | | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 2201; 5 U.S.C. § 706(2)(D); 5 U.S.C. § 706(2)(A); U.S. Constitution

Brief description of cause:
Challenge to applicability and constitutionality of the Corporate Transparency Act, 31 U.S.C. § 5336

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
Declaratory judgment; injunctive relief

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 9/10/24 | /s/ Damon W.D. Wright |

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

**ALL PLAINTIFFS LISTED BELOW**

COMMUNITY ASSOCIATIONS INSTITUTE

CANTERBURY CROSSING CONDOMINIUM TRUST

TOWNHOUSE GREEN COOPERATIVE

TERRACES ON MEMORIAL HOMEOWNERS ASSOCIATION

REGENCY AT ASHBURN GREENBRIER CONDOMINIUM ASSOCIATION

FARRCROFT HOMEOWNERSASSOCIATION, INC.

**ALL ATTORNEYS LISTED BELOW**

Brendan Bunn, No. 38461
Chadwick, Washington, Moriarty,
Elmore & Bunn, P.C.
3201 Jermantown Road, Suite 600
Fairfax, VA 22030
Tel: 703-352-1900
Fax: 703-352-5293
bpbunn@chadwickwashington.com

*Attorneys for Canterbury
Crossing Condominium Trust,
Townhouse Green Cooperative Inc.,
Terraces on Memorial Homeowners
Association, Farrcroft Homeowners
Association, Regency at Ashburn Greenbrier
Condominium Association*

Edmund Allcock (*Pro Hac Vice* forthcoming)
Allcock Marcus
10 Forbes Road, Suite 400W
Braintree, MA 02184
Tel: 781-884-1660
ed@amcondolaw.com

*Attorneys for Canterbury Crossing
Condominium Trust*

Damon W.D. Wright, No. 40319
Clair E. Wischusen, No. 99174
Stephanie Bortnick, No. 87216
Gordon Rees Scully Mansukhani LLP
277 S. Washington Street, Suite 550
Alexandria, VA 22314
Tel: 202-399-1009
Fax: 202-800-2999
dwright@grsm.com
cwischusen@grsm.com
sbortnick@grsm.com

Gretchen Sperry (*Pro Hac Vice*
forthcoming)
Mary J. Goers (*Pro Hac Vic*
forthcoming)
Gordon Rees Scully Mansukhani LLP
One North Wacker, Suite 1600
Chicago, IL 60606
Tel: 312-565-1400
Fax: 312-565-6511
gsperry@grsm.com
mgoers@grsm.com

*Attorneys for Community Associations
Institute*

JA11

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| COMMUNITY ASSOCIATIONS INSTITUTE; CANTERBURY CROSSING CONDOMINIUM TRUST; TOWNHOUSE GREEN COOPERATIVE; TERRACES ON MEMORIAL HOMEOWNERS ASSOCIATION; REGENCY AT ASHBURN GREENBRIER CONDOMINIUM ASSOCIATION; AND FARRCROFT HOMEOWNERS ASSOCIATION, INC. | ) ) ) ) ) ) ) ) ) ) | Case No. _____ |
| Plaintiffs, | ) ) | |
| v. | ) | |
| JANET YELLEN, in her official capacity as the Secretary of the United States Department of the Treasury, UNITED STATES DEPARTMENT OF THE TREASURY, and ANDREA GACKI, in her official capacity as Director of Financial Crimes Enforcement Network, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## **COMPLAINT**

Plaintiffs Community Associations Institute ("CAI"), Canterbury Crossing Condominium Trust, Townhouse Green Cooperative, Terraces on Memorial Homeowners Association, Regency at Ashburn Greenbrier Condominium Association, and Farrcroft Homeowners Association bring this action in their own stead and on behalf of CAI's Community Association members against Janet Yellen, in her official capacity as the Secretary of the U.S. Department of the Treasury, the U.S. Department of the Treasury ("the Treasury"), and Andrea Gacki, in her official capacity as Director of the Financial Crimes Enforcement Network ("FinCEN"), seeking a declaration that Community Associations are exempt from compliance with the Corporate Transparency Act, 31

U.SC. § 5336 (the "CTA"); seeking judicial review under the Administrative Procedure Act ("APA") of FAQs issued by FinCEN's creating new legislative rules outside of the APA's notice-and-comment procedures; seeking judicial review under the APA that FinCEN's denial of CAI's request for an exemption was arbitrary and capricious; and that the CTA is unconstitutional as applied to Community Associations, regardless of their organizational form and structure.

## JURISDICTION AND VENUE

1.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 702-703. It has jurisdiction under 5 U.S.C. §§ 705-706 and 28 U.S.C. §§ 1361 and § 2201-2202 to render the declaratory and injunctive relief that Plaintiffs request.

2.      Venue is proper in this Court under 28 U.S.C. § 1391(e)(3) because no real property is involved, Plaintiff CAI is headquartered in Falls Church, Virginia, within this judicial district and it has members in all fifty states.

3.      Defendants are agencies or officers of the United States sued in their official capacities.

## PARTIES

4.      CAI is an international not-for-profit research and education organization with 63 chapters and 47,000 members formed in 1973 by the Urban Land Institute, the National Association of Home Builders, the U.S. League of Savings and Loan Associations, the Veterans Administration, and the U.S. Department of Housing and Urban Development to provide education, guidance and advocacy for and on behalf of condominium associations, homeowner associations, housing cooperatives, business trusts, planned unit developments, and similar entities (collectively, "Community Associations"). CAI has its principal place of business at 6402

Arlington Blvd, Suite 500, Falls Church, VA  22042. CAI brings this action in its own behalf and in a representational capacity on behalf of its Community Association volunteer Community Board members.

5.      Plaintiff Canterbury Crossing Condominium is the organization of unit owners for the Canterbury Crossing Condominium, which is a sixty-six (66) unit residential condominium in Holbrook, Massachusetts. Canterbury Crossing Condominium is registered as a condominium trust and was created by the recording of a Master Deed recorded in Norfolk County Land Court in 1986. It is a Massachusetts nonprofit entity and is tax-exempt under Section 528 of the Internal Revenue Code.

6.      Plaintiff Townhouse Green Cooperative ("Townhouse Green") was incorporated as a housing cooperative in Clinton Township, Michigan in 1968. Townhouse Green Cooperative is the organization of unit owners for a 255-unit Michigan not-for-profit corporation and submits its federal tax filing as a tax-exempt entity using IRS Form 1120-C.

7.      Plaintiff Terraces on Memorial Homeowners Association ("Terraces") is the organization of unit owners for a 273-unit homeowners association in Houston, Texas. It is a Texas nonprofit corporation and is tax-exempt under Section 528 of the Internal Revenue Code.

8.      Plaintiff Regency at Ashburn Greenbrier Condominium Unit Owners Association ("Greenbrier") is the organization of unit owners for a 142-unit condominium complex located in Loudon County, Virginia. Greenbrier is an age 55-and-older active adult community within a larger adult community called Regency at Ashburn Community Association. It is an unincorporated condominium association. Greenbrier is a Virginia not-for-profit entity and is tax exempt under Section 528 of the Internal Revenue Code.

9.     Plaintiff Farrcroft Homeowners Association, Inc. ("Farrcroft") is the organization of unit owners for a 300-unit homeowners association located in suburban Northern Virginia. It is a nonstock corporation. Farrcroft is a Virginia not-for-profit entity and is tax exempt under Section 528 of the Internal Revenue Code.

10.    Defendant U.S. Department of the Treasury is an executive branch department of the federal government located at 1500 Pennsylvania Avenue, NW, Washington, D.C. 20500 responsible for the administration and enforcement of the CTA, through FinCEN, which is a bureau of the U.S. Department of the Treasury, located at 2070 Chain Bridge Road, Vienna, VA 22182.

11.    Defendant Janet Yellen is the Secretary of the U.S. Treasury and is named as a party in her official capacity.

12.    Defendant Andrea Gacki is the Director of FinCEN and is named as a party in her official capacity.

## FACTUAL ALLEGATIONS

### The Requirements of the CTA

13.    The CTA was enacted on January 1, 2021, as part of the omnibus National Defense Authorization Act for Fiscal Year 2021.[1]

14.    The stated purpose of the CTA is to combat money laundering, the financing of terrorism, and other illicit activity by cracking down on the use of anonymous "shell companies."

15.    To that end, the CTA requires most business entities to provide sensitive personal information to FinCEN, regardless of corporate form, area of industry, or likelihood of engaging

---

[1]  William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388.

in financial crimes.

16.     The CTA requires "reporting companies" to provide personal identifying information to FinCEN regarding each "beneficial owner" and "applicant."

17.     A "reporting company" is defined as a "corporation, limited liability company, or similar entity that is (i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or (ii) formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." 31 U.S.C. § 5336(a)(11)(A).

18.     A "beneficial owner" is defined as "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise" (i) "exercises substantial control over the entity"; or (ii) "owns or controls not less than 25 percent of the ownership interests of the entity." *Id*. § 5336(a)(3)(A).

19.     An "applicant" is defined as any individual who files an application to form a reporting company or "registers or files an application to register" a non-U.S. company to do business in the United States. *Id*. § 5336(a)(2).

20.     For each beneficial owner and applicant, the reporting company must provide to FinCEN their full legal name, date of birth, current residential or business street address, and "unique identifying number from an acceptable identification document," such as an unexpired passport or State-issued identification card or driver's license, provided that the same has a photograph of the individual, and also download a photograph or copy of their State-issued

identification card or driver's license or obtain a FinCEN-issued identifier number. 31 U.S.C. § 5336(b)(2)(A).[2]

21.    This personal information must be reported within 30 days of formation or registration of the reporting company, or, in the case of existing reporting companies, prior to January 1, 2025. *Id*. § 5336(b)(1)(B), (C).

22.    If there are any changes to the reported data—such as if a "beneficial owner" or "applicant" moves their personal residence or gets a new driver's license—the entity must provide updated information to FinCEN no more than 30 days after the change. *Id*. § 5336(b)(1)(D).

23.    Reporting companies, beneficial owners, and applicants that "willfully" fail to comply with the CTA's reporting requirements are subject to a civil penalty of up to $500 per day up to $10,000, two years' imprisonment, or both a fine and confinement. *Id*. § 5336(h)(1), (3).

**Database of Personal Information.**

24.    In a vast database, FinCEN will retain the personal identifying information of beneficial owners and applicants reported under the CTA, including photographs of their faces as they appear on state issued identification cards.

25.    The CTA requires FinCEN to retain this personal identifying information for at least five years after the date on which the reporting company is wound down. 31 U.S.C. § 5336(c)(1).

26.    FinCEN is authorized to share this personal identifying information with federal, state, local, and tribal law enforcement agencies; with financial institutions for customer due

---

[2]   In order to obtain a FinCEN identifier number, the individual or the organization must make the same disclosures otherwise required under the CTA.

diligence (with the reporting company's consent); and with "a Federal functional regulator or other appropriate regulatory agency," including foreign governmental agencies. *Id.* § 5336(c)(2)(B).

27.     If the request for personal identifying information comes from a state, local, or tribal law enforcement agency, the statute requires that it come through "appropriate protocols," and that "a court of competent jurisdiction… has authorized the law enforcement agency to seek the information in a criminal or civil investigation." *Id.* § 5336(c)(2)(B)(i)(II).

28.     However, no court authorization is required if the request comes from a "Federal agency engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity." *Id.* § 5336(c)(2)(B)(i)(I).

29.     Similarly, if a federal agency requests a beneficial owner or an applicant's personal identifying information on behalf of a non-U.S. law enforcement agency, prosecutor, or judge, for instance, pursuant to an international treaty, FinCEN may provide that information so long as the requested data is limited to the "investigation or national security or intelligence activity" that the foreign or international entity has in mind. *Id.* § 5336(c)(2)(B)(ii).

30.     For example, if a foreign government acting pursuant to a U.S.-ratified treaty like the United Nations Convention Against Corruption, requests certain personal identifying information of beneficial owners or applicants related to LLC-owned real property located in the United States, FinCEN is authorized to provide such data without any independent examination of the foreign country's need for the information.

### The Form, Structure, and Operation of Community Associations

31.     CAI's industry data estimates that, as of 2020, there are approximately 75.5 million Americans living in 365,000 Community Associations in the United States. This number constitutes roughly 30% of the population of the United States.

32.     There are three primary types of Community Associations in the United States: condominiums, homeowner's associations, and cooperatives.

33.     Overwhelmingly, the creation, organization, management, and termination of Community Associations are governed by state statute.

34.     Every Community Association, regardless of how and where it is formed, is an organization of owners whose purpose is to maintain, repair and replace the common elements of the community, manage its finances, preserve and protect the property's value, and enforce the rules and restrictions of the community.

35.     The majority of these Community Association organizations are non-profit entities that may be incorporated companies, unincorporated associations, and in some cases, business trusts.

36.     Regardless of the form, all Community Associations file annual statements with the state Secretary of State's office, the local registry of deeds, or a similar office, identifying the unit owners who serve as officers, directors, or trustees of the Association.

37.     While Community Associations are called the "last bastion of affordable housing" in the United States, the communities they represent are quite varied.

38.     Some are urban two-family or three-floor buildings, others are mobile home parks, campground communities, large sprawling communities, and even over-55 age-restricted communities.

39.     Some community members are unsophisticated first-time homebuyers just learning about the responsibilities and burdens of homeownership and Community Association governance.

40.     Others, like age-restricted communities, are comprised of elderly or retired individuals on fixed incomes, many of whom are not computer savvy or abreast of regulatory developments.

41.     Still, others are sophisticated high-rise buildings with amenities in places like Miami, Los Angeles, Houston, and New York. Unit owners, including those who serve on their Community Association Boards, are often high profile, high net worth individuals with a greater desire for privacy.

42.     Community Associations are generally created after a building developer sells the majority of the individual units in the community and turns over control to the homeowners.

43.     The governing body of a Community Association is the board of directors or trustees (the "Community Board").

44.     Community Board members are elected by their fellow homeowners, who serve in that capacity as unpaid volunteers. State enabling statutes generally provide that Board members must be owners within the community.

45.     These volunteer homeowners are elected to their Community Boards annually and sometimes more frequently in case of death, resignation, or removal by their fellow homeowners.

46.     Unlike a traditional corporation or limited liability company, Community Board members have no different financial stake in the Community Association than their fellow homeowners.

47.     Community Boards range in size from 3 members to 11 members who typically serve terms of 1 to 3 years each.

48.     Some Community Associations have primary and secondary boards, meaning multiple boards in a single community could govern different aspects of the community.

49.     Community Boards often have staggered terms to prevent annual turnover of the entire Board, but there is usually turnover of Community Board members at least once a year.

50.     Community Association by-laws typically contain provisions to replace Community Board Members who resign, die, or are removed from office. Resignation frequently follows from Community Board members moving out of the Community Association.

51.     Approximately 67% of CAI members surveyed reported that they experience Community Board changes every year, and approximately another 18% of CAI members surveyed reported that they experience Community Board changes every three years.

52.     Under ordinary circumstances, it is well recognized that Community Associations have difficulty recruiting homeowners to run and serve on their Community Boards. It is a time-consuming, uncompensated volunteer position that often requires board members to resolve disputes among fellow homeowners in their community—their neighbors.

53.     No CAI member surveyed reported that they are compensated for serving on their Community Board and approximately 81% of CAI members surveyed stated that the CTA reporting requirements will affect homeowner volunteer participation on the Community Boards and the ability to recruit homeowners for the Community Boards.

**The CTA's Injurious Impact on Plaintiffs**

54.     Compliance with the CTA will be unduly burdensome for Community Associations and will lead to mass resignations from the Board.

55.     Typically, Community Associations file an annual statement with the state Secretary of State, local registry of deeds, or other state government agency listing the names of the current Community Board Members. The document is usually completed and filed by a Community Board member, a property manager, or an agent of the Community Board.

56.     The CTA requires the reporting of data to the federal government well beyond what most States currently require for entity formations and reporting in their respective jurisdictions, and without regard to whether the entity engages in interstate commerce.

57.     CAI is not aware of any state government agency that requires Community Associations to provide state agencies with personal identifying information, such as birth dates, active driver's license or passport information, or accompanying photo identification.

58.      Over 75% of CAI members surveyed reported that they would not feel comfortable sharing personal identifying information for fear that uncontrolled access to that information makes them increasingly vulnerable to data breaches and possible identity theft, even inadvertently.

59.     For the same reasons, Community Board members and agents will be reluctant to take responsibility for collecting and storing other Community Board members' personal identifying information.

60.     Nor will Community Board members or agents want to be responsible for filing BOI reports or tracking when the updated reporting requirements are triggered for as many as 11 board members—such as when a member resigns, changes their name, or renews their driver's license or passport—given that they or the Association face steep penalties if amended reports are not filed within thirty days of such changes.

61.     79% of CAI members surveyed report being concerned that they may be held personally responsible for not strictly complying with reporting requirements and exposed to fines levied against the Community Association, which could be assessed in the form of increased dues against all members of the Community Association. That liability may also attach where an

individual beneficial owner who is not a board member refuses to disclose personal identifying information.

62.     Industry data also shows that more than 100,000 Community Associations are self-managed and likely unaware of their reporting obligations under the CTA or the severe penalties that may be imposed on them for failing to comply.

63.     In addition to the above-described burdens imposed by the CTA, volunteer Community Board members may be forced to expend limited resources to consult lawyers to parse through nearly 100 pages of regulations to determine whether the vague and confusing reporting requirements of the CTA apply, or alternatively, risk incurring severe penalties for interpreting such terms on their own.

64.     Volunteer Community Board members are unlikely to know the legal meaning of "beneficial ownership" under the vague terms of the statute and regulations.

65.     For example, the CTA defines a "beneficial owner," in part, as an individual or entity that "directly or indirectly, through any contract, arrangement, understanding, [or] relationship… exercises substantial control" over the entity. 31 U.S.C. § 5336(a)(3)(A).

66.     The term "substantial control" could apply to make a property manager or managing agent hired by the Community Association a "beneficial owner" whose personal identifying information must be reported to FinCEN.

67.     By the same token, the entire Community of owners could be considered "beneficial owners" because state condominium statutes and/or by-laws give owners the power to elect Board members and also to ratify or veto the Community Board's decisions.

68.     If a statute or the by-laws require the Community Board to "obtain the approval of a majority of homeowners" to pass an annual budget, authorize an improvement to the common

areas, obtain a loan, call a special meeting, or vote to remove a Community Board member, the entire community of owners could be viewed as exercising "substantial control" of the Association.

69.     Conversely, the CTA also defines a "beneficial owner" as one who owns or controls "not less than 25 percent of the ownership interests of the entity." 31 U.S.C. § 5336(a)(3)(A). An individual who owns 25% of the units in the community need not be a member of the Community Board, in which case that individual would have no power over the operation or finances of the Community Board. Yet that owner is considered a "beneficial owner" whose personal identifying information must be reported to FinCEN despite having no ability to engage in illegal financial transactions on behalf of the entity.

70.     If that individual refused to provide his personal identifying information to FinCEN, the entire Community Association would be subject to liability for severe non-reporting penalties under the CTA.

### The CTA's Injurious Impact on Volunteerism

71.     The CTA's reporting requirements, and risk of personal liability for non-reporting penalties, will deter homeowners from volunteering to serve on their Community Boards. Approximately 53% of CAI members surveyed cited that the reporting requirements were at least one of the reasons why they will stop serving as a member of their Community Board.

72.     Congress expressly recognized that volunteerism is adversely impacted by the risk of potential personal liability in adopting the Volunteer Protection Act, 42 U.S.C. §§ 14501, *et seq.*, which limits a volunteer's risk of tort liability when acting for nonprofit organizations or governmental entities.

73.    With the Volunteer Protection Act, Congress found that "the willingness of volunteers to offer their services to nonprofits and other organizations is deterred by the potential for liability actions against them" and, "as a result, many nonprofit public and private organizations … have been adversely affected by the withdrawal of volunteers from boards of directors and services in other capacities." 42 U.S.C. §§ 14501(a)(1), (2).

74.    Similarly here, requiring Community Board members to provide personal information to the federal government as part of CTA compliance—and be subject to personal liability if they or other Board members do not comply with the CTA's reporting requirements— will not only exacerbate homeowners' reluctance to volunteer for these positions. It will also result in a slew of resignations that will disrupt the operation of Community Associations across the United States.

### Community Associations are Not Engaged in Interstate Commerce

75.    The vast majority of Community Associations are not engaged in commerce at all, and to the extent they are, they are non-profit entities.

76.    Their primary purpose is to maintain, repair, and replace the common areas of the Community Association.

77.    These non-profit entities are required by statute to have a board comprised of owners whose primary function is to maintain, repair, and replace common elements of the communities.

78.    The activities of Community Associations are overwhelmingly intrastate rather than interstate.

### CTA Compels and Chills Speech and Association and Affects Participation in Local Politics and/or Advocacy and Lobbying Activities by Community Associations

79.     Given the nature of property ownership, many Community Associations actively participate in the political process to lobby for public services, funding, or other cooperation from elected officials.

80.     Community Associations frequently advocate for and against issues that affect the community and/or its residents. These issues may include local planning and zoning related policies, environmental sustainability issues; zoning; short and long-term rentals; fining and foreclosure; building and façade inspections; housing affordability; and electronic voting and virtual meetings.

81.     The prospect of having to report sensitive personal identifying information to FinCEN is likely to deter homeowners from serving on their Community Boards to avoid the personal risks associated with being a "beneficial owner" or "applicant."

82.     Without homeowners willing to serve as Community Board members, Community Associations will no longer be able to serve in an advocacy role for their members in the community.

83.     As a result, Community Associations will be denied the opportunity to exercise their free speech and free association rights or participate in lobbying their government in violation of the First Amendment.

84.     The burdens the CTA imposes upon entity formation and annual reporting in every state will have a direct, predictable impact on CAI itself.

85.     An important service CAI offers to its membership is the provision of information, education, assistance, and advocacy regarding legal and regulatory compliance issues facing Community Associations.

86.     To serve faithfully the needs and interests of its membership, CAI has already been—and will continue to be—forced to devote its own scarce resources to assisting members in understanding how the CTA applies to them, how it will affect their Community Associations, and what they must do to comply.

87.     The benefits of the CTA do not justify the burdens it imposes on Community Associations and CAI and its chapters.

**Community Associations are Non-Profit Organizations Exempt from the CTA**

88.     According to FinCEN, the "reporting companies" subject to the CTA will include approximately 32.6 million existing entities in 2024, plus roughly 5 million additional corporate entities created or registered under State law every year from 2025 to 2035, as well as foreign companies registered to do business in the United States. Beneficial Ownership Information Reporting Requirements for Financial Crimes Enforcement Network (FinCEN), 87 Fed. Reg. at 59549 (2022).

89.     However, the CTA excludes 23 categories of entities from the definition of a "reporting company," and those entities do not have to comply with the BOI reporting requirements of the CTA.

90.     Congress also specifically excluded non-profit organizations ("NPOs") from the CTA's reach: "[t]he term 'reporting company' does not include… any organization that is described in section 501(c) of the Internal Revenue Code… and exempt from tax under section 501(a) of such Code." 31 USC § 5336(a)(11)(B)(xix) ("NPO Exemption").

91.     For the last decade, Treasury and FinCEN have published the National Terrorist Financing Risk Assessment Report ("NFTRA Report") in which they have stated that "the vast

majority of U.S.-based tax-exempt [NPOs] face little or no risk of being abused for [terrorist financing]." 2024 National Terrorist Financing Risk Assessment, p. 23-25.[3]

92.     The 2024 NTFRA Report states that NPOs are considered very low risk for engaging in illicit financial activity because they abide by internal due diligence standards, self-governance, transparency, and other accountability and compliance measures. *Id.*

93.     Section 5336(a)(11)(B)(xxiv) of the CTA allows FinCEN to create additional exemptions when the collection of BOI "would not be highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes." 31 USC § 5336(a)(11)(B)(xxiv).

94.     Prior to 1976, homeowners and condominium management associations largely qualified for tax-exempt status under Section 501(c).

95.     With the passage of the Tax Reform Act of 1976, Congress created Section 528 of the Internal Revenue Code to provide a tax-exemption classification unique to "homeowners associations."[4] 26 USC § 528.

---

[3]   Available   at   https://home.treasury.gov/system/files/136/2024-National-Terrorist-Financing-Risk-Assessment.pdf (last accessed September 10, 2024).

[4] "Homeowners association" is defined as "an organization which is a condominium management association, a residential real estate management association, or a timeshare association," if (A) it is organized and operated "to provide for the acquisition, construction, management, maintenance, and care of association property"; (B) 60% or more of its gross income for the taxable year "consists solely of amounts received as membership dues, fees, or assessments" from owners of residential units, residences, lots, or timeshare rights; (C) 90% or more of its expenditures for the taxable year are for the "acquisition, construction, management, maintenance, and care of association property" or activities for members of the timeshare association; (D) no part of its net earnings inures to the benefit of any private shareholder or individual (with limited exceptions); and (E) it elects to have this section apply for the taxable year. 26 USC § 528(c).

96.     Section 528 states that "[a] homeowners association shall be considered an organization exempt from income taxes for the purpose of any law which refers to organizations exempt from income taxes." 26 USC § 528(a).

97.     Despite this language, FinCEN does not recognize that "homeowners associations," as defined by Section 528, or Community Associations, as defined herein, are NPOs exempt from the CTA. *See* FinCEN Beneficial Ownership Information FAQs.[5]

98.     Nor did FinCEN exercise its authority under Section 5336(a)(11)(B)(xxiv) of the CTA to create an additional exemption for Community Associations in promulgating implementing regulations for the CTA on September 30, 2022. *See* 31 C.F.R. § 1010.380(c)(2).

**FinCEN's Improper Issuance of FAQs Classifying Homeowners Associations as Reporting Companies Subject to the CTA**

99.     On December 28, 2023, CAI submitted a request to FinCEN seeking an exemption from the CTA's reporting requirements under the NPO Exemption for all community living associations, including homeowners associations, condominium associations, and housing cooperatives.

100.    The correspondence stated that, although Community Associations are not organized under Section 501(c) of the Internal Revenue Code, they are non-profit organizations that operate the same way as the Section 501(c) NPOs that are excluded from the CTA's reporting requirements. Accordingly, it requested that Community Associations be granted the same exclusion.

101.    Instead of responding to CAI's correspondence, FinCEN released a Frequently Asked Question ("FAQ") regarding the categorization of homeowners associations as reporting

---

[5] https://www.fincen.gov/sites/default/files/shared/BOI-FAQs-QA-508C.pdf

companies on its website. FAQ C.10 now claims that homeowners associations are considered a

reporting company. FAQ C.10 states:

*C. 10. Are homeowners associations reporting companies?*

It depends. Homeowners associations (HOAs) can take different forms. As with any entity, if an HOA was not created by the filing of a document with a secretary of state or similar office, then it is not a domestic reporting company. An incorporated HOA or other HOA that was created by such a filing also may qualify for an exemption from the reporting requirements. For example, HOAs recognized by the IRS as section 501(c)(4) social welfare organizations (or that claim such status and meet the requirements) may qualify for the tax-exempt entity exemption. An incorporated HOA that is not a section 501(c)(4) organization, however, may fall within the reporting company definition and therefore be required to report BOI to FinCEN.

[Updated June 10, 2024]

102.    Further, FAQ D.13 details who the "beneficial owner" of a homeowners association

is under the CTA. FAQ D.13 states:

*D. 13. Who is the beneficial owner of a homeowners association?*

A homeowners association (HOA) that meets the reporting company definition and does not qualify for any exemptions must report its beneficial owner(s). A beneficial owner is any individual who, directly or indirectly, exercises substantial control over a reporting company, or owns or controls at least 25 percent of the ownership interests of a reporting company.

There may be instances in which no individuals own or control at least 25 percent of the ownership interests of an HOA that is a reporting company. However, FinCEN expects that at least one individual exercises substantial control over each reporting company. Individuals who meet one of the following criteria are considered to exercise substantial control over the HOA:

- the individual is a senior officer;

- the individual has authority to appoint or remove certain officers or a majority of directors of the HOA;

- the individual is an important decision-maker; or

- the individual has any other form of substantial control over the HOA.

[Issued April 18, 2024]

103.    By issuing these FAQs in lieu of responding to CAI's exemption request, FinCEN improperly denied CAI and homeowners associations the opportunity to engage in any meaningful discussion before it created a new categorization of Community Associations as reporting companies and created identification criteria for determining "beneficial ownership"  without engaging with CAI.

104.    On July 25, 2024, FinCEN responded to CAI's exemption request sent seven months earlier. FinCEN stated that, if a Community Association met the definition of a "reporting company," it would be required to report BOI to FinCEN under the CTA.

105.    FinCEN also stated that it would consider CAI's exemption request, but noted that Community Associations should comply with the BOI reporting requirements absent an exemption.

**FinCEN's FAQC.10 and D.13 are final administrative decisions under the Administrative Procedure Act ("APA")**

106.    FinCEN's July 25, 2024 correspondence also demonstrates that it treats the FAQs as controlling in the same manner as a legislative rule. Therefore, they are "binding" for purposes of asserting an APA challenge.

107.    The FAQs categorize some community associations as reporting companies and identify criteria for determining who their beneficial owners might be. The FAQs are FinCEN's only determination on this topic, despite CAI's correspondence requesting an exception to the CTA's reporting requirements months earlier.

108.    Further, legal consequences flow from FinCEN's FAQ since, as stated in the FAQs, there are "direct and appreciable legal consequences" should a community association not comply with the reporting category as outlined in FAQ C.10.

109.    These FAQs will lead Community Associations, and Plaintiffs, to believe that they substantively control the categorization of their entities as it relates to the CTA.

**The CTA was Declared Unconstitutional by the United States District Court for the Northern District of Alabama**

110.    On March 1, 2024, in the case of *National Small Business United v. Yellen*, No. 5:22-cv-01448 (N.D. Ala.), a federal district court in the Northern District of Alabama entered a final declaratory judgment concluding that the CTA exceeds the Constitution's limits on Congress's power and enjoined the Department of the Treasury and FinCEN from enforcing the CTA.[6] CAI now seeks a similar ruling as it applies to Community Associations and its members and/or a declaration that CTA does not apply to Community Associations.

## CAUSES OF ACTION

## COUNT I

## Declaratory Judgment Under 28 U.S.C. §§ 2201 *et seq.*

111.    Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated in the paragraphs above.

112.    An actual controversy exists as to whether Community Associations are exempt from compliance with the CTA.

113.    Accordingly, Plaintiffs seek, pursuant to 28 U.S.C. § 2201, a judgment declaring that the CTA does not apply to Community Associations.

114.    A declaration is necessary and appropriate at this time to affirm that Community Associations are not reporting companies under the CTA because, in the absence of such a

---

[6]   On March 11, 2024, the United States Department of the Treasury and FinCEN appealed that Judgment to the 11th Circuit Court of Appeals, where it remains pending.

declaration, they may face federal prosecution resulting in harsh criminal and/or civil penalties for wrongful non-compliance.

115.    Under the CTA's NPO Exemption, non-profit organizations are expressly excluded from the definition of reporting companies: "[t]he term 'reporting company' does not include… any organization that is described in section 501(c) of the Internal Revenue Code… and exempt from tax under section 501(a) of such Code." 31 USC § 5336(a)(11)(B)(xix).

116.    CAI's member Community Associations are also NPOs excluded from the CTA's regulatory requirements for reporting companies under the tax-exemption classification unique to "homeowners associations" in Section 528(a) of the Internal Revenue Code, 26 U.S.C. § 528(a).[7]

117.    Under Section 528(a), "[a] homeowners association shall be considered an organization exempt from income taxes for the purpose of any law which refers to organizations exempt from income taxes." 26 USC § 528(a).

118.    Reading Section 528(a) together with the NPO Exemption, Community Association members are "exempt from tax under section 501(a)" and therefore excluded from the definition of a "reporting company" under the CTA.

119.    Accordingly, this Court should declare that the beneficial ownership reporting requirements of the CTA do not apply to Community Associations.

---

[7] "Homeowners association" is defined as "an organization which is a condominium management association, a residential real estate management association, or a timeshare association," if (A) it is organized and operated "to provide for the acquisition, construction, management, maintenance, and care of association property"; (B) 60% or more of its gross income for the taxable year "consists solely of amounts received as membership dues, fees, or assessments" from owners of residential units, residences, lots, or timeshare rights; (C) 90% or more of its expenditures for the taxable year are for the "acquisition, construction, management, maintenance, and care of association property" or activities for members of the timeshare association; (D) no part of its net earnings inures to the benefit of any private shareholder or individual (with limited exceptions); and (E) it elects to have this section apply for the taxable year. 26 USC § 528(c).

120.    Plaintiffs further request, pursuant to 28 U.S.C. § 2201, that the Court enjoin Defendants and any other agency or employee acting on behalf of the United States from enforcing the CTA against Community Associations and their respective Community Board members.

## COUNT II

### Administrative Procedure Act, 5 U.S.C. § 706(2)(D)
### Lack of Notice and Comment (FAQs C.10 and D.13)

121.    Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated above.

122.    The APA provides that courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

123.    The APA requires agencies to publish notice of all "proposed rule making" in the Federal Register, 5 U.S.C. § 553(b), and to "give interested persons as opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c).

124.    Agencies must follow notice-and-comment procedures when proposing new rules, except where the agency is merely promulgating "interpretive rules, general statements of policy, or rules of agency organization, procedure or practice." 5 U.S.C. § 5(b).

125.    FAQs C.10 and D.13 are final agency actions subject to judicial review under the APA because they create new rules not sourced from the statutory authority or governing rule.

126.    FAQs C.10 and D.13 are not mere interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice. Rather, they significantly affect Community Associations' rights and obligations.

127.    As such, FAQs C.10 and D.13 are legislative rules that substantively amended FinCEN's existing CTA regulations and are subject to the notice-and-comment procedures under

the APA, but were issued and became effective without notice and comment in violation of the APA.

128.    Accordingly, pursuant to 5 U.S.C. § 706(2)(D), Plaintiffs request that the Court declare unlawful and set aside FAQs C.10 and D.13 and enjoin Defendants from enforcing, applying, or implementing FAQs C.10 and D.13.

<u>**COUNT III**</u>

<u>**Administrative Procedure Act, 5 U.S.C. § 706(2)(A),**</u>
<u>**Agency Action that is Arbitrary and Capricious (Denial of Exclusion for Community**</u>
<u>**Associations)**</u>

129.    Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated above.

130.    Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary and capricious or otherwise not in accordance with law or contrary to the Constitution. 5 U.S.C. § 706(2)(A).

131.    CAI provided several reasons for FinCEN to consider when evaluating its request for an exemption for Community Associations:

(a.) they are nonprofit organizations like Section 501(c) organizations, although they are tax exempt under the derivative Section 528 of the Income Tax Code;

(b.) they collect and expend assessments through very limited mechanisms, making them ill-suited for terrorist financing or money laundering;

(c.) there is virtually no risk of them being used to fund terrorist activity or launder money due to their self-governance, transparency, and accountability mechanisms, as Treasury has publicly stated; and

(d.) compliance with the CTA would be extremely burdensome for Community Associations without yielding any information of value to the CTA's purpose of detecting and preventing financial crimes.

132.   FinCEN did not examine the arguments or relevant data or articulate any explanation for issuing FAQs that effectively denied CAI's exemption request without including a rational connection between the facts found and the choice made.

133.   FinCEN acted arbitrarily and capriciously when it relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before it, and is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

134.   Accordingly, pursuant to 5 U.S.C. § 706(2)(A), Plaintiffs request that the Court declare unlawful and set aside FAQs C.10 and D.13 and enjoining Defendants from enforcing, applying, or implementing FAQs C.10 and D.13.

## COUNT IV

**Unconstitutional Invasion of Privacy; Unreasonable Search and Seizure Violation of the Fourth Amendment; Compelled Self Incrimination Violation of the Fifth Amendment; Right of Privacy Violation of the Ninth Amendment (U.S. Const. Amends. IV, V, IX)**

135.   Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated above.

136.   The CTA is a statute providing for criminal punishments enacted for the purpose of harvesting "sensitive" personal information from individuals to create a database for law enforcement purposes by FinCEN and other United States and foreign law-enforcement and intelligence agencies. The stated purpose of the CTA is to provide the federal government with a supplemental means of enforcing federal criminal laws. No matter the degree of invasiveness,

suspicionless searches and compelled disclosures are never allowed if their principal end is crime-solving.

137.    Privacy is often a key motivation in State entity formation. No State has chosen to require the extent of disclosure of beneficial ownership and applicant information upon filing that the CTA mandates. Upon information and belief, no State, for instance, appears to require birth dates and personal identification numbers of filers or photo id's and drivers licenses. The States' entity-formation laws reflect the judgment that individuals need not disclose sensitive information as a condition of forming corporate entities. Individuals who form an entity under such State laws have a reasonable expectation of privacy from the intrusion of the federal government as to that information. The CTA's requirements violate that expectation of privacy by compelling the disclosure of that information by individuals protected by the Fourth, Fifth, and Ninth Amendments.

138.    The CTA contains no limitations on the provision of the required personal information to situations where there is an articulable individualized suspicion of a crime or wrongdoing by such beneficial owners and applicants. The CTA also authorizes the provision of private, personal information to foreign governments, federal regulators, and regulatory agencies without any court authorization or specific requirements regarding those federal and foreign government agencies' need for the information.

139.    By requiring, under threat of criminal penalty, reporting companies to provide individuals' "sensitive" personal information for law enforcement purposes in the absence of specific prior indicia of wrongdoing, the CTA deprives Plaintiff and the members of CAI and Community Associations of their privacy rights and violates the Fourth Amendment, Fifth Amendment, and Ninth Amendment of the Constitution of the United States.

140.    By compelling disclosures and permitting the release of sensitive personal data to federal and foreign government agencies without the reporting company's consent or authorization from a court of competent jurisdiction, *see* 31 U.S.C. § 5336(c)(2)(B) (requiring court authorization for requests from state, local, or tribal law enforcement agencies and consent from a financial institution, without imposing a similar requirement of court authorization for requests from federal or non-U.S. law enforcement agencies), the CTA violates the Fourth, Fifth, and Ninth Amendment rights of Plaintiffs and the members of CAI.

### COUNT V

### Compelled Speech and Unreasonable Burdens on the Freedoms of Speech and Association (U.S. Const. Amend. I)

141.    Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated in the paragraphs above.

142.    Under the CTA, the obligation to report personal information to the federal government arises at the time of formation of an entity under State law. The CTA forces filers to disclose more personal information to the federal government than what is required to be disclosed under State entity-formation statutes; in most States, disclosure of "beneficial ownership" as expansively set forth in the CTA and "applicant" personal information is not required at all. State laws providing for entity formation, however, reflect the States' respective judgments that the provision of such information is not a necessary or appropriate prerequisite of entity formation.

143.    Community Associations, for the most part, are required to form entities under State law, without seeking 501(c) federal tax-exempt status, for the purpose of running and/or operating recreational facilities and/or maintaining, repairing and replacing common elements within a Community Association, all of which is affiliated with home ownership. They need volunteer

homeowners in the form of Community Boards to run the associations. Many of these U.S. persons who would have to be registered under the CTA have a heightened reason to desire privacy, as this pertains solely to their ownership of their home.

144.    The CTA compels Community Associations and Community Board members to publicly reveal their associations to the federal government, which may in turn transmit that information upon request to: (i) federal and State law enforcement agencies, courts, and prosecutors; (ii) foreign governments and law enforcement authorities; (iii) financial institutions; and (iv) various federal regulators and regulatory agencies.

145.    This forced disclosure will also deter such persons from exercising their rights of free speech and association and dissuade others from joining or assuming leadership positions within Community Associations in the entities (and thus arguably becoming "beneficial owners"). It will also affect Community Associations' ability to advocate on behalf of their members for issues that affect their local communities.

146.    The United States does not have a compelling, overriding interest in obtaining the information required by the CTA because less onerous alternatives are available to accomplish the stated goals of the CTA and the methods employed by the Act are not narrowly tailored for their stated purpose.

147.    The most obvious and direct way to stem money laundering and international terrorism funding is to ramp up regulation and scrutiny of large cross-border money transfers, for instance, by banks, financial agents, and escrow agents. The requirements of the CTA are neither justified by nor necessary to promote the stated goals of the CTA.

148.    By requiring, under threat of criminal sanction, CAI and its member Community Associations and Community Board members to disclose information in the manner mandated by

the CTA despite the availability of less onerous alternative methods to achieve the statute's stated goals, the CTA's disclosure requirements constitute compelled speech in violation of the First Amendment to the Constitution of the United States.

149.    By requiring U.S. persons who have formed, wish to form or who have volunteered to participate in the governance of a Community Association to engage in protected speech despite the availability of less onerous alternative methods to achieve the stated goals of the CTA, the CTA violates the First Amendment by burdening the right to speech and private association. As the Supreme Court recently affirmed, "a substantial relation to an important interest is not enough to save a disclosure regime that is insufficiently tailored. This requirement makes sense. Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—'[b]ecause First Amendment freedoms need breathing space to survive.'" *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2384 (2021) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

## <u>COUNT VI</u>

### <u>Unconstitutional Usurpation of the States' Power to Regulate Entity Formations in Excess of Congress's Constitutional Powers (U.S. Const. Art. I, Amends. IX, X)</u>

150.    Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated above.

151.    For more than two centuries, the States have had independent authority to charter corporations and otherwise regulate the formation and governance of corporations they have chartered. This was a sovereign power of the British Crown that was commonly understood to have devolved to the original thirteen States through their charters after the adoption of the Declaration of Independence in 1776. The newly independent States began chartering corporations soon after independence for the purposes of creating financial and transportation infrastructure,

forming subordinate municipal governments, and for charitable and other public purposes. *See* Ronald E. Seavoy, *The Public Service Origins of the American Business Corporation*, 52 Bus. History R. 30, 33 (1978).

152.    The Constitution did not intrude on this power of the States to charter corporations. At the Constitutional Convention, Virginia delegate James Madison introduced a proposal to give Congress the authority "to grant charters of incorporation where the interest of the U.S. might require & the legislative provisions of individual States may be incompetent." 2 *The Records of the Federal Convention of 1787*, at 615 (Max Farrand, ed., 1911). Madison's proposal reflected the settled understanding that the States possessed—and would continue to retain under the new Constitution—the primary sovereign powers for chartering corporate entities. *See id*. at 616 (containing James Madison's notes documenting the defeat of his proposal for an explicit Congressional power of chartering corporations by a vote of 3 in favor and 8 against).

153.    As the Supreme Court made clear in 1819, other than ensuring that State legislatures did not impair vested colonial-era corporate charters, the Constitution does not vest the federal government—including Congress and the Treasury Department—with any authority to dictate to the States the terms under which they charter companies. *See Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518 (1819). This fundamental principle remains true today, as corporations formed for private purposes have proliferated and now outnumber the public-purpose and non-commercial corporations prevalent in the Founding era. The States remain the primary sovereigns for the creation of corporate entities and, pursuant to the well-established "internal affairs" doctrine, the internal functioning of such entities remains a matter of the law of the State of formation. "It thus is an accepted part of the business landscape in this country for

States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares." *CTS Corp. v. Dynamics Corp. of Am.,* 481 U.S. 69, 91, (1987).[8]

154.    Despite this original constitutional meaning, history, and tradition, the CTA aims to establish "a clear, Federal standard for incorporation practices," 31 U.S.C. § 5336 note (5)(A), above and beyond what State entity laws require, imposing a penalty—mandatory disclosure of names, addresses, birth dates, photographs, drivers licenses and identification numbers of all beneficial owners and applicants—on persons who seek to form entities under State law. As detailed above, failure to make these disclosures is punishable by fines and imprisonment. In addition, the CTA also interferes with State authority to determine the permissible structures of corporate or homeowner ownership by prohibiting any State from authorizing the issuance of "a certificate in bearer form evidencing either a whole or fractional interest" in an entity created and organized under that State's laws. 31 U.S.C. § 5336(f). Upon information and belief, although many States authorized such bearer certificates through the early twenty-first century, no State currently does so. Nevertheless, the CTA's categorical prohibition is an unprecedented intrusion on the States' sole authority to regulate the formation and governance of State-entities' internal affairs.

155.    One of the enumerated powers of Congress—and perhaps the most heavily used of those powers in recent decades—is the power to regulate foreign, interstate, or Indian commerce. Congress also can wield its taxing power to tax income earned by individuals through corporate entities as it currently does through federal income taxes on corporations. However, Congress has no regulatory interest or constitutional authority over corporate formation because a reporting

---

[8] Although Congress has the ability to create federally chartered corporations, it has no authority to intervene in the internal affairs of entities organized under State law, except as noted above.

company has not yet engaged in any foreign, interstate, or Indian commerce at the moment of its inception. The formation of an entity under State law is an entirely ministerial act and many entities will engage in no activity until some indeterminate time after they have been formed.

156.    Indeed, Community Associations and many of the "reporting companies" subject to the Act may never engage in any such foreign, interstate, or Indian commerce. State law permits the formation of a corporate entity for numerous purposes unrelated to commerce, such as local property holding or associational entities like neighborhood organizations and residential housing associations.

157.    For example, Section 10A-1-2.01 of the Alabama Business and Nonprofit Entities Code indicates that a "domestic entity may have any lawful purpose or purposes, unless otherwise provided by this title." Ala. Code § 10A-1-2.01 (2014) (emphasis added). Section 101(b) of the Delaware General Corporation Law provides that a "corporation may be incorporated or organized under this chapter to conduct or promote any lawful business or purposes, except as may otherwise be provided by the Constitution or other law of this State." 8 Del. Code § 101(b) (emphasis added).

158.    Similarly, Section 18-106(a) of the Delaware Limited Liability Company Act provides that "[a] limited liability company may carry on any lawful business, purpose or activity, whether or not for profit . . . ." 6 Del. Code § 18-1101. A large proportion of the CTA's coverage is thus likely to include entities that do not engage in commerce or business at all, or that engage in strictly intrastate commerce (such as residential real property holding) outside the reach of federal regulation.

159.    This fact exposes a fundamental flaw in the CTA's structure: it does not regulate any specifically identified commercial activity. "The Constitution grants Congress the power to 'regulate Commerce.' The power to regulate commerce presupposes the existence of commercial

activity to be regulated." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 520 (2012) (emphasis in original). As discussed above, there is no exercise of commerce inherent in the creation of a state-chartered entity to be the organization of unit owners for a Community Association; it is an entirely ministerial act, and many entities so formed do not engage in any commercial activity. By imposing requirements on the mere act of entity formation without any inkling as to whether the formed entity will engage in commercial activity, the CTA clearly exceeds Congress's power to regulate interstate, foreign, and Indian commerce.

160.   Community Associations do not engage in interstate commerce.

161.   The CTA commandeers State agencies by coercing States into giving notice to State filers of the CTA's reporting requirements and providing filers with a copy of the CTA filing form. Because the States are the only agents capable of providing notice to entity formation filers at the time of formation, States are likely to feel compelled to provide the notice and the FinCEN filing form to protect their citizens from the severe criminal penalties that would result from failure to comply with the CTA's filing requirements.

162.   Through these requirements, the CTA violates Plaintiffs' rights and the rights of all CAI members by exceeding the enumerated powers of the federal government set forth in Article I, Section 8 of the Constitution of the United States, violating the Ninth and Tenth Amendments, and violating the constitutional principles of federalism and retained State powers.

## COUNT VII

### Unconstitutional Violation of Due Process
### (U.S. Const. Amend. V)

163.   Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated in the paragraphs above.

164.    Both the CTA and the FinCEN rules relating to the CTA fail to provide definitions specific enough for CAI, its Community Association members and the volunteer Community Board members of each of those Community Associations or similar entities to understand what conduct is required to avoid criminal sanctions including, but not limited to, failing to sufficiently define "beneficial owner," "understanding," "relationship," "substantial control," and "applicant."

165.    All these terms, most significantly "beneficial owner" and "applicant," have no obvious analogue in State entity formation laws, which typically address "organizers" and "incorporators." In addition, the CTA's overall framework for mandatory reporting, updating, access, and record-keeping is so vague and complex that Community Association members and their Board members or other similar entities cannot reasonably comply with these requirements.

166.    Should Community Association members, their Board members, and similar entities be forced to attempt to comply with the vague and complex requirements of the CTA to avoid criminal penalties, they will be forced to incur substantial costs and other burdens. The stated goals of the CTA do not justify the enormous burden it places on Community Associations and their volunteer Community Board Members or similar entities and can be accomplished through less onerous alternative means.

167.    By subjecting Community Association members, their Board members, and similar entities and individuals, including millions of U.S. persons, covered by the CTA to potential criminal sanctions without adequate notice of the actions required to avoid the sanctions, and, by the same token, expanding the federal government's discretion in enforcing the requirements, the CTA violates the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

## **COUNT VIII**

### **Unconstitutional Infringement of Right of Equal Protection**

168.    Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated in the paragraphs above.

169.    Under the Equal Protection Clause of the Fifth Amendment, Plaintiffs must be afforded equal protection of the laws, ensuring similar treatment to similarly situated persons.

170.    FinCEN, Treasury, and related federal agencies have publicly recognized that the "vast majority" of domestic nonprofit organizations ("NPOs") "face little or no risk" of being used in terrorist financing schemes, for example, because they observe certain due diligence practices, including self-governance, transparency, and other accountability and compliance measures.

171.    Under Section 31 U.S.C. § 5336(a)(11)(B)(xix) of the CTA, an NPO described in Section 501(c) of the Internal Revenue Code and exempt from tax under Section 501(a) of that Code, are exempt from the CTA's filing requirements. 26 U.S.C. § 501(a), (c).

172.    Community Associations are required by state law to operate as NPOs.

173.    Community Associations are tax-exempt entities as described in Section 528 of the Internal Revenue Code pertaining to "certain homeowners associations" (which definition includes Community Associations as herein defined). Section 528(a) states that a homeowners association "shall be considered an organization exempt from income taxes for the purpose of any law which refers to organizations exempt from income taxes." 26 U.S.C. § 528(a).

174.    Community Associations observe the same due diligence practices, including self-governance, transparency, and other accountability and compliance measures, as other NPOs.

175.    Community Associations are required by state law provide homeowners, and often prospective homebuyers and their lenders, with open access to their financial records and books upon request.

176.    As a matter of industry standard, many Community Associations' by-laws also require that their financial records be audited or inspected by an independent auditor on an annual basis.

177.    Despite the fact that state laws require Community Associations to be organized as NPOs, make their financial records available to homeowners and others upon request, and that they are tax-exempt under the specific provisions of Section 528 of the Code, FinCEN refused to grant Community Associations an exemption from the CTA's filing requirements under the NPO Exemption.

178.    The CTA and FinCEN's application of it infringes on Plaintiffs' and their members' rights to equal protection of the law. Tax-exempt NPOs organized under Section 528 of the Code must comply with the CTA, but tax-exempt NPOs organized under Section 501(c) of the Code do not, even though both categories of NPOs observe the same due diligence practices that make them of "little or no risk" of engaging in the types of financial crimes targeted by the CTA. 2024 National Terrorist Financing Risk Assessment, p. 23-25; *see also* 31 USC § 53365336(a)(11)(B)(xxiv).

179.    The Government cannot articulate any legitimate interest or rational basis for exempting NPOs organized under Section 501(c) of the Code from the requirements of the CTA but not exempting NPOs organized under Section 528, despite having the same or functionally similar disclosure requirements.

180.     By subjecting Plaintiffs, Community Associations, and their Board members to the requirements and burdens of the CTA, including possible imprisonment, while simultaneously allowing exemptions for NPOs organized under 501(c) of the Code, the CTA violates the guarantee of equal protection under the Fifth Amendment to the Constitution of the United States.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court:

181.     On Count I, declare that the CTA does not apply to Community Associations;

182.     On Count I, enjoin Defendants and any other agency or employee acting on behalf of the United States from enforcing the CTA against Community Associations and their respective Community Board members;

183.     On Counts II and III declare unlawful and set aside FAQs C.10 and D.13 because FinCEN failed to follow the Administrative Procedure Act's notice-and-comment procedures and FinCEN's denial of CAI's request for an exclusion under the CTA was arbitrary and capricious;

184.     On Counts IV through VIII, declare that the CTA is unconstitutional facially or as applied to Community Associations;

185.     On Counts IV through VIII, enjoin Defendants and any other agency or employee acting on behalf of the United States from enforcing the CTA generally or as against Community Associations and their respective volunteer Community Board members;

186.     On all Counts, destroy any personal identifying information provided by Community Associations and their respective Community Board members to FinCEN and over which it currently maintains possession; and

187.     On all Counts award Plaintiffs their costs and attorneys' fees and grant such other relief as the Court may deem just and proper.

Dated: September 10, 2024

Respectfully submitted,

*/s/ Brendan Bunn*
Brendan Bunn, No. 38461
Chadwick, Washington, Moriarty,
Elmore & Bunn, P.C.
3201 Jermantown Road, Suite 600
Fairfax, VA 22030
Tel: 703-352-1900
Fax: 703-352-5293
bpbunn@chadwickwashington.com

*Attorneys for Canterbury*
*Crossing Condominium Trust,*
*Townhouse Green Cooperative Inc.,*
*Terraces on Memorial Homeowners*
*Association, Farrcroft Homeowners*
*Association, Regency at Ashburn Greenbrier*
*Condominium Association*

Edmund Allcock (*Pro Hac Vice* forthcoming)
Allcock Marcus
10 Forbes Road, Suite 400W
Braintree, MA 02184
Tel: 781-884-1660
ed@amcondolaw.com

*Attorneys for Canterbury Crossing*
*Condominium Trust*

*/s/ Damon W.D. Wright*
Damon W.D. Wright, No. 40319
Clair E. Wischusen, No. 99174
Stephanie Bortnick, No. 87216
Gordon Rees Scully Mansukhani LLP
277 S. Washington Street, Suite 550
Alexandria, VA 22314
Tel: 202-399-1009
Fax: 202-800-2999
dwright@grsm.com
cwischusen@grsm.com
sbortnick@grsm.com

Gretchen Sperry (*Pro Hac Vice*
forthcoming)
Mary J. Goers (*Pro Hac Vic*
forthcoming)
Gordon Rees Scully Mansukhani LLP
One North Wacker, Suite 1600
Chicago, IL 60606
Tel: 312-565-1400
Fax: 312-565-6511
gsperry@grsm.com
mgoers@grsm.com

*Attorneys for Community Associations*
*Institute*

# GROUP EXHIBIT A

**Index – Group Exhibit A**

| **Exhibit Number** | **Exhibit Title** |
|---|---|
| Exhibit A-1 | Declaration of Senya Ehrstein |
| Exhibit A-2 | Declaration of Nancy Wiegand |
| Exhibit A-3 | Declaration of Nick Kornuta |
| Exhibit A-4 | Declaration of Cheri Heaton |
| Exhibit A-5 | Declaration of Kathi Robinson |
| Exhibit A-6 | Declaration of Thomas M. Skiba |

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| COMMUNITY ASSOCIATIONS INSTITUTE, )<br><br>Plaintiffs, )<br><br>v. )<br><br>JANET YELLEN, in her official capacity as the )<br>Secretary of the United States Department of the )<br>Treasury, UNITED STATES DEPARTMENT OF )<br>THE TREASURY, and ANDREA GACKI, in her )<br>official capacity as Director of the Financial Crimes )<br>Enforcement Network, )<br><br>Defendants. ) | Case No. _____ |

## **AFFIDAVIT OF SENYA EHRSTEIN**

Now Comes the Affiant, Senya Ehrstein and deposes on oath and states the following:

1. My name is Senya Ehrstein, I own a condominium unit within the Canterbury Crossing Condominium in Holbrook, Massachusetts, which is where I currently reside.

2. I am over eighteen (18) years old, and I am competent to attest to the facts set forth herein.

3. For the last twenty-eight ("28") years, I have served as Trustee on the Board of Trustees for the Canterbury Crossing Condominium Trust ("Condominium Trust"), which is the organization of unit owners for the Canterbury Crossing Condominium, which is a is a sixty-six (66) unit residential condominium located at 610 S Franklin St., Holbrook, MA. I am currently the Chairperson/President of the Board of Trustees.

4. The Canterbury Crossing Condominium was created by the recording of a Master Deed recorded with the Registered Land Division of the Norfolk County Land Court on November 25, 1986 as document number 138687 and certificate number 7337, pursuant to and in accordance with Massachusetts General Laws, Chapter 183A § 1, et seq.

5. The Declaration of Trust for the Canterbury Crossing Condominium was registered sequentially after the filing of the Master Deed, also on November 25, 1986.

Exhibit A-1

6.  Together the Master Deed and Declaration of Trust contain various restrictions, rules and by-laws for the operation of the Condominium.

7.  The Condominium Trust is responsible for the maintenance, repair and replacement of the common area of the Condominium, as well as enforcement of the restrictions and rules and regulations of the Condominium. The Condominium Trust also responds to various complaints and concerns lodged by unit owners, on a variety of possible issues. Unit Owners of the Condominium pay monthly assessments based on an annual budget adopted by the Condominium Trust.

8.  The Condominium Trust establishes a budget every year for the operation of the Condominium, which includes among other things, the estimated cost for the maintenance and repair of the Condominium common areas, insurance for the property and its operation, as well as reserves for future capital replacement projects, professional fees, etc.

9.  Once the budget is established, the unit owners are assessed their proportionate share of common expenses, which are paid monthly.  Once received, the Condominium Trust pays vendors and allocates reserves for future capital improvements.

10. The purpose of the Condominium Budgeting process is to ensure the effective maintenance of common areas of the Condominium and to reserve funds for future capital replacements.  The Condominium Trust is a not-for-profit entity that owns no real property. The common areas of the property are owned by the unit owners as tenants in common.  The Condominium Trust's primary function and reason for its existence is to maintain, repair and replace the common elements of the condominium, as required by Massachusetts General Laws c. 183A § 10(b)(4).

11. In addition to the concerns internal to our community, the Condominium Trust also from time to has communications and dealings the Town of Holbrook and the Commonwealth of Massachusetts on matters that touch and concern the Condominium, such as zoning and public health and/or safety matters.

12. The Condominium Trust files its federal tax return under the "homeowners association" designation under Section 528 of the Internal Revenue Code

13. The Condominium Trust is operated by and through its Board of Trustees, which currently consists of myself and four (4) other unit owners.

14. The Board of Trustees for the Canterbury Crossing Condominium Trust are elected by our fellow unit owners to serve a three (3) year term, which terms are staggered to ensure continuity of Board representation.  Elections are conducted during the Condominium's annual meeting.

2

Exhibit A-1

15. The position of Trustee is volunteer in nature (unit owners volunteer to nominate themselves to be elected by their fellow unit owners) and is uncompensated.

16. Unit owners at the Condominium have the legal right to attend all open Board meetings. Many owners do attend to observe our meetings and also to raise the kinds of concerns about our community noted above, which we address during board meetings or the annual meeting.

17. Turnover of the Board of Trustees occurs at least annually in conjunction with elections and sometimes more frequently, due to death, incapacitation, resignation, or the selling of a unit by a member of the current Board. In such situations, an election is held or an appointment of another unit owner is made to maintain the required number of Trustees pursuant to the Declaration of Trust.

18. Every time there is a change in the constituency of the Board, an appropriate certificate identifying the change (sometimes a certificate of resignation but more frequently a certificate of appointment) is recorded at the Registered Land Division of the Norfolk County Land Court, as required by Massachusetts General Laws, Chapter 183A § 8(i).

19. The Condominium's financial information and statements are available to every unit owner on demand, as well as prospective purchasers, and every lender or first mortgagee on a unit pursuant to Massachusetts General Laws, Chapter 183A § 10(c). Financial records are reviewed annually by a certified public accountant.

20. Given the requirements of the Federal Corporate Transparency Act, I am likely to resign as a volunteer Trustee now that I understand I have to provide private information to the Federal Government, including a copy of my Massachusetts driver's license or passport, both of which contain a photograph of my face.

21. I am particularly concerned that the Federal Corporate Transparency Act permits the Federal Government to share my personal information, including a photograph of my face, with other federal and state agencies as well as foreign governments for law enforcement purposes, in most cases without requiring a showing of reasonable suspicion of criminal activity or judicial oversight.

22. I anticipate that the Corporate Transparency Act's filing requirements will result in resignations by other members of our Board of Trustees for the same reasons and will stifle future volunteerism at the Condominium. . Serving as a volunteer on a Condominium Trust in a 66-unit community is time consuming and can often be a thankless task.  It is an uncompensated position.  Examples of some of the issues that the Condominium Trust deals with on a day to day basis include but are not limited to:

    a.  Complaints about owners or their tenants smoking in the common areas;

3

Exhibit A-1

b. Complaints about certain owners being too noisy or a nuisance;

c. Unit owners causing damage to other owner's units or the common areas, often times through their toilets;

d. Complaints by owners alleging discriminatory treatment;

e. Complaints by owners relative to pets or service or emotional support animals;

f. Requests by owners for reasonable accommodations due to disability;

g. Claims by owners relative to harassment by other owners;

h. Processing of insurance claims;

i. Issues with vendors; and

j. Complaints relative to building or grounds maintenance;

23. Requiring condominium board members to file their private personal information with the Federal Government will discourage rather than encourage participation in our community.

24. Without a functioning Board of Trustees, it is my understanding the Condominium Trust will go into receivership. In my view, this will create instability and inconsistency in the operation of the Board and will impact our Unit Owners.

25. Also, the Corporate Transparency Act's requirement that the Condominium Trust report ongoing changes in the composition of our Board is burdensome and will surely be costly for the Condominium Trust and the Condominium Unit Owners. By way of example only, we do not keep track or record of when fellow board members renew their Massachusetts driver's license, which is a trigger under the Federal Corporate Transparency Act for an amendment to a Trustee's filing an updated beneficial owner report. Under the Act, we will now be required to keep track of when a Trustee's driver's license is set to expire, to ensure that they make their filing, so the rest of us and the organization do not get penalized, fined or imprisoned.

26. It is already difficult for us to recruit volunteers from the Condominium to serve on our Board. The Condominium Trustees have concerns about the significant civil and criminal penalties that could be imposed upon volunteer Trustees or on the Trust itself for violations of the Corporate Transparency Act, which we understand could be as high as $500 per day or even imprisonment. Penalties and imprisonment by the Federal

4

Exhibit A-1

Government are far beyond what any of us could have expected as a possibility when volunteering to serve as Condominium Trustees.

27. I am particularly concerned about what could happen if one Trustee deemed to be a "beneficial owner" fails to comply with the Federal Corporate Transparency Act's filing requirements, as it may subject the other Trustees or the Condominium Trust as an entity to penalties, fines or imprisonment.

28. I believe that the reporting requirements of the Corporate Transparency Act will harm the operation of our Condominium Trust in a meaningful way, as it may lead to fewer Trustees than required by our governing documents. The result of this circumstance would result in our Board of Trustees being unable to meet their obligations and responsibilities to maintain the condominium, ultimately leading to a decline in the value of our homes.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS    TH DAY OF SEPTEMBER, 2024.

Senya Ehrstein

5

Exhibit A-1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

_____
                                    )
COMMUNITY ASSOCIATIONS              )
INSTITUTE                           )
           Plaintiff,               )
                                    )
v.                                  )
                                    )
JANET YELLEN, in her official capacity )    Case No.: _____
as the Secretary of the United States )
Department of the Treasury, UNITED  )
STATES DEPARTMENT OF THE            )
TREASURY, and ANDREA GACKI in       )
her official capacity as Director of )
Financial Crimes Enforcement Network, )
           Defendants.              )
_____ )

## **<u>DECLARATION OF NANCY WIEGAND</u>**

1. My name is Nancy Wiegand, and I reside in Fairfax, Virginia.

2. I am over eighteen (18) years old, and I am competent to attest to the facts set forth herein.

3. Since 2023, I have served on the Board of Directors for the Farrcroft Homeowners Association, Inc. ("Farrcroft") and currently serve as the Association's President.

4. Farrcroft is comprised of just under 300 single family homes in suburban Northern Virginia. Farrcroft was created by its developer in 1998 and is located just adjacent to historic Old Town Fairfax in Virginia.

5. In addition to the nearly 300 homes in Farrcroft, the Association owns a historic residence (the Farr House) which houses the Association's office and is also available to its members for use for meetings and social functions. The Association also owns an outdoor pool and pool house for use by its members and their guests.

6. Farrcroft is a nonstock corporation created by Articles of Incorporation filed by the original developer with the Virginia State Corporation Commission and is also a Property Owners' Association formed pursuant to the Virginia Property Owners' Association Act. The Association owns the common area within the community and is charged with maintaining and administering the grounds and common facilities.

1

Exhibit A-2

7. The Association files its federal tax return under the "homeowners association" designation under Section 228 of the Internal Revenue Code and is a not-for-profit entity.

8. Farrcroft is comprised of a variety of demographic groups, including primarily upper middle class Virginia citizens, with most of the owners in the community living in their homes. The ownership encompasses a range of young families to those who are retired.

9. The Association Board of Directors ("Board") is the "executive organ" of the Association.  The Board is comprised of volunteer directors who own homes within Farrcroft and serve on the Board to "give back" to their community and ensure that it is properly and efficiently run for the lot owners in the community. While the Association itself is an incorporated entity created by a filing with a state agency, all the homes in Farrcroft are subject to a Declaration of Covenants, Conditions, and Restrictions recorded in the local land records division, with lot owners subject to the Declaration by virtue of owning a lot in the community.

10. The Board is responsible for the administering, maintaining, managing and repairing the common area of the Association, as well as enforcement of the restrictions, rules, and regulations of the community. The Board also responds to the various complaints and concerns lodged by homeowners, ranging from issues with the Farr House and pool to concerns about the state of our landscaping and grounds maintenance. Addressing homeowner concerns and complaints is one of the necessities of doing our jobs as volunteer directors. Owners of lots in Farrcroft pay monthly assessments based on an annual budget adopted by the Board of Directors.

11. The Board is comprised of five lot owners, who are elected to their positions by their fellow homeowners. They serve three-year terms, which are staggered based upon when they were elected. Only lot owners in the community serve on the Board.  In addition, all lot owners in Farrcroft have the legal right to attend the Board meetings, pursuant to Section 55.1-1816 of the Virginia Property Owners' Association Act. To provide a mechanism in which to hear lot owners' concerns or issues, each Board meeting allots time for a residents' forum.

12. In addition to the concerns internal to our community, the Board of Directors also has ongoing communications with officials from our locality, the City of Fairfax, regarding the status and maintenance of our "public access" trails and streams that run through our Common Area, as well as storm water drainage issues affecting our two ponds. These ponds serve as a repository of all collected sediment that drifts downstream from the common waterway

13. Turnover of the Board occurs at least annually in conjunction with an election held at the Association's Annual Meeting. Turnover sometimes occurs more frequently if directors resign their positions, sell their homes or due to other circumstances. Currently, when there is a change in the Board's composition, the Association's management company notes this fact in the Association meeting minutes and records.

Exhibit A-2

14. By state law (Va. Code Section 55.1-1815) of the Property Owners Association Act, all Farrcroft books and records, including financial records, contracts and audits are available to every lot owner who requests to see them if they are in good standing. Virginia law requires that we provide access within five days of the request.

15. As provided for in our Association Bylaws, our financials are audited annually by an independent public accountant. In addition, the volunteer Board of Directors reviews the financials at each monthly meeting of the Board.

16. Per Article IV, Section 4 of our Association Bylaws, no director is permitted to receive compensation for serving on the Board. The positions are purely volunteer. In addition, Board members serving our community have no different financial stake in Farrcroft than their fellow homeowners. We each own a lot in the community.

17. Given the intrusive requirements of the federal Corporate Transparency Act as applied to Homeowner Associations, I am seriously considering whether to continue to volunteer on my community's Board of Directors. As I understand it, the Act requires that I provide personally identifiable information (PII) to the United States Government, including a copy of my state-issued driver's license, which contains a photograph of my face. Moreover, my PII can be provided upon request to a wide range of other agencies, including foreign governments without my consent.

18. Other Board members have expressed similar concerns about continuing to volunteer on the Board of Directors both because of the requirement of filing of our private information with the Government and the ability for government agencies– even governments of other countries -- to request access to our personal information, as provided by the Act. In my view, this will create instability and inconsistency in the operation of the Board and will impact our homeowners.

19. The filing requirements will likely stifle the number of people in Farrcroft who will voluntarily serve on future Boards. As our positions are purely voluntary, this makes the filing requirements unduly burdensome.

20. It is already difficult for us to recruit volunteers from the community to serve on our Board. As part of our solicitation for volunteers to run for a position on the Board, we will now have to highlight the requirements of the Corporate Transparency Act. This will only make this situation more difficult, with fewer owners willing to serve given the requirement to upload your private data and the broad information sharing of this data. In addition, our Board has substantial concerns about the significant civil and criminal penalties that could be imposed upon Farrcroft's volunteer directors for violations of the Corporate Transparency Act, which we understand could be as high as $500 per day or even imprisonment. Again, this kind of civil/criminal risk is far beyond what any of us could have expected as volunteers in our community association.

Exhibit A-2

21. I believe the reporting requirements of the Corporate Transparency Act will harm the operation of our homeowners' association in a meaningful way, perhaps leading to an unstaffed Board of Directors, which I understand could result in receivership for our Association.

22. Finally, the intended purpose of the Corporate Transparency Act is to combat money laundering, tax fraud and terrorism financing, given the transparency of our financial records, to include the monthly review at our public meetings, and annual auditing, applying the Corporate Transparency Act to a non-profit HOA run by volunteers is clearly overreach and will be harmful to the effective management of our community.

I hereby declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

Nancy Wiegand, President                                    Date
Farrcroft Homeowners Association, Inc.

4

Exhibit A-2

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

_____

COMMUNITY ASSOCIATIONS )
INSTITUTE )
         Plaintiff, )
)
v. )
)
JANET YELLEN, in her official capacity )    Case No.
as the Secretary of the Unit States )
Department of the Treasury, UNITED )
STATES DEPARTMENT OF THE )
TREASURY, and ANDREA GACKI in )
her official capacity as Director of )
Financial Crimes Enforcement Network, )
         Defendants. )
_____

## DECLARATION OF NICK KORNUTA

1. My name is Nick Kornuta. I reside at 14534 Basalt Ln., Houston, TX 77077 within the Terraces on Memorial Homeowners Association, Inc. I currently serve in the role of President.

2. I am over eighteen (18) years old, and I am competent to attest to the facts set forth herein.

3. I have served on the Board of Directors for the Terraces on Memorial Homeowners Association, Inc. ("HOA" or "Terraces") since the Spring of 2009. The primary role of the Board of Directors (Board) is to enforce the Deed Restrictions to maintain the desirability of the community and to keep property values as high as possible for all our residents. One of our roles is reminding residents of the covenants that they agreed to follow when they purchased their homes. The next priority of the Board is to manage and maintain the assets owned by the HOA, which means that they belong to the entire community – all the owners -- in the aggregate.

4. Our community consists of 273 homes in three sections. This community has an attractive central lake that includes a surrounding path for walking and leisure time outdoors. The community is gated, so we must maintain the gates and roads since these features are not managed by the City of Houston. We have a shared amenity relationship with the neighboring property owner's association whereby we pay them a fee to allow our residents to use their facilities. Those include a tennis court, basketball court, child's playground, and a swimming pool. These amenities further increase the desirability of our community and add to the overall property values in the eyes of future homeowners.

5. Our community association's Board is made up of five members. Three of the seats must be comprised of one resident from each of the three sections with the final two members coming from anywhere in the community (also known as our At-Large representatives). This composition is purposeful so that residents from the various sections can convey their unique concerns and so that fair representation can be achieved. The current Board is composed of three women and two men.

1

Exhibit A-3

6. The volunteer Board members serve two-year terms that are staggered so that an election never results in an entire slate of new individuals, ensuring institutional continuity. Each year at an annual meeting of all members, an election is held where candidates from throughout the community can run for the Board. Neither I nor my fellow volunteer directors receive compensation, as it is expressly prohibited by our governing documents. Furthermore, we are prohibited from providing any services to our HOA for compensation.

7. Terraces on Memorial Homeowners Association's original declaration of covenants, conditions and restricts were initially filed on October 11, 2005, and amended to its final version on November 10, 2005.  The Articles of Incorporation were executed on October 4, 2005.

8. The HOA is incorporated in Texas as a nonprofit corporation and is governed under the Texas Property Owners Association Act which requires the election of a volunteer board, access to the HOA financial statements, budget, and other books and records to all homeowners and prospective buyers. Texas statute mandates disclosure of community governing documents and financial statements, filing of management certificates, and additional member transparency mandates. Terraces records a management certificate with Harris County including the following information according to Section 209.04 of the Texas Property Code which requires the management certificate to contain the following information:
    - The name of the subdivision, and the association.
    - The recording data for the subdivision, along with recording data for the declaration and any amendments to the declaration.
    - The name and mailing address of the association.
    - The name, mailing address, telephone number, and e-mail address of the association's designated representative.
    - The web address of any website on which the HOA's dedicatory instruments are available (in accordance with Section 207.006, Texas Property Code).
    - The amount and description of a fee or fees charged by the association relating to a property transfer in the subdivision; and
    - Other information the association considers appropriate.

9. Terraces is responsible for paying all the community's bills, seeking competitive quotes for goods and services and billing residents for the annual fees that fund the HOA's operations. Our HOA has hired a Management Company to carry out our operations under the guidance of the Board. The Board meets monthly, and all decisions are managed through a majority vote. These meetings are held at regular times and announced in advance, as they are open to the membership. The Management Company helps to create minutes of each meeting and those are published on a website for all residents to access.

10. The HOA has an audit done each year by an independent auditor. At each annual meeting, the summary annual financial statement is shared with all community members. Terraces files an annual tax filing with the Internal Revenue Service using form 1120H tax return form as a "homeowners association" under section 528 of the Internal Revenue Code.

11. As President of the HOA, I serve as a representative and Vice President of the City of Houston's Super Neighborhood #17.   There are 25-28 homeowners associations within the Super Neighborhood. Super neighborhoods were created to encourage residents of neighboring communities to work together to identify, prioritize and address the needs and concerns of the broader community. This creates a manageable framework for community action and allows the city to provide services more efficiently. The Super Neighborhood program was initially launched

Exhibit A-3

under the city's Planning and Development department. The program was codified in the city's Municipal Code under Chapter 33, ARTICLE VIII.

12. In my role as President of the HOA and VP of the Super Neighborhood, I am engaged in civic duty, meeting regularly with the Houston Police Department, City Council, and Housing Authority.  The Super Neighborhood is often the first line of awareness and subsequent communication to city officials on issues like traffic snarls, emergency vehicle throughways, safety related to line painting on streets and roads, tree branch and other debris, etc.   Our work is that of the greater good for the greater community, City of Houston, Harris County, and the State of Texas.

13. The filing requirements and penalties under the Corporate Transparency Act causes several concerns. First, prospective volunteer directors will be dissuaded from serving by the necessity to share personal information with the federal government and possibly other state or foreign government agencies. We all know that even government agencies can be vulnerable to a data breach.  Second, and not a small issue, the penalties for not correctly reporting or managing one's records are very onerous. Daily fines and prison time are not a desirable potential consequence of holding a volunteer position.

14. Given the Corporate Transparency Act's filing requirements and penalties, I no longer wish to volunteer for this position and expect to see resignations of other members of our Board.  As beneficial as volunteering can be, the huge downside risk is palpable and a bit frightening. Even without the Corporate Transparency Act, our HOA has had several periods -- sometimes lasting years -- when we could not seat a full 5-member Board. Volunteers are very hard to find, given how busy people are, and these additional federal reporting requirements could shrink our already tiny pool of potential candidates to 0.

15. If we are actually required to follow this new law, there is also a near 100% likelihood that the Board would have to incur additional expense to hire a third party (either our management company or our attorney or some newly formed special purpose contractor) to manage the validity of every registration as our Board changes over time. And it will certainly change. This will come as an added expense to every homeowner that lives within our HOA.

16. And finally, living in Houston, which lacks true zoning laws, HOAs are the only form of community governance that allows for orderly communities and tidy neighborhoods, particularly gated communities, that do not get regular city services and code enforcement efforts. These new federal requirements will be one more barrier to ensuring that our neighborhoods remain attractive and well managed.

I hereby declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

_____               _____
Nick Kornuta, President
Terraces on Memorial Homeowners Association, Inc.       Date

Exhibit A-3

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

_____

COMMUNITY ASSOCIATIONS ) 
INSTITUTE )
          Plaintiff, )
 )
v. )
 )
JANET YELLEN, in her official capacity )     Case No.
as the Secretary of the Unit States )
Department of the Treasury, UNITED )
STATES DEPARTMENT OF THE )
TREASURY, and ANDREA GACKI in )
her official capacity as Director of )
Financial Crimes Enforcement Network, )
         Defendants. )
_____)

## DECLARATION OF CHERI HEATON,
## BOARD PRESIDENT, TOWNHOUSE GREEN COOPERATIVE

1. My name is Cheri Heaton, and I reside in Clinton Township, Michigan

2. I am over eighteen (18) years old, and I am competent to attest to and confirm the facts set forth herein.

3. Since 2015, I have served as vice president, secretary, and now President of the Townhouse Green Cooperative ("the Cooperative").

4. Townhouse Green Cooperative was established in 1968 as a housing cooperative, located in Clinton Township, Michigan. There are 255 townhome units in the community. The deed and articles of incorporation for the Cooperative are dated June 25, 1968. Townhouse Green Cooperative is a wonderful community with magnificent appeal and character and is one of the charter community members of the affordable housing movement in Michigan. The front courtyards and expansive recreational facility of our community create a peaceful and homey environment for our members and residents.

5. Townhouse Green Cooperative is a Michigan not-for profit corporation and operates accordingly. Organized under Michigan Statute 125.1473 Consumer housing cooperative; articles of incorporation.

      Sec. 73. In addition to other requirements of law, the articles of incorporation of a consumer housing cooperative shall provide all of the following:

1

Exhibit A-4

(a) That the consumer housing cooperative has been organized exclusively to provide authority-aided housing facilities for persons of low and moderate income, or for persons whose income does not exceed limits established in this act, and for social, recreational, commercial, and communal facilities necessary to serve and improve a residential area in which authority-aided or federally-aided housing is located or is planned to be located thereby enhancing the viability of the housing or that the consumer housing cooperative has been organized to provide nonauthority aided housing for persons of low and moderate income or persons whose income does not exceed limits established in this act, and at least 50% of the cooperative's assets are in housing with the remaining assets being utilized to meet other consumer needs.

An owner's membership certificate represents one share of stock in the Corporation and is bought and sold like other shares of stock in a corporation but with one critical difference: any outgoing member sells the membership certificate to the incoming member. The Certificate of Stock (Membership Certificate) entitles that member to live within a specific unit under a renewing lease arrangement, which roughly is equivalent to owner a home. When the share of stock is sold, the Membership Certificate transfers to the incoming member for the designated resale fee, with the new incoming member now able to reside in the unit.

6. Owners of shares of stock in Townhouse Green Cooperative entitles those owners to one vote in deciding issues facing the Cooperative, as well as to live here and participate in the Board Meetings. Like other community associations, the Board of our cooperative is responsible for arranging for the maintenance of the building exterior, hot water heaters, plumbing and electrical wiring, all of which benefit the members and residents of the Cooperative.  The Cooperative also maintains the common areas used by our residents, such as lawns, trees and shrubs, the parking lots, etc.  Of course, each resident is encouraged to landscape their area near their home and to keep a beautiful, well-groomed lawn.

7. Townhouse Green Cooperative is a self-governing body where the member/shareholders help to set the rules, guidelines and limitations related to residency. Members are expected to read and follow the rules. Members are also encouraged to become active in some phase of our "volunteer" programs. Fortunately, the Cooperative thrives on the talents and ideas of our members, and our "carrying charges" (the assessed dues that pay for our common expenses) are considerably less than rent or house payments because of the "gift" of members who volunteer to serve the Cooperative. Along with these things also comes a pride of ownership.

8. Townhouse Green Cooperative files annual tax form 1120-C.

9. The community is comprised of various groups of owners, many of whom are over 50 years old and are generally middle class.

2

Exhibit A-4

10. The Board is comprised of five shareholders, who are elected to their positions by their fellow shareholders. They serve three-year terms and are volunteers. The State of Michigan requires that a Board be established for the Cooperative, with only members serving on the Board.

11. As with most other community associations, turnover ono our Board occurs at least annually in conjunction with elections. This sometimes occurs more frequently, if a board member resigns or sells their share.

12. Our financial reports are completed monthly by our management company and reviewed by the Board. There is also an annual audit carried out by a CPA, and copies of the annual audited financial statements, and other books and records; including budget and meeting minutes are available to all shareholders.

13. Neither I, nor my fellow board members are compensated to run our housing cooperative, as it is a volunteer position.

14. Unlike a traditional corporation or limited liability company, the Board members have no different financial stake in Townhouse Green than their fellow shareholders. We all own shares that entitle us to reside in the Cooperative.

15. Given the CTA's filing requirements and penalties, I no longer wish to serve in this volunteer position. With the filing requirements, I understand that I have to provide personal and private information to a database of the United Sates Government. With the penalties, I understand that I could be civilly or criminally prosecuted if I or another Board member make a mistake in failing to update our filing. This is too big a burden to bear given that we are just volunteers trying to make our community better.

16. The CTA's filing requirements and penalties will result in resignations of other members of our Board, will create instability and inconsistency in the operation of the Board, and will negatively impact our shareholders and our community. It is already difficult to find five GOOD volunteers to take on the responsibility of running a cooperative, and the CTA will only make this more difficult and lead to dire consequences for our nonprofit Cooperative.

I hereby declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

_Cheri Heaton_

Cheri Heaton, Board President
Townhouse Green Cooperative

Date

3

Exhibit A-4

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

_____
)
COMMUNITY ASSOCIATIONS            )
INSTITUTE                         )
          Plaintiff,              )
)
v.                                )
)
JANET YELLEN, in her official capacity )   Case No.: _____
as the Secretary of the United States  )
Department of the Treasury, UNITED     )
STATES DEPARTMENT OF THE          )
TREASURY, and ANDREA GACKI in     )
her official capacity as Director of   )
Financial Crimes Enforcement Network, )
        Defendants.            )
_____)

## DECLARATION OF KATHI ROBINSON

1.  My name is Kathi Robinson, and I reside in Ashburn, Virginia.

2.  I am over eighteen (18) years old, and I am competent to attest to the facts set forth herein.

3.  Since 2022, I have served on the Board of Directors for the Regency at Ashburn Greenbrier Condominium Unit Owners Association ("Greenbrier") and currently serve as the Association's President.

4.  Greenbrier is a 55-and-older active adult community developed by national builder Toll Brothers. It is comprised of 142 condominium units in Loudoun County, Virginia. Greenbrier was created by its developer in 2017 and is part of a larger adult community called Regency at Ashburn Community Association, which has a pool and clubhouse.

5.  The owners in our condominium are comprised primarily of retired Americans who have "downsized" from a single-family homes so we could take advantage of condominium-style living, with the Association maintaining the grounds and exterior of our homes, leaving us free to pursue our hobbies, volunteer in our communities and enjoy our lives.

6.  Greenbrier is an unincorporated condominium association created by the filing of a Declaration in Loudoun County land records and is a condominium association created pursuant to the Virginia Condominium Act. The Association manages, administers and

1

Exhibit A-5

maintains the common elements within the community and enforces the rules and regulations that binds all of us as owners in the complex.

7. The Association files its federal tax return under the "homeowners association" designation under Section 528 of the Internal Revenue Code and is a not-for-profit entity.

8. The Association's Board of Directors ("Board") is the elected governing body of our Association, also known as an "executive organ" under the Virginia Condominium Act. Our Board is made up of volunteers who own units at Greenbrier and is comprised of owners with a variety of skills and backgrounds. In essence, we volunteers are trying to give back to our community.

9. Our Greenbrier Board is responsible for the maintaining, managing and repairing the common elements of the Association, as well as enforcement of the restrictions, rules, and regulations of the community. We also respond to complaints and concerns raised by our residents, ranging from the types of plantings our landscapers use to leaks that sometimes occur between units.  While these responsibilities are difficult enough given that we are volunteers, it is part of our fiduciary duty to our members, all of whom pay monthly assessments based on an annual budget adopted by the Board of Directors.

10. The Board is made up of five unit owners, who are elected by the homeowners. We serve two-year terms depending when we were elected.  In addition, all unit owners in Greenbrier have the legal right to attend our open Board meetings, pursuant to Section 55.1-1949 of the Virginia Condominium Act. Our BOD meeting agenda always has a Homeowner's Open Forum at the beginning and end of every meeting – also a legal requirement – to hear owners' concerns or issues at each Board meeting.

11. In addition to the concerns wholly internal to our community, the Board also has regular communications with officials from Loudoun County and a neighboring association regarding the status the trail system that runs through our community. In addition, we worked closely with our local County officials regarding the bond release process when our developer was trying to finish our development.

12. Our Board turns over at least annually in conjunction with our Annual Meeting and election. Turnover sometimes happens more often if directors resign their positions (or have health issues, not uncommon in a retirement community). Currently, when there is a change in the Board roster or any of our committees, the Association's management company notifies all residents at the beginning of each month.  Our board Secretary will note these changes in our meeting minutes and records.

13. By state law (Va. Code Section 55.1-1945) of the Virginia Condominium Act), all Greenbrier books and records (financial records, contracts, audits, invoices, etc.) are available to every unit owner who requests to see them if they are in good standing. Virginia law requires that we provide access within five days of the request.  Our governing documents, budget, and all Para.12 anouncements can be downloaded by residents from our community website, TownSq.io

2

Exhibit A-5

14. As provided for in our Bylaws, our financial accounts are audited annually by an independent public accountant. In addition, the volunteer Board of Directors reviews the financial, including our expenditures and income, at each monthly meeting. Owners also can review that information at the same meeting.

15. Per Section 3.9 of our Bylaws, no directors are permitted to receive compensation for serving on the Board. The positions are purely volunteer, with our Board members having no different financial stake in Greenbrier than their fellow homeowners. We each own a unit in the community.

16. Given the requirements of the federal Corporate Transparency Act as applied to condo associations, I and other members of my Board are unlikely to continue volunteering on my community's Board of Directors. As I understand it, the Act requires that I provide personally identifiable information (PII) to the United States Government, including a copy of my state-issued driver's license, which contains a photograph of my face. Moreover, my PII can be provided upon request to a wide range of other agencies for law enforcement purposes, including foreign governments without my consent.

17. I believe the Corporate Transparency Act's requirements will result in resignations by members of our Board of Directors. This is due to the requirement of furnishing our private information with the federal government, not to mention the fact that various individuals are able to request access to our personal information, as provided by the CTA. The resulting reduction of volunteerism in our community could prove devastating for Greenbrier, as we are retired Americans who are in no way interested in sharing so much personal data with the world. Our recent election was the first time in 4 years that we have finally had a full board. We recently amended our bylaws to reduce the director's term from three years to two.

18. I also believe the filing requirements will reduce the number of owners who will voluntarily serve on future Boards. Our positions are purely volunteer, yet these filing requirements are burdensome and intrusive. Again, trying to convince our neighbors to run for a Director's seat has been less than satisfactory. In the four years I have lived here, we have never had more nominees than seats we needed to fill.

19. As part of our internal process for solicitation of volunteers to run for the Board, we will have no choice but to highlight the requirements of the Corporate Transparency Act. We anticipate very few owners will be willing to serve given the requirement to upload so much private data. My Board also has concerns about the significant penalties (civil and criminal) that could be imposed upon Greenbrier volunteer directors for violations of the Corporate Transparency Act, which we understand could be as high as $500 per day or even imprisonment. This risk is far beyond what any of us could have expected as volunteers in our community association.

3

Exhibit A-5

20. The reporting requirements of the Corporate Transparency Act will harm the operation of our homeowners' association in a meaningful way, perhaps leading to an unstaffed Board of Directors, which I understand could result in receivership for our Association.

21. Finally, we do understand that the intended purpose of the CTA is to combat money laundering and terrorism financing. However, given the transparency of our financial records, including monthly review at meetings (open to the membership), as well as our annual audit, the CTA's applicability to a non-profit condo association run by volunteers is clearly overreach and will be harmful to the effective management of our community.

I hereby declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

Signed by:

*Kathi H Robinson*

Kathi Robinson, President
Regency at Ashburn Greenbrier Condominium
Unit Owners Association

9/9/2024

Date

4

Exhibit A-5

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| _____ ) | |
| COMMUNITY ASSOCIATIONS ) | |
| INSTITUTE ) | |
|         Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| JANET YELLEN, in her official capacity ) | Case No. |
| as the Secretary of the Unit States ) | |
| Department of the Treasury, UNITED ) | |
| STATES DEPARTMENT OF THE ) | |
| TREASURY, and ANDREA GACKI in ) | |
| her official capacity as Director of ) | |
| Financial Crimes Enforcement Network, ) | |
|         Defendants. ) | |
| _____) | |

## <u>DECLARATION OF THOMAS M. SKIBA</u>

1. My name is Thomas M. Skiba, and I reside in Alexandria, VA.

2. I am over eighteen (18) years old and I am competent to attest to the facts set forth herein.

3. Since 2002, I have served as the Chief Executive Officer for Community Associations Institute ("CAI").

4. CAI is an international membership organization dedicated to building better communities through supporting and educating residents who live in communities with homeowners associations, condominium associations, cooperatives, trusts, and other planned communities (collectively, "Community Associations").

5. In total, there are more than 365,000 Community Associations in America, with more than 75.5 million Americans residing in these Community Associations. All Community Associations strive to preserve the nature and character of the community, provide services and amenities to residents, protect property values, and meet established expectations of the other homeowners in their communities.

6. CAI's members include Community Association Board members and other homeowner leaders, community managers, association management firms, and other professionals who provide products and services to associations.

7. CAI currently has more than 47,000 members representing Community Associations across the country.

1

Exhibit A-6

8. The typical Community Association is governed by an all-volunteer Board of residents elected by their fellow homeowners to manage the Association and its finances, operate and maintain the common areas of the property, administer the rules and restrictions for the community, set policy, and oversee the professionals and businesses hired to assist in operating and maintaining the property.

9. CAI provides information, education, and resources to the homeowner volunteers who serve on Community Association Boards and the professionals who support them.

10. CAI has created information and learning centers and other educational resources to assist Community Association members in running their respective communities effectively and efficiently.

11. Among these resources is a Toolkit that provides Community Association members with guidance on recruiting and retaining volunteers to serve on boards and committees. Recruiting volunteers for Board service has long been a challenge for Community Associations due to the fact that these are time-consuming unpaid positions that sometimes requires volunteers to handle unpleasant tasks, like resolving disputes between residents.

12. CAI also assists Community Association members in their efforts to advocate effectively for issues that directly impact their communities at the federal, state, and local levels.

13. CAI compiles information on state and federal legislation that impacts Community Associations. Members can monitor that legislation through the Legislative and Policy Tracking Map on CAI's website. The Legislative and Policy Tracking Map is updated daily with new legislation and updates on pending legislation to ensure CAI members have the most current information available to assist them in their local advocacy efforts.

14. Advocacy efforts typically involve issues related to risk management, disaster response and recovery, building safety, and environmental sustainability.

15. Over the past year, CAI and its members have been intently focused on the Corporate Transparency Act ("CTA") because of the devastating impact it will have on volunteerism in Community Associations throughout the country and their ability to carry on as functioning entities for the benefit of their communities.

16. The CTA is designed to "prevent and combat money laundering, terrorist financing, corruption, tax fraud, and other illicit activity," which is often accomplished through the use of shell corporations and other methods of concealment that are incompatible with state laws and guidelines that govern Community Association operations. *See* Federal Register, "Beneficial Ownership Information Reporting Requirements."[1]

---

[1] Available at https://www.federalregister.gov/ documents/2022/ 09/30/2022-21020/beneficial-ownership-information-reporting-requirements (last accessed September 9, 2024).

Exhibit A-6

17. The CTA applies to any "reporting company," which is an entity that was simply "created by the filing of a document with a secretary of state" or similar office. 31 U.S.C. § 5336(a)(11)(A).

18. Any "beneficial owner" of the reporting company must file "beneficial ownership information reports" ("BOI reports") with the Financial Crimes Enforcement Network ("FinCEN"), the law enforcement arm of the U.S. Department of Treasury. 31 U.S.C. § 5336(b)(2).

19. A "beneficial owner" is defined as an individual who "directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise (i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity." 31 U.S.C. § 5336(a)(3)(A).

20. BOI reports require individuals to disclose personal identifying information, including their full legal name, address, date of birth, and a "unique identifying number," such as a driver's license or passport number, along with a photograph of that document that includes the individual's photograph. 31 U.S.C. § 5336(b)(2). The information will be stored in a federal government database for at least five years after dissolution of the reporting company, which, for Community Associations, is more or less indefinitely. 31 U.S.C. § 5336(c)(1). Failure to comply with the reporting requirements results in steep civil penalties of $500 per day and/or criminal penalties of a $10,000 fine and up to two years' imprisonment, or both. 31 U.S.C. § 5336(h)(3)(A).

21. Under the CTA, FinCEN can disclose personal identifying information obtained through BOI reports to any federal national security, intelligence, or law enforcement agency upon request. There is no requirement that the request be related to enforcement of the CTA. 31 U.S.C. § 5336(c)(2)(B)(i)(I).

22. FinCEN may disclose personal identifying information to state, local, or Tribal law enforcement agencies for use in any criminal or civil investigation, with no requirement if authorized by a court of competent jurisdiction or an officer of the court. 31 U.S.C. § 5336(c)(2)(B)(i)(II). Again, there is no requirement that the investigation be related to the CTA.

23. FinCEN may also disclose personal identifying information from BOI reports to a law enforcement agency, prosecutor, or judge of a foreign country under an international treaty, agreement, or convention, or upon request from a "trusted foreign countr[y]" when no treaty, agreement, or convention is available. 31 U.S.C. § 5336(c)(2)(B)(ii).

24. Community Associations do not operate like the traditional corporations and small businesses that are the focus of the CTA's regulations. They are volunteer-run, non-profit entities created and regulated by state law that serve primarily to manage the maintenance and operating expenses for the common elements of the community, which are funded through pro rata contributions collected from fellow homeowners.

Exhibit A-6

25. Community Associations are required by state law to allow any resident to inspect their books and records on request. Some states even require that financial records be audited or inspected by an independent auditor on an annual basis.

26. Community Associations also provide financial data to prospective homebuyers and their lenders as an industry standard to demonstrate the financial strength of the organization, which is correlated with home value.

27. These transparency and accountability practices, which are either state-mandated or industry-standard, put Community Associations at a very low risk of engaging in the types of financial crimes that are the subject of the CTA.

28. FinCEN, Treasury, and other relevant agencies have publicly recognized that the "vast majority" of domestic nonprofit organizations ("NPOs") "face little or no risk" of being used in terrorist financing schemes, for example, because of their due diligence in practicing transparency and accountability measures. 2024 National Terrorist Financing Risk Assessment, p. 23-24.[2]

29. Indeed, nonprofit organizations that are tax exempt under section 501(c) of the Internal Revenue Code are exempt from the CTA's reporting requirements ("NPO Exception"). 31 U.S.C. § 5336(a)(11)(B)(xix).

30. Most Community Associations are also tax-exempt, nonprofit organizations organized under section 528 of the Internal Revenue Code applicable to "certain homeowners associations."  Under that section, a homeowners association "shall be considered an organization exempt from income taxes for the purpose of any law which refers to organizations exempt from income taxes." 26 U.S.C. § 528.

31. In December 2023, CAI requested that FinCEN recognize Community Associations under the NPO Exception or under the "catch-all" provision that exempts entities where the collection of BOI information would not serve the public interest and would not be highly useful in national security, intelligence, and law enforcement efforts to detect, prevent, or prosecute the financial crimes targeted by the CTA.

32. CAI's rationale for this request was clear: applying the CTA's unduly burdensome reporting requirements on Community Associations, and subjecting them and their unpaid volunteer Board members to the significant civil and criminal penalties, will cause the mass resignation of sitting Board members and deter other already-reluctant residents to volunteer for Board service.

33. FinCEN did not respond to our request, but instead, issued FAQs confirming that Community Associations are reporting companies under the CTA and defining who their beneficial owners are.

---

[2] Available at: https://home.treasury.gov/system/files/136/2024-National-Terrorist-Financing-Risk-Assessment.pdf (last accessed Sept. 9, 2024).

Exhibit A-6

34. In August of 2024, CAI released a survey to its Community Association members to gather data on the effect the CTA is having on their communities. More than 850 CAI members, overwhelmingly sitting Board members, responded to the survey.

35. Sixty percent of those who responded reported being somewhat or very uncomfortable furnishing their personal identifying information to FinCEN in BOI reports. Over 70% of respondents reported being somewhat or very uncomfortable with how FinCEN is permitted to use their personal identifying information.

36. Members cited the following specific concerns about the CTA's reporting requirements, among others:

    a. Potential legal consequences for the Association or for Board members personally (79%);

    b. Providing personal identifying information to be stored in a federal government database (77%);

    c. Potential data breach or identity theft (76%);

    d. Ongoing recordkeeping requirements and impact on business operations (69%);

    e. Compliance concerns due to complicated and/or ambiguous reporting requirements (66%);

    f. Financial penalties and increased compliance costs (64%).

37. Each of these concerns demonstrates the critical impact the CTA filing requirements will have on Community Associations and their ability to function. Significantly, 80% of respondents said they believe the BOI filing requirements will cause Board members to resign, and 88% believe the BOI filing requirements will affect their ability to recruit volunteers for future Board service. Twenty-two percent of respondents said they would not have the requisite number of Board members to serve in needed roles after the CTA takes effect on January 1, 2025; another 50% said they were unsure whether they could fill all necessary roles.

38. The survey data makes clear that the disclosure of sensitive personal information that can be shared among federal, state, and foreign law enforcement agencies, and the personal risk of incurring civil or criminal penalties for failing to disclose that information will cause Board members to resign and deter already-reluctant homeowners from volunteering for future Board service. Without functioning Boards, Community Associations will not be able to fulfill their statutory obligations to homeowners; some may even fall into receivership. The CTA will cause great harm to Community Associations nationwide.

I hereby declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

Thomas M. Skiba
Digitally signed by Thomas M. Skiba
Date: 2024.09.09 17:17:18 -04'00'

Thomas M. Skiba, CEO                                    Date
Community Associations Institute

Exhibit A-6

# EXHIBIT 1

**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRIGINIA**
Alexandria Division

| | |
|---|---|
| _____ ) <br> ) <br> COMMUNITY ASSOCIATIONS ) <br> INSTITUTE, *et al.*, ) <br> ) <br>         Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> JANET YELLEN, *et al.*, ) <br> ) <br>         Defendants. ) <br> _____ ) | No. l:24-cv-1597-MSN-LRV |

**DECLARATION OF JAMES MARTINELLI**

I, James Martinelli, declare the following to be a true and correct statement of facts:

1.  I am the Acting Associate Director for the Policy Division of the Financial Crimes Enforcement Network (FinCEN), a bureau within the United States Department of the Treasury. I have held this position since March 2024.  I previously served in several other roles within FinCEN, including as Deputy Associate Director for the FinCEN Policy Division, Director of FinCEN's Office of Regulatory Policy, and Section Chief for Regulatory Interpretation at FinCEN.  In my official capacity as Acting Associate Director for the FinCEN Policy Division, I participate in the supervision of many aspects of FinCEN operations, including FinCEN's implementation of the Corporate Transparency Act (CTA).

2.  FinCEN was created in 1990 and became a bureau of the U.S. Department of the Treasury by virtue of the USA PATRIOT Act of 2001.  The Director of FinCEN is appointed by the Secretary of the Treasury and reports to the Treasury Under Secretary for Terrorism and Financial Intelligence.

3.   The mission of FinCEN is to safeguard the financial system from illicit use, counter money laundering and the financing of terrorism, and promote national security through the collection, analysis, and dissemination of financial intelligence and strategic use of financial authorities.  FinCEN exercises regulatory functions primarily under the Currency and Foreign Transactions Reporting Act of 1970, as amended by Title III of the USA PATRIOT Act of 2001 and other legislation, which legislative framework is commonly referred to as the "Bank Secrecy Act" (BSA).  The BSA is the nation's first and most comprehensive Federal anti-money laundering and countering the financing of terrorism (AML/CFT) statute.  The Secretary of the Treasury has delegated to the Director of FinCEN the authority to implement, administer, and enforce compliance with the BSA and associated regulations.

4.   The CTA, enacted as part of the Anti-Money Laundering Act of 2020 in the National Defense Authorization Act for Fiscal Year 2021 and codified in relevant part at 31 U.S.C. § 5336, amended the BSA to, among other things, require certain entities to report information to FinCEN about their beneficial owners and the individuals who created or registered them.

5.   Due to the nature of my official duties, I am familiar with FinCEN's development of regulations implementing the CTA's requirements as well as FinCEN's promulgation of guidance regarding the CTA and those implementing regulations.  I am also familiar with FinCEN's consideration of requests for exemptions from these requirements, including the request for an exemption for "community associations" submitted to FinCEN by Thomas Skiba, on behalf of Community Associations Institute (CAI), through a letter dated December 28, 2023 (Exhibit A).

2

JA78

6.   The statements I make in this declaration are made on the basis of my personal knowledge, upon information acquired by me from FinCEN staff through the performance of my official duties, and upon conclusions reached and determinations made in accordance therewith.

7.   On December 8, 2021, building on an earlier advance notice of proposed rulemaking, FinCEN published a Notice of Proposed Rulemaking (NPRM), 86 Fed. Reg. 69920, to give the public an opportunity to review and comment on a proposed rule implementing the CTA's provisions requiring entities to report to FinCEN information about their beneficial owners and the individuals who created or registered the entities.  In response to the NPRM, FinCEN received over 240 comments.  Submissions came from a broad array of individuals and organizations, including Members of Congress, government officials, groups representing small business interests, corporate transparency advocacy groups, the financial services industry and trade associations representing its members, law enforcement representatives, and other interested groups and individuals.

8.   FinCEN has not identified any NPRM comments submitted by CAI or any other plaintiff in this case.  FinCEN received several comments from other persons arguing that FinCEN's implementing regulation should exempt all nonprofit organizations from the CTA's reporting requirements, even those that do not qualify for tax-exempt status under section 501(c) of the Internal Revenue Code.  FinCEN, however, has not identified any comments to the NPRM arguing that community associations, homeowners associations, entities subject to section 528 of the Internal Revenue Code, or any other related entities in particular should be exempt from the CTA's reporting requirements.  FinCEN's final rule implementing these requirements, 87 Fed. Reg. 59498, was published September 30, 2022, and became effective January 1, 2024.

3

JA79

9.   FinCEN has published a range of guidance materials to assist the public with complying with the CTA's requirements.  These materials may be accessed through FinCEN's website at https://www.fincen.gov/boi.  Among other resources, these materials include a small entity compliance guide, an education and outreach toolkit, instructional videos, and dozens of answers to frequently asked questions (FAQs).  These FAQs are found at https://www.fincen.gov/boi-faqs.

10. FinCEN's guidance materials, including the FAQs, are not intended to alter any requirements of the CTA or its implementing regulations.  As FinCEN's FAQs expressly state, "These FAQs are explanatory only and do not supplement or modify any obligations imposed by statute or regulation."  Rather than imposing new requirements, FinCEN's guidance materials restate and explain the existing requirements of the CTA and FinCEN's implementing regulations in a way more readily accessible to and understandable by the general public than the CTA and FinCEN's regulations themselves.

11. FinCEN also has been engaging in a variety of outreach efforts to raise awareness of the CTA's requirements.  Through these outreach events, FinCEN has received questions from a variety of stakeholders, including industry and trade groups, congressional offices, professional communities of interest, business owners, and the general public.  In addition, FinCEN has a dedicated Beneficial Ownership Contact Center to receive inquiries relating to the CTA's beneficial ownership information reporting requirements.

12. FinCEN first published FAQs about the CTA's beneficial ownership reporting requirements on its webpage in March 2023.  Since then, FinCEN has periodically amended

these FAQs to add new FAQs addressing additional issues and to clarify existing FAQs. FinCEN continues to update these FAQs.

13. To determine what FAQs to publish, FinCEN reviews questions received through various channels, including outreach events and the contact center.  Generally, FinCEN considers content that an issue is 1) generally applicable to a likely large population, 2) raised in many inquiries, or 3) valuable due to the uniqueness of its topic to be potentially appropriate for an FAQ.  FinCEN typically considers content that is very specific or only applies to a small population not to be appropriate for an FAQ.

14. To date, FinCEN has published two FAQs directly addressing homeowners associations' CTA reporting obligations, FAQs C.10 and D.13.  Both of these FAQs were originally published on April 18, 2024, and FAQ C.10 was then amended on June 10, 2024.  The amendments to FAQ C.10 did not change the FAQ's meaning but made certain technical clarifications to its language.

15. FinCEN published FAQs C.10 and D.13 because FinCEN had received multiple inquiries regarding homeowners associations' reporting obligations and because of the potentially broad population to which such guidance would apply.  Although FinCEN representatives attended a video meeting with CAI representatives on April 17, 2024, to discuss CAI's concerns, these FAQs were in development prior to that meeting, and the FAQs were not FinCEN's response to CAI's December 28, 2023, request that FinCEN create an exemption for "community associations."

16. FinCEN has not denied CAI's December 28, 2023, exemption request, which remains under consideration at FinCEN as of the date of this declaration.  Jimmy Kirby, FinCEN's

5

Deputy Director, sent a letter (Exhibit B) to Thomas Skiba, Chief Executive Officer of CAI, on July 25, 2024, explaining that FinCEN was considering CAI's request to exempt "community associations" pursuant to the relevant legal requirements.  As of the date of this declaration, FinCEN representatives last spoke to CAI representatives regarding CAI's pending exemption request on August 20, 2024.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 2, 2024.

James R. Martinelli
Digitally signed by James R. Martinelli
Date: 2024.10.02 08:16:02 -04'00'

James Martinelli
Acting Associate Director, Policy Division
Financial Crimes Enforcement Network

6

Martinelli Declaration,

Exhibit A



**community**
ASSOCIATIONS INSTITUTE

Vishnu Sharma, CPA, CFE
2023 President
Sharma & Associates
Ft. Lauderdale, FL

Jeevan J. D'Mello, CMCA, AMS,
LMS, PCAM
President-Elect
Zenesis Corporation
Dubai, UAE

Jessica M. Towles, CMCA, AMS, PCAM
Immediate Past President
CCMC, Littleton, CO

Peter Kristian, CMCA, LSM, PCAM
Chairman
Government & Public Affairs Committee
Hilton Head Plantation—General
Manager
Hilton Head Island, SC

Ronald L. Perl, Esq.
Chairman
Federal Legislative Action Committee
Hill Wallack, LLP
Princeton, NJ

Thomas M. Skiba, CAE
Chief Executive Officer

Dawn M. Bauman, CAE
Chief Strategy Officer
Executive Director

6402 Arlington Blvd.
Suite 500
Falls Church, VA 22042
888.224.4321
www.caionline.org

December 28, 2023

The Honorable Janet Yellen          Ms. Andrea Gacki
Secretary                                       Director
U.S. Department of Treasury        Financial Crimes Enforcement Network
1500 Pennsylvania Avenue, NW     2070 Chain Bridge Road
Washington, DC 20220                   Vienna, VA 22182

Subject: Request for Exemption from Beneficial Ownership Interest Reporting
under the Corporate Transparency Act and Anti-Money Laundering Act of
2021

Dear Secretary Yellen and Director Gacki:

I am writing to you on behalf of Community Associations Institute (CAI), the
only national entity representing condominium associations, homeowners
associations, and housing cooperatives across the United States. As we
navigate implementation of the Corporate Transparency Act (CTA) and Anti-
Money Laundering (AML) Act of 2021, we respectfully request an exemption
for community associations from the beneficial ownership interest reporting
requirements outlined in the legislation.

According to the Foundation for Community Association Research, the
authoritative source in our field, there are approximately 70.1 million
Americans residing in more than 355,000 community associations nationwide.
These associations range from two-unit condominiums to large-scale
associations with thousands of homes. The majority of these associations have
fewer than 50 homeowners and are self-managed by volunteers who are not
aware of their obligations under the statute.[1]

We acknowledge the importance of transparency and accountability in
financial transactions, and we firmly believe community associations are
inherently low-risk entities for money laundering and terrorist activities. The
Department of the Treasury has acknowledged this in its statement, explicitly
stating that local and regional nonprofits, which closely align with our
member associations, pose a low risk in these areas.

---

[1] Source: Foundation for Community Association Research. "Community Association Fact Book 2022."
https://www.caionline.org/about/research/Documents/2022%20Fact%20Book.pdf

**Page 2 – Community Associations Institute (CAI)**
**Community association exemption request from BOI**

When you consider creating exemptions under CTA and AML, you must consider the financial model of a community association. Given the source and use of funds for community associations, there is no risk of terrorist activity and money laundering. [2]

- Community associations are usually organized as nonprofit, nonstock corporations in the state or statutorily authorized unincorporated associations. They usually do <u>not</u> qualify for a nonprofit tax determination by the IRS under Section 501(c) of the tax code. Instead, they typically file using Form 528/1120-H for homeowners associations. Which is a specific tax code form for community associations with a control in place very similar to the 501© status of the tax code.
- The community association is comprised of owners in a community. The owners each pay their fair share of the association's expenses through assessments. Assessments are determined by a budget adopted by an elected board of directors. The assessments are essentially the community association's only source of income. The only other income is typically minimal and generated by user fees and fines for violating the community's covenants.
- Assessments are like property taxes. They pay for the services delivered by the community including trash and snow removal, street maintenance, lighting, insurance, recreation facilities, stormwater management, landscaping, and more.
- Association expenses are usually fixed costs spent on contracts like trash removal, elevator maintenance, roof maintenance, landscaping, street maintenance, insurance, and payment for maintenance and repair of other amenities.
- Assessments also pay for services of licensed attorneys and CPAs who assist association boards in legal and financial compliance.
- The board of directors of a community association cannot collect assessments or make expenditures not authorized by the recorded covenants for their community.

Thus, it is obvious community associations are not a viable vehicle for terrorist activities or money laundering and should be exempted from the CTA and AML requirements.

Furthermore, the legislation explicitly outlines 23 exemptions from reporting requirements. One of which is granted to IRS tax-exempt organizations. Community associations operate like tax-exempt entities—with many small assessments and constrained expenditures. Consequently, we contend our members should be extended the same exemption afforded to tax-exempt organizations as outlined in the law. The specific exemptions language from the Corporate Transparency Act is outlined in section 6203(b)(6)(E). [3]

The legislation explicitly exempts entities that exercise governmental authority. Community associations, while private, exist primarily to govern common interest communities. They are providers of essential services similar to local governments. We respectfully suggest it makes sense to treat community associations like other entities that exercise governmental authority.

---

[2] Department of the Treasury. "Anti-Money Laundering and Countering the Financing of Terrorism (AML/CFT) Programs; Effectiveness." https://home.treasury.gov/system/files/126/20180511_SAR_AboutUs.pdf

---

[3] Corporate Transparency Act. Section 6203(b)(6)(E). https://www.congress.gov/bill/116th-congress/house-bill/2513/text

**Page 3 – Community Associations Institute (CAI)**
**Community association exemption request from BOI**

Another reason to grant an exemption is the redundancy of the information collection process. Community associations already furnish detailed information on their board members as part of annual tax or other statutory filings. Mandating an additional layer of reporting creates an unnecessary burden on these associations, especially for smaller associations that are self managed by volunteers.

The Foundation for Community Association Research estimates 2.5 million volunteer leaders serving on their community board of directors will be affected by this burdensome reporting requirement. This number is so large because directors of a community association may change every year.

Those who govern community associations are not investors and serve without any remuneration. We fear complying with this reporting requirement may stifle volunteerism and expose volunteers to civil and criminal penalties. Why should an unpaid volunteer subject themselves to the risk of liability? That risk will exacerbate the ongoing problem of finding volunteers to serve on community association boards. Reporting burdens are magnified by requirements in the CTA that updates be filed within 30 days of any changes to BOI. There is frequent turnover in association board members (beneficial owners) increasing this reporting burden and potential penalties for noncompliance. This impact emphasizes the urgency of our request for an exemption to alleviate the administrative and financial strain on our member associations.

In conclusion, we respectfully urge the Department of the Treasury to exempt community associations from the Corporate Transparency Act and Anti-Money Laundering Act of 2021. The inherent nature of community associations as low-risk entities, coupled with their existing compliance through federal and state filings, underscores the redundancy and impracticality of subjecting them to additional reporting obligations.

We appreciate your time and attention to this matter and welcome the opportunity to engage in further dialogue to address any concerns or provide additional information to aid understanding of the unique position of community associations. Please feel free to contact my colleague, Dawn M. Bauman, CAE, CAI's chief strategy officer at dbauman@caionline.org or (703) 867-5588 anytime.

Sincerely,

Thomas M. Skiba, CAE
Chief Executive Officer
Community Associations Institute

Martinelli Declaration,

Exhibit B



Financial Crimes Enforcement Network
U.S. Department of the Treasury

*Washington, D.C. 20220*

July 25, 2024

Thomas M. Skiba
Chief Executive Officer
Community Associations Institute
6402 Arlington Blvd.
Suite 500
Falls Church, VA 22042

Subject:  Request for Exemption to the Corporate Transparency Act's Reporting Requirements
for Certain Community Associations

Dear Mr. Skiba:

Thank you for your letter to the Financial Crimes Enforcement Network (FinCEN) dated
December 28, 2023, on behalf of the Community Associations Institute (CAI). Your letter
requests an exemption for a category of entities—certain community associations, such as
homeowners associations, condominium associations, and housing cooperatives (collectively,
"HOAs")—from the obligation to report beneficial ownership information ("BOI") to FinCEN
under the Corporate Transparency Act (CTA).[1]

As you are aware, FinCEN issued implementing regulations at 31 CFR 1010.380 to implement
the BOI reporting requirements of the CTA.[2] Among other things, the regulations set forth the
definition of a "reporting company," and specify what information such entities must report to
FinCEN. The regulations also set forth 23 exemptions at 31 CFR 1010.380(c)(2) that describe
categories of entities that are not included in the reporting company definition and which,
consequently, are not required to report their BOI. These exemptions are closely based on the 23
statutory exemptions enumerated in the CTA.[3]

HOAs are not specifically listed within these exemptions. Therefore, if an HOA otherwise meets
the definition of a "reporting company" and does not meet the criteria set out in one of the 23
exemptions, it is required to report BOI to FinCEN under the CTA and its implementing
regulations, 31 CFR 1010.380.

---

[1] The CTA is Title LXIV of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year
2021, Public Law 116-283 (Jan. 1, 2021). Division F of the NDAA is the Anti-Money Laundering Act of 2020,
which includes the CTA at section 6403. The CTA is codified at 31 U.S.C. 5336.
[2] *See generally* FinCEN, Beneficial Ownership Information Reporting Requirements, 87 FR 59498 (Sept. 30, 2022).
[3] 31 U.S.C. 5336(a)(11)(B).

*www.fincen.gov*

Thomas M. Skiba

July 25, 2024                                                                                         Page 2

Under the CTA, the Director of FinCEN[4] is authorized to exempt a "class of entities" from the BOI reporting requirements in certain circumstances by excluding them from the definition of a reporting company.[5]  In order to exempt a class of entities, the CTA requires the issuance of a regulation by which FinCEN determines that requiring BOI from such entities:

- would not serve the public interest; and
- would not be highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes. [6]

The written concurrence of the Attorney General and the Secretary of Homeland Security is also required.

FinCEN is considering your request to exempt a class of HOA entities, pursuant to the above legal requirements.  In the meantime, however, as stated previously, unless an entity qualifies for an exemption found at 31 CFR 1010.380(c)(2), it may be considered a reporting company that must report its BOI to FinCEN.  Additional information may be found on FinCEN's BOI website at *https://www.fincen.gov/boi*.

Sincerely,

Jimmy Kirby
Deputy Director

---

[4] The authority of the Secretary of the Treasury to administer the Bank Secrecy Act has been delegated to the Director of FinCEN.  Treasury Order 180-01 (Jan. 14, 2020), *available at* https://home.treasury.gov/about/general-information/orders-and-directives/treasury-order-180-01.
[5] 31 U.S.C. 5336(a)(11)(B)(xxiv).
[6] *Id.*

```
  1                 UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
  2                     ALEXANDRIA DIVISION

  3   ------------------------------------------x
                                                :
  4   COMMUNITY ASSOCIATIONS INSTITUTE, et al.  : Civil Action No.:
                                                : 1:24-cv-1597
  5                     Plaintiffs,             :
             v.                                 :
  6                                             :
      U.S. DEPT. OF THE TREASURY, et al.,       : October 11, 2024
  7                                             :
                        Defendants.             :
  8   ------------------------------------------x

  9                 TRANSCRIPT OF MOTION HEARING
              BEFORE THE HONORABLE MICHAEL S. NACHMANOFF,
 10               UNITED STATES DISTRICT COURT JUDGE

 11                 A P P E A R A N C E S

 12    FOR THE PLAINTIFF:      DAMON W. WRIGHT, ESQ.
       (CAI)                   CLAIR WISCHUSEN, ESQ.
 13                            Gordon & Rees, LLP
                               277 S. Washington St.
 14                            Suite 550
                               Alexandria, VA 22314
 15
       FOR THE PLAINTIFF:      EDMUND A. ALLCOCK, ESQ.
 16    (Canterbury Crossing    Allcock & Marcus, LLC
       Condominium Trust)      10 Forbes Road
 17                            Suite 400
                               Braintree, MA 02184
 18
                               BRENDAN BUNN, ESQ.
 19                            Chadwick Washington Moriarty Elmore
                               & Bunn, PC
 20                            3201 Jermantown Rd.
                               Suite 600
 21                            Fairfax, VA 22030

 22    FOR THE DEFENDANT:      KIRSTIN O'CONNOR, DOJ-USAO
       (U.S. Department of     PETER B. BAUMHART, DOJ-USAO
 23    the Treasury)           2100 Jamieson Ave.
                               Alexandria, VA 22314
 24

 25
```

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

OFFICIAL U.S. COURT REPORTER:    MS. TONIA M. HARRIS, RPR
                               United States District Court
                               401 Courthouse Square
                               Tenth Floor
                               Alexandria, VA 22314

1      **P R O C E E D I N G S**

2      (Court proceedings commenced at 9:44 a.m.)

3

4              THE COURTROOM CLERK:  CAI, et al versus U.S. DOT, et

5      al.  24-1597.

6              Counsel, please note your appearances for the

7      record.

8              MS. O'CONNOR:  Good morning, Your Honor.  Kirstin

9      O'Connor and Peter Baumhart from the U.S. Attorney's Office

10     for the defendants.  Along with us is agency counsel, Timothy

11     Johnson from Vinson.

12             THE COURT:  Good morning to you all.

13             MR. WRIGHT:  Good morning, Your Honor.  David Wright

14     on behalf of the Community Associations Institute and with me

15     is my partner, Clair Wischusen, with my firm.  And also

16     Brendan Bunn and Edmund Allcock.  And if you could identify --

17             MR. BUNN:  Yes, Your Honor.  I'm here representing

18     the Farrcroft HOA, the Regency at Ashburn Condominium, and

19     it's right here in Virginia.  And then two of the other

20     individual association plaintiffs, the Townhouse Green

21     Cooperative and the Terraces on Memorial.

22             THE COURT:  All right, good morning.

23             MR. ALLCOCK:  Good morning, Your Honor.  Ed Allcock

24     admitted pro hac vice from Massachusetts -- thank you for

25     that -- on behalf of Canterbury Crossing Condominium Trust.

1          THE COURT:  Good morning.

2          MR. WRIGHT:  And, Your Honor, we also have Tom

3   Steven and Don Bowman (ph) with the Communication Associations

4   Institute.

5          THE COURT:  Good morning.  Who will be arguing

6   today?

7          MR. WRIGHT:  Your Honor, I'll be arguing the primary

8   argument for the plaintiffs.  Because of the different

9   arguments we have, Clair Wischusen is going to argue the

10  commerce clause claim.  And Mr. Bunn and Mr. Allcock are going

11  to speak in more depth with respect to irreparable harm.

12          I know the Court has got a busy docket --

13          THE COURT:  I do, and we have limited time.  We have

14  a jury that will be coming back around 10:30.  And, you know,

15  I want to make sure we have a full argument this morning, but

16  we have to be efficient with our time and I may help.  You

17  know I permitted the plaintiffs to file a 45-page brief and

18  then, of course, had to give the same consideration to the

19  defense.  Shockingly, everyone took me up on the ability to

20  write 45-page material, and there's a lot there.  I don't

21  fault anyone for their advocacy.

22          I will note that I've been looking at the variety of

23  cases around the country and I'm sure you all have been too,

24  and not just the case before the 11th Circuit from Alabama and

25  the Oregon case, both of which are cited.  But, of course,

1   there was a case argued in the Western District of Michigan, a

2   case in Maine, a case in Texas, which just had an argument

3   yesterday, I believe.  Shockingly, when I looked at those

4   briefs, none of them were 45 pages long.  They managed to make

5   all of these arguments in 20 pages, 30 pages.  I'm not sure

6   what that says.  Of course you all didn't raise the 9th and

7   10th Amendments.

8           MR. WRIGHT:  You had the benefit of our 20-page

9   reply as well.

10          THE COURT:  I'm not sure why you're reminding me of

11  that, but that's all right.

12          But this is a very interesting matter and there are

13  a lot of issues.  I think I may help focus the argument here

14  as we go on, but I'll -- it's your motion.  I'll let you

15  start, but don't be insulted if I sort of cut you off and say

16  this is what I want to hear about.

17          MR. WRIGHT:  Understood.  So to begin, Your Honor,

18  the constitutionality of the Corporate Transparency Act, it's

19  not determined by reference to whether law enforcement is

20  good, money laundering is bad, it's got to be determined and

21  evaluated based on what it requires, what it regulates and the

22  actual impact it has on citizens.  And those other cases what

23  makes our situation very unique is we're talking about

24  community associations that are volunteers.  It's never been

25  the case that a volunteer has subjected themselves to this

1  type of civil or criminal liability.  There is no law out

2  there like this.  And here we have 370,000 community

3  associations across the country.  30 percent of Americans live

4  in those associations.  And they're already doing a thankless,

5  selfless job.  They're dealing with their neighbor who is

6  telling folks that why -- why is the playground not working,

7  what are we going to do about the pool, or the city wants to

8  build a data center next to the next property.  What about

9  that.  They are dealing with all of these things at the end of

10  the day.  Trash cans being left in the street by the police,

11  and complaints about someone not picking up after their dog,

12  or the holiday party, or maybe another resident who has

13  conspiracy theories and thinks that somehow the community

14  association board members are responsible for whatever is

15  going on with national politics.

16        This is their daily life.  It's selfless, it's

17  thankless.  And when you add the overlay of the Corporate

18  Transparency Act on top of that and the massive administrative

19  burden it imposes on volunteers on top of the liability risks,

20  it's very serious and there will be mass resignations.  It's a

21  sacrifice that volunteers just shouldn't be expected to make

22  and rational people won't make them.

23        THE COURT:  Let me ask you about the term,

24  "community association."  I've been trying to, as best I can,

25  understand it and learn the terminology.  I'm familiar with

1   homeowners association, HOA.  It seems like they are similar

2   terms.  But does community associations encompass something

3   greater than that?  These are property-based associations

4   where people live together and may have some shared expenses

5   with regard to common spaces or other things, or am I -- is it

6   something more?  Was this just a rebranding or is it

7   describing something more?

8           MR. WRIGHT:  They can be considered homeowners

9   associations or condo associations, but they operate typically

10  with six board members, give or take, and of those five are

11  officers.  There are bylaws.  They are regulated at the state

12  level.  I think 30 of the states require mandatory audits.

13  The other states, those community associations, do it based on

14  best practices.  But they are basically responsible for

15  maintaining the bylaws, the rules of the association, and also

16  making sure the common areas:  The swimming pool, the condo

17  building, the lobby, the elevators.  They sign insurance

18  contracts, they make sure the utilities are paid, the

19  internet, the water, the gas.

20          THE COURT:  So in essence there's an economic

21  component in the sense that you can't -- you can't run one of

22  these things without collecting money and spending money,

23  right, in order to maintain the property in some way.

24          MR. WRIGHT:  Yes.  There could be condo dues, things

25  of that sort, that's correct.

1          THE COURT:  All right.

2          MR. WRIGHT:  So as I think you're aware, the CTA

3   requires sort of two -- at least two things.  One is that the

4   beneficial owners of the reporting entity have to make a

5   filing with FinCEN, this is the beneficial owner report.  And

6   beneficial owners are defined in the CTA as being someone who

7   owns 25 percent or more of the business or directly or

8   indirectly controls the business.  And, as we know, FinCEN has

9   said okay community associations, we believe that means the

10  board as well as if someone in that community association

11  happens to own 25 percent or more of the property in that

12  association.

13          So it requires this filing and the beneficial owners

14  need to submit their personal information as well as their

15  identification documents, upload a passport, or a driver's

16  license.  So that's one requirement.  It goes into this

17  national criminal law enforcement database.  And we know the

18  former director of FinCEN said the reason for the Corporate

19  Transparency Act, what we like about it is it allows us to not

20  have to deal with warrants or subpoenas because those things

21  waste government resources, we need to be able to move faster,

22  to be able to investigate, pursue financial crimes.

23          So that's one requirement.  And then the other

24  requirement is that if -- and I'm just going to focus on

25  community associations here.  If someone from the board leaves

1    or joins, resigns, or dies, which happens often, there's a lot

2    of turnover, the beneficial owners or the association needs to

3    update the filing with FinCEN within 30 days.  And if they

4    fail to do so, they can be subject to civil penalties of up to

5    $500.

6            THE COURT:  Mr. Wright, I know all of this.  I

7    really want to hear what's your best argument because you made

8    a lot of them, so I need to know what's most important to you.

9            MR. WRIGHT:  Well, Fourth Amendment.  There's a

10   statutory interpretation argument, Your Honor.  And we've

11   briefed that and if you have any questions about that, I'm

12   happy to explain that.  But there is, in the statute, there's

13   a nonprofit exemption.  It refers to 501, Section 501.  And

14   there is another IRS code provision, the Internal Revenue Code

15   provision 528 that says, "If you're subject to 528, you're

16   also exempt from any other law relating to tax exempt

17   organizations."  So for purposes of statutory construction,

18   and we cited a case in our reply that dealt with this same

19   phrase "any law," we believe community associations are

20   already exempt.  Now, FinCEN disagrees.

21           And so let me turn to the Fourth Amendment.  The

22   government acknowledges that the Corporate Transparency Act it

23   needs to comply with the Fourth Amendment.  And to do that,

24   because the Fourth Amendment presumes that a warrant is

25   required for a search, the government has to come up with some

1  exception of the Fourth Amendment probable cause and warrant

2  requirement.  As you probably read, they rely on the *Shultz*

3  case.  And they say this has already been tested.  It's

4  already been approved because of the Supreme Court decision in

5  *Shultz*.  But *Shultz* dealt with banks and the Bank Secrecy Act,

6  a highly regulated business type.  It's involved in

7  transactions all the time, of course, which could be used to

8  commit crimes -- financial crimes.

9       In the *Shultz* case --

10       THE COURT:  But why does that matter?  Why does it

11  matter that banks are highly regulated and that community

12  associations are less regulated?

13       MR. WRIGHT:  It matters in terms of the burden and

14  the impact and the 5th -- between what the law is trying to

15  accomplish and what the impact of the harm actually are.  I

16  mean that's exactly what the Supreme Court said in *Shultz*.

17  They said, Congress recognized the importance of large and

18  unusual currency transactions and ferreting out criminal

19  activity and desire to strengthen the statutory basis for such

20  -- requiring such a report.  So it's the requirement to report

21  a transaction over $10,000, which they described as unusual,

22  an abnormally large transaction.

23       So what you have with *Shultz* is a situation where

24  there is some activity that is somewhat suspicious.  And the

25  banks that are sophisticated, highly regulated, it's not much

1  of a burden on them to make this report.  For Fourth Amendment

2  purposes, it's a highly regulated industry, and it doesn't

3  require a warrant.  It's not this probable cause -- there's a

4  little bit of individualized reasonable suspicion because of

5  the size of the transaction, but that's what makes a

6  difference.  So then you have to say, okay, is that comparable

7  to requiring community associations and all of these board

8  members to upload their information to a national database for

9  criminal law enforcement purposes?  And I should have told you

10 as well, the law requires that you provide a physical business

11 address for the covered entity.  Well, community associations

12 are made up of homes.  They don't have a physical place of

13 business.  So someone on the board is going to need to

14 volunteer to provide their own home address to a federal

15 criminal law enforcement agency.  And, again, every time

16 someone dies or they go off on an extended vacation and take a

17 leave of absence from the board, all these things require the

18 board to continually update this or face up to four years in

19 prison and a $10,000 fine for volunteers, totally different.

20       BSA, Bank Secrecy Act, that was about the entity.

21 The Corporate Transparency Act is about the entity, but also

22 these individuals and nonprofits doing volunteer work, making

23 sure the playground works are not the same as banks.

24       THE COURT:  I understand these arguments and I

25 understand the deep desire of community associations not to

1    have to divulge this information, but these are really

2    arguments on the equities.  And I'm focused on the -- on the

3    law --

4            MR. WRIGHT:  So they are not.  Your Honor,

5    respectfully they are not.  If you read the cases and look at

6    the Fourth Amendment test and the First Amendment test with

7    respect to chilled speech -- yes, they could also be arguments

8    on that piece.  But if you take a look at the *Edmond* case that

9    dealt with checkpoints, it's not about the equities, it's

10   about a dragnet sweep and how that violates the Fourth

11   Amendment.  If you look at *Brown v. Texas*, it's unlawful for

12   there to be a law that says the police can approach someone

13   and say, "Give me your identification."

14           If you take a look at the *Patel* case, and that was

15   from 2015, it's a burden -- and it doesn't satisfy the Fourth

16   Amendment.  There's no exception when a law says, Law

17   enforcement gets to walk into a hotel and say produce your

18   guest records and their driver's license information.  So

19   yeah, the equities do matter, but it goes to the fit between

20   what the statute supposed to accomplish and what it actually

21   does, and you just can't say there is a law enforcement

22   exception, make things faster, easier for law enforcement

23   exception to the Fourth Amendment.  There is no save law

24   enforcement resources exception.  So that's -- equities, yes,

25   but that's not all of it, Your Honor.

1          And in the same -- I know you've read this, and I'm

2    not trying to disagree with you, but it really goes to all of

3    these things, and that comes through from the cases.  And the

4    same is true with respect to the First Amendment, Your Honor.

5    The *Bonta* case is very much analogous to this situation here,

6    and that was a case where the State of California had a law

7    that said charities must produce lists of everyone who has

8    donated $5,000 or more.  And the Court said, the Supreme Court

9    said, okay, we get that the government has an interest,

10   because they are saying -- the state was saying there could be

11   fraud with charities, there's abuse, we need to know who the

12   donors are so we can make sure we have a database that's going

13   to allow us to better root out charity fraud.  And the Supreme

14   Court said, No, what you've done here crosses the line and

15   violates the First Amendment.  You're compelling speech by

16   forcing these charities to disclose who their members are, but

17   you're also chilling the freedom of association because there

18   are some people who will not want the government to know if

19   they donated to a charity.  There must be a substantial

20   relationship or a relevant correlation between the disclosure

21   requirement and the government interests.  And Justice

22   Roberts, Chief Justice Roberts says, No, you don't have that

23   here.

24          And so, we have the same thing here, the effect is

25   the same as they were concerned about in *Bonta*.  The effect is

1   people are going to be less likely to be part of associations,

2   to volunteer when they could face reprisals and real harm to

3   their entire lives.  It's inevitable that community

4   associations are not going to be able to comply with this law.

5   The 30-day requirement by itself is just completely

6   impractical.  Again, people get sick, they get busy on the

7   job, they're going to miss these deadlines, and that would

8   expose them to criminal penalties.

9            So, again, any rational person is going to say,

10  forget this, I'm out.  Yes, inequity argument; yes inequitable

11  harm argument, but it also goes to the base point of

12  constitutionality.  It's not just a law enforcement, money

13  laundering is bad.  So whatever the government wants to do to

14  make it easier to go after it that actually needs -- according

15  to the framers -- that we need the protections of the Fourth

16  Amendment, the First Amendment.  That's exactly what they're

17  concerned about.  If you go through the cases, and I know you

18  have and -- you will see that them coming up again and again.

19  So my mouth is a little dry I'm --

20           THE COURT:  It's all right.  I would like to hear on

21  the commerce clause.  I think you said your colleague was

22  going to address that.

23           MR. WRIGHT:  Thank you.  I appreciate it.

24           THE COURT:  All right, thank you.  And then I'll let

25  the government respond to all the arguments.

1    MS. WISCHUSEN:  Thank you, Your Honor.  The CTA also

2  fails as a federal overreach, because it exceeds congressional

3  authority as the Court found in National Small Business

4  United.  In the papers, there is a lot of discussion about

5  what the statute regulates.  And then in the government's

6  papers, there are a lot of discussion about the purpose of the

7  act and stopping money laundering and stopping funding of

8  terrorism.  But you have to actually look at what the statute

9  regulates like the Court did in National Small Business

10  United.  And it's clear from the statute that what its

11  regulating is corporate formation and corporate existence.

12  And this is significant, because historically a state and

13  corporation has been a matter of state sovereignty.  States

14  have always had the authority to --

15    THE COURT:  How is it regulating a state formation

16  or corporation formation?  I understand the argument that this

17  is traditionally the realm of the state, but it's not -- the

18  federal government isn't through this telling who can be in a

19  community association or what it should look like or -- so I'm

20  a little curious about what you mean by "regulating the

21  corporate formation," as opposed to collecting information

22  from particular kinds of entities.

23    MS. WISCHUSEN:  Sure, I mean it is stating that

24  unless someone complies with the Corporate Transparency Act

25  that they cannot charter a corporation, they cannot have a

16

1  corporation exist.  Certainly, you know, it doesn't address

2  some of the more detailed requirements that state law

3  addresses, but it's even more damaging --

4         THE COURT:  Help me understand that just a little

5  bit.  I understand if you don't comply, you potentially are

6  exposed to potential criminal liability.  And so you've got

7  your argument about this is really going to turn people off

8  from volunteering to be on their home owners association or

9  whatever.  But are you suggesting that it would dissolve the

10  homeowners association by not having complied with the CTA

11  that the federal government is somehow affecting its ability

12  to exist, as opposed to having these mechanisms to get

13  compliance by potentially punishing people who don't comply?

14         MS. WISCHUSEN:  Certainly in the context of

15  community associations if the draconian penalties, both civil

16  and criminal, turn volunteers off from volunteering to be

17  board members and the board is unable to constitute a board to

18  operate the entity, then, yeah, potentially the --

19         THE COURT:  So you mean de facto that that would

20  just be the consequence of people not volunteering as then the

21  homeowners association would cease to exist, not that the

22  federal government is essentially declaring somehow a home

23  owners association doesn't have a right to exist?

24         MS. WISCHUSEN:  Correct, correct.  So the CTA is

25  regulating an area of state sovereignty and cases like *Lopez*

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

JA105

1   say if the federal government is going to tread on an area of

2   state control, then there has to be a connection to interstate

3   commerce.

4           The government here is relying on the third prong

5   that is used, the *Lopez* test that is used, in looking at

6   whether a regulation can be sustained under the commerce

7   clause, looks at whether the activity has a substantial

8   relationship to interstate commerce.  So they are relying on

9   this far removed prong, and also arguing that the authorities

10  amplified by the necessary and proper clause.  However, when

11  you look at the regulation, it is regulating the ministerial

12  act of corporate formation.  It provides the trigger for the

13  statute, which is the filing of a document with a state

14  attorney general or similar office.

15          The government in its brief argues that under state

16  codes entities are able to engage in commercial transactions

17  like borrowing money and entering contracts.  And so, based on

18  this anticipated future conduct, it is regulation of

19  commercial activity and that they are really regulating entity

20  operation.  But the problem with this argument is the holding

21  in *NFIB Sebelius*, which invalidated the individual mandate

22  under the Affordable Care Act where Congress held that you

23  can't use the -- I'm sorry where the Court held that Congress

24  couldn't use the necessary and proper clause to regulate those

25  who are not by some preexisting activity already within the

1  sphere of federal regulation.  So basically you couldn't use

2  future anticipated commercial activity to justify something

3  that was regulating here just individual existence, somebody's

4  individual existence, which is analogous here to what the

5  Corporate Transparency Act is doing in regulating the

6  existence of a corporation.

7          The Corporate Transparency Act is also not justified

8  under the foreign commerce clause.  Again, it is regulating

9  domestic incorporation while the scope in regulating foreign

10  commercial activity may be broader.  The cases hold that the

11  scope under the foreign congress clause over domestic commerce

12  is the same, nor is it justified based on tax powers just

13  because incidentally once this data base is created tax

14  authorities would have access to it in seeking to prosecute

15  tax crimes.

16          THE COURT:  All right.  Thank you very much.

17          MR. ALLCOCK:  Your Honor, I'm a long way from home,

18  but would it be okay for me to say this in a couple of words

19  before the government goes?

20          THE COURT:  Sure.  I'll hear from you very briefly.

21  Just keep an eye on the clock.

22          MR. ALLCOCK:  Thank you, Your Honor.  My name is

23  Edmund Allcock.

24          So, Your Honor, one of the questions you asked

25  initially was -- what is this community association thing.  I

1  just want to point out that it's a coverall for three

2  different types of property owners associations:

3  Condominiums, HOAs, and cooperatives. Now, colloquially HOA

4  is usually used as the term for the board that operates the

5  entity, whether it's a condominium cooperative or a homeowners

6  association. Those entities usually take three different

7  forms. Either they're incorporated, they're unincorporated,

8  and then in some states, like, for example, Massachusetts, we

9  have this form that's called a Condominium Trust.

10        Now, the interesting thing about this, this is the

11  Corporate Transparency Act. And I actually think, quite

12  frankly, on its face, two-thirds of the organizations of the

13  structural form of the organizations we represent are not

14  covered by the Act. When you look at the FAQs, which are in

15  the record, the FAQ put out by FinCEN, it says, "Are HOAs

16  reporting companies?" The government's response is, "It

17  depends. HOA's can take different forms." If an HOA was not

18  created by the filing of a document with the Secretary of

19  State office or a similar office, then it's not a reporting

20  entity.

21        THE COURT: And if that's the case, then there would

22  be lack of standing then for your potential clients?

23        MR. ALLCOCK: I think, Your Honor, what it would be,

24  what it suggest to me, is that two-thirds of the organizations

25  that we represent, two-thirds of HOA's in this country are not

1   subject to the Corporate Transparency Act, which, quite

2   frankly, the government -- the government seemingly admits by

3   saying "it depends."

4           THE COURT:  But if that's the case, what is there

5   for me to resolve?  In other words, if that's the case.

6           (Mr. Wright stands.)

7           THE COURT:  Well, we can only have one person argue

8   at a time, Mr. Wright.  You'll get your chance.

9           MR. ALLCOCK:  Well, Your Honor, what there is to

10  resolve is to say that there is a likelihood of success here.

11  That there are community associations that, quite frankly, are

12  not even subject to the Act.  They do not have to, they do not

13  have to comply, or they should not have to comply.  The

14  government -- the government seems to suggest that it depends.

15  And the reason I think that language "it depends" is important

16  is because, as you've heard from Mr. Wright, the life blood of

17  the community associations are volunteers.  These are

18  homeowners who volunteer to serve on the board.  The board's

19  purpose is maintain, repair, and replace the property.  That's

20  the purpose.  Maintain, repair, and replace their homes.

21          So these individuals sign up to -- without any pay,

22  without any compensation, to make sure that the entire

23  property retains its value, stays in good shape, good order,

24  for the folks that buy homes there.

25          Now, what happens when those individuals sign up and

1 they understand, okay, there's five of us. And now, now we

2 are suddenly subject -- we have to do this reporting thing.

3 What if one of our board members doesn't report, now we are

4 subject to criminal penalties. We are subject to

5 imprisonment. It's not just the mass resignations, Your

6 Honor, it is -- there will be a complete lack of volunteerism

7 for owners to submit to these boards, which is going to result

8 in homeowner associations across the country not having

9 representation. When they don't have representation -- I know

10 Attorney Bunn and I have had this happen on occasion, very

11 rarely -- there has to be perhaps a receiver appointed or the

12 association simply falls into disrepair, which then means the

13 value of the property is impacted, the values of people's

14 homes are impacted.

15          And I think the government said, Well, you submitted

16 a couple of affidavits indicating that people would resign. I

17 believe we submitted -- I think Appendix 6, a survey done by

18 CAI nationwide that indicated 81 percent of homeowners that

19 serve on these boards would resign. But the question is, if I

20 am an homeowner, why would I volunteer to subject myself to

21 the possibility of criminal penalties if one of my fellow

22 board members does not comply. So one of the hallmarks, I

23 think, Your Honor, of any statute where there is a criminal

24 penalty, is there is sufficient notice of what the crime is.

25 How you would be subject to imprisonment or criminal

1  penalties?  Here, the government says "it depends," and on top

2  of that, we are now subjected to the possibility of penalties

3  if one of our fellow board members --

4          THE COURT:  I understand your point.  And just in

5  the interest of time, I have to give the government the

6  opportunity to respond.

7          MR. ALLCOCK:  Thank you, Your Honor.

8          THE COURT:  Thank you very much.

9          MS. O'CONNOR:  Thank you, Your Honor.  I'll try to

10  be brief.  I wanted to start where plaintiff's counsel left

11  off here and refer the Court to footnote 6 in our opposition

12  which addresses the definition of community associations, and

13  it depends on phraseology.  We would just note, I think the

14  parties are in agreement that community associations that

15  qualify as 501(c)(4) entities fall squarely within the

16  nonprofit exemption in the CTA and everyone agrees they do not

17  have to make the disclosures under the CTA and they would not

18  have standing to challenge the CTA in this case.

19          I would also note that one of the named plaintiffs,

20  Townhouse Green Cooperative, is a cooperative association that

21  is basically covered by a separate provision of the Internal

22  Revenue Code.  So I think basically what we've tried to do is

23  address plaintiff's arguments here from the statutory claim,

24  which is about 528 organizations.  So I'm happy to answer the

25  Court's questions on that, but just to --

1          (Court reporter clarification.)

2          MS. O'CONNOR:  528, correct, yes.  But we tried to

3   explain our understanding of plaintiff's position in that

4   footnote.

5          I also just wanted to note one clarification, which

6   is that the CTA only imposes penalties for willful violations

7   of the statute.  And so this idea that, you know, inadvertent

8   noncompliance is going to result in prison time, I think,

9   frankly, is an exaggeration.

10         But briefly, if I may, Your Honor, I wanted to

11  address the commerce clause question first.  The Supreme Court

12  has instructed us to look at the primary purpose of the

13  statute when evaluating a commerce clause claim, and here

14  Congress has answered the question explicitly for us, which is

15  to combat financial crime.  That includes the financing of

16  terrorism, money laundering, and other illicit financial

17  activities.

18         It's hard to imagine activities that are more

19  commercial in nature than these and plaintiffs attempt to get

20  around --

21         THE COURT:  I'm sorry what is "the these."

22         MS. O'CONNOR:  Oh, financial crimes, money

23  laundering, et cetera, that these are commercial in nature.

24  In plaintiff's attempt to pluck an individual regulated entity

25  that may engage in trust state commerce out from this broad

1   interstate regulation, is exactly what the Supreme Court has

2   instructed courts not to do in *Raich* and in *Wickard*.

3          In here, from plaintiff's counsel's arguments today,

4   I think it's quite clear that homeowners associations, condo

5   associations, do like to engage in commerce.  As Your Honor

6   indicated, they collect fees, they pay out in order to

7   maintain their properties, put on these other events, et

8   cetera.  And as counsel just indicated, in their view, if

9   homeowner associations and condo associations are not

10  operating properly, the value of their properties goes down

11  and, of course, that impacts interstate commerce as well.

12         THE COURT:  Let me ask you this, how do you respond

13  to the argument that the Court in Alabama seems to have

14  adopted that this is really about the formation of these

15  organizations as opposed to their operation?  That it's just

16  the mere fact that they've, you know, got a president, vice

17  president, even before they've actually done anything.  So

18  unlike *Raich* and *Wickard* where people are growing marijuana or

19  weed or whatever and it's intrastate, they're actually doing

20  something.  Here it's just the mere coming into existence that

21  triggers the requirements to turn over this information.

22         MS. O'CONNOR:  Yes, Your Honor.  Our position is

23  that the CTA is designed to regulate these entities from the

24  time of formation, not regulating the formation itself.  So

25  the idea is that regulated entities have to begin complying

1  from the beginning of their existence onward, but the actual

2  act of formation is not being regulated here.  And I think

3  that's clear from the provisions of the CTA that require

4  updates to the disclosures anytime a beneficial ownership

5  changes.  So that, of course, is ongoing.  And the CTA also

6  applies to entities that have formed prior to the effective

7  dates.  So it's not regulating their formation, right, it is

8  regulating their conduct going forward.  And I think to that

9  point, I would just like to distinguish plaintiff's reliance

10 on the Affordable Care Act case, *NFIB*, which was about

11 compelling an individual who is intentionally opting out of

12 commerce, compelling that person to purchase a specific

13 product, and that is not what we have here.  We have

14 organizations who are forming or incorporating specific for

15 the purpose of being able to conduct business in their own

16 name as community associations are.  It's not an anticipation

17 of future commercial activity.  The existence of these

18 corporate entities going forward is what's being regulated

19 here.

20         THE COURT:  All right.

21         MS. O'CONNOR:  I would also like to note, Your

22 Honor, that, you know, plaintiff's argue for this commerce

23 clause claim that they do not engage in commerce, but then

24 they also rely on their tax exempt status under the Internal

25 Revenue Code for their statutory claim, and I would submit

1    that there's a little bit of tension there that, you know, why

2    would these entities need to have tax exempt status if they

3    have no income or assets that would need to be taxed.

4           So I would like to turn briefly to the Fourth

5    Amendment.  And I would, you know, urge the Court to reject

6    plaintiff's attempt to apply cases that have arisen and

7    completely different Fourth Amendment context.  The vehicle

8    checkpoint cases, the discretionary physical search cases.  We

9    think those are plainly not applicable here.  The Supreme

10   Court --

11          THE COURT:  Well, those are cases just dealing with

12   random citizens without any reason for the government to have

13   any interest in them.  In other words, you're driving down the

14   street and you run into a check point or you're walking in a

15   park and a police officer approaches you, but absent any other

16   reason for the government to be interested.  So here the

17   question is whether or not an interest in community

18   associations is sufficient for the government to require this

19   information to be provided.  And their argument, of course, is

20   show us the example of the terrorist network that used a

21   homeowners association to launder money and send it overseas

22   and nobody -- there's nothing in the record to suggest that

23   that's -- that's ever happened.

24          So the question is, why are these particular groups

25   being singled out?

1          MS. O'CONNOR:  Yes, Your Honor.  So I would point

2     the Court to the Supreme Court's decision in *Shultz*, which

3     address a very similar type of disclosure requirement.  And in

4     that case it was also in response to the -- to Congress's

5     conclusion that, in that case banks, in this case other

6     smaller type businesses were engaging or were being used for

7     illicit financial activity.  And the Court there didn't say

8     that every disclosure requirement forever more is

9     constitutional.  It set up a reasonableness test, which

10    requires that the information sought is limited in nature.

11    Sufficiently --

12         THE COURT:  Is there any -- and I understand.  Is

13    there any difference, though, between the fact that that

14    burden was placed on banks, not on the customers.  So the

15    concern was customers using the banks to engage in structuring

16    or money laundering.  And so, therefore, the banks would have

17    to turn over that information.  But in this case, you're not

18    asking a third party for this information.  You're asking the

19    people themselves to disclose this information, correct?

20         MS. O'CONNOR:  I think that's right, Your Honor.

21    One thing that plaintiffs have tried to do here -- and, you

22    know, I think this is accurate, right, you have board members

23    who are volunteers, but they are also the beneficial owners of

24    these entities.  It's not donors, it's not customers, it's the

25    heads of these groups that Congress is concerned were going to

1  be used for these illicit activities.  And so, I think here,

2  you know, the Supreme Court in *Shultz* was very clear that when

3  you have a corporate or a similar entities that is engaging in

4  commerce like banks, and like the entities covered by the CTA,

5  they can be required to make certain disclosures to the

6  government about those activities if the reasonableness

7  requirement is met.  And I think here, you know, Congress is

8  very tailored in how it selected the entities that would be

9  regulated.  Although, you know, plaintiffs disagree with

10  policy assessment here, Congress did exempt 23 categories of

11  entities that would not have to disclose, which includes, as

12  plaintiffs indicated, many community association that fall

13  under 501(c)(4).

14          And there are, as plaintiff's know, an additional

15  mechanism to seek exemptions for entities who think they

16  should also be exempt.  So I think here, you know, although

17  certainly, you know, there is colloquial distinctions between

18  community associations and banks, I don't think that actually

19  changes the Fourth Amendment analysis under *Shultz*.

20          THE COURT:  Do you want to address anything with

21  regard to the First Amendment?

22          MS. O'CONNOR:  If Your Honor has questions, you

23  know, I would be happy to.  I would just note briefly that

24  this case is not like *Bonta*.  *Bonta* was a case, as I just

25  indicated, where the information was about donors who were

1  being harassed, who were receiving threats of violence, and

2  that's just not this case.  There's nothing in the record

3  about that.  And the exacting scrutiny standard that the

4  Supreme Court set forth there would be satisfied here.

5          If I may just briefly touch on irreparable harm,

6  Your Honor.

7          THE COURT:  Yes.

8          MS. O'CONNOR:  I think plaintiffs have put forward a

9  real parade of horribles here that is not supported in the

10  record.  There's 300,000 plus community associations in this

11  country.  They've put out a survey with 850 responses that

12  some of which say that they think other people might resign

13  from the board.  And there's no indication, number one, that

14  that is sufficiently nonspeculative to meet their burden, but

15  also that receivership or any of these, you know, fatalistic

16  outcomes that they're suggesting are actually going to happen

17  and would be irreparable.

18          So for these reasons, Your Honor, we would submit

19  the plaintiffs have not met their burden here.

20          THE COURT:  Let me just ask one question before I

21  give plaintiffs another opportunity before we wrap up.

22          Which is, is there anything else about these other

23  cases around the country Alabama, or Western District of

24  Michigan, Maine, Texas, or Oregon that you think is

25  significant for the Court to consider?  Of course I'm always

1  interested in what other courts are doing.  We're all looking

2  at these issues at the same time.  None of them are binding,

3  of course, on the Court.  It did seem like this case was

4  somewhat different in the nature of the plaintiffs here.

5  Although, there's a slight level of confusion added by these

6  other entities that may not have standing.  But the other

7  cases, as I looked at them, all seem to be either serve a

8  generic opposition to the CTA on behalf of the small business

9  owners, just regular LLC's, or commercial entities.

10      So do you think there's anything the Court should be

11 focused on looking at this case as compared to those or do you

12 think the analysis is the same whether it's the Fourth

13 Amendment or the commerce clause or what have you?

14      MS. O'CONNOR:  Thank you for that question, Your

15 Honor.  So I would note that the Court in Oregon essentially

16 adopted some of the language that the government had used in

17 some of the other briefs around the country for the Fourth

18 Amendment purposes, so I think that shows the strength of our

19 argument here.  And I do think that that would apply to the

20 community associations and these other small business groups

21 that have been litigating elsewhere.  The APA claims and the

22 statutory interpretation claims are unique to this case

23 because we have the FAQ issue and the exemption issue that

24 these -- that CAI specifically has.

25      THE COURT:  But your position on that -- and we

1  don't have time, and I think I understand those issues, is

2  essentially that there is no final agency action.  The FAQ's

3  -- I know there's an argument about the timing that it

4  happened.  They came out immediately after something else, but

5  the affidavit, and your argument is, this is still under

6  consideration.  There's an active effort for the agency to

7  review and decide whether to make changes, and that's your

8  position without giving a date.

9          MS. O'CONNOR:  That's correct.

10         THE COURT:  Without giving a date.

11         MS. O'CONNOR:  It worked for the government, Your

12  Honor, so.  That's correct.  That's the unique part of this

13  case.  My understanding is that the other cases do have, you

14  know, largely overlapping arguments with respect to the

15  constitutional arguments.

16         THE COURT:  All right.  Thank you.

17         MS. O'CONNOR:  Yes, thank you.

18         THE COURT:  Mr. Wright I'll give you a chance to

19  wrap up whatever you think is most important and to make sure

20  that you've made your strongest arguments on irreparable harm.

21  I know we heard a little bit of that from Mr. Allcock, and I'm

22  familiar with it and the pleadings, but if you want to address

23  that --

24         MR. WRIGHT:  With respect to Mr. Allcock and the

25  point he was making, the point is that a lot of community

1  associations actually don't file anything with the secretary

2  of state, but they file it with the court, in the land records

3  division of the court which creates ambiguity, because the

4  land records office of the court is the same as any similar

5  office in the language of the statute. So that was the point

6  he was making, but I don't think there is a standing issue

7  there.

8          But let me go back to the First Amendment argument.

9  There's a statement about *Bonta* is different because it

10 involved threats of violence. No, it didn't at all. That's

11 not *Bonta*. NAACP, decades ago, yes. *Bonta* dealt with the

12 charity and the list of people who donated to charity over

13 $5,000. And the Supreme Court said, "Our cases have said that

14 disclosure requirements can chill an association even if there

15 is no disclosure to the general public." So no third party is

16 threatening these donors, even if there is no disclosure to

17 the general public.

18         The Court said it exact, "Scrutiny is triggered by

19 state action, which may, emphasis on "original," have the

20 effect of curtailing the freedom to associate. And by the

21 possible -- italicize emphasis "original" -- possible the

22 deterrent effect of disclosure.

23         And the protections of First Amendment are triggered

24 not only by actual restrictions on an individual's ability to

25 join with others to further share goals. The risk of a

1　chilling effect is not the risk.  So associations are involved

2　with social activities, economic issues, health, welfare,

3　environmental, zoning, all of those things.  And the onerous

4　burden and risk for civil and criminal liability that imposes,

5　seeking imposes, does chill speech, does violate the Freedom

6　Association Act.

7　　　　　In the dialogue back and forth with opposing counsel

8　you referred to some of the cases in the Fourth Amendment

9　context.  It's dealing with random encounters with people for

10　whom the government shall have no risk to be -- no concern to

11　be interested about.  It's really, in our view, the same here.

12　There's no legislative history saying anything about community

13　associations, members of vices hiding in the bushes, Russian

14　oligarchs buying up community associations to launder money.

15　Nothing like that.  So it is effectively no reason for the

16　government to be concerned so that is important for the Fourth

17　Amendment analysis.  And the cases that we've discussed aren't

18　just those cases.  The *Patel* case dealt with hotels and

19　requirements that hotels disclosed who's a guest at the hotel.

20　　　　　The Free Speech Coalition case, out of the Third

21　Circuit, that dealt with pornography producers and

22　requirements that they upload information about who is

23　actually being filmed in these movies.  Uploaded, not random

24　encounters on the street asking for ID.  *Airbnb v. City of New*

25　*York*, that's a U.S. District Court opinion, but very helpful

1  and informative.  And that was a statute that required Airbnb

2  and other similar companies to upload who their users were,

3  who the people were that were renting out Airbnbs, and the

4  government said we need this to be able to go after companies

5  or people that are violating the short term rental laws.  It

6  would make it easier for us to have all of this in a database

7  so we can go after them.  It will save the government money

8  and that's an important government interest.  And the Court

9  said, no, no, no.  There's still a Fourth Amendment

10  requirement.  You haven't demonstrated a special needs

11  exception.  You haven't demonstrated why the warrant

12  requirement and the Fourth Amendment should be disregarded,

13  and I'll encourage you to review that case in more depth.

14       So in our reply, Your Honor, there's a hypothetical

15  that we have, and I want to add to that hypothetical.  So the

16  original hypothetical was, imagine this (knocking on the

17  lectern) excuse me, I'm with federal law enforcement, I'm here

18  at your community association board meeting, we're

19  investigating money laundering, we're investigating terrorism

20  and financing, I need everyone on the board immediately to

21  produce your identification documents.  We're going to come by

22  and we're going to photograph them, we need everyone to pull

23  out their wallets.  Let me see your driver's license.  Sir,

24  you need to produce your driver's license right now.  This is

25  a requirement of federal law.  If you don't do this right now,

we're going to arrest you.  You're going to face up to a

$10,000 fine and two years in prison.  Do you want to do that

to your family?  And by the way, who is an officer of this

board?  Are you the president, you're the treasurer, okay.

All of you, he's going to make you go to prison too.

The fact that -- the way the government set it up is

people have to -- are compelled to provide their information

as opposed to an agent showing up and doing this makes no

difference under the law and the Fourth Amendment, but that's

the consequence.  Then let's add to that, say 60 days later,

(knock on the lectern), hello, you remember me, I'm a federal

law enforcement agent.  All right, as you know, I'm

investigating money laundering and terrorist financing.  Once

again, I need everyone to produce their identification, but

hold on, I don't recognize you from that last meeting.  I was

here two months ago.  Who are you?  I'm Doris Jones.

Ms. Jones, are you on the board?  Well, yeah, I'm on the

board.  Have you provided your identification documents to the

financial crimes enforcement network database.  Well, let me

check.  No.  I'm looking right here you haven't.  All of you

are responsible for her failure.  All the senior officers are

responsible unless you can come up with a good excuse, you can

tell it to the judge, but I'm going to have to go ahead and

arrest you Ms. Jones and the other board members, and you can

take up your case that it wasn't willful once you're in front

1  of the Eastern District of Virginia.

2          That's the same consequence.  That's the practical

3  real world that's happening with electronics.  And again, the

4  requirement to have to update this every 30 days, every time

5  there's a change for community issues, it makes the statute

6  not just unfair, not just bad policy, but it makes it

7  violative of the First Amendment and the Fourth Amendment.

8          THE COURT:  All right.  Thank you.

9          MR. BUNN:  Your Honor, if I can add one point.  I

10 know the last thing you want to hear is from another lawyer.

11 I would just like you to know one concern.  I want to bring us

12 back -- Brendan Bunn for the individuals.

13         THE COURT:  I didn't actually give you permission to

14 speak.

15         MR. BUNN:  You did not.  You're right.

16         THE COURT:  I was wondering how much Mr. Wright

17 advised you of the way we do things here.  But all right,

18 you've got 30 seconds.

19         MR. BUNN:  I'll be very brief, Your Honor.  So I

20 just want to leave the Court with one thought here, which is

21 that the deadline for the CTA compliance for this

22 volunteer-run organization is breathing down the neck of all

23 of these 365,000 associations throughout the country.  It's

24 the end of the year.  And the potential devastating impact on

25 voluntarism is not something that is just imagined.

1      My office represents about 4,000 of these entities

2  and it is the number one issue that we're facing on a daily

3  basis from our clients as well as it is laid out in the

4  declarations here.  We contrast that potential serious harm

5  against the public interest, which is simply we're looking for

6  a delay in the implication and applicability of the CTA as to

7  these organizations until we get to the merits of this case.

8  So we're basically asking to hold the status quo on that for

9  the time being.  I see very little harm to the public interest

10  given the types of organizations we're talking about here,

11  which are nonprofits, volunteer run, and they just run their

12  local communities.  I just want to leave the Court with that

13  final thought, Your Honor.

14      THE COURT:  Thank you.  And although it was highly

15  unusual it's apropos.  Let me add before we wrap up here -- my

16  trial is going to begin in ten minutes -- let me just ask you

17  about process.  What is your -- I'm going to take this under

18  advisement.  I'm not going to rule right now.  You've given me

19  a lot to think about, and although I teased you at the

20  beginning, I appreciate the very good briefing on this issue.

21  And, of course, with this matter being litigated around the

22  country it is an interesting and complicated issue that

23  deserves a lot of attention from the Court.

24      On the other hand, I am mindful of the timing here

25  as its been emphasized that January 1st is around the corner.

1  And as you all know we like to keep up the tradition of the

2  rocket docket and move swiftly.  So I'm not going to make any

3  promises and then break them, but I will endeavor to give you

4  an answer as quickly as possible.

5          Let's just take this outside of the realm whether I

6  grant relief or deny relief.  What do we imagine happens next

7  in this case?  Looking at the way this has been handled

8  elsewhere some of these things have been decided on summary

9  judgment, some of them on the preliminary injunction.  The

10 Oregon case I know, as the plaintiff's pointed out, there was

11 no evidence presented and the Court referred to that here.

12 There is evidence in the record certainly with regard to the

13 irreparable harm issue.

14          Do the parties envision discovery or development of

15 the record in a different way?  Would we be coming back and

16 addressing these same issues regardless of the Court's

17 decision on the preliminary injunction in one month, in

18 two months.  Clearly somebody is going to be unhappy and want

19 the Fourth Circuit to address this.  Whether they'll address

20 it on the timeline that Mr. Bunn has suggested would be

21 beneficial, I have no idea.  So I'll give you 30 seconds each

22 to tell me your thoughts on where we go from here.

23          MR. WRIGHT:  We should visit a magistrate judge and

24 have a settlement conference.  I'm joking.  Seriously --

25          THE COURT:  Why not?

1          MR. WRIGHT:  It's civil litigation.  I'm not

2     entirely joking.  If FinCEN is actually considering an

3     exemption, they should -- it would be a good reason for them

4     to agree to the injunction without agreeing to any of the

5     merits.  Just say we agree to the injunction so we have the

6     time to do what we said we were going to do, and that would

7     pose no harm to the government and the public interest.  It

8     would give them an opportunity to do what they have said they

9     are doing.  But putting that aside, Your Honor, yes, I think

10    there would be cross motions for summary judgment, or perhaps

11    an emergency appeal to the Fourth Circuit.  But I don't

12    believe this is the type of case -- we're a little bit

13    disappointed that the government says there are only two

14    people who are going to resign, but we don't believe this is a

15    case that requires discovery.

16          THE COURT:  So the cross motions for summary

17    judgment wouldn't involve anything other than perhaps

18    additional declarations?  You would simply propose a briefing

19    schedule.

20          MR. WRIGHT:  That's correct.

21          THE COURT:  For summary judgment, not some period of

22    discovery.

23          MR. WRIGHT:  Right.  And frankly, the arguments

24    would turn a lot on how you decide the issues.  And, you know,

25    we -- on one side or the other we are sort of arguing our

1  motion to reconsider.

2          THE COURT:  All right.  Thank you.

3          MS. O'CONNOR:  Thank you, Your Honor.  Briefly.  We

4  haven't discussed this with plaintiffs so we would like a

5  little bit more time to consider, but our plan as of the

6  moment was to file a motion to dismiss in mid-November on our

7  answer date, but, of course, that would depend largely on what

8  happens with the PI.  If it's been decided by then, if it's in

9  our favor, et cetera, and whether either party decides to take

10  an appeal.  So it's a little bit up in the air.

11          THE COURT:  No, and I understand.  And frankly, the

12  way this has proceeded in other courts has reflected -- some

13  are motions to dismiss, some have been summary judgment, some

14  have been preliminary injunctions.  It's really just getting

15  an answer and seeing what the next group of courts will do.

16          So I appreciate everyone's effort.  I appreciate you

17  allowing me to keep this within the time that I had this

18  morning, and I thank you for your arguments this morning.

19  Court will be in recess.

20

21          **(Proceedings adjourned at 10:42 a.m.)**

22

23

24

25

```
 1                   CERTIFICATE OF REPORTER

 2

 3              I, Tonia Harris, an Official Court Reporter for

 4    the Eastern District of Virginia, do hereby certify that I

 5    reported by machine shorthand, in my official capacity, the

 6    proceedings had and testimony adduced upon the Motion

 7    hearing in the case of the **COMMUNITY ASSOCIATIONS**

 8    **INSTITUTE, et al. versus U.S. DEPT. OF THE TREASURY, et**

 9    **al.**, Civil Action No.: 1:24-cv-1597, in said court on the

10    11th day of October, 2024.

11              I further certify that the foregoing 41 pages

12    constitute the official transcript of said proceedings, as

13    taken from my machine shorthand notes, my computer realtime

14    display, together with the backup tape recording of said

15    proceedings to the best of my ability.

16              In witness whereof, I have hereto subscribed my

17    name, this November 5, 2024.

18

19

20

21                              _____
                                Tonia M. Harris, RPR
22                              Official Court Reporter

23

24

25

                                                              41
```

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

COMMUNITY ASSOCIATIONS
INSTITUTE, et al
              *Plaintiffs*,

    v.

JANET YELLEN, Secretary of the United
States Department of the Treasury, et al.,
              *Defendants*.

No. 1:24-cv-1597 (MSN/LRV)

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Plaintiffs' motion for a preliminary injunction. ECF 13. Plaintiffs are comprised of an organization that represents various community associations (CAs) across the United States, along with several such associations. They filed this action seeking injunctive and declaratory relief to prevent enforcement of the Corporate Transparency Act ("CTA") against CAs by the Department of the Treasury ("Treasury"). Plaintiffs levy a barrage of challenges against the CTA as applied to them, claiming, in turn, that requiring their members to disclose so-called "beneficial owners" to the Treasury is unwarranted under the statute, violates the Administrative Procedure Act ("APA"), exceeds Congress' Article I authority, and is unconstitutional under the First and Fourth Amendments. Upon consideration of the pleadings, the parties' oral argument and for the following reasons, the Court will DENY Plaintiffs' motion.

## I.    BACKGROUND

### A.    Community Associations

CAs are creatures of state law, and are typically registered as nonprofit corporations, unincorporated associations, cooperatives, or business trusts. ECF 14 at 2. CAs are governed by

board members who reside in the area governed by that CA. *Id.*[1] Board members are typically elected volunteers who carry out their CA's business, including budgeting, property management, and enforcement of rules and restrictions. *Id.* at 2-3. These board members do not have a different ownership interest in the CAs than their fellow homeowners. *Id.*

For federal tax purposes, CAs are governed by Section 528 of the Internal Revenue Code. That section provides for taxation of CAs' "taxable income," which is gross income not received in the form of membership dues, fees, or assessments levied on CAs' members. 26 U.S.C. § 528(b), (d). The law further provides that CAs "shall be considered an organization exempt from income taxes for the purpose of any law which refers to organizations exempt from income taxes." *Id.* § 528(a).

## B. The Corporate Transparency Act

As part of the National Defense Authorization Act for Fiscal Year 2021, Congress passed the Anti-Money Laundering Act of 2020 ("AMLA"). *See* Pub. L. No. 116-283, div. F, 134 Stat. 4547 (2021). The AMLA was enacted to "improve coordination and information sharing among the agencies tasked with administering anti-money laundering," "modernize anti-money laundering" laws, "encourage technological innovation . . . to more effectively counter money laundering and the financing of terrorism," and "to establish uniform beneficial ownership reporting requirements." *Id.* § 6002, 134 Stat. 4547, 4547-4548. That last goal—establishing beneficial ownership reporting requirements—is the one at issue here, and was put in place with the aim of "improv[ing] transparency for national security, intelligence, and law enforcement agencies and financial institutions concerning corporate structures," "discourag[ing] the use of shell corporations as a tool to disguise and move illicit funds," "assist[ing] national security,

---

[1] These board members are sometimes also referred to as directors or trustees. ECF 14 at 2.

intelligence, and law enforcement agencies with the pursuit of crimes," and "protecti[ing] the national security of the United States." *Id.* This was to be achieved by "establish[ing] a secure, nonpublic database at FinCEN for beneficial ownership information." *Id.*[2]

As a means of achieving this goal, the AMLA included as one part the CTA. 134 Stat. at 4604-4625, 31 U.S.C. § 5336. The CTA requires any "reporting company" to submit to FinCEN a report containing the name, date of birth, address, and identification document (such as a passport or state I.D.) of each of that company's "beneficial owners." 31 U.S.C. § 5336(b).

The CTA defines a reporting company as a "corporation, limited liability company, or other similar entity that is (i) created by the filing of a document with a secretary of state or similar office under the law of a State or Indian tribe; or (ii) formed under the law of a foreign country and registered to do business in the United States." *Id.* § 5336(a)(11)(A). Expressly excluded from the definition of reporting entities are governmental bodies, certain financial entities, entities with more than 20 employees and more than $5 million in gross receipts. *Id.* § 5336(a)(11)(B). Two express exceptions are particularly important here. First, the CTA excludes any "organization that is described in section 501(c) of the Internal Revenue code of 1986 (determined without regard to section 508(a) of such code) and exempt from tax under section 501(a) of such code." *Id.* § 5336(a)(11)(B)(xix)(I). Furthermore, the Secretary of the Treasury may, by regulation, "with the written concurrence of the Attorney General and the Secretary of Homeland Security," exclude any other "entity or class of entities" that she has "determined should be exempt . . . because requiring beneficial ownership information from the entity or class of entities— (I) would not serve the public interest; and (II) would not be highly useful in national security, intelligence, and law

---

[2] FinCEN is used as shorthand for the Financial Crimes Enforcement Network, a bureau of the United States Department of the Treasury.

enforcement efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes."

A "beneficial owner," in turn, "means, with respect to an entity, an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise— (i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity." *Id.* § 5336(a)(3)(A).

The Department of the Treasury issued a final rule governing the implementation of the CTA, which was published in the Federal Register on September 30, 2022. 87 Fed. Reg. 59498; 31 C.F.R. § 1010.380. That regulation provides that any reporting company created on or after January 1, 2024, must file an initial report with FinCEN after its creation becomes effective with a secretary of state, and that a reporting company created before January 1, 2024, shall have until January 1, 2025, to file such a report. 31 C.F.R. § 1010.380(a)(1)(i)-(iii). It further requires that an entity submit an updated report within 30 days when "there is any change with respect to required information previously submitted." *Id.* § 1010.380(a)(2). The reports submitted must include each beneficial owner's full legal name, date of birth, address, identifying number, and an image of the document from which the identifying number was obtained. *Id.* § 1010.380(b)(1)(ii).

The Treasury's final rule also provides additional explanation regarding the definition of a beneficial owner. *Id.* § 1010.380(d). The Treasury indicates that an individual exercises substantial control over a reporting company when she "(A) Serves as a senior officer of the reporting company; (B) Has authority over the appointment or removal of any senior officer or a majority of the board of directors (or similar body); (C) Directs, determines, or has substantial influence over important decisions made by the reporting company." *Id.* § 1010.380(d)(1).

Noncompliance with the CTA subjects a person to both civil and criminal liability. A person who willfully provides false beneficial ownership information or fails to report such information shall be subject to civil penalties of $500 per day, or "may be fined not more than $10,000, imprisoned for not more than 2 years, or both." 31 U.S.C. § 5336(h)(1), (3).

The CTA authorizes FinCEN to share beneficial ownership information upon receipt of a request from federal or state law enforcement agencies, or upon a request from a federal agency on behalf of a foreign law enforcement agency, prosecutor, or judge of another country under an applicable international treaty, agreement, convention or official request. *Id.* § 5336(c).

## C.    Procedural History

In December 2023, Plaintiff Community Associations Institute ("CAI") sent a letter to the Director of FinCEN requesting that CAs "be extended the same exemption afforded to tax-exempt organizations as outlined in the law." ECF 14-2 at 3. CAI claimed that CAs "are not a viable vehicle for terrorist activities or money laundering," that they "already furnish detailed information on their board members as part of annual tax or other statutory filings," and that "[t]hose who govern community associations are not investors and serve without any remuneration." *Id.* at 3-4.[3]

In June 2024, FinCEN posted a page of "FAQs" regarding the CTA on its website. Question C.10 involved CAs. It stated that CAs which are not recognized as 501(c)(4) organizations and are formed by the filing of a document with a secretary of state may fall within the definition of a reporting company and be required to report their beneficial owners to FinCEN.[4] Question D.13 addressed the issue of who qualifies as a beneficial owner of a CA. FinCEN wrote

---

[3]  CAI has also lobbied for legislation in Congress. ECF 14 at 19. To that end, Representative Richard McCormick of Georgia introduced the Community Association Reporting Exemption Act, which would add an additional exception to the CTA for any "entity subject to taxation under section 528 of the Internal Revenue Code of 1986." H.R. 9045, 118th Cong., § 2 (2024).
[4] Financial Crimes Enforcement Network, Beneficial Ownership Information, *Frequently Asked Questions*, https://www.fincen.gov/boi-faqs (last accessed Oct. 23, 2024) [hereinafter FinCEN FAQs].

that individuals who are "senior officer[s]," have "authority to appoint or remove" officers of the CA, are "important decision-maker[s]," or "ha[ve] any other form of substantial control" over the CA, would be considered a beneficial owner under the CTA.

FinCEN responded to CAI's letter in July 2024. Deputy Director Jimmy Kirby wrote to the CAI that CAs "are not specifically listed" among the CTA's exemptions and must therefore report to FinCEN their beneficial owners if they "otherwise meet[] the definition of a 'reporting company.'" ECF 14-4 at 2. Deputy Director Kirby further explained that FinCEN was considering whether to exempt CAs as a "class of entities" under Section 5336(a)(11)(B)(xxiv), but noted that to do so it must make certain factual findings and obtain the written concurrence of the Attorney General of the United States and the Secretary of Homeland Security. *Id.* at 3.

## II.     LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20. The third and fourth factors "merge when the government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435.

## III.    ANALYSIS

### A.      Likelihood of success on the merits.

#### 1.       Nonprofit exemption

Plaintiffs first argue that they are entitled to declaratory relief from reporting obligations under the CTA because they fall under the exception to the definition of "reporting companies" for nonprofit organizations. ECF 14 at 15-19. There, Congress provided that "any organization that is described in section 501(c) of the Internal Revenue Code . . . and exempt from tax under

section 501(a) of such Code" is not encompassed within the term "reporting company," and therefore need not report beneficial ownership information to FinCEN. 31 U.S.C. § 5336(a)(11)(B)(xix)(I).

Plaintiffs cannot rely directly on Section 501 of the Internal Revenue Code to demonstrate that they are covered by the exemption here. Section 501(c) lists a number of different types of organizations (29 in total) that are exempt from taxation under Section 501(a). And 501(a) simply grants tax-exempt status to all those organizations listed in 501(c) and 501(d). But CAs like Plaintiffs are not included among those organizations "described in section 501(c)." Indeed, they are described elsewhere, in Section 528 of the Internal Revenue Code.

Stuck with this reality, Plaintiffs rely on a more roundabout argument in their attempt to shoehorn CAs into the CTA's nonprofit exemption. They argue that Section 528(a), where Congress provided that a "homeowners association shall be considered an organization exempt from income taxes for the purpose of any law which refers to organizations exempt from income taxes," 26 U.S.C. § 528, means that the reference to exempt organizations in the CTA should be read to include Plaintiffs. That is, the CTA is "any law," and it "refers to organizations exempt from income taxes," and so CAs should "be considered an organization exempt from income taxes for the purpose of" the CTA.

This argument cannot be squared with the CTA's plain meaning, which controls here. *United States v. Ide*, 624 F.3d 666, 668 (4th Cir. 2010) ("When interpreting a statute, we first consider the plain meaning of the statutory language."); *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous."). The nonprofit exemption applies not to "organizations exempt from income taxes" generally, but to the discrete category of organizations "described in section 501(c)

. . . *and* exempt from tax under section 501(a)." 31 U.S.C. § 5336(a)(11)(B)(xix) (emphasis added).
Even if this Court were to find that "exempt from tax under section 501(a)" is a phrase that "refers
to organizations exempt from income taxes," 26 U.S.C. § 528(a), CAs would not meet the first
prong of the exemption, which requires they be organizations "described in section 501(c)." *Id.* §
5336(a)(11)(B)(xix)(I).

Adopting Plaintiffs' reading of the CTA's nonprofit exemption, even if it were plausible,
would also be inappropriate under the canon against surplusage because it would render another
one of the CTA's exceptions entirely superfluous. That canon supplies the "cardinal rule of
statutory interpretation that no provision should be construed to be entirely redundant." *Kungys v.
United States*, 485 U.S. 759, 778 (1988) (plurality opinion). "When a statutory construction . . .
renders an entire subparagraph meaningless, . . . the canon applies with special force." *Pulsifer v.
United States*, 601 U.S. 124, 143 (2024) (citing *National Ass'n of Mfrs. v. Department of Defense*,
583 U.S. 109, 128 (2018)) (cleaned up). Reading the CTA's nonprofit exemption to include CAs
would do just that, rendering the statute's subparagraph providing an exemption for political
organizations wholly unnecessary. That subparagraph—occurring immediately after the nonprofit
exemption—provides that a "political organization (as defined in section 527(e)(1) of [the Internal
Revenue Code]) that is exempt from tax under Section 527(a) of such Code" shall be exempt from
the CTA's reporting requirements. 31 U.S.C. § 5336(a)(11)(B)(xix)(II). On Plaintiffs' reading,
political organization would already be exempt, since Section 527(a), like Section 528(a), provides
that a "political organization shall be considered an organization exempt from income taxes for
the purpose of any law which refers to organizations exempt from income taxes." 26 U.S.C. §
527(a). Because that reading would render "meaningless" a subparagraph "designed to serve a

concrete function," *Pulsifer*, 601 U.S. at 143, the canon against surplusage applies and counsels strongly in favor of a reading of the nonprofit exemption that does not include CAs.[5]

For these reasons, Plaintiffs are not likely to succeed on the merits of their claim that the statutory exemptions in the CTA relieve CAs of the obligation to report beneficial ownership information.

## 2.    Administrative Procedure Act

Next, Plaintiffs argue that FinCEN's "FAQs," which determined that CAs "may fall within the reporting company definition" and outlined the individuals who may be the "beneficial owner" of a CA, violated the APA's notice-and-comment rulemaking requirements or, in the alternative, were arbitrary and capricious. ECF 14 at 19-26. This argument cannot succeed because Plaintiffs do not challenge a final agency action.

### i.    FinCEN was not required to engage in notice-and-comment rulemaking to issue its FAQs.

Plaintiffs' first argument is that FinCEN's FAQs were—at least with respect to CAs—a legislative rule that was required to pass through notice-and-comment rulemaking. *Id.* at 19-24. Under the APA, "rules" which have the "force and effect of law" are required to be "issued through a statutorily prescribed notice-and-comment process." *Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620-621 (4th Cir. 2018) (citing 5 U.S.C. § 553(a)-(c); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015)). But the APA excludes from this requirement "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). If a legislative rule is passed without going through the process

---

[5]  The government points also to legislative and regulatory history that suggests Congress may have intended a narrow reading of the CTA's exceptions. ECF 35 at 24 (citing 166 Cong. Rec. S7311 (2020) (Statement of Sen. Brown; 87 Fed. Reg. 59,498, 59542 (Sept. 30, 2022)).

of notice-and-comment rulemaking, a court may enjoin an agency from enforcing the policy stated therein. *King's Daughters*, 896 F.3d at 624.

The Fourth Circuit has held that interpretive rules[6] "simply state what the administrative agency thinks the statute means, and only 'remind' affected parties of existing duties." *King's Daughters*, 896 F.3d at 620 (citing *Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*, 874 F.2d 205, 207 (1989)). Put otherwise, interpretive rules "are those that clarify a statutory or regulatory term, remind parties of existing statutory or regulatory duties, or merely track preexisting requirements and explain something the statute or regulation already required." *Mendoza v. Perez*, 754 F.3d 1002, 1021 (2014) (cleaned up) (citation omitted). "By contrast, 'a substantive or legislative rule, pursuant to properly delegated authority, has the force of law, and creates new law or imposes new rights or duties.'" *King's Daughters*, 896 F.3d at 620 (citing *Jerri's*, 874 F.2d at 207). "[A] rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in law or policy." *Id.* (quoting *Mendoza*, 754 F.3d at 1021).

The distinction between legislative and interpretive rules "is not always easily made," *Jerri's*, 875 F.2d at 207, but is hardly difficult to apply here. For starters, FinCEN does not hold out that the rules come with any force of law and prefaces them by explaining that they "are explanatory only and do not supplement or modify any obligations imposed by statute or regulation."[7] A closer examination reveals this to be correct—that is, the FAQs are "merely an explanation of the statutory requirements." ECF 35 at 31. FAQ C.10 simply reiterates that CAs which do not fall into an exemption such as the nonprofit exemption "may fall within the reporting

---

[6]  While the APA uses "interpretative," modern judicial decisions more commonly use "interpretive." *Perez*, 575 U.S. 92, 97 n.1.

[7]  FinCEN FAQs, *supra* note 4.

company definition."[8] And its FAQ D.13, addressing who is the beneficial owner of a CA, simply restates the definition of a beneficial owner promulgated in FinCEN's prior binding regulation at 31 C.F.R. § 1010.380(d)(1). Plaintiffs may take issue with the CTA and its implementing regulations, but they identify no point where the FAQs "supplement[]" that law, "adopt[] a new position inconsistent with existing regulations, or otherwise effect[] a substantive change in law or policy." *King's Daughters*, 896 F.3d at 620. On the contrary, the FAQs merely "remind [CAs] of [their] existing statutory or regulatory duties." *Mendoza*, 752 F.3d at 1021.

Plaintiffs point to *Texas Children's Hosp. v. Azar*, 315 F. Supp.3d 322 (D.D.C. 2018), as a case where an agency's FAQs were found to be legislative rules requiring notice and comment. ECF 14 at 22-23. The court there found that the FAQ at issue had independent legal effect because the statute did not provide for the policy outlined in the FAQ, and the FAQ *contradicted* a prior legislative rule. *Texas Children's*, 315 F. Supp. 3d at 332-333. That is unlike the situation here, where the FAQs simply restate the CTA's preexisting statutory and regulatory requirements.[9] Plaintiffs are therefore unlikely to succeed on the merits of any argument that would require the FAQs to have undergone notice-and-comment rulemaking.

> ### ii. Plaintiffs cannot challenge the FAQs under the APA because they are not final agency action.

Plaintiffs next argue that the FAQs should be set aside as arbitrary and capricious under 5 U.S.C. § 706(2)(A). ECF 14 at 24-26. This argument can be disposed of quickly, because the FAQs are not final agency action. *See* 5 U.S.C. § 704 (providing that "final agency action for

---

[8] *Id.*

[9] Plaintiffs argue that the FAQs "substantive[ly] change the regulations' meaning" because "neither the CTA nor the regulations mention a 'senior officer,' an individual who is authorized to 'appoint or remove certain officers,' or an 'important decision-maker' within the definition of a 'beneficial owner.'" ECF 14 at 23. The trouble with this argument is that those terms do appear in FinCEN's regulation. 31 C.F.R. § 1010.380(d)(1)(A)-(C) (providing that a person who "[s]erves as a senior officer," "[h]as authority over appointment or removal," or "[d]irects, determines, or has substantial influence over important decisions" possesses substantial control over a reporting company).

which there is no other adequate remedy in court [is] subject to judicial review"). For agency action to be final, it (1) "must mark the consummation of the agency's decisionmaking process;" and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *United States Army Corps of Engineers v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 177-178 (1997)). The FAQs meet neither criterion. For one, the FAQs referenced are not necessarily "the consummation of the agency's decisionmaking process," *id.*—indeed, they have been updated several times and "FinCEN expects to publish additional guidance" regarding the CTA "in the future."[10] Furthermore, they are by their own terms "explanatory only," and do not purport (nor do they) determine CAs' rights or obligations.[11] Whatever obligations CAs are subject to are those imposed by the CTA itself or FinCEN's regulation.[12]

### 3.     Congressional Authority

Plaintiffs also ask this Court to follow the lead of the Northern District of Alabama, which in *National Small Business United v. Yellen*, No. 5:22-cv-1448-LCB, 2024 WL 899372 (N.D. Ala. Mar. 1, 2024), found that the CTA "exceeds the Constitution's limits on the legislative branch and lacks a sufficient nexus to any enumerated power to be a necessary and proper means of achieving Congress' policy goals." *Id.* at *1. This Court respectfully disagrees and finds Plaintiffs are unlikely to be able to show that Congress overstepped the outer bounds of its commerce power when it enacted the CTA.[13]

---

[10] FinCEN FAQs, *supra* note 4.

[11] *Id.*

[12] Plaintiffs frame the FAQs as "final" in the sente that they constitute a "*de facto* denial of Plaintiffs' request for an exemption under the CTA." ECF 14 at 24-26. But they do no such thing. The FAQs do not mention that exemption request, and FinCEN continues to consider whether an exemption is warranted. *See* ECF 35-1 ¶ 16.

[13] Finding that the CTA is likely a valid exercise of Congress's commerce power, this Court need not address Plaintiffs' or the government's arguments regarding Congress's Taxing or Foreign Affairs powers.

12

The Constitution authorizes Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) (quoting U.S., Const., Art. I, § 8, cl. 3). Pursuant to this power, Congress "can regulate the channels of interstate commerce," "the instrumentalities of interstate commerce, and persons and things in interstate commerce," as well as "activities that substantially affect interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005). As part of that third category, the Supreme Court's "case law firmly establishes Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Id.* at 17. The Court has "never required Congress to legislate with scientific exactitude" when it comes to its commerce power. *Id.* Moreover, the Necessary and Proper Clause supplements Congress' authority, expanding the "relevant inquiry" to "whether the means chosen are 'reasonably adapted' to the attainment of a legitimate end under the commerce power." *United States v. Comstock*, 560 U.S. 126, 135 (2010) (quoting *Gonzales*, 545 U.S. at 37 (Scalia, J., concurring in the judgment)).

Plaintiffs and the government agree that the CTA does not regulate the "channels" or "instrumentalities" of interstate commerce. ECF 14 at 36-37; ECF 35 at 14 (arguing only that the "CTA's reporting requirements fit comfortably within the *third* permissible category of Commerce Clause regulation) (emphasis added). The issue then boils down to whether the CTA regulates activity that has a substantial effect on interstate commerce (or is reasonably adapted so some such end). Plaintiffs argue it does not. On their view, the CTA regulation of "the creation and operation of Community Associations" deals with "wholly intrastate functions performed entirely under state law." ECF 14 at 39. "The mere formation of a Community Association," Plaintiffs posit, "is a

13

ministerial and non-economic act that has no substantial economic effect on interstate commerce." *Id.*

On the government's view, this framing entirely misses the point of the CTA. The government argues that the "CTA does not, and does not purport to, regulate corporate-entity formation . . . . Rather, the CTA governs the conduct of a covered entity *as a going concern*." ECF 35 at 16 (emphasis in original). That is, the CTA's requirements extend well beyond a corporation's formation. *Id.* On the government's telling, the CTA's ongoing reporting requirements are a necessary means of implementing Congress' power under the Commerce clause to prevent and regulate "money laundering" and "other illicit financial activities." *Id.* at 14-15.

The government's view of the CTA's role is more persuasive, as it squares with the Act's structure, purpose, and role in Congress's broader statutory regime targeting money laundering and terrorism financing. This Court therefore finds that there is a "rational basis" for concluding that the regulated activities, "taken in the aggregate, substantially affect interstate commerce." *Gonzales*, 545 U.S. at 22. To begin with, while the CTA's reporting requirement may be *triggered* by corporate entity formation, it makes little sense to see the Act as *regulating* corporate entity formation.[14] Rather, the CTA regulates the ongoing *conduct* of covered entities.

Next, the proper analysis under the Commerce Clause does not focus solely on the CAs' particular circumstances, but on the aggregate effect of *all* regulated entities' conduct. *See e.g., Raich*, 545 U.S. at 18-19 (finding that Congress could criminalize the production and use of homegrown marijuana because it could nonetheless have "a substantial effect on supply and demand in the national market"); *Wickard v. Filburn*, 317 U.S. 111, 127-28 (1942) (finding that

---

[14] As Plaintiffs are well aware, the CTA applies equally to both pre-existing and newly formed corporate entities, all of which must file the required disclosures. 31 U.S.C. § 5336(a)(11); 31 C.F.R. § 1010.380(a)(1)(i)-(iii). Furthermore, updated reporting is required whenever a covered entity experience a change in beneficial ownership, irrespective of when the entity was formed. 31 U.S.C. § 5336(b)(1)(D).

Congress had a rational basis for believing that, in the aggregate, "home-consumed wheat would have a substantial influence on price and market conditions"). Accordingly, this Court need not focus on the purported function of CAs in "maintain[ing] the common areas of the property," ECF 14 at 49, but on the activities of all regulated covered entities, including "the harmful economic practices the CTA is specifically designed to combat." ECF 35 at 18. At bottom, this Court cannot conclude that Plaintiffs are likely to succeed in showing that a Commerce power that allows Congress to regulate the production of wheat or marijuana for home consumption cannot be extended so far as to impose modest reporting requirements that help prevent the interstate and international commercial crimes of money laundering and terror financing.

### 4.     Challenges under the First and Fourth Amendments

Plaintiffs urge this Court to find that they are likely to prevail on their claim that the CTA violates both their First Amendment rights of free speech and free association, and their Fourth Amendment rights to be free from illegal searches and seizures. ECF 14 at 27, 31. But the Court concludes that Plaintiffs have not shown a likelihood of success on the merits with respect to either claim.

#### i.     Plaintiffs are unlikely to succeed on their First Amendment Claim

Plaintiffs argue that the CTA violates their First Amendment rights because it impermissibly compels Board members' speech and chills their right to freely associate. ECF 14 at 12. But the compelled speech doctrine typically only applies when the government requires an individual to convey a "particular message" publicly. *See, e.g.*, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018). And the CTA does not require the *public* disclosure of

information.[15] The CTA therefore does not violate the compelled-speech doctrine. *See also Firestone v. Yellen*, 2024 WL 4250192, at *9 (D. Or. Sept. 20, 2024). In any event, the CTA's requirements are neither an unjustified nor unduly burdensome way for the CTA to "strengthen the government's ability to detect and prosecute financial crime" ECF 35 at 39.[16]

Plaintiffs' free association claim fares no better. Plaintiffs contend that their "free association rights are also violated because, as they have attested, they will resign from Board service rather than disclose their personal identifying information pursuant to the CTA." ECF 14 at 13. But such speculations about *potential* resignations are insufficient to demonstrate a likelihood of success on the merits. *See Firestone,* 2024 WL 4250192, at *9 ("Plaintiffs' speculative and conclusory assertions that reporting beneficial ownership or control information will 'deter … persons from exercising their free speech and association and dissuade others from joining or assuming leadership positions' are insufficient." (citation omitted)); *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.").

Plaintiffs are therefore unlikely to succeed on their claim that the CTA contravenes the First Amendment. Even if the First Amendment is properly implicated by the CTA's disclosure requirement, the Government likely has met its burden of proving that such compelled speech serves a legitimate government purpose and that any infringement of Plaintiffs' freedom of association is justified.

---

[15] "[T]he information the CTA requires entities to disclose is 'not for publication, nor is it a matter of considerable controversy, such as compelling political, ideological, or religious speech.'" ECF 35 at 38 (quoting *MA LEG Partners 1 v. City of Dallas,* 442 F. Supp. 3d 958, 968 (N.D. Tex. 2020)).
[16] The "unjustified and unduly burdensome" standard typically applies to commercial speech (rather than a compelled speech analysis), but the CTA nonetheless satisfies this heightened standard.

ii.     **Plaintiffs are unlikely to succeed on their Fourth Amendment Claim**

Plaintiffs argue that the CTA's disclosure requirements unconstitutionally invade Plaintiffs' reasonable expectations of privacy without individualized suspicion of wrongdoing. ECF 14 at 27, 28. In Plaintiffs' view, the disclosure of their personal identifying information is akin to the checkpoint in *Edmond*, where the Court found the government's suspicionless stops for the purpose of detecting criminal activity unconstitutional. *Id.* at 31; *City of Indianapolis v. Edmond*, 531 U.S. 32, 40, 41 (2000).

But reporting requirements are not new, nor do they contravene the Fourth Amendment. ECF 35 at 34, 35. The Supreme Court has held as much: "[R]eporting requirements are by no means per se violations of the Fourth Amendment. Indeed, a contrary holding might well fly in the face of the settled sixty-year history of self-assessment of individual and corporate income taxes in the United States." *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 59-60 (1974). In *Shultz*, the Court upheld a statute requiring banks to disclose the name, address, and social security number of persons making transactions above a specific dollar amount. *Id.* at 67. The Court concluded that the reporting requirements were reasonable under the Fourth Amendment because Congress had found this information highly useful "in criminal, tax, or regulatory investigations." *Id.* at 26. The same rationale follows here where "the CTA directs the disclosure of information that Congress explicitly identified as 'highly useful' to combatting serious crimes." *Firestone*, 2024 WL 4250192, at *10. Because the CTA likely falls "within the category of reasonable reporting requirements that courts have long understood as constitutional," *id.*, this Court finds that Plaintiffs are unlikely to succeed on the merits of their Fourth Amendment claim.

B.     **Irreparable Harm**

Plaintiffs also fail to meet the second required element to obtain a preliminary injunction. To meet this element, Plaintiffs must "demonstrate that irreparable injury is *likely* in the absence

17

of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). This "clear showing of irreparable harm" must be "neither remote nor speculative, but actual and imminent." *Scotts Co. v. United Industries Corp.*, 315 F.3d 264, 283 (4th Cir. 2002) (internal citations and quotations omitted).

Plaintiffs first contend that where they "have succeeded in establishing that their constitutional rights are being threatened or violated, a finding of irreparable harm is required." ECF 14 at 42. But as explained above, Plaintiffs have not established such violations. Accordingly, "[w]ithout [Plaintiffs'] alleged constitutional injury, [they] ha[ve] failed to show that [they] will suffer irreparable harm." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022).

Plaintiffs next set forth their concern that without injunctive relief CAs will face a mass resignation of their volunteer board members who do not wish to provide their personal information or be subject to the corresponding penalties. ECF 14 at 42. And when these board members resign, Plaintiffs fear, CAs will not be able to continue operating. *Id.* at 43. But Plaintiffs have failed to offer nonspeculative evidence about potential resignations. In support of their allegations of irreparable harm, Plaintiffs have included with their motion declarations from several CA leaders. These declarants respectively, claim they are "likely to resign," "seriously considering whether to continue to volunteer," "no longer wish to volunteer," "no longer wish to serve," and "are unlikely to continue volunteering," respectively. ECF 14-1 at 5, 10, 14, 17, 20. These tentative statements of concerns by a handful of individual board members do not push Plaintiffs' concerns over the edge from "remote and speculative" to "actual and imminent," especially considering the possibility that other members of the community could replace any board members who resign.[17] Moreover, the "possibility that . . . corrective relief will be available

---

[17] Plaintiffs also point to a survey conducted of CAI members in which 80% reported that the CTA will cause board members to resign. ECF 38 at 20. But, as noted during oral argument and in Plaintiffs' pleadings, there are over 300,000 CA boards across the country and only 850 CAI members responded to the survey. *See* ECF 14 at 10; ECF 14-6 at 5.

at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). If Plaintiffs are ultimately successful in obtaining an exemption from FinCEN, any board members who resign could return to their positions. *Cf. Nken*, 556 U.S. at 435 (removal of immigrants pending review of petitions not irreparable harm where they could return to the country if eventually successful).

Given the *de minimis* nature of the alleged harm (individual taxpayers already disclose the same information to the Treasury every time they file their tax returns) and Plaintiffs' failure to establish that a substantial number of its members are likely to resign, the Court finds that Plaintiffs have not made the clear showing of irreparable harm required for preliminary relief.

### C.     Balance of Equities and Public Interest

Plaintiffs argue that the public interest and equities weigh in favor of an injunction, reiterating their claims that CAs will be unable to operate if the CTA goes into effect on account of mass resignations. ECF 14 at 44. Notwithstanding the problems with this argument noted above, this ignores the public interest (as noted by Congress) in the effective enforcement of federal law to counter money laundering and terrorism financing. *See MediNatura Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021) (public interest weighs in favor of agency enforcement of regulations to protect the public); *Delaware State Sportsmen's Ass'n v. Delaware Dep't of Safety and Homeland Security*, 108 F.4th 194, 205 (3d Cir. 2024) ("'There is always a public interest in prompt execution' of the laws.") (quoting *Nken*, 556 U.S. at 436). Plaintiffs have not therefore shown that the third and fourth factors weigh in favor of a preliminary injunction.

### IV.     CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiffs' Motion for Preliminary Injunction (ECF 13).

**SO ORDERED.**

/s/
_____
Michael S. Nachmanoff
United States District Judge

October 24, 2024
Alexandria, Virginia

20

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| COMMUNITY ASSOCIATIONS INSTITUTE, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:24-cv-1597 (MSN/LRV) |
| v. | ) ) | |
| JANET YELLEN, Secretary of the United States Department of the Treasury, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

**NOTICE OF APPEAL**

Plaintiffs Community Associations Institute, Canterbury Crossing Condominium Trust, Townhouse Green Cooperative, Terraces on Memorial Homeowners Association, Regency at Ashburn Greenbrier Condominium Association, and Farrcroft Homeowners Association appeal to the United States Court of Appeals for the Fourth Circuit from the District Court's Memorandum Opinion and Order (ECF #40) entered on October 24, 2024, denying their Motion for Preliminary Injunction (ECF #13).

Respectfully submitted, this 4th day of November, 2024.

/s/ Brendan Bunn
Brendan Bunn, No. 34861
Chadwick, Washington, Moriarty,
Elmore & Bunn, P.C.
3201 Jermantown Road, Suite 600
Fairfax, VA 22030
Tel: 703-352-1900
Fax: 703-352-5293
bpbunn@chadwickwashington.com

*Attorneys for Canterbury*
*Crossing Condominium Trust,*
*Townhouse Green Cooperative,*
*Terraces on Memorial Homeowners*

/s/ Damon W.D. Wright
Damon W.D. Wright, No. 40319
Clair E. Wischusen, No. 99174
Gordon Rees Scully Mansukhani LLP
277 S. Washington Street, Suite 550
Alexandria, VA 22314
Tel: 202-399-1009
Fax: 202-800-2999
dwright@grsm.com
cwischusen@grsm.com

*Attorneys for Community Associations*
*Institute*

*Association, Farrcroft Homeowners*
*Association, Regency at Ashburn Greenbrier*
*Condominium Association*

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2024, the foregoing was filed and served electronically by the Court's CM/ECF system upon all registered users.

*/s/ Damon W.D. Wright*
Damon W.D. Wright (No. 40319)

2
JA152

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2024, I electronically filed the foregoing document using the Court's CM/ECF system, which will then send notification of such filing to all counsel of record.

/s/ Clair E. Wischusen
Clair E. Wischusen