**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

COMMUNITY ASSOCIATIONS INSTITUTE *et al.*,

*Plaintiffs-Appellants*,

*v.*

U.S. DEPARTMENT OF THE TREASURY *et al.*,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Case No. 1:24-CV-01597-MSN-LRV

**OPENING BRIEF OF APPELLANTS**

Brendan P. Bunn
CHADWICK, WASHINGTON
MORIARTY, ELMORE & BUNN, P.C.
3201 Jermantown Road, Suite 600
Fairfax, VA 22030
Tel: (703) 352-1900
bpbunn@chadwickwashington.com

*Counsel for Appellants Canterbury
Crossing Condominium Trust,
Townhouse Green Cooperative Inc.,
Terraces on Memorial Homeowners
Association, Farrcroft Homeowners
Association, Regency at Ashburn Greenbrier
Condominium Association*

Damon W.D. Wright
Clair E. Wischusen
GORDON REES SCULLY
MANSUKHANI LLP
277 S. Washington Street, Ste. 550
Alexandria, VA 22314
(703) 650-7030
dwright@grsm.com
cwischusen@grsm.com

*Counsel for Appellant
Community Associations Institute*

## DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Appellants, Community Associations Institute ("CAI"), Canterbury Crossing Condominium Trust, Townhouse Green Cooperative Inc., Terraces on Memorial Homeowners Association, Regency at Ashburn Greenbrier Condominium Association, and Farrcroft Homeowners Association (collectively, "Plaintiffs" or "Appellants"), disclose that:

1.   None of Appellants are a publicly held corporation or other publicly held entity.

2.   None of Appellants have a parent corporation.

3.   No publicly held corporation or other publicly held entity owns 10% more of the stock of Appellants.

4.   No publicly held corporation or other publicly held entity has a direct financial interest in the outcome of the litigation.

5.   CAI is a trade association. However, there are no publicly held members whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity.

6.   This case does not arise out of a bankruptcy proceeding.

7.   This is not a criminal case in which there was an organizational victim.

November 12, 2024        */s/ Brendan P. Bunn*          */s/ Clair E. Wischusen*

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE CASE.................................................................3

      A.      Plaintiffs and the Operation of State-Created Community Associations ...............................................................4

      B.      The Corporate Transparency Act (CTA) ...................................7

      C.      CAI's Exemption Request and the FAQs. ...............................12

      D.      Impact of the CTA on Community Associations. ....................14

      E.      Proceedings Below.................................................................17

      F.      Standard of Review ...............................................................19

SUMMARY OF THE ARGUMENT ....................................................20

ARGUMENT ......................................................................................22

    I.      The District Court Erred in Concluding that Plaintiffs Did Not Demonstrate a Likelihood of Success on Their Claim that the CTA Exceeds Congress' Powers...............................................................22

      A.      Congress Does Not Have Power to Enact the CTA Under the Commerce Clause and the Necessary and Proper Clause. .......25

      B.      The CTA Is Not Authorized by Congress' Foreign Affairs or Taxing Powers.......................................................................30

    II.     The District Court Erred in Concluding that Plaintiffs Did Not Demonstrate a Likelihood of Success on Their Fourth Amendment Claim. ..............................................................32

    III.    The District Court Erred in Concluding that Plaintiffs Did Not Demonstrate a Likelihood of Success on Their First Amendment Claim. ..............................................................43

IV.     Because the District Court Erred in Rejecting the Plaintiffs'
Likelihood of Success on the Merits, It Also Erred in Applying the
Irreparable Harm, Public Interest, and Balance of Equities Factors...50

CONCLUSION ................................................................................................54

REQUEST FOR ORAL ARGUMENT ..................................................................54

CERTIFICATE OF COMPLIANCE......................................................................55

CERTIFICATE OF SERVICE ............................................................................56

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Vac EMS, Inc. v. Macon-Bibb Cty.*,
   37 F.4th 103 (11th Cir. 2022) ...............................................................52

*Americans for Prosperity Found. v. Bonta*,
   594 U.S. 595 (2021)......................................................................*passim*

*Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*,
   459 U.S. 87 (1982).................................................................................46

*Brown v. Texas*,
   443 U.S. 47 (1979)................................................................33, 41, 42

*BST Holdings, LLC v. OSHA*,
   17 F.4th 604 (5th Cir. 2021) ...............................................................52

*Cal. Bankers Ass'n v. Shultz*,
   416 U.S. 21 (1974)................................................................33, 36, 37

*Carpenter v. U.S.*,
   585 U.S. 296 (2018)....................................................................34, 40

*Centro Tepeyac v. Montgomery Cty.*,
   722 F.3d 184 (4th Cir. 2013) ...............................................................52

*City of Indianapolis v. Edmond*,
   531 U.S. 32 (2000)..............................................................33, 35, 39, 40

*City of Los Angeles v. Patel*,
   576 U.S. 409 (2015)......................................................................*passim*

*CTS Corp. v. Dynamics Corp. of Am.*,
   481 U.S. 69 (1987)...............................................................................25

*Elrod v. Burns*,
   427 U.S. 347 (1976)..............................................................................51

*Firestone v. Yellen*,
   No. 3:24-cv-1034, 2024 WL 4250192 (D. Or. Sept. 20, 2024).........................32

*Free Speech Coal.,Inc. v. Attorney Gen. U.S.*,
   825 F.3d 149 (2016).........................................................................................39

*Gibbons v. Ogden*,
   9 Wheat. 1, 6 L.Ed. 23 (1824) ........................................................................23

*Giovani Carandola, Ltd. v. Bason*,
   303 F.3d 507 (4th Cir. 2002) ....................................................................52, 53

*Gonzales v. Raich*,
   545 U.S. 1 (2005)......................................................................................23, 28

*Gonzalez v. Raich*,
   545 U.S. 66 (1975).........................................................................................28

*Griswold v. Connecticut*,
   381 U.S. 479 (1965).......................................................................................44

*Hiibel v. Sixth Jud. Dist. Ct. of Nevada*,
   542 U.S. 177 (2004).......................................................................................42

*Kyllo v. U.S.*,
   533 U.S. 27 (2001).........................................................................................40

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
   2 F.4th 330 (4th Cir. 2021) .......................................................................19, 20

*Maryland v. Wirtz*,
   392 U.S. 183 (1968).......................................................................................30

*McCulloch v. Maryland*,
   4 Wheat. 316, 4 L.Ed. 579 (1819) ..................................................................23

*McCulloch v. State*,
   17 U.S. 316 (1819).........................................................................................28

*Michigan Dep't of State Police v. Sitz*,
   496 U.S. 444 (1990).......................................................................................39

*Mills v. District of Columbia*,
571 F.3d 1304 (D.C. Cir. 2009).........................................................50

*NAACP v. Alabama*,
357 U.S. 449 (1958)...............................................................46, 47

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012).............................................................*passim*

*Nat'l Small Business United (NSBU) v. Yellen*,
No. 5:22-cv-01488, 2024 WL 899372 (N.D. Ala. Mar. 2, 2024)...........24, 30, 31

*Roberts v. United States Jaycees*,
468 U.S. 609 (1984)......................................................................44

*Rumsfeld v. Forum for Acad. Institutional Rights, Inc.*,
547 U.S. 47 (2006)........................................................................45

*Sabri v. U.S.*,
541 U.S. 600 (2004)......................................................................27

*Sarsour v. Trump*,
245 F.Supp.3d 719 (E.D. Va. 2017) ...............................................19

*In re Search Warrant Issued June 13, 2019*,
942 F.3d 159 (4th Cir. 2019) .......................................................19

*Shelton v. Tucker*,
364 U.S. (1960)............................................................................46

*Shelton v. Tucker*,
364 U.S. 479 (1960)...............................................................46, 47

*Skinner v. Ry. Lab. Executives' Ass'n*,
489 U.S. 602 (1989)......................................................................39

*U.S. Dep't of Justice v. Reps. Comm. For Freedom of Press*,
489 U.S. 749 (1989)......................................................................40

*U.S. v. Comstock*,
560 U.S. 126 (2010)..............................................................23, 28, 31

*U.S. v. Edwards*,
   498 F.2d 496 (2d Cir. 1974) ...............................................39

*U.S. v. Jones*,
   565 U.S. 400 (2012).............................................................38

*U.S. v. Lopez*,
   514 U.S. 549 (1995)..........................................18, 24, 29, 30

*U.S. v. Morrison*,
   529 U.S. 598 (2000)............................................................29

*Wickard v. Filburn*,
   317 U.S. 111 (1942)............................................................28

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)........................................................19, 50

*WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*,
   553 F.3d 292 (4th Cir. 2009) ..............................................50

**Constitutions**

U.S. Const. Article I, § 8...............................................................30

U.S. Const. Article I, § 8, cl. 3....................................................23

U.S. Const. Article I, § 8, cl. 18..................................................23

U.S. Const. Article II, § 2 ...........................................................30

**Rules**

Fed. Rules Civ. Proc. 65 ..............................................................19

**Statutes**

8 U.S.C. § 1324a(b) ....................................................................38

26 U.S.C. § 528............................................................................10

26 U.S.C. § 6012..........................................................................38

26 U.S.C. § 6031-60......................................................................38

26 U.S.C. § 6103(i)(1)(A)...................................................................38

28 U.S.C. § 1292(a)(1)....................................................................1, 18

28 U.S.C. § 1331...............................................................................1

31 U.S.C. § 5336...............................................................................3

31 U.S.C. § 5336(a)(2)....................................................................8, 9

31 U.S.C. § 5336(a)(3)(A).................................................................8

31 U.S.C. § 5336(a)(11)(A)...............................................................8

31 U.S.C. § 5336(a)(11)(B)...............................................................9

31 U.S.C. § 5336(b)(1)(A).................................................................8

31 U.S.C. § 5336(b)(1)(B).................................................................9

31 U.S.C. § 5336(b)(1)(C).................................................................9

31 U.S.C. § 5336(b)(1)(D).................................................................9

31 U.S.C. § 5336(b)(2)......................................................................8

31 U.S.C. § 5336(b)(2)(A).................................................................9

31 U.S.C. § 5336(c)(2)(B)................................................................12

31 U.S.C. § 5336(c)(5)(A)–(B).........................................................12

31 U.S.C. § 5336(h)(1)(A)–(B).........................................................10

31 U.S.C. § 5336(h)(6)....................................................................10

31 U.S.C. § (h)(3)(A)(i)-(ii)............................................................10

42 U.S.C. § 14501...........................................................................51

42 U.S.C. § 14501(a)(1)..................................................................16

42 U.S.C. § 14501(a)(2)..................................................................16

42 U.S.C. § 14501(a)(3)..................................................................16

42 U.S.C. § 14501(a)(6)................................................................16

42 U.S.C. § 14501(a)(7)(A)..........................................................16

42 U.S.C. § 14501(b)....................................................................16

52 U.S.C. § 30104(a).....................................................................38

Del. Code Ann. Title 8, § 122........................................................26

Pub. L. No. 116-283, 134 Stat. 3388 (2021)..............................7, 8

Pub. L. No. 116-283, div. F, § 6402(2), 134 Stat. ........................8

Pub. L. No. 116-283, div. F, § 6402(5), 134 Stat. at 4604 ...........8

**Regulations**

31 C.F.R. § 1010.380(a)(1)(iii)........................................................9

31 C.F.R § 1010.380(a)(2)...............................................................9

31 C.F.R § 1010.380(b)(1)(ii)..........................................................9

87 Fed. Reg. 59498 .........................................................11, 31, 34

87 Fed. Reg. 59504 .........................................................11, 31, 34

87 Fed. Reg. 59505 .....................................................................11

**Other Authorities**

2 M. Farrand, *Records of the Federal Convention of 1787*, at 325
    (Pinckney) & 615-616 (Madison)..............................................25

# JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because the district court denied Plaintiffs' motion for preliminary injunction. Plaintiffs noticed their appeal on November 4, 2024, fewer than 30 days after the district court's October 24, 2024 order denying a preliminary injunction.

# STATEMENT OF ISSUES

1)      Whether the district court erred in finding that Plaintiffs had not demonstrated a likelihood of success on the merits of their claim that, either on its face or as applied to community associations, the Corporate Transparency Act ("CTA") exceeds Congress' authority under Article I.

2)      Whether the district court erred in finding that Plaintiffs had not demonstrated a likelihood of success on the merits of their claim that, as applied to community associations, the CTA violates their Fourth Amendment rights to be free from unreasonable search and seizure.

3)      Whether the district court erred in finding that Plaintiffs had not demonstrated a likelihood of success on the merits of their claim that, as applied to community associations, the CTA violates their First Amendment rights of freedom of speech and association.

4)      Whether the district court erred in finding that Plaintiffs had not demonstrated that community associations will suffer irreparable harm absent preliminary injunctive relief and that the balance of the equities and public interest weigh in favor of preliminary injunctive relief.

## STATEMENT OF THE CASE

In 2021, Congress enacted the Corporate Transparency Act ("CTA"), 31 U.S.C. § 5336, for the purpose of combating the use of anonymous shell companies for money laundering, terrorism financing, and other illicit financial activities. To make it easier for law enforcement to detect, investigate, and prosecute crime, the CTA requires certain entities to disclose personal information and identification records about their beneficial owners to the Financial Crimes Enforcement Network ("FinCEN"). Despite an ostensibly narrow purpose, the Government intends to enforce the CTA against 365,000 community associations—organizations with virtually no risk of financial crime—and millions of unpaid, volunteer board members.

Absent judicial relief, the CTA will force community associations and their volunteers to disclose personal information and identification documents for entry into a law enforcement database, regularly update the disclosure, and face civil and criminal penalties in the event of an error or omission. The CTA would mandate the disclosure by January 1, 2025, and within thirty (30) days whenever volunteers join or leave the board, even though the Government has no warrant or suspicion of any wrongdoing. For countless unpaid volunteers already performing selfless, often thankless roles in serving their communities, this intrusion on personal privacy,

administrative burden, and potential civil and criminal liability is an unexpected, frightening, and additional sacrifice they cannot make. They will resign.

This unwarranted federal overreach disregards constitutional limits, infringes on state sovereignty, and constitutes an unreasonable search and seizure and encroachment on freedoms of association and speech. The district court's analysis below did not meaningfully address the unusually grave impact the CTA would have on community associations and their volunteers. Nor did the district court address, or even acknowledge, several analogous Supreme Court cases that strongly support Plaintiffs' constitutional claims. The district court instead consistently recited the CTA's criminal investigative purpose to hold that this was sufficient to defeat Plaintiffs' constitutional claims.

Unless this Court intervenes with injunctive relief by the January 1, 2025 compliance deadline, the CTA will undermine the essential structure and function of community associations by triggering mass resignations by unpaid volunteer board members, dissuading future volunteers from serving their communities, and leaving countless communities without effective operational governance, weakening the fabric and foundation of communities for over 75 million Americans.

## A. Plaintiffs and the Operation of State-Created Community Associations

Plaintiffs include community associations from states across the country, as well as the Community Associations Institute (CAI), a nonprofit membership

organization that educates, provides operational resources, and advocates for the interests of community associations and their volunteer boards. JA13 ¶ 4, JA14–15 ¶¶ 5–9, JA72 ¶ 9. CAI has more than 47,000 members, which include homeowners, board members, association managers, management firms, and other professionals who provide services to community associations. JA13 ¶ 4, JA71 ¶¶ 6–7. CAI serves more than 75.5 million homeowners who live in more than 365,000 community associations in the United States. JA18 ¶ 31, JA71 ¶ 5. These residents constitute roughly 30% of the population of the United States. JA18 ¶ 31.

Community associations fall into three primary categories: condominium associations, homeowners' associations, and housing cooperatives. JA19 ¶ 32. Community associations are formed and governed under state statutes and exist primarily to manage common areas of property for the benefit of all homeowners. JA19 ¶ 33–34, JA72 ¶ 8. Nearly all community associations operate as nonprofit entities, whether organized as corporations, unincorporated associations, cooperatives, business trusts, or some other form. JA19 ¶ 35. Each association is governed by a volunteer board consisting of elected homeowners, referred to as board members, directors, or trustees (collectively, "board members"). JA20 ¶ 43, JA72 ¶ 8. The board members typically adopt operating budgets, collecting monthly dues from homeowners to cover maintenance and operational expenses. JA72 ¶ 8. Unlike traditional corporations, community association board members are typically

unpaid, hold no financial or ownership interest in the association beyond their own status as homeowners, and typically serve terms of one to three years. JA20 ¶ 46–47, JA21 ¶ 53.

Recruiting volunteer board members has long been challenging. JA21 ¶ 52, JA69 ¶ 18, JA72 ¶ 11. Community board service is demanding, often requiring board members to take on difficult and thankless tasks, such as enforcing rules or resolving disputes among neighbors. JA21 ¶ 52, JA54 ¶ 22. High turnover is common, as board members frequently resign or move, leaving difficult to fill vacancies. JA21 ¶ 51, JA54 ¶ 17, JA58 ¶ 13, JA68 ¶ 12. Community associations often struggle to find candidates for elections, and filling recurring vacancies on short notice is even more challenging. JA72 ¶ 11.

The CTA dramatically exacerbates the volunteerism and recruitment challenges because it would require even more sacrifice from volunteers. JA25 ¶ 74. Absent relief in this case, a current or potential board member evaluating whether to serve their community must decide if they are prepared to risk their financial well-being and liberty in the event the community association or another volunteer board member fails to comply with the CTA or makes a filing error or omission. As applied to community associations and their volunteers, the CTA imposes unreasonable burden, chills associational rights, and serves no substantial government purpose. It

threatens to undermine the function and stability of community associations across the country.

## B. The Corporate Transparency Act (CTA)

The CTA, enacted as part of the National Defense Authorization Act for Fiscal Year 2021, requires most entities incorporated under State law to disclose beneficial owner information to the Treasury Department's criminal enforcement arm. *See* Pub. L. No. 116-283, 134 Stat. 3388 (2021). By requiring these disclosures, Congress aimed to crack down on financial crimes like money laundering and terrorism financing, which are often committed through anonymous shell corporations. In Congress' view, "[f]ederal legislation providing for the collection of beneficial ownership information for corporations, limited liability companies, or other similar entities formed under the laws of the States" was "needed" to:

(A) set a clear, Federal standard for incorporation practices;

(B) protect vital United States national security interests;

(C) protect interstate and foreign commerce;

(D) better enable critical national security, intelligence and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity; and

(E) bring the Unite[d] States into compliance with international anti-money laundering and countering the financing of terrorism

7

standards[.]

*Id.* div. F, § 6402(5), 134 Stat. at 4604 (codified at 31 U.S.C. § 5336 note). Congress found that "most or all States do not require information about the beneficial owners of" entities formed under their laws. *Id.* § 6402(2). Accordingly, the CTA requires "reporting companies" to provide personal identifying information to FinCEN regarding each "beneficial owner" and "applicant." 31 U.S.C. §§ 5336(b)(1)(A), (b)(2).

A "reporting company" is defined as a "corporation, limited liability company, or similar entity that is (i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or (ii) formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." 31 U.S.C. § 5336(a)(11)(A). A "beneficial owner" is defined as "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise" (i) "exercises substantial control over the entity;" or (ii) "owns or controls not less than 25 percent of the ownership interests of the entity." *Id*. § 5336(a)(3)(A). An "applicant" is defined as any individual who files an application to form a reporting company or "registers or files an application to register" a non-U.S. company to do business in the United States. *Id*. § 5336(a)(2).

For each beneficial owner and applicant, reporting companies must submit to FinCEN their full legal name, date of birth, current residential or business address, and a unique identifying number from a government-ID, such as a passport or driver's license, along with a copy of the ID. 31 U.S.C. § 5336(b)(2)(A); 31 C.F.R § 1010.380(b)(1)(ii). Starting January 1, 2024, this personal information must be reported within 30 days of formation or registration of the reporting company, or, in the case of existing reporting companies, prior to January 1, 2025. 31 U.S.C. § 5336(b)(1)(B), (C); 31 C.F.R. § 1010.380(a)(1)(iii). If any reported information changes—such as a name or address update for a "beneficial owner" or "applicant"—the entity must submit the updated data to FinCEN within 30 days. 31 U.S.C. § 5336(b)(1)(D); 31 C.F.R § 1010.380(a)(2).

The CTA exempts 24 kinds of entities from beneficial-owner reporting, including financial institutions, U.S. entities with more than 20 employees and $5 million in gross receipts, and nonprofit organizations ("NPOs") "described in section 501(c) of the Internal Revenue Code" and "exempt from tax under section 501(a) of such Code" ("NPO Exemption"). *See* 31 U.S.C. § 5336(a)(11)(B). Treasury and FinCEN have consistently recognized that NPOs pose minimal risk for activities like money laundering or terrorist financing due to mandated self-governance, transparency, and accountability practices that deter financial misconduct. *See* Dept. of the Treasury, "2024 National Terrorist Financing Risk Assessment," pp. 23–25

9

(available at: https://home.treasury.gov/system/files/136/2024-National-Terrorist-Financing-Risk-Assessment.pdf) (last accessed Nov. 9, 2024). Most state laws require community associations to operate as tax-exempt nonprofit organizations; however, the majority file federal tax returns under section 528 of the Internal Revenue Code, specifically designated for "homeowners associations." 26 U.S.C. § 528. Nevertheless, like other NPOs, community associations maintain strict internal standards of due diligence, including self-governance, transparency, and other accountability and compliance measures.

The CTA enforces compliance through monetary penalties and prison terms. "Any person" who "willfully" fails to report or update beneficial-owner information, or who files "false or fraudulent" information, "shall be liable to the United States for a civil penalty" of up to $500 per day. 31 U.S.C. § 5336(h)(1)(A)–(B), (h)(3)(A)(i)–(ii). Additionally, they "may be fined up to $10,000, imprisoned for not more than 2 years, or both." *Id.* Under the statute, "willfully" is defined as "the voluntary, intentional violation of a known legal duty." *Id.* § 5336(h)(6).

The CTA aims to collect beneficial ownership information from entities to facilitate the detection and prosecution of financial crime. Yet, the CTA was also expressly designed to circumvent traditional Fourth Amendment protections. FinCEN's then-Director testified to Congress that the CTA would eliminate the need for investigators to comply with fundamental safeguards, such as obtaining grand

jury subpoenas or search warrants, to obtain beneficial ownership information. *See Beneficial Ownership Information Reporting Requirements*, 87 Fed. Reg. 59498, 59504. The Director highlighted that these requirements "take[] an enormous amount of time" and "waste[] resources." *Id.* Thus, the CTA was designed to grant law enforcement, intelligence, and national security agencies immediate access to non-public beneficial ownership information without the hassle of a warrant or judicial oversight. *Id.* at 59505.

The CTA establishes a vast database of personal identifying information that may be shared with other law enforcement agencies and foreign governments and used for various law enforcement purposes. The CTA authorizes FinCEN to disclose beneficial ownership information to:

(1)     a "Federal agency engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity;"

(2)     a "State, local or Trial law enforcement agency, if a court of competent jurisdiction … has authorized the law enforcement agency to seek the information in a criminal or civil investigation;"

(3)     a "law enforcement agency, prosecutor, or judge of another country" via "a request from a Federal agency" pursuant to "an international treaty, agreement, convention, or official request made by law enforcement, judicial, or prosecutorial authorities in trusted foreign countries" for "authorized investigation

or national security or intelligence activity" by the foreign country;

(4)     a "financial institution subject to customer due diligence [CDD] requirements, with the consent of the reporting company, to facilitate compliance" with CDD requirements; and

(5)     a "Federal functional regulator or other appropriate regulatory agency" such as the Securities and Exchange Commission.

31 U.S.C. § 5336(c)(2)(B). Additionally, the CTA mandates that FinCEN's beneficial owner information "be accessible for inspection or disclosure to officers and employees" of Treasury Department officials, including IRS agents for "tax administration." *Id.* § 5336(c)(5)(A)–(B).

### C. CAI's Exemption Request and the FAQs.

On December 28, 2023, CAI submitted a letter to FinCEN requesting an exemption for community associations from the CTA's reporting requirements under the NPO Exemption. JA84–86. CAI explained that community associations, as tax-exempt nonprofits, adhere to state-mandated transparency and accountability practices comparable to those required for NPOs under section 501(c). JA85–86. Since community associations also present "little or no risk" of financial crimes, CAI argued that they should fall within the NPO Exemption. JA74 ¶ 28, JA85.

FinCEN representatives met with CAI representatives to discuss CAI's exemption request on April 17, 2024. JA81 ¶ 15. The next day, April 18, 2024,

FinCEN released "FAQs" on its website that definitively classified homeowners associations as reporting companies under the CTA. JA81 ¶ 14. FAQ C.10 states that most homeowners associations are considered reporting companies:

*C. 10. Are homeowners associations reporting companies?*

It depends. Homeowners associations (HOAs) can take different forms. As with any entity, if an HOA was not created by the filing of a document with a secretary of state or similar office, then it is not a domestic reporting company. An incorporated HOA or other HOA that was created by such a filing also may qualify for an exemption from the reporting requirements. For example, HOAs recognized by the IRS as section 501(c)(4) social welfare organizations (or that claim such status and meet the requirements) may qualify for the tax-exempt entity exemption. An incorporated HOA that is not a section 501(c)(4) organization, however, may fall within the reporting company definition and therefore be required to report BOI to FinCEN.

[Updated June 10, 2024].[1]

Further, FAQ D.13 defines a "beneficial owner" of a homeowners association under the CTA, stating:

There may be instances in which no individuals own or control at least 25 percent of the ownership interests of an HOA that is a reporting company. However, FinCEN expects that at least one individual exercises substantial control over each reporting company. Individuals who meet one of the following criteria are considered to exercise substantial control over the HOA:

- the individual is a senior officer;
- the individual has authority to appoint or remove certain officers or

---

[1] Financial Crimes Enforcement Network, "Beneficial Ownership Information, Frequently Asked Questions" ¶ C. 10. (available at: https://www.fincen.gov/boi-faqs#C_10) (last accessed Nov. 12, 2024).

a majority of directors of the HOA;

- the individual is an important decision-maker; or
- the individual has any other form of substantial control over the HOA.

[Issued April 18, 2024].[2]

By letter dated July 25, 2024, seven months after CAI's December 28, 2023 letter, FinCEN then responded again to CAI's exemption request. J88–89. Rather than substantively address CAI's points, FinCEN recited the NPO Exemption and the catch-all exemption, which exempts entities from reporting requirements if FinCEN and certain other government officials determine that their beneficial owner information would not be "highly useful" to law enforcement. FinCEN's response concluded that it "is considering [CAI's] request to exempt a class of [Community Associations]" and that community associations are required to comply with the CTA in the meantime. J88-89.

**D. Impact of the CTA on Community Associations.**

The CTA threatens to eviscerate community associations by causing the mass resignation of volunteer board members who are legitimately concerned about their personal liability. JA21 ¶ 54, JA25 ¶ 74, JA54 ¶ 22, JA60 ¶ 21, JA63 ¶ 14, JA66 ¶ 15, JA74 ¶ 32, JA75 ¶ 37–38.  In declarations filed with the district court, CAI and

---

[2] Financial Crimes Enforcement Network, "Beneficial Ownership Information" ¶ D. 13. (available at: https://www.fincen.gov/boi-faqs#D_13) (last accessed Nov. 12, 2024).

Plaintiff community associations' volunteer board members explained just this. *See* JA52–75. CAI CEO Tom Skiba's declaration describes CAI's survey of over 850 community association board members across the country, with 80% reporting that the CTA will lead to board member resignations and 88% reporting that the CTA will deter other potential board members from volunteering to serve their communities. JA75 ¶¶ 34, 37.

Further, Cheri Heaton, president of a Michigan housing cooperative, states she "no longer wish[es] to serve in this volunteer position" due to the CTA's filing requirements and penalties, noting "[t]his is too big a burden to bear given that we are just volunteers trying to make our community better." JA64–66 ¶¶ 1, 3, 15. Senya Ehrstein, chair of a Massachusetts condominium association, expressed that she is "likely to resign" out of privacy concerns and the risk of indiscriminate data sharing by FinCEN with other government entities. JA52, 54 ¶¶ 1, 3, 20–21. Nick Kornuta, president of a Houston homeowners association, also "no longer wishes to volunteer," citing the threat of criminal penalties—a risk he deems unacceptable in a volunteer role. JA61-63 ¶¶ 1, 11, 14. Kathi Robinson, president of a condominium association in Ashburn, Virginia, has stated she is "unlikely to continue volunteering," noting that the CTA's requirements deter potential board members from stepping forward due to severe penalties for non-compliance. JA67, 69 ¶¶ 1, 3, 16–18. Nancy Wiegand, president of a homeowners association in Fairfax, Virginia,

reports she and others are "seriously considering" whether to continue volunteering, adding that the CTA's reporting requirements "will harm the operation of our homeowners' association in a meaningful way," potentially leaving the board unstaffed and placing the association at risk of receivership. JA57–60 ¶¶ 1, 3, 17, 18, 21.

This is not a surprise and is not speculation. Congress has long recognized the significant deterrent effect that the threat of personal liability has on volunteerism. Nearly thirty years ago, Congress enacted the Volunteer Protection Act (VPA) to protect against "liability abuses related to volunteers serving nonprofit organizations." 42 U.S.C. § 14501(b). In passing the VPA, Congress acknowledged volunteers' "legitimate fears … about frivolous, arbitrary, or capricious lawsuits" and noted that the "willingness of volunteers to offer their services is deterred" by potential liability. *Id.* § 14501(a)(7)(A), (a)(1). To avoid such risk, volunteers withdraw from or avoid service altogether, diminishing the ability of nonprofit groups to impact their communities. These concerns also increase nonprofit operating costs by requiring organizations to hire individuals for roles previously filled by volunteers, while raising litigation and insurance expenses. *Id.* § 14501(a)(2), (3), (6).

As applied to community associations and their volunteers, the CTA is neither reasonable nor supports a substantial government interest. Congress also said

nothing to indicate it intended to burden the 30% of people who live in our country's more than 365,000 community associations, making up the fabric and foundation of American neighborhoods. Yet, the record evidence reveals the CTA's profound and unintended impact: volunteer board members, compelled to sacrifice further and face risk of civil and criminal penalties, will resign, while potential successors will be unwilling to serve for the same reason. JA63 ¶ 14, JA66 ¶¶ 15–16, JA69 ¶¶ 17, 19, JA75 ¶ 37–38. For those community associations left without a full or properly-formed board, most state laws would require imposition of a judicial receivership so dues are collected, insurance is paid, and common areas are maintained. JA55 ¶ 24, JA60 ¶ 21, JA70 ¶ 20, JA75 ¶ 38. The CTA poses an existential threat to the stability, governance, and civic contributions of community associations across the country.

### E. Proceedings Below

On September 10, 2024, CAI along with several community associations, filed suit against the Department of Treasury and Secretary Yellen and FinCEN's Director Gacki in their official capacities and moved for a preliminary injunction enjoining enforcement of the CTA. JA4–5, JA9. With their preliminary injunction motion, Plaintiffs asserted that the CTA should be interpreted to include community associations within the NPO Exemption and that FinCEN's FAQs constituted a rejection of CAI's exemption request and were issued in violation of the Administrative Procedure Act. Dkt. 14 at 15-26. In addition, Plaintiffs asserted that

the CTA is unconstitutional as it exceeds Congress' power under Article I, violates the Fourth Amendment as applied to community associations and their volunteers, and violates the First Amendment as applied to community associations and their volunteers. *Id.* at 27-42.

After full briefing, on October 11, 2024, the district court held a hearing on Plaintiffs' preliminary injunction motion. JA7, JA90–130. On October 24, 2024, the district court issued its opinion denying the motion. JA131–150. The district court inexplicably failed to address several recent Supreme Court cases strongly supporting Plaintiffs' likelihood of success, including *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) (Commerce Clause), *U.S. v. Lopez*, 514 U.S. 549, 553 (1995) (Commerce Clause), *City of Los Angeles v. Patel*, 576 U.S. 409 (2015) (Fourth Amendment), and *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) (First Amendment). The district court also mischaracterized and downplayed Plaintiffs' evidence of irreparable harm, describing as "speculative" declarations from several persons confirming that they were likely to resign from board service, as well as CAI's survey evidence from over 850 board members, 80% of whom reported the CTA would lead to resignations and 88% of whom reported it would deter others from volunteering. JA147-149.

On November 4, 2024, Plaintiffs filed an interlocutory appeal under 28 U.S.C. § 1292(a)(1). JA7, JA151–152. Thereafter, the parties jointly moved to stay the

underlying case during the appeal, which the district court granted on November 7, 2024. JA7–8. To streamline the appeal, Plaintiffs are limiting their arguments to constitutional claims under Article I, the Fourth Amendment, and the First Amendment. Due to the January 1, 2025, compliance deadline for most covered entities under the CTA, Plaintiffs submitted a motion to expedite briefing and argument. *See* Mot. for Expedited Consideration, Nov. 7, 2024. The motion is currently pending.

### F. Standard of Review

Rule 65 of the Federal Rules of Civil Procedure provides for preliminary injunctive relief where plaintiffs can demonstrate: "(1) they are likely to succeed on the merits of their case; (2) they are likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of the equities tips in their favor; and (4) an injunction would be in the public interest." *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

This Court reviews a district court's denial of a preliminary injunction for abuse of discretion, reviewing factual findings for clear error and legal conclusions de novo. *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021) (citing *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 171 (4th Cir. 2019)). A district court abuses its discretion if it rests its decision on a

clearly erroneous finding of a material fact, misapprehends the laws, or ignores

unrebutted, significant evidence. *Leaders of a Beautiful Struggle*, 2 F.4th at 339, 348

(reversing and remanding denial of plaintiffs' motion for preliminary injunction).

## SUMMARY OF THE ARGUMENT

The district court erred in failing to find that Plaintiffs demonstrated a

likelihood of success on their claim that the CTA exceeds federal authority under

Article I because it imposes an unprecedented federal police power over entity

formation—a power historically reserved to the States—contrary to the text, history,

and precedent of the Constitution. The Constitution provides no express power for

Congress to encroach upon States' authority to regulate corporations, a power that

predates ratification. The Commerce and Necessary and Proper Clauses do not

justify such federal authority, as mere corporate existence is not a commercial act.

Any argument to the contrary is foreclosed by *Sebelius*, which rejects the notion that

future participation in interstate commerce can justify federal regulation. *See* 567

U.S. at 557.

The district court also erred in not recognizing a likelihood of success on

Plaintiffs' claim that the CTA compels unreasonable, suspicionless searches in

violation of the Fourth Amendment. The CTA mandates that volunteers forming or

serving on community association boards report their personal information to the

federal government, without any warrant or suspicion of wrongdoing, merely to

populate a criminal and financial-intelligence database. Failure to comply, whether by an individual or fellow board members, subjects them to potential fines and imprisonment. This requirement epitomizes a paradigmatic Fourth Amendment violation similar to the practice invalidated in *Patel*, 576 U.S. 409, 412, which the district court failed to distinguish or even address.

The district court further erred in concluding that Plaintiffs failed to show a likelihood of success on their First Amendment claim. By compelling disclosure of personal identifying information and requiring that persons accept the risk of civil and criminal liability as a condition of board service, the CTA chills the freedom of association of community association members. *Bonta*, 594 U.S. 595, which struck down similar disclosure mandates as an undue burden on associational rights, controls here. The district court's failure to apply *Bonta's* exacting scrutiny standard ignored controlling precedent and the chilling effect that the CTA's broad disclosure requirements have on voluntary civic engagement and local governance.

Additionally, the district court's denial of irreparable harm disregarded overwhelming evidence of immediate injury to constitutional rights and to community associations and their board members. The CTA's sweeping mandates expose board members to privacy intrusions, potential penalties, and deterrence from service, threatening the stability of associations representing millions of U.S. homeowners. Courts consistently hold that even temporary deprivations of

constitutional freedoms constitute irreparable harm.

Finally, the balance of equities and public interest strongly favor granting an injunction. An injunction would maintain the status quo, holding off the January 1, 2025 deadline that threatens to disrupt community governance. The injunction would uphold constitutional protections, while imposing no undue burden on the Government. The public interest is best served by protecting associational and privacy rights, particularly where no evidence connects volunteer-run associations to the CTA's purported anti-money laundering and terrorism financing objectives.

Accordingly, this Court should reverse the district court and remand with instructions to immediately enter a preliminary injunction halting enforcement of the CTA against community associations.

## ARGUMENT

### I. The District Court Erred in Concluding that Plaintiffs Did Not Demonstrate a Likelihood of Success on Their Claim that the CTA Exceeds Congress' Powers.

The district court erred in upholding the CTA's disclosures requirements under the Commerce Clause and Necessary and Proper Clause by finding a "rational basis" to conclude that it regulates activities, which, "taken in the aggregate, substantially affect interstate commerce." JA144. This approach expands the commerce power beyond its constitutional limits and overlooks the CTA's unprecedented intrusion into state sovereignty over corporate chartering.

"The Federal Government 'is acknowledged by all to be one of enumerated powers.'" *Sebelius*, 567 U.S. at 533 (citing *McCulloch v. Maryland*, 4 Wheat. 316, 405, 4 L.Ed. 579 (1819)). The Constitution's "enumeration of powers is also a limitation of powers, because '[t]he enumeration presupposes something not enumerated.'" *Sebelius*, 567 U.S. at 534 (quoting *Gibbons v. Ogden*, 9 Wheat. 1, 195, 6 L.Ed. 23 (1824)). Despite the federal government's dramatic expansion over the past two centuries, "it still must show that a constitutional grant of power authorizes each of its actions." *Sebelius*, 567 U.S. at 535 (citing *U.S. v. Comstock*, 560 U.S. 126 (2010)).

Under the Constitution, Congress has the power to "regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. The Commerce Clause empowers Congress to regulate three distinct areas: (1) "the channels of interstate commerce," (2) "the instrumentalities of interstate commerce" and "persons or things in interstate commerce," and (3) "activities that substantially affect interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005). The Necessary and Proper Clause authorizes Congress to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers." U.S. Const. art. I, § 8, cl. 18.

"Given its expansive scope, it is no surprise that Congress has employed the commerce power in a wide variety of ways to address the pressing needs of the

time." *Sebelius*, 567 U.S. at 549. However, there is no prior history of a federal enactment requiring the reporting of personal information of owners and applicants of State-chartered entities to the federal government for law enforcement purposes based merely on the entity's existence. The CTA, therefore, operates as a broad and unprecedent information dragnet that disproportionately impacts law-abiding citizens to serve law enforcement objectives, while intruding on long-established State sovereignty over corporate charters and individual privacy rights without any clear limiting principle. While "legislative novelty is not necessarily fatal . . . sometimes the most telling indication of a severe constitutional problem … is the lack of historical precedent for Congress's action." *Sebelius*, 567 U.S. at 549 (quotations omitted; cleaned up). At the very least, the Court "should 'pause to consider the implications of the Government's arguments' when confronted with such new conceptions of federal power." *Id.* (quoting *Lopez*, 514 U.S. at 561 (1995)).[3]

---

[3] Earlier this year, the Northern District of Alabama issued a comprehensive opinion declaring the CTA unconstitutional on the grounds that it exceeds Congress' authority under the Commerce Clause and other enumerated powers in *Nat'l Small Business United (NSBU) v. Yellen*, No. 5:22-cv-01488, 2024 WL 899372 (N.D. Ala. Mar. 2, 2024). Although pending appeal by the Eleventh Circuit, *NSBU's* carefully reasoned decision provides strong persuasive value.

## A. Congress Does Not Have Power to Enact the CTA Under the Commerce Clause and the Necessary and Proper Clause.

Congress' power to regulate commerce "presupposes the existence of commercial activity to be regulated." *Sebelius*, 567 U.S. at 550. "As expansive as [the] cases construing the scope of the commerce power have been, they all have one thing in common: They uniformly describe the power as reaching 'activity.'" *Id.* at 551 (collecting cases).

The CTA does not, however, regulate existing activity; it regulates corporate existence. It compels both existing and newly formed entities to disclose information, regardless of whether they conduct any activity at all. Entity formation has historically been a matter reserved to the states. *See CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 91 (1987). The Constitution does not authorize Congress to regulate entity formation. At the Constitutional Convention, proposals by Madison and Pinckney to grant Congress an explicit power to incorporate were rejected over concerns about encroaching on State authority to charter corporations. 2 M. Farrand, *Records of the Federal Convention of 1787*, at 325 (Pinckney) & 615–616 (Madison). This history underscores that entity formation is not commercial activity and does not substantially affect interstate commerce. If forming a corporation were inherently commercial, Madison and Pinckney would not have needed to propose a specific Article I power to incorporate—Congress' powers to regulate commerce would have been sufficient.

Unable to justify the CTA's invasion of State sovereign power over entity formation, the Government reframed it below as regulating "*conduct* of a covered entity as a going concern*,*" observing that entities may go on to conduct transactions like making contracts, borrowing money, and transferring property. Dkt. 35 at 15, 16 (emphasis added) (citing Del. Code Ann. tit. 8, § 122). However, the Government's argument is misdirection, since the CTA is not triggered by these activities and the CTA does not regulate these activities. Moreover, the fact that an entity may conduct *potential future* commercial activity does not give Congress authority to regulate it. *Sebelius*, 567 U.S. at 557. That argument is foreclosed by *Sebelius*, which the district court's decision cites, but inexplicably fails to address.

In *Sebelius*, the Supreme Court held that the Affordable Care Act's individual mandate, which required certain individuals to purchase health insurance or face penalties, exceeded Congress' power under the Commerce Clause because it did not regulate pre-existing commercial activity. *Id.* at 560. The Court rejected the notion that the individual mandate was "sufficient to trigger Congress' authority" because most individuals "will, at some unknown point in the future, engage in a health care transaction." *Id.* at 557 ("The proposition that Congress may dictate the conduct of an individual today because of prophesied future activity finds no support in our precedent."). The Court held that Congress may only "anticipate the *effects* on commerce" of preexisting economic activity; it cannot regulate someone "simply

because he will predictably engage" in commerce. *Sebelius*, 567 U.S. at 557.

*Sebelius* further held that Congress could not use the Necessary and Proper Clause to regulate "those" who are not "by some pre-existing activity" *already* "within the sphere of federal regulation." *Id.* The Court emphasized that prior cases upholding laws under the Necessary and Proper Clause involved situations where the laws regulated those already subject to federal power, such as "provisions permitting continued confinement of those *already in federal custody* when they could not be safely released, *Comstock*, 560 U.S. at 129; criminalizing bribes involving organizations *receiving federal funds*, *Sabri v. U.S.*, 541 U.S. 600, 602, 605 (2004), and tolling state statutes of limitations while cases are *pending in federal court*, *Jinks v. Richland County*, 538 U.S. 456, 459, 462 (2003)." (cleaned up, emphasis in original). The Court cautioned, "[t]he Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions. Any police power to regulate individuals as such, as opposed to their activities, remains vested in the States." *Id.*

Like the individual mandate, the disclosure requirements are not sufficient to trigger Congress' authority because they seek to regulate entities over which the federal government has no prior regulatory authority. They do so even though the entities have not yet engaged in commerce, much less committed the financial crimes the Government claims the CTA to be a "necessary and proper" means of

effectuating its powers under the Commerce Clause. By attempting to use the Necessary and Proper Clause in this way, the Government treats it not as a derivative power, but as a "'great substantive and independent power,'" which *Sebelius* expressly rejects. *Sebelius*, 567 U.S. at 560-561 (quoting *McCulloch v. State*, 17 U.S. 316, 411 (1819)); *see also Comstock*, 560 U.S. at 144 (invocations of federal power under the Necessary and Proper Clause may not "invade state sovereignty or otherwise improperly limit the scope of powers that remain with the States.") (internal quotations and citation omitted).

The district court nevertheless concluded, with only cursory analysis, that the CTA's disclosure requirements fall within Congress' authority to regulate activities that, in the aggregate, "substantially affect interstate commerce." JA145. Relying on *Wickard v. Filburn*, 317 U.S. 111 (1942) and *Gonzalez v. Raich*, 545 U.S. 66 (1975), the court reasoned that if Congress could regulate the home production of wheat or marijuana, it could similarly impose "modest reporting requirements" aimed at curbing interstate crimes like money laundering and terrorism financing. Dkt. 35 at 14. However, *Wickard* and *Gonzalez,* regarded as some of the most far-reaching applications of the Commerce Clause, do not support the CTA's requirements. In those cases, Congress regulated activities—wheat and marijuana production—that had a cumulative effect on interstate markets by impacting supply and demand. *Wickard*, 317 U.S. at 127-128; *Gonzalez*, 545 U.S. at 19. By contrast, the CTA

regulates entities solely based on their existence, without any activity at all. This distinction is critical.

Moreover, in linking the CTA's disclosure mandates to the prevention of potential money laundering and terrorism financing, the district court relied on a rationale explicitly rejected by the Supreme Court in *Lopez* and *Morrison*. *Lopez*, 514 U.S. at 564; *U.S. v. Morrison*, 529 U.S. 598, 615 (2000). In *Lopez*, the Court cautioned that allowing Congress to regulate local gun possession as a means of deterring violent crime would "leave no limitation on federal power" and would intrude on areas "where States historically have been sovereign." 514 U.S. at 564. Likewise, in *Morrison*, the Court dismissed the argument that Congress could regulate gender-motivated violence simply because its aggregate impact might affect interstate commerce, emphasizing that such a view would "obliterate the Constitution's distinction between local and national authority." 529 U.S. at 615.

Similarly here, Congress cannot regulate entities as a means of curbing their potential use in money laundering or terrorism financing, as this approach would erase meaningful limits on federal power and encroach upon areas "where States historically have been sovereign." *Lopez*, 514 U.S. at 564. Allowing such a justification would effectively grant Congress "a general police power of the sort retained by the States." *Lopez*, 514 U.S. at 567. While Congress' Commerce Clause authority has grown alongside the national economy, courts have "always

recognized that the power to regulate commerce, though broad indeed, has limits." *Maryland v. Wirtz*, 392 U.S. 183, 196 (1968). By concluding that Congress may regulate entities based solely on their existence, the district court's reasoning offers "no limitation on federal power" and, if accepted, would extend federal reach to an area historically regulated by the states. *Lopez*, 516 U.S. at 564.

## B. The CTA Is Not Authorized by Congress' Foreign Affairs or Taxing Powers

Although the district court did not address them, the Government's other enumerated powers arguments fail to sustain the CTA. Congress' foreign affairs and national security powers—whether considered alone or with the Necessary and Proper Clause—do not extend to the entirely intrastate activity of entity formation. The Government failed to identify any specific foreign affairs power in the Constitution that the CTA implements, such as the powers to define and punish offenses against the Law of Nations, declare war, or make treaties. U.S. Const. Art. 1 § 8 & Art. II, § 2. Instead, the Government argued that the CTA was motivated by the need to comply with international standards and prevent foreign actors from using domestic entities to conceal illicit activities. *See* Dkt. 35 at 19. But while catching bad actors and "[c]ompliance with international standards may be good policy, … it is not enough to make the CTA 'necessary' or 'proper.'" *NSBU*, 2024 WL 899372, at *10.

Finally, although not addressed by the district court, the CTA also cannot be justified under Congress' taxing power, even as amplified by the Necessary and Proper Clause. For a statute to be a valid exercise of the Necessary and Proper Clause, it must be "'reasonably adapted' to the attainment of a legitimate end under" Congress' enumerated powers. *Comstock*, 560 U.S. at 135 (quotation omitted). The CTA's burdensome disclosure requirements serve an investigative purpose, not taxation. *See* 87 Fed. Reg. 59498, 59504. Although tax officials could eventually access the database, this is incidental to the CTA's primary law enforcement purpose. As *Sebelius* noted, "Congress' authority under the taxing power is limited to requiring an individual to pay money into the Federal Treasury, no more." 567 U.S. at 574. Extending the Necessary and Proper Clause "to permit Congress to bring its taxing power to bear just by collecting 'useful' data and allowing tax-enforcement officials access to that data" "would be a 'substantial expansion of federal authority.'" *NSBU*, 2024 WL 899372, at *21 (quoting *Sebelius*, 567 U.S. at 574).

***** 

The district court's failure to address and apply *Sebelius* and *Lopez* was reversible error. It makes no difference that a community association may ultimately enter into contracts or otherwise engage in transactions affecting interstate commerce because the CTA's requirements are not triggered by these activities, because the CTA does not regulate these activities, and because the fact that an entity

may conduct *potential future* commercial activity does not give Congress authority to regulate it. The district court should have found that Plaintiffs demonstrated a likelihood of success on their claim that the CTA exceeds Congress' authority under Article I.[4]

## II. The District Court Erred in Concluding that Plaintiffs Did Not Demonstrate a Likelihood of Success on Their Fourth Amendment Claim.

The CTA violates the Fourth Amendment because it would require community associations and their volunteers to obtain and produce information and personal identification documents without any suspicion of wrongdoing and without any opportunity to obtain precompliance review before a neutral decisionmaker. If today the Government can compel community associations to disclose volunteer information for criminal investigative purposes, tomorrow it could compel businesses to disclose information about anyone for criminal investigative purposes, all without suspicion or probable cause. This is the warrantless investigatory regime

---

[4] *Firestone v. Yellen*, No. 3:24-cv-1034, 2024 WL 4250192 (D. Or. Sept. 20, 2024) should be given no weight. The *Firestone* court denied a preliminary injunction to enjoin the CTA, largely because the movants provided no supporting evidence. *Id.* at 1. Moreover, the *Firestone* court failed to follow controlling precedent in incorrectly concluding the CTA could be upheld under the Commerce Clause simply because it regulates "entities with the capacity to engage in commerce," regardless of whether they are engaged in or will engage in commerce. *Id.* at 7. This holding directly contravenes *Sebelius*. 567 U.S. at 557 ("The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions.").

the Fourth Amendment prohibits.

For purposes of Plaintiffs' Fourth Amendment claim, the district court needed to examine whether the CTA's requirements are reasonable as applied to community associations and whether the Government could establish an exception to the Fourth Amendment's warrant requirement. The district court did not do so. It did not address what makes community associations and their unpaid volunteers unique. It did not address pertinent Supreme Court case law, including *Patel*, 576 U.S. at 412, *City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000), and *Brown v. Texas*, 443 U.S. 47, 49 (1979).

The district court instead relied almost exclusively on *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974). JA147. Since *Shultz* recognized that "reporting requirements are by no means *per se* violations of the Fourth Amendment" and held that certain bank reporting requirements were reasonable under the Fourth Amendment since Congress had found this information highly useful "in criminal, tax, or regulatory investigations," the district court held "the same rationale follows here where 'the CTA directs the disclosure of information that Congress explicitly identified as 'highly useful' in combatting serious crimes.'" JA147. The district court's analysis was flawed in several respects.

Even if the CTA imposes reporting requirements, it is still a suspicionless search and seizure requiring the Government to support an exception to the Fourth

Amendment's warrant requirements. No legislative history supports that information from community associations and their volunteers would be "highly useful" in combatting serious crimes. There is a major distinction between imposing reporting requirements on banks, a highly regulated business type with information about financial crimes, versus volunteer run community associations. Finally, Fourth Amendment precedent, including *Patel*, *Edmond*, and *Brown*, confirm that no exception to the warrant requirement applies, especially with respect to community associations.

With the Fourth Amendment, "a central aim of the Framers was to place obstacles in the way of a too permeating police surveillance." *Carpenter v. U.S.*, 585 U.S. 296, 305 (2018). Yet, the CTA was intentionally designed to circumvent these "obstacles." As FinCEN's then-Director testified, the CTA's driving purpose was to eliminate the necessity of "grand jury subpoenas" and "search warrants" when conducting criminal investigations because those constitutional requirements took too much time and "waste[d] resources." 87 Fed. Reg. 59498, 59504. Because the Fourth Amendment generally requires a warrant, "searches conducted outside the judicial process, without prior approval by a judge or a magistrate judge, are *per se* unreasonable … subject only to a few specifically established and well-delineated exceptions." *Patel*, 576 U.S. at 412. Further, when a law authorizes searches "primarily for the ordinary enterprise of investigating crimes," no exception applies

and either a warrant or—at minimum—individualized suspicion is necessary. *Edmond*, 531 U.S. at 44. Unless the CTA satisfies an exception to the warrant requirement, it violates the Fourth Amendment. *Patel*, 576 U.S. at 419–420. No exception applies here.

Imagine that FinCEN agents interrupted a community association meeting in the community clubhouse, announced they were investigating money laundering and terrorism, demanded identification documents from each board member, and then threatened all with criminal penalties if any member declined to cooperate. Imagine that, two months later, FinCEN agents returned to the same meeting, identified a board member they had not previously seen, determined that the community association had not updated the BOI report with this board member's information, and then proceeded to arrest all board members. There is no functional distinction between these unreasonable searches and the CTA as applied here. That is, it makes no Fourth Amendment difference that the CTA would compel community associations to upload information, rather than have officers physically seize it. The fact the Government can seize information and records with greater ease does not mean that the Fourth Amendment's warrant or individualized suspicion requirement no longer applies.

The Government did not dispute that the CTA needs to comply with the Fourth Amendment or that the CTA mandates disclosure of information so law

enforcement can investigate and prosecute people. Rather, the Government argued—and the district court agreed—that the CTA was reasonable under the Fourth Amendment because it imposes "reporting requirements" like *Shultz* and because Congress determined the CTA would require production of information "highly useful" in combatting crime. Yet, the district court's analysis overlooked that *Shultz* is distinguishable, that Congress made no finding that information from community associations and their volunteers would be useful at all, and that the Government has identified no exception to the Fourth Amendment's warrant requirement that could apply with respect to community associations.

In *Shultz*, 416 U.S. at 37, the Supreme Court explained that the Bank Secrecy Act ("BSA") "provides for certain reports of domestic transactions where such reports have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." The Court emphasized that "Congress recognized the importance of reports of large and unusual currency transactions in ferreting out criminal activity, and desired to strengthen the statutory basis for requiring such reports." *Id.* at 38. Consistent with the BSA's narrow focus on certain transactions facilitated by highly-regulated businesses, "the Secretary has required *only* that financial institutions file certain reports with the Commissioner of Internal Revenue." *Id.* at 39 (emphasis added). Accordingly, the Court held "[t]he regulations do not impose unreasonable reporting requirements on the banks [since] [t]he regulations require

the reporting of information with respect to abnormally large transactions in currency, most of which information the bank as a party to the transaction already possesses or would acquire." *Id.* at 67.

*Shultz* makes sense given what banks do, how they are used, and what the BSA required. But these considerations have nothing in common with what community associations do, how they are used, or the unreasonable burdens the CTA would impose on them. Without saying as much, the district court, however, apparently presumed that banks and community associations, as well as the BSA and the CTA, are somehow analogous to each other. They are not.

As Congress recognized, banks are sophisticated, commercial entities that play a critical role in criminal investigations due to their handling of large financial transactions. By contrast, community associations are volunteer-run, non-profits that exist to help their local communities and Congress made no finding about community associations or how they could possibly assist "in ferreting out criminal activity." As Congress recognized, the BSA's requirements were triggered by "abnormally large transactions in currency" and "large and unusual currency transactions." By contrast, the CTA's requirements are triggered by the very normal act of forming an entity or experiencing turnover among a volunteer board. As Congress recognized, the BSA's requirements were narrowly focused on the entity, *i.e.*, the bank. By contrast, the CTA requires that an entity's volunteers provide

information and identification records or face criminal and civil liability.[5] The district court's reliance, actually exclusive reliance, on *Shultz* was error.

Although the district court did not address the argument, the Government also argued below that the CTA satisfies the Fourth Amendment since other laws require businesses to report information to federal agencies. However, those laws are not targeted at investigating criminal activity. The immigration statute, 8 U.S.C. § 1324a(b), concerns compliance with immigration and employment laws, requiring certain employers to retain documentation to verify that an employee "is not an unauthorized alien" and to "make it available for inspection." The campaign finance statute, 52 U.S.C. § 30104(a), is focused on fair and transparent elections, requiring political committees to file reports with the FEC. The tax statutes, 26 U.S.C. §§ 6012, 6031-60, are about tax assessment and collection, and tax return information ordinarily cannot be disclosed by the IRS to federal prosecutors absent a court order, which generally requires proof of individualized suspicion. 26 U.S.C. § 6103(i)(1)(A). Unlike these laws, the CTA is specifically targeted at helping law enforcement to investigate and prosecute crime.

---

[5] Further, the CTA would require that community associations send law enforcement copies of people's drivers licenses and passports—records the community associations do not possess and may not be able to obtain. It also makes no difference that these are government-issued documents. There is "no case" supporting "the argument that what would otherwise be an unconstitutional search is not such where it produces only public information." *U.S. v. Jones*, 565 U.S. 400, 409 (2012).

Although the district court did not address the argument, the Government further argued below that the CTA satisfies the "special needs" exception to the Fourth Amendment. However, the "special needs" exception applies only when "special needs, *beyond the normal need for law enforcement*, make the warrant and probable-cause requirement impracticable." *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 619 (1989) (emphasis added). The prime examples are suspicionless airline security searches and DUI checkpoints where safety is the primary concern. *See U.S. v. Edwards*, 498 F.2d 496, 500 (2d Cir. 1974); *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 450 (1990).[6] By contrast, the CTA's sole justification is the "normal need for law enforcement," there is nothing "special" about this, and the Government also cannot support that any "special needs" permit the Government to conduct a warrantless search of community associations.

The CTA is the functional equivalent of the checkpoint in *City of Indianapolis v. Edmond*, 531 U.S. 32, 48 (2000), which was discussed in the briefing below but the district court did not address. There, the government attempted to defend suspicionless stops by asserting officers had no discretion and thus everyone was

---

[6] It is possible for a warrantless administrative search to comply with the Fourth Amendment in certain "pervasively regulated" industries. *Patel*, 576 U.S. at 424. But that doctrine applies only to industries where "no reasonable expectation of privacy could exist." *Free Speech Coal.*, 825 F.3d at 169. Thus, this "narrow exception" applies to only four industries: liquor sales, firearms dealing, mining, and running an automobile junkyard." *Patel*, 576 U.S. at 424.

stopped. "[W]hat principally distinguishes these checkpoints from those we have previously approved is their primary purpose." *Id.* at 40. The Supreme Court emphasized it has "never approved a checkpoint program whose primary purpose [is] to detect evidence of ordinary criminal wrongdoing." *Id.* at 41. The Court refused "to recognize exceptions to the general rule of individualized suspicion where governmental authorities primarily pursue their general crime control ends."*Id.* If suspicionless searches were permitted whenever government pursued an interest in "crime control," people could be subjected to checkpoints as "a routine part of American life." *Id.* at 42. To prevent this, the Court found it necessary to "draw[] the line" and declare suspicionless searches "designed primarily to serve the general interest in crime control" unconstitutional. *Id.* at 42. The CTA is the same unconstitutional checkpoint, "designed primarily to serve the general interest in crime control," only in far broader, repetitive, and more modern form.[7]

The CTA likewise mirrors the unconstitutional reporting regime in *Patel*, 576 U.S. at 419–420, also discussed extensively in the briefing below but not addressed

---

[7] "[T]here is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country and a computerized summary located in a single clearinghouse of information." *U.S. Dep't of Justice v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 764 (1989). Moreover, while the intrusion is not burdensome or even known to the suspect, warrantless searches of cell site data and thermal imaging are unconstitutional even though they require nothing from the suspect. *See, e.g., Carpenter*, 585 U.S. at 313 (cell site data); *Kyllo v. U.S.*, 533 U.S. 27, 35 (2001) (thermal imaging).

by the district court. There, the Court examined an ordinance that required hotels to collect and make available to police officers on demand a "guest's name and address" and other sensitive information, with failure to comply a misdemeanor. *Id.* at 412-13. Observing that "modern hotel registries contain sensitive information, such as driver's licenses and credit card numbers," the Court explained "searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are *per se* unreasonable ... subject to only a few specifically established and well-delineated exceptions." *Id.* at 419, 426 (citations omitted). The Court viewed the ordinance as an "administrative search" not in aid of criminal investigation but "ensur[ing] compliance with the recordkeeping requirement, which in turn deters criminals from operating on the hotels' premises." *Id.* at 420. Nevertheless, the ordinance violated the Fourth Amendment because "absent consent, exigent circumstances, or the like," the subject of even an administrative search "must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Id.* The CTA has the same infirmities.

The CTA is likewise functionally the same as the statute in *Brown v. Texas*, 443 U.S. 47, 49 (1979), which again was briefed below but not addressed by the district court. There, the Supreme Court examined a statute which made it a crime "for a person to refuse to give his name and address to an officer 'who has lawfully stopped him and requested the information.'" A police officer stopped the defendant,

demanded he identify himself, and—when the defendant refused—charged him under the statute. *Id*. at 48–49. The officer later acknowledged "the only reason he stopped appellant was to ascertain his identity." *Id*. at 52. Notwithstanding the statute's "weighty social objective in large metropolitan centers: prevention of crime," the statute violated the Fourth Amendment. *Id*.; *see also Hiibel v. Sixth Jud. Dist. Ct. of Nevada,* 542 U.S. 177, 186–187 (2004) (law enforcement must have reasonable suspicion to conduct a *Terry* stop and then compel someone to disclose their identity). In the same way, the CTA makes it a crime "for a person to refuse to give his name and address" to law enforcement even though law enforcement has no reasonable suspicion, probable cause, or warrant. And in the same way, the CTA violates the Fourth Amendment.

The CTA is effectively the same, if not worse, than the laws overturned in the cases above. Rather than reasonable, it would conscript community associations and their volunteers to report and regularly update their personal information or face civil and criminal liability, so law enforcement can bypass subpoenas or warrants and thus more quickly conduct criminal investigations. Yet, Congress made no finding that personal information from community associations and their volunteers would serve any law enforcement or crime control interests. Nor is Congress broadly declaring that a law serves "law enforcement or crime control interests" any kind of exception to the Fourth Amendment's warrant requirement. Because the Government can

neither support that the CTA's application to community associations and their volunteers is reasonable nor support any exception to the Fourth Amendment's warrant requirement, the district court should have found that Plaintiffs demonstrated a likelihood of success on their Fourth Amendment claim.

### III. The District Court Erred in Concluding that Plaintiffs Did Not Demonstrate a Likelihood of Success on Their First Amendment Claim.

The CTA violates the First Amendment's compelled speech doctrine because it would require community associations and their volunteers to report and regularly update their personal information or face civil and criminal liability if an error or omission were ever made. The CTA violates the First Amendment's freedom of association because the risk of civil and criminal liability is now deterring and threatens to deter countless people from continuing or beginning to serve on their community association boards. The CTA's chilling effect on people's willingness to volunteer with their community associations is not speculation, but confirmed by record evidence.

For purposes of Plaintiffs' First Amendment claim, the district court needed to examine the CTA's impact on community associations and their volunteers with "exacting scrutiny" which required analyzing whether the "government-mandated disclosure regime [is] narrowly tailored to the government's asserted interest" and whether there is a "substantial relation between the disclosure requirement and a sufficiently important government interest." *Bonta*, 594 U.S. at 607. The district

court did not do so. Although *Bonta* should have controlled, the district court never mentioned it, but relied on the Government's misstatements of law to hold that the compelled speech doctrine "typically only applies when the government requires an individual to convey a 'particular message' publicly," "the CTA does not require the *public* disclosure of information," and "[t]he CTA therefore does not violate the compelled speech doctrine." (emphasis in original). Although hard to follow, the district court further held that the CTA does not violate associational rights since Plaintiffs attested "they will resign from Board service rather than disclose their personal identifying information" but "speculations about *potential* resignations are insufficient to demonstrate a likelihood of success on the merits." (emphasis in original). JA146. The entirety of the district court's analysis is at odds with *Bonta* and other controlling First Amendment precedent.

The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984); *see also Griswold v. Connecticut*, 381 U.S. 479, 483 (1965) ("[W]e have protected forms of 'association' that are not political in the customary sense but pertain to the social, legal, and economic benefit of the members."). The Supreme Court has defined "expressive activity" broadly, covering collectives that "'engage in a variety of civic, charitable, lobbying, fundraising, and other activities.'" *Roberts v. U.S. Jaycees*, 468

U.S. 609, 626–627 (1984). This includes community associations.

As their name suggests, community associations perform a special role in communities by allowing their members to speak with an organized, collective voice to government officials on matters of public concern. *Rumsfeld v. Forum for Acad. Institutional Rights, Inc.*, 547 U.S. 47, 68 (2006) ("The right to speak is often exercised most effectively by combining one's voice with the voices of others"). By any measure, community associations have civic, political and economic interests, as they meet and advocate on environmental, zoning, health, safety, and other matters. JA53 ¶ 11, JA58 ¶ 12, JA63 ¶ 12. More than most organizations, however, community associations are unique in ways that make the risk of a CTA reporting mistake and thus the risk of CTA penalties exceedingly high, *i.e.*, they are run by unpaid volunteers, their boards face frequent turnover, and each volunteer must rely on fellow unpaid volunteers to hope and trust administrative mistakes are not made.

The district court's analysis was flawed in several respects, including by failure to apply the "exacting scrutiny" test to Plaintiffs' "as applied" First Amendment claim. The Government offered nothing, and the district court said nothing, to support how forcing community associations to produce personal information about their volunteers, under threat of civil and criminal penalties, satisfies "exacting scrutiny" or would serve "a sufficiently important government interest." There is no legislative history to support any such conclusion. The district

court's opinion does not even acknowledge the test. It may be true that investigating money laundering and terrorist financing is an important government interest, but this does not support that volunteer run community associations have anything to do with it.

The district court also failed to apply controlling law when concluding that the compelled speech doctrine is limited to circumstances where a person is required to publicly communicate a particular message or is otherwise limited to the public disclosure of information. JA145. The First Amendment compelled speech law supports just the opposite. The Supreme Court has frequently applied the compelled speech doctrine to invalidate laws by which the government sought to compel organizations to disclose membership lists or sought to compel a person to disclose their affiliations, not to the general public, but to the government. *See Shelton v. Tucker*, 364 U.S. 479, 485–490 (1960); *NAACP v. Alabama*, 357 U.S. 449, 460 (1958); *Brown v. Socialist Workers '74 Campaign Comm. (Ohio),* 459 U.S. 87, 101–102 (1982); *Bonta*, 594 U.S. at 616–617. Thus, in *Shelton v. Tucker*, 364 U.S. at 485–490, the Court invalidated on First Amendment grounds a state law requiring that teachers annually file with a state agency an affidavit listing every organization they joined or contributed to in prior five years. Emphasizing the chilling effect this could have on someone's willingness to participate in associations, the Court explained "[e]ven if there were no disclosure to the general public, the pressure upon

a teacher to avoid any ties which might displease those who control his professional destiny would be constant and heavy." *Shelton*, 364 U.S. at 486; *see also Bonta*, 594 U.S. at 616–617 ("[o]ur cases have said that disclosure requirements can chill association '[e]ven if there [is] no disclosure to the general public'").

The district court likewise misconstrued the facts and law when explaining that, although Plaintiffs attested "they will resign from Board service rather than disclose their personal identifying information," "speculations about *potential* resignations are insufficient." JA146. The district court apparently believed there could be no freedom of association claim unless and until board members had already resigned. But this is not the law. In *Bonta*, 594 U.S. at 617, where the Supreme Court struck down a law requiring disclosure of charity donor information, the Court emphasized that "[e]xacting scrutiny is triggered by state action which *may* have the effect of the curtailing the freedom to associate," and the "'*possible* deterrent effect of disclosure,'" *id.* (quoting *NAACP v. Alabama*, 357 U.S. at 460–461) (emphasis in original); and "the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals [rather] *the risk of a chilling effect is enough*," *id.* at 618–619 (emphasis added). This is the controlling First Amendment precedent the district court should have applied. Further, the record evidence easily supports a "possible deterrent effect" and "the risk of a chilling effect," with CAI's survey confirming

that 88% of respondents expect volunteer board members to resign. JA75.

Finally, the district court erred by not following *Bonta* (or even addressing it) and instead effectively holding that the First Amendment is satisfied simply because the CTA's purpose is investigating and prosecuting financial crime. JA146. In *Bonta*, the Supreme Court addressed a law requiring charities to report to the government "the names and addresses of donors who have contributed more than $5,000 in a particular tax year." 594 U.S. at 602. The government asserted an interest in conserving resources and rooting out charity fraud, citing complaints of misconduct "from 'misuse, misappropriation, and diversion of charitable assets,' to 'false and misleading charitable solicitations,' to other 'improper activities by charities soliciting charitable donations.'" *Id.* at 611–612.

The *Bonta* Court concluded, however, that the government's interest was not narrowly tailored to the burden it imposed. "The [government] may well prefer to have every charity's information close at hand, just in case. But the prime objective of the First Amendment is not efficiency." *Id.* at 615. Because the government's interest did not justify "cast[ing] a dragnet for sensitive … information from tens of thousands of charities each year" and there was "dramatic mismatch … between the interest that the Attorney General seeks to promote and the disclosure regime that he has implemented," the government could not satisfy "exacting scrutiny" and the law violated the First Amendment's freedom of association. *Id.* at 614.

The CTA poses the same problem here. In dragnet fashion, it would require approximately 365,000 community associations to produce personal information and identification documents for millions of people—exposing them to civil and criminal penalties if they fail to continually update their information—without any showing that the data is critical or necessary for investigating financial crimes. The Government's claimed interest does not sufficiently justify this massive burden. Nor does it justify triggering the resignation of volunteer board members across the country who reasonably fear that an inadvertent mistake could lead to their prosecution. As in *Bonta*, there is a "dramatic mismatch … between the interest that the [Government] seeks to promote and the disclosure regime that [it] has implemented." *Id.* at 597.

The district court's failure to address and apply *Bonta* was reversible error. The district court neglected to apply *Bonta*'s "exacting scrutiny" to the CTA's impact on community associations, instead reciting CTA's criminal investigative purpose while overlooking CTA's burdens and its chilling effect on volunteerism. Because the Government can neither support that the "government-mandated disclosure regime [is] narrowly tailored to the government's asserted interest" nor support a "substantial relation between the disclosure requirement and a sufficiently important government interest," the district court should have found that Plaintiffs demonstrated a likelihood of success on their First Amendment claim.

**IV. Because the District Court Erred in Rejecting the Plaintiffs' Likelihood of Success on the Merits, It Also Erred in Applying the Irreparable Harm, Public Interest, and Balance of Equities Factors.**

In addition to a likelihood of success on the merits, Plaintiffs established that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in their favor, and that an injunction is in the public interest. *See Winter*, 555 U.S. at 20. The district court expressly tied its analysis of these three prongs to its legal conclusion that Plaintiffs were unlikely to succeed on the merits of their constitutional and other claims. JA147–148. As a result, it erroneously held that none of the preliminary injunction factors favored Plaintiffs. Should this Court reject the district court's constitutional analysis, it must also reject its flawed application of the remaining preliminary injunction factors.

Plaintiffs have established that the CTA's reporting requirements infringe on their constitutional rights, which alone constitutes irreparable harm. Courts have consistently recognized that violations of constitutional rights cause irreparable injury, as even temporary deprivations cannot be undone. *See WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (irreparable harm is "inseparably linked" to the likelihood of success on a First Amendment claim); *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, 'for

even minimal periods of time, unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))).

Moreover, Plaintiffs have overwhelmingly shown that the CTA is causing and will continue to cause irreparable harm to community associations and their volunteers. As confirmed by Plaintiffs' unrebutted declarations and CAI's survey, the CTA is now chilling board member service by instilling genuine, reasonable fears about intrusion on personal privacy, a difficult and ongoing administrative burden, and especially civil and criminal liability in the event an error or omission were ever made. JA52–76. Senya Ehrstein, Nancy Wiegand, Nick Kornuta, Cheri Heaton, and Kathi Robinson have declared they are resigning or are likely to resign and cease volunteering, and CAI's survey of over 850 board members confirm that these concerns are pervasive: 80% of respondents anticipate resignations, and 88% believe the CTA will deter future volunteers. JA54 ¶ 20, JA59 ¶ 17, JA63 ¶ 14, JA66 ¶ 15, JA69 ¶ 17, JA76 ¶ 37. The fact that volunteers who fear liability are inclined to cease being volunteers is also not surprising, as Congress identified these same concerns with passage of the Volunteer Protection Act, 42 U.S.C. § 14501, decades ago. The district court's contrary finding, describing Plaintiffs' evidence as merely "tentative statements of concern," was unsupported and an abuse of discretion. JA148.

The district court should have held that the balance of equities strongly favors an injunction, particularly with the looming January 1, 2025 reporting deadline. This Court has recognized that preventing government officials from enforcing likely unconstitutional practices does not harm the government. *See Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013) (citing *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)). CAI represents over 47,000 members, including board members and association managers who serve 75.5 million homeowners across more than 365,000 associations, representing nearly one-third of the U.S. population. JA13 ¶ 4, JA71 ¶¶ 6–7. Given its impact on volunteerism, the CTA places these community associations in jeopardy of violating operational requirements under state law, threatening their ability to function and serve their communities. *See Air Vac EMS, Inc. v. Macon-Bibb Cty.*, 37 F.4th 103, 116 (11th Cir. 2022) (balance of equities favors plaintiffs where enforcement of a likely unconstitutional statute would disrupt their operations); *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("A stay will do OSHA no harm whatsoever. Any interest OSHA may claim in enforcing an unlawful (and likely unconstitutional) regulation is illegitimate."). An injunction will impose no administrative burden on FinCEN; it will simply prevent enforcement of the CTA against community associations and maintain the pre-litigation status quo while the constitutionality of the CTA's application is fully considered.

Finally, the district court should have found that the public interest supported a preliminary injunction since "upholding constitutional rights surely serves the public interest." *Giovani Carandola*, 303 F.3d at 521. Rather than actually examine how the public would be affected if community associations and their volunteers are subject to the CTA, however, the district court just recited "the public interest (as noted by Congress) in the effective enforcement of federal law to counter money laundering and terrorism financing." JA149. This is the same error that pervades the district court's analysis across all of Plaintiffs' constitutional claims.

The district court repeatedly recited and relied on the CTA's criminal investigative purpose to reject Plaintiffs' constitutional claims. JA145, 147, 149. But a law is not constitutional or in the public interest simply because Congress declared that it has a criminal investigative purpose. The district court should have recognized that Congress did not find that volunteer-run community associations have any connection to money laundering or terrorism financing and likewise that the Government never argued or identified evidence supporting that volunteer-run community associations have any connection to money laundering or terrorism financing. In all events, the public interest is not served by forcing unpaid volunteers to subject themselves to civil and criminal liability in the event of a filing error or omission or to otherwise resign from serving their communities.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court and remand with instructions to immediately enter a preliminary injunction to halt enforcement of the CTA's reporting requirements against community associations.

## REQUEST FOR ORAL ARGUMENT

Because this case has significant implications for community associations and presents good and valid circumstances to examine the constitutionality of the Corporate Transparency Act, Appellants believe oral argument would assist the Court in resolving this appeal.

November 12, 2024      Respectfully submitted,

/s/ Brendan P. Bunn      /s/ Clair E. Wischusen

Brendan P. Bunn       Damon W.D. Wright

CHADWICK, WASHINGTON     Clair E. Wischusen

MORIARTY, ELMORE & BUNN, P.C.  GORDON REES SCULLY

3201 Jermantown Road, Suite 600  MANSUKHANI LLP

Fairfax, VA 22030      277 S. Washington Street, Ste. 550

Tel: (703) 352-1900     Alexandria, VA 22314

bpbunn@chadwickwashington.com Tel: (703) 650-7030

            dwright@grsm.com

*Counsel for Appellants, Canterbury* cwischusen@grsm.com

*Crossing Condominium Trust,*

*Townhouse Green Cooperative Inc.,* *Counsel for Appellant,*

*Terraces on Memorial Homeowners* *Community Associations Institute*

*Association, Farrcroft Homeowners*

*Association, Regency at Ashburn*

*Greenbrier Condominium Association*

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations because it contains 12,122 words (as determined by the Microsoft Word system used to prepare it), excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface and type-style requirements because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point, Times New Roman font.

*/s/ Clair E. Wischusen*
Clair E. Wischusen

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2024, this brief was filed with the Clerk of the Court through the appellate CM/ECF system, which will send notification to all registered counsel of record.

*/s/ Clair E. Wischusen*
Clair E. Wischusen

# **ADDENDUM**

31 U.S.C. ¶ 5336 (Beneficial ownership information reporting requirements)

(e) GUIDANCE.—The Secretary of the Treasury, in consultation with the Attorney General and Federal, State, Tribal, and local law enforcement agencies, shall issue guidance on the required elements of a keep open request.

(Added Pub. L. 116–283, div. F, title LXIII, § 6306(a)(1), Jan. 1, 2021, 134 Stat. 4588.)

## § 5334. Training regarding anti-money laundering and countering the financing of terrorism

(a) TRAINING REQUIREMENT.—Each Federal examiner reviewing compliance with the Bank Secrecy Act, as defined in section 6003 of the Anti-Money Laundering Act of 2020, shall attend appropriate annual training, as determined by the Secretary of the Treasury, relating to anti-money laundering activities and countering the financing of terrorism, including with respect to—

(1) potential risk profiles and warning signs that an examiner may encounter during examinations;

(2) financial crime patterns and trends;

(3) the high-level context for why anti-money laundering and countering the financing of terrorism programs are necessary for law enforcement agencies and other national security agencies and what risks those programs seek to mitigate; and

(4) de-risking and the effect of de-risking on the provision of financial services.

(b) TRAINING MATERIALS AND STANDARDS.—The Secretary of the Treasury shall, in consultation with the Financial Institutions Examination Council, the Financial Crimes Enforcement Network, and Federal, State, Tribal, and local law enforcement agencies, establish appropriate training materials and standards for use in the training required under subsection (a).

(Added Pub. L. 116–283, div. F, title LXIII, § 6307(a), Jan. 1, 2021, 134 Stat. 4590.)

REFERENCES IN TEXT

Section 6003 of the Anti-Money Laundering Act of 2020, referred to in subsec. (a), is section 6003 of div. F of Pub. L. 116–283, which is set out as a note under section 5311 of this title. Such section 6003 defines terms, including the Bank Secrecy Act, as used in div. F of Pub. L. 116–283.

## § 5335. Prohibition on concealment of the source of assets in monetary transactions

(a) DEFINITION OF MONETARY TRANSACTION.—In this section, the term the term "monetary transaction"—

(1) means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in section 1956(c)(5) of title 18) by, through, or to a financial institution (as defined in section 1956(c)(6) of title 18);

(2) includes any transaction that would be a financial transaction under section 1956(c)(4)(B) of title 18; and

(3) does not include any transaction necessary to preserve the right to representation of a person as guaranteed by the Sixth Amendment to the Constitution of the United States.

(b) PROHIBITION.—No person shall knowingly conceal, falsify, or misrepresent, or attempt to conceal, falsify, or misrepresent, from or to a financial institution, a material fact concerning the ownership or control of assets involved in a monetary transaction if—

(1) the person or entity who owns or controls the assets is a senior foreign political figure, or any immediate family member or close associate of a senior foreign political figure, as set forth in this title or the regulations promulgated under this title; and

(2) the aggregate value of the assets involved in 1 or more monetary transactions is not less than $1,000,000.

(c) SOURCE OF FUNDS.—No person shall knowingly conceal, falsify, or misrepresent, or attempt to conceal, falsify, or misrepresent, from or to a financial institution, a material fact concerning the source of funds in a monetary transaction that—

(1) involves an entity found to be a primary money laundering concern under section 5318A or the regulations promulgated under this title; and

(2) violates the prohibitions or conditions prescribed under section 5318A(b)(5) or the regulations promulgated under this title.

(d) PENALTIES.—A person convicted of an offense under subsection (b) or (c), or a conspiracy to commit an offense under subsection (b) or (c), shall be imprisoned for not more than 10 years, fined not more than $1,000,000, or both.

(e) FORFEITURE.—

(1) CRIMINAL FORFEITURE.—

(A) IN GENERAL.—The court, in imposing a sentence under subsection (d), shall order that the defendant forfeit to the United States any property involved in the offense and any property traceable thereto.

(B) PROCEDURE.—The seizure, restraint, and forfeiture of property under this paragraph shall be governed by section 413 of the Controlled Substances Act (21 U.S.C. 853).

(2) CIVIL FORFEITURE.—

(A) IN GENERAL.—Any property involved in a violation of subsection (b) or (c), or a conspiracy to commit a violation of subsection (b) or (c), and any property traceable thereto may be seized and forfeited to the United States.

(B) PROCEDURE.—Seizures and forfeitures under this paragraph shall be governed by the provisions of chapter 46 of title 18 relating to civil forfeitures, except that such duties, under the customs laws described in section 981(d) of title 18, given to the Secretary of the Treasury shall be performed by such officers, agents, and other persons as may be designated for that purpose by the Secretary of Homeland Security or the Attorney General.

(Added Pub. L. 116–283, div. F, title LXIII, § 6313(a), Jan. 1, 2021, 134 Stat. 4596.)

## § 5336. Beneficial ownership information reporting requirements

(a) DEFINITIONS.—In this section:

(1) ACCEPTABLE IDENTIFICATION DOCUMENT.—The term "acceptable identification document" means, with respect to an individual—

(A) a nonexpired passport issued by the United States;

(B) a nonexpired identification document issued by a State, local government, or Indian Tribe to the individual acting for the purpose of identification of that individual;

(C) a nonexpired driver's license issued by a State; or

(D) if the individual does not have a document described in subparagraph (A), (B), or (C), a nonexpired passport issued by a foreign government.

(2) APPLICANT.—The term "applicant" means any individual who—

(A) files an application to form a corporation, limited liability company, or other similar entity under the laws of a State or Indian Tribe; or

(B) registers or files an application to register a corporation, limited liability company, or other similar entity formed under the laws of a foreign country to do business in the United States by filing a document with the secretary of state or similar office under the laws of a State or Indian Tribe.

(3) BENEFICIAL OWNER.—The term "beneficial owner"—

(A) means, with respect to an entity, an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise—

(i) exercises substantial control over the entity; or

(ii) owns or controls not less than 25 percent of the ownership interests of the entity; and

(B) does not include—

(i) a minor child, as defined in the State in which the entity is formed, if the information of the parent or guardian of the minor child is reported in accordance with this section;

(ii) an individual acting as a nominee, intermediary, custodian, or agent on behalf of another individual;

(iii) an individual acting solely as an employee of a corporation, limited liability company, or other similar entity and whose control over or economic benefits from such entity is derived solely from the employment status of the person;

(iv) an individual whose only interest in a corporation, limited liability company, or other similar entity is through a right of inheritance; or

(v) a creditor of a corporation, limited liability company, or other similar entity, unless the creditor meets the requirements of subparagraph (A).

(4) DIRECTOR.—The term "Director" means the Director of FinCEN.

(5) FINCEN.—The term "FinCEN" means the Financial Crimes Enforcement Network of the Department of the Treasury.

(6) FINCEN IDENTIFIER.—The term "FinCEN identifier" means the unique identifying number assigned by FinCEN to a person under this section.

(7) FOREIGN PERSON.—The term "foreign person" means a person who is not a United States person, as defined in section 7701(a) of the Internal Revenue Code of 1986.

(8) INDIAN TRIBE.—The term "Indian Tribe" has the meaning given the term "Indian tribe" in section 102 of the Federally Recognized Indian Tribe List Act of 1994 (25 U.S.C. 5130).

(9) LAWFULLY ADMITTED FOR PERMANENT RESIDENCE.—The term "lawfully admitted for permanent residence" has the meaning given the term in section 101(a) of the Immigration and Nationality Act (8 U.S.C. 1101(a)).

(10) POOLED INVESTMENT VEHICLE.—The term "pooled investment vehicle" means—

(A) any investment company, as defined in section 3(a) of the Investment Company Act of 1940 (15 U.S.C. 80a–3(a)); or

(B) any company that—

(i) would be an investment company under that section but for the exclusion provided from that definition by paragraph (1) or (7) of section 3(c) of that Act (15 U.S.C. 80a–3(c)); and

(ii) is identified by its legal name by the applicable investment adviser in its Form ADV (or successor form) filed with the Securities and Exchange Commission.

(11) REPORTING COMPANY.—The term "reporting company"—

(A) means a corporation, limited liability company, or other similar entity that is—

(i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or

(ii) formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe; and

(B) does not include—

(i) an issuer—

(I) of a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l); or

(II) that is required to file supplementary and periodic information under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d));

(ii) an entity—

(I) established under the laws of the United States, an Indian Tribe, a State, or a political subdivision of a State, or under an interstate compact between 2 or more States; and

(II) that exercises governmental authority on behalf of the United States or any such Indian Tribe, State, or political subdivision;

(iii) a bank, as defined in—

(I) section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813);

(II) section 2(a) of the Investment Company Act of 1940 (15 U.S.C. 80a–2(a)); or

(III) section 202(a) of the Investment Advisers Act of 1940 (15 U.S.C. 80b–2(a));

(iv) a Federal credit union or a State credit union (as those terms are defined in

section 101 of the Federal Credit Union Act (12 U.S.C. 1752));

(v) a bank holding company (as defined in section 2 of the Bank Holding Company Act of 1956 (12 U.S.C. 1841)) or a savings and loan holding company (as defined in section 10(a) of the Home Owners' Loan Act (12 U.S.C. 1467a(a)));

(vi) a money transmitting business registered with the Secretary of the Treasury under section 5330;

(vii) a broker or dealer (as those terms are defined in section 3 of the Securities Exchange Act of 1934 (15 U.S.C. 78c)) that is registered under section 15 of that Act (15 U.S.C. 78o);

(viii) an exchange or clearing agency (as those terms are defined in section 3 of the Securities Exchange Act of 1934 (15 U.S.C. 78c)) that is registered under section 6 or 17A of that Act (15 U.S.C. 78f, 78q–1);

(ix) any other entity not described in clause (i), (vii), or (viii) that is registered with the Securities and Exchange Commission under the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.);

(x) an entity that—

(I) is an investment company (as defined in section 3 of the Investment Company Act of 1940 (15 U.S.C. 80a–3)) or an investment adviser (as defined in section 202 of the Investment Advisers Act of 1940 (15 U.S.C. 80b–2)); and

(II) is registered with the Securities and Exchange Commission under the Investment Company Act of 1940 (15 U.S.C. 80a–1 et seq.) or the Investment Advisers Act of 1940 (15 U.S.C. 80b–1 et seq.);

(xi) an investment adviser—

(I) described in section 203(l) of the Investment Advisers Act of 1940 (15 U.S.C. 80b–3(l)); and

(II) that has filed Item 10, Schedule A, and Schedule B of Part 1A of Form ADV, or any successor thereto, with the Securities and Exchange Commission;

(xii) an insurance company (as defined in section 2 of the Investment Company Act of 1940 (15 U.S.C. 80a–2));

(xiii) an entity that—

(I) is an insurance producer that is authorized by a State and subject to supervision by the insurance commissioner or a similar official or agency of a State; and

(II) has an operating presence at a physical office within the United States;

(xiv)(I) a registered entity (as defined in section 1a of the Commodity Exchange Act (7 U.S.C. 1a)); or

(II) an entity that is—

(aa)(AA) a futures commission merchant, introducing broker, swap dealer, major swap participant, commodity pool operator, or commodity trading advisor (as those terms are defined in section 1a of the Commodity Exchange Act (7 U.S.C. 1a)); or

(BB) a retail foreign exchange dealer, as described in section 2(c)(2)(B) of that Act (7 U.S.C. 2(c)(2)(B)); and

(bb) registered with the Commodity Futures Trading Commission under the Commodity Exchange Act (7 U.S.C. 1 et seq.);

(xv) a public accounting firm registered in accordance with section 102 of the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7212);

(xvi) a public utility that provides telecommunications services, electrical power, natural gas, or water and sewer services within the United States;

(xvii) a financial market utility designated by the Financial Stability Oversight Council under section 804 of the Payment, Clearing, and Settlement Supervision Act of 2010 (12 U.S.C. 5463);

(xviii) any pooled investment vehicle that is operated or advised by a person described in clause (iii), (iv), (vii), (x), or (xi);

(xix) any—

(I) organization that is described in section 501(c) of the Internal Revenue Code of 1986 (determined without regard to section 508(a) of such Code) and exempt from tax under section 501(a) of such Code, except that in the case of any such organization that loses an exemption from tax, such organization shall be considered to be continued to be described in this subclause for the 180-day period beginning on the date of the loss of such tax-exempt status;

(II) political organization (as defined in section 527(e)(1) of such Code) that is exempt from tax under section 527(a) of such Code; or

(III) trust described in paragraph (1) or (2) of section 4947(a) of such Code;

(xx) any corporation, limited liability company, or other similar entity that—

(I) operates exclusively to provide financial assistance to, or hold governance rights over, any entity described in clause (xix);

(II) is a United States person;

(III) is beneficially owned or controlled exclusively by 1 or more United States persons that are United States citizens or lawfully admitted for permanent residence; and

(IV) derives at least a majority of its funding or revenue from 1 or more United States persons that are United States citizens or lawfully admitted for permanent residence;

(xxi) any entity that—

(I) employs more than 20 employees on a full-time basis in the United States;

(II) filed in the previous year Federal income tax returns in the United States demonstrating more than $5,000,000 in gross receipts or sales in the aggregate, including the receipts or sales of—

(aa) other entities owned by the entity; and

(bb) other entities through which the entity operates; and

(III) has an operating presence at a physical office within the United States;

(xxii) any corporation, limited liability company, or other similar entity of which the ownership interests are owned or controlled, directly or indirectly, by 1 or more entities described in clause (i), (ii), (iii), (iv), (v), (vii), (viii), (ix), (x), (xi), (xii), (xiii), (xiv), (xv), (xvi), (xvii)[1] (xix), or (xxi);

(xxiii) any corporation, limited liability company, or other similar entity—

(I) in existence for over 1 year;

(II) that is not engaged in active business;

(III) that is not owned, directly or indirectly, by a foreign person;

(IV) that has not, in the preceding 12-month period, experienced a change in ownership or sent or received funds in an amount greater than $1,000 (including all funds sent to or received from any source through a financial account or accounts in which the entity, or an affiliate of the entity, maintains an interest); and

(V) that does not otherwise hold any kind or type of assets, including an ownership interest in any corporation, limited liability company, or other similar entity;

(xxiv) any entity or class of entities that the Secretary of the Treasury, with the written concurrence of the Attorney General and the Secretary of Homeland Security, has, by regulation, determined should be exempt from the requirements of subsection (b) because requiring beneficial ownership information from the entity or class of entities—

(I) would not serve the public interest; and

(II) would not be highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes.

(12) STATE.—The term "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, American Samoa, Guam, the United States Virgin Islands, and any other commonwealth, territory, or possession of the United States.

(13) UNIQUE IDENTIFYING NUMBER.—The term "unique identifying number" means, with respect to an individual or an entity with a sole member, the unique identifying number from an acceptable identification document.

(14) UNITED STATES PERSON.—The term "United States person" has the meaning given the term in section 7701(a) of the Internal Revenue Code of 1986.

(b) BENEFICIAL OWNERSHIP INFORMATION REPORTING.—

(1) REPORTING.—

(A) IN GENERAL.—In accordance with regulations prescribed by the Secretary of the Treasury, each reporting company shall submit to FinCEN a report that contains the information described in paragraph (2).

(B) REPORTING OF EXISTING ENTITIES.—In accordance with regulations prescribed by the Secretary of the Treasury, any reporting company that has been formed or registered before the effective date of the regulations prescribed under this subsection shall, in a timely manner, and not later than 2 years after the effective date of the regulations prescribed under this subsection, submit to FinCEN a report that contains the information described in paragraph (2).

(C) REPORTING AT TIME OF FORMATION OR REGISTRATION.—In accordance with regulations prescribed by the Secretary of the Treasury, any reporting company that has been formed or registered after the effective date of the regulations promulgated under this subsection shall, at the time of formation or registration, submit to FinCEN a report that contains the information described in paragraph (2).

(D) UPDATED REPORTING FOR CHANGES IN BENEFICIAL OWNERSHIP.—In accordance with regulations prescribed by the Secretary of the Treasury, a reporting company shall, in a timely manner, and not later than 1 year after the date on which there is a change with respect to any information described in paragraph (2), submit to FinCEN a report that updates the information relating to the change.

(E) TREASURY REVIEW OF UPDATED REPORTING FOR CHANGES IN BENEFICIAL OWNERSHIP.—The Secretary of the Treasury, in consultation with the Attorney General and the Secretary of Homeland Security, shall conduct a review to evaluate—

(i) the necessity of a requirement for corporations, limited liability companies, or other similar entities to update the report on beneficial ownership information in paragraph (2), related to a change in ownership, within a shorter period of time than required under subparagraph (D), taking into account the updating requirements under subparagraph (D) and the information contained in the reports;

(ii) the benefit to law enforcement and national security officials that might be derived from,[2] and the burden that a requirement to update the list of beneficial owners within a shorter period of time after a change in the list of beneficial owners would impose on corporations, limited liability companies, or other similar entities; and

(iii) not later than 2 years after the date of enactment of this section, incorporate[2] into the regulations, as appropriate, any changes necessary to implement the findings and determinations based on the review required under this subparagraph.

(F) REGULATION REQUIREMENTS.—In promulgating the regulations required under subparagraphs (A) through (D), the Secretary of the Treasury shall, to the greatest extent practicable—

---

[1] So in original. Probably should be followed by a comma.

[2] So in original.

(i) establish partnerships with State, local, and Tribal governmental agencies;

(ii) collect information described in paragraph (2) through existing Federal, State, and local processes and procedures;

(iii) minimize burdens on reporting companies associated with the collection of the information described in paragraph (2), in light of the private compliance costs placed on legitimate businesses, including by identifying any steps taken to mitigate the costs relating to compliance with the collection of information; and

(iv) collect information described in paragraph (2) in a form and manner that ensures the information is highly useful in—

(I) facilitating important national security, intelligence, and law enforcement activities; and

(II) confirming beneficial ownership information provided to financial institutions to facilitate the compliance of the financial institutions with anti-money laundering, countering the financing of terrorism, and customer due diligence requirements under applicable law.

(G) REGULATORY SIMPLIFICATION.—To simplify compliance with this section for reporting companies and financial institutions, the Secretary of the Treasury shall ensure that the regulations prescribed by the Secretary under this subsection are added to part 1010 of title 31, Code of Federal Regulations, or any successor thereto.

(2) REQUIRED INFORMATION.—

(A) IN GENERAL.—In accordance with regulations prescribed by the Secretary of the Treasury, a report delivered under paragraph (1) shall, except as provided in subparagraph (B), identify each beneficial owner of the applicable reporting company and each applicant with respect to that reporting company by—

(i) full legal name;

(ii) date of birth;

(iii) current, as of the date on which the report is delivered, residential or business street address; and

(iv)(I) unique identifying number from an acceptable identification document; or

(II) FinCEN identifier in accordance with requirements in paragraph (3).

(B) REPORTING REQUIREMENT FOR EXEMPT ENTITIES HAVING AN OWNERSHIP INTEREST.—If an exempt entity described in subsection (a)(11)(B) has or will have a direct or indirect ownership interest in a reporting company, the reporting company or the applicant—

(i) shall, with respect to the exempt entity, only list the name of the exempt entity; and

(ii) shall not be required to report the information with respect to the exempt entity otherwise required under subparagraph (A).

(C) REPORTING REQUIREMENT FOR CERTAIN POOLED INVESTMENT VEHICLES.—Any corporation, limited liability company, or other similar entity that is an exempt entity described in subsection (a)(11)(B)(xviii) and is formed under the laws of a foreign country shall file with FinCEN a written certification that provides identification information of an individual that exercises substantial control over the pooled investment vehicle in the same manner as required under this subsection.

(D) REPORTING REQUIREMENT FOR EXEMPT SUBSIDIARIES.—In accordance with the regulations promulgated by the Secretary, any corporation, limited liability company, or other similar entity that is an exempt entity described in subsection (a)(11)(B)(xxii), shall, at the time such entity no longer meets the criteria described in subsection (a)(11)(B)(xxii), submit to FinCEN a report containing the information required under subparagraph (A).

(E) REPORTING REQUIREMENT FOR EXEMPT GRANDFATHERED ENTITIES.—In accordance with the regulations promulgated by the Secretary, any corporation, limited liability company, or other similar entity that is an exempt entity described in subsection (a)(11)(B)(xxiii), shall, at the time such entity no longer meets the criteria described in subsection (a)(11)(B)(xxiii), submit to FinCEN a report containing the information required under subparagraph (A).

(3) FINCEN IDENTIFIER.—

(A) ISSUANCE OF FINCEN IDENTIFIER.—

(i) IN GENERAL.—Upon request by an individual who has provided FinCEN with the information described in paragraph (2)(A) pertaining to the individual, or by an entity that has reported its beneficial ownership information to FinCEN in accordance with this section, FinCEN shall issue a FinCEN identifier to such individual or entity.

(ii) UPDATING OF INFORMATION.—An individual or entity with a FinCEN identifier shall submit filings with FinCEN pursuant to paragraph (1) updating any information described in paragraph (2) in a timely manner consistent with paragraph (1)(D).

(iii) EXCLUSIVE IDENTIFIER.—FinCEN shall not issue more than 1 FinCEN identifier to the same individual or to the same entity (including any successor entity).

(B) USE OF FINCEN IDENTIFIER FOR INDIVIDUALS.—Any person required to report the information described in paragraph (2) with respect to an individual may instead report the FinCEN identifier of the individual.

(C) USE OF FINCEN IDENTIFIER FOR ENTITIES.—If an individual is or may be a beneficial owner of a reporting company by an interest held by the individual in an entity that, directly or indirectly, holds an interest in the reporting company, the reporting company may report the FinCEN identifier of the entity in lieu of providing the information required by paragraph (2)(A) with respect to the individual.

(4) REGULATIONS.—The Secretary of the Treasury shall—

(A) by regulation prescribe procedures and standards governing any report under para-

graph (2) and any FinCEN identifier under paragraph (3); and

(B) in promulgating the regulations under subparagraph (A) to the extent practicable, consistent with the purposes of this section—

(i) minimize burdens on reporting companies associated with the collection of beneficial ownership information, including by eliminating duplicative requirements; and

(ii) ensure the beneficial ownership information reported to FinCEN is accurate, complete, and highly useful.

(5) EFFECTIVE DATE.—The requirements of this subsection shall take effect on the effective date of the regulations prescribed by the Secretary of the Treasury under this subsection, which shall be promulgated not later than 1 year after the date of enactment of this section.

(6) REPORT.—Not later than 1 year after the effective date described in paragraph (5), and annually thereafter for 2 years, the Secretary of the Treasury shall submit to Congress a report describing the procedures and standards prescribed to carry out paragraph (2), which shall include an assessment of—

(A) the effectiveness of those procedures and standards in minimizing reporting burdens (including through the elimination of duplicative requirements) and strengthening the accuracy of reports submitted under paragraph (2); and

(B) any alternative procedures and standards prescribed to carry out paragraph (2).

(c) RETENTION AND DISCLOSURE OF BENEFICIAL OWNERSHIP INFORMATION BY FINCEN.—

(1) RETENTION OF INFORMATION.—Beneficial ownership information required under subsection (b) relating to each reporting company shall be maintained by FinCEN for not fewer than 5 years after the date on which the reporting company terminates.

(2) DISCLOSURE.—

(A) PROHIBITION.—Except as authorized by this subsection and the protocols promulgated under this subsection, beneficial ownership information reported under this section shall be confidential and may not be disclosed by—

(i) an officer or employee of the United States;

(ii) an officer or employee of any State, local, or Tribal agency; or

(iii) an officer or employee of any financial institution or regulatory agency receiving information under this subsection.

(B) SCOPE OF DISCLOSURE BY FINCEN.—FinCEN may disclose beneficial ownership information reported pursuant to this section only upon receipt of—

(i) a request, through appropriate protocols—

(I) from a Federal agency engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity; or

(II) from a State, local, or Tribal law enforcement agency, if a court of competent jurisdiction, including any officer of such a court, has authorized the law enforcement agency to seek the information in a criminal or civil investigation;

(ii) a request from a Federal agency on behalf of a law enforcement agency, prosecutor, or judge of another country, including a foreign central authority or competent authority (or like designation), under an international treaty, agreement, convention, or official request made by law enforcement, judicial, or prosecutorial authorities in trusted foreign countries when no treaty, agreement, or convention is available—

(I) issued in response to a request for assistance in an investigation or prosecution by such foreign country; and

(II) that—

(aa) requires compliance with the disclosure and use provisions of the treaty, agreement, or convention, publicly disclosing any beneficial ownership information received; or

(bb) limits the use of the information for any purpose other than the authorized investigation or national security or intelligence activity;

(iii) a request made by a financial institution subject to customer due diligence requirements, with the consent of the reporting company, to facilitate the compliance of the financial institution with customer due diligence requirements under applicable law; or

(iv) a request made by a Federal functional regulator or other appropriate regulatory agency consistent with the requirements of subparagraph (C).

(C) FORM AND MANNER OF DISCLOSURE TO FINANCIAL INSTITUTIONS AND REGULATORY AGENCIES.—The Secretary of the Treasury shall, by regulation, prescribe the form and manner in which information shall be provided to a financial institution under subparagraph (B)(iii), which regulation shall include that the information shall also be available to a Federal functional regulator or other appropriate regulatory agency, as determined by the Secretary, if the agency—

(i) is authorized by law to assess, supervise, enforce, or otherwise determine the compliance of the financial institution with the requirements described in that subparagraph;

(ii) uses the information solely for the purpose of conducting the assessment, supervision, or authorized investigation or activity described in clause (i); and

(iii) enters into an agreement with the Secretary providing for appropriate protocols governing the safekeeping of the information.

(3) APPROPRIATE PROTOCOLS.—The Secretary of the Treasury shall establish by regulation protocols described in paragraph (2)(A) that—

(A) protect the security and confidentiality of any beneficial ownership information provided directly by the Secretary;

(B) require the head of any requesting agency, on a non-delegable basis, to approve the standards and procedures utilized by the requesting agency and certify to the Secretary semi-annually that such standards and procedures are in compliance with the requirements of this paragraph;

(C) require the requesting agency to establish and maintain, to the satisfaction of the Secretary, a secure system in which such beneficial ownership information provided directly by the Secretary shall be stored;

(D) require the requesting agency to furnish a report to the Secretary, at such time and containing such information as the Secretary may prescribe, that describes the procedures established and utilized by such agency to ensure the confidentiality of the beneficial ownership information provided directly by the Secretary;

(E) require a written certification for each authorized investigation or other activity described in paragraph (2) from the head of an agency described in paragraph (2)(B)(i)(I), or their designees, that—

(i) states that applicable requirements have been met, in such form and manner as the Secretary may prescribe; and

(ii) at a minimum, sets forth the specific reason or reasons why the beneficial ownership information is relevant to an authorized investigation or other activity described in paragraph (2);

(F) require the requesting agency to limit, to the greatest extent practicable, the scope of information sought, consistent with the purposes for seeking beneficial ownership information;

(G) restrict, to the satisfaction of the Secretary, access to beneficial ownership information to whom disclosure may be made under the provisions of this section to only users at the requesting agency—

(i) who are directly engaged in the authorized investigation or activity described in paragraph (2);

(ii) whose duties or responsibilities require such access;

(iii) who—

(I) have undergone appropriate training; or

(II) use staff to access the database who have undergone appropriate training;

(iv) who use appropriate identity verification mechanisms to obtain access to the information; and

(v) who are authorized by agreement with the Secretary to access the information;

(H) require the requesting agency to establish and maintain, to the satisfaction of the Secretary, a permanent system of standardized records with respect to an auditable trail of each request for beneficial ownership information submitted to the Secretary by the agency, including the reason for the request, the name of the individual who made the request, the date of the request, any disclosure of beneficial ownership information

made by or to the agency, and any other information the Secretary of the Treasury determines is appropriate;

(I) require that the requesting agency receiving beneficial ownership information from the Secretary conduct an annual audit to verify that the beneficial ownership information received from the Secretary has been accessed and used appropriately, and in a manner consistent with this paragraph and provide the results of that audit to the Secretary upon request;

(J) require the Secretary to conduct an annual audit of the adherence of the agencies to the protocols established under this paragraph to ensure that agencies are requesting and using beneficial ownership information appropriately; and

(K) provide such other safeguards which the Secretary determines (and which the Secretary prescribes in regulations) to be necessary or appropriate to protect the confidentiality of the beneficial ownership information.

(4) VIOLATION OF PROTOCOLS.—Any employee or officer of a requesting agency under paragraph (2)(B) that violates the protocols described in paragraph (3), including unauthorized disclosure or use, shall be subject to criminal and civil penalties under subsection (h)(3)(B).

(5) DEPARTMENT OF THE TREASURY ACCESS.—

(A) IN GENERAL.—Beneficial ownership information shall be accessible for inspection or disclosure to officers and employees of the Department of the Treasury whose official duties require such inspection or disclosure subject to procedures and safeguards prescribed by the Secretary of the Treasury.

(B) TAX ADMINISTRATION PURPOSES.—Officers and employees of the Department of the Treasury may obtain access to beneficial ownership information for tax administration purposes in accordance with this subsection.

(6) REJECTION OF REQUEST.—The Secretary of the Treasury—

(A) shall reject a request not submitted in the form and manner prescribed by the Secretary under paragraph (2)(C); and

(B) may decline to provide information requested under this subsection upon finding that—

(i) the requesting agency has failed to meet any other requirement of this subsection;

(ii) the information is being requested for an unlawful purpose; or

(iii) other good cause exists to deny the request.

(7) SUSPENSION.—The Secretary of the Treasury may suspend or debar a requesting agency from access for any of the grounds set forth in paragraph (6), including for repeated or serious violations of any requirement under paragraph (2).

(8) SECURITY PROTECTIONS.—The Secretary of the Treasury shall maintain information security protections, including encryption, for information reported to FinCEN under subsection (b) and ensure that the protections—

(A) are consistent with standards and guidelines developed under subchapter II of chapter 35 of title 44; and

(B) incorporate Federal information system security controls for high-impact systems, excluding national security systems, consistent with applicable law to prevent the loss of confidentiality, integrity, or availability of information that may have a severe or catastrophic adverse effect.

(9) REPORT BY THE SECRETARY.—Not later than 1 year after the effective date of the regulations prescribed under this subsection, and annually thereafter for 5 years, the Secretary of the Treasury shall submit to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives a report, which—

(A) may include a classified annex; and

(B) shall, with respect to each request submitted under paragraph (2)(B)(i)(II) during the period covered by the report, and consistent with protocols established by the Secretary that are necessary to protect law enforcement sensitive, tax-related, or classified information, include—

(i) the date on which the request was submitted;

(ii) the source of the request;

(iii) whether the request was accepted or rejected or is pending; and

(iv) a general description of the basis for rejecting the such request, if applicable.

(10) AUDIT BY THE COMPTROLLER GENERAL.— Not later than 1 year after the effective date of the regulations prescribed under this subsection, and annually thereafter for 6 years, the Comptroller General of the United States shall—

(A) audit the procedures and safeguards established by the Secretary of the Treasury under those regulations, including duties for verification of requesting agencies systems and adherence to the protocols established under this subsection, to determine whether such safeguards and procedures meet the requirements of this subsection and that the Department of the Treasury is using beneficial ownership information appropriately in a manner consistent with this subsection; and

(B) submit to the Secretary of the Treasury, the Committee on Banking, Housing, and Urban Affairs of the Senate, and the Committee on Financial Services of the House of Representatives a report that contains the findings and determinations with respect to any audit conducted under this paragraph.

(11) DEPARTMENT OF THE TREASURY TESTIMONY.—

(A) IN GENERAL.—Not later than March 31 of each year for 5 years beginning in 2022, the Director shall be made available to testify before the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives, or an appropriate subcommittee thereof, regarding FinCEN issues, including, specifically, issues relating to—

(i) anticipated plans, goals, and resources necessary for operations of FinCEN in implementing the requirements of the Anti-Money Laundering Act of 2020 and the amendments made by that Act;

(ii) the adequacy of appropriations for FinCEN in the current and the previous fiscal year to—

(I) ensure that the requirements and obligations imposed upon FinCEN by the Anti-Money Laundering Act of 2020 and the amendments made by that Act are completed as efficiently, effectively, and expeditiously as possible; and

(II) provide for robust and effective implementation and enforcement of the provisions of the Anti-Money Laundering Act of 2020 and the amendments made by that Act;

(iii) strengthen[2] FinCEN management efforts, as necessary and as identified by the Director, to meet the requirements of the Anti-Money Laundering Act of 2020 and the amendments made by that Act;

(iv) provide[2] for the necessary public outreach to ensure the broad dissemination of information regarding any new program requirements provided for in the Anti-Money Laundering Act of 2020 and the amendments made by that Act, including—

(I) educating the business community on the goals and operations of the new beneficial ownership database; and

(II) disseminating to the governments of countries that are allies or partners of the United States information on best practices developed by FinCEN related to beneficial ownership information retention and use;

(v) any policy recommendations that could facilitate and improve communication and coordination between the private sector, FinCEN, and the Federal, State, and local agencies and entities involved in implementing innovative approaches to meet their obligations under the Anti-Money Laundering Act of 2020 and the amendments made by that Act, the Bank Secrecy Act (as defined in section 6003 of the Anti-Money Laundering Act of 2020), and other anti-money laundering compliance laws; and

(vi) any other matter that the Director determines is appropriate.

(B) TESTIMONY CLASSIFICATION.—The testimony required under subparagraph (A)—

(i) shall be submitted in unclassified form; and

(ii) may include a classified portion.

(d) AGENCY COORDINATION.—

(1) IN GENERAL.—The Secretary of the Treasury shall, to the greatest extent practicable, update the information described in subsection (b) by working collaboratively with other relevant Federal, State, and Tribal agencies.

(2) INFORMATION FROM RELEVANT FEDERAL, STATE, AND TRIBAL AGENCIES.—Relevant Federal, State, and Tribal agencies, as determined by the Secretary of the Treasury, shall, to the extent practicable, and consistent with applicable legal protections, cooperate with and provide information requested by FinCEN for purposes of maintaining an accurate, complete, and highly useful database for beneficial ownership information.

(3) REGULATIONS.—The Secretary of the Treasury, in consultation with the heads of other relevant Federal agencies, may promulgate regulations as necessary to carry out this subsection.

(e) NOTIFICATION OF FEDERAL OBLIGATIONS.—

(1) FEDERAL.—The Secretary of the Treasury shall take reasonable steps to provide notice to persons of their obligations to report beneficial ownership information under this section, including by causing appropriate informational materials describing such obligations to be included in 1 or more forms or other informational materials regularly distributed by the Internal Revenue Service and FinCEN.

(2) STATES AND INDIAN TRIBES.—

(A) IN GENERAL.—As a condition of the funds made available under this section, each State and Indian Tribe shall, not later than 2 years after the effective date of the regulations promulgated under subsection (b)(4), take the following actions:

(i) The secretary of a State or a similar office in each State or Indian Tribe responsible for the formation or registration of entities created by the filing of a public document with the office under the law of the State or Indian Tribe shall periodically, including at the time of any initial formation or registration of an entity, assessment of an annual fee, or renewal of any license to do business in the United States and in connection with State or Indian Tribe corporate tax assessments or renewals—

(I) notify filers of their requirements as reporting companies under this section, including the requirements to file and update reports under paragraphs (1) and (2) of subsection (b); and

(II) provide the filers with a copy of the reporting company form created by the Secretary of the Treasury under this subsection or an internet link to that form.

(ii) The secretary of a State or a similar office in each State or Indian Tribe responsible for the formation or registration of entities created by the filing of a public document with the office under the law of the State or Indian Tribes shall update the websites, forms relating to incorporation, and physical premises of the office to notify filers of their requirements as reporting companies under this section, including providing an internet link to the reporting company form created by the Secretary of the Treasury under this section.

(B) NOTIFICATION FROM THE DEPARTMENT OF THE TREASURY.—A notification under clause

(i) or (ii) of subparagraph (A) shall explicitly state that the notification is on behalf of the Department of the Treasury for the purpose of preventing money laundering, the financing of terrorism, proliferation financing, serious tax fraud, and other financial crime by requiring nonpublic beneficial ownership information of business entities formed or registered to do business in the United States.

(f) NO BEARER SHARE CORPORATIONS OR LIMITED LIABILITY COMPANIES.—A corporation, limited liability company, or other similar entity formed under the laws of a State or Indian Tribe may not issue a certificate in bearer form evidencing either a whole or fractional interest in the entity.

(g) REGULATIONS.—In promulgating regulations carrying out this section, the Director shall reach out to members of the small business community and other appropriate parties to ensure efficiency and effectiveness of the process for the entities subject to the requirements of this section.

(h) PENALTIES.—

(1) REPORTING VIOLATIONS.—It shall be unlawful for any person to—

(A) willfully provide, or attempt to provide, false or fraudulent beneficial ownership information, including a false or fraudulent identifying photograph or document, to FinCEN in accordance with subsection (b); or

(B) willfully fail to report complete or updated beneficial ownership information to FinCEN in accordance with subsection (b).

(2) UNAUTHORIZED DISCLOSURE OR USE.—Except as authorized by this section, it shall be unlawful for any person to knowingly disclose or knowingly use the beneficial ownership information obtained by the person through—

(A) a report submitted to FinCEN under subsection (b); or

(B) a disclosure made by FinCEN under subsection (c).

(3) CRIMINAL AND CIVIL PENALTIES.—

(A) REPORTING VIOLATIONS.—Any person that violates subparagraph (A) or (B) of paragraph (1)—

(i) shall be liable to the United States for a civil penalty of not more than $500 for each day that the violation continues or has not been remedied; and

(ii) may be fined not more than $10,000, imprisoned for not more than 2 years, or both.

(B) UNAUTHORIZED DISCLOSURE OR USE VIOLATIONS.—Any person that violates paragraph (2)—

(i) shall be liable to the United States for a civil penalty of not more than $500 for each day that the violation continues or has not been remedied; and

(ii)(I) shall be fined not more than $250,000, or imprisoned for not more than 5 years, or both; or

(II) while violating another law of the United States or as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period, shall be fined

not more than $500,000, imprisoned for not more than 10 years, or both.

(C) SAFE HARBOR.—

(i) SAFE HARBOR.—

(I) IN GENERAL.—Except as provided in subclause (II), a person shall not be subject to civil or criminal penalty under subparagraph (A) if the person—

(aa) has reason to believe that any report submitted by the person in accordance with subsection (b) contains inaccurate information; and

(bb) in accordance with regulations issued by the Secretary, voluntarily and promptly, and in no case later than 90 days after the date on which the person submitted the report, submits a report containing corrected information.

(II) EXCEPTIONS.—A person shall not be exempt from penalty under clause (i) if, at the time the person submits the report required by subsection (b), the person—

(aa) acts for the purpose of evading the reporting requirements under subsection (b); and

(bb) has actual knowledge that any information contained in the report is inaccurate.

(ii) ASSISTANCE.—FinCEN shall provide assistance to any person seeking to submit a corrected report in accordance with clause (i)(I).

(4) USER COMPLAINT PROCESS.—

(A) IN GENERAL.—The Inspector General of the Department of the Treasury, in coordination with the Secretary of the Treasury, shall provide public contact information to receive external comments or complaints regarding the beneficial ownership information notification and collection process or regarding the accuracy, completeness, or timeliness of such information.

(B) REPORT.—The Inspector General of the Department of the Treasury shall submit to Congress a periodic report that—

(i) summarizes external comments or complaints and related investigations conducted by the Inspector General related to the collection of beneficial ownership information; and

(ii) includes recommendations, in coordination with FinCEN, to improve the form and manner of the notification, collection and updating processes of the beneficial ownership information reporting requirements to ensure the beneficial ownership information reported to FinCEN is accurate, complete, and highly useful.

(5) TREASURY OFFICE OF INSPECTOR GENERAL INVESTIGATION IN THE EVENT OF A CYBERSECURITY BREACH.—

(A) IN GENERAL.—In the event of a cybersecurity breach that results in substantial unauthorized access and disclosure of sensitive beneficial ownership information, the Inspector General of the Department of the Treasury shall conduct an investigation into FinCEN cybersecurity practices that, to the extent possible, determines any vulnerabilities within FinCEN information security and confidentiality protocols and provides recommendations for fixing those deficiencies.

(B) REPORT.—The Inspector General of the Department of the Treasury shall submit to the Secretary of the Treasury a report on each investigation conducted under subparagraph (A).

(C) ACTIONS OF THE SECRETARY.—Upon receiving a report submitted under subparagraph (B), the Secretary of the Treasury shall—

(i) determine whether the Director had any responsibility for the cybersecurity breach or whether policies, practices, or procedures implemented at the direction of the Director led to the cybersecurity breach; and

(ii) submit to Congress a written report outlining the findings of the Secretary, including a determination by the Secretary on whether to retain or dismiss the individual serving as the Director.

(6) DEFINITION.—In this subsection, the term "willfully" means the voluntary, intentional violation of a known legal duty.

(i) CONTINUOUS REVIEW OF EXEMPT ENTITIES.—

(1) IN GENERAL.—On and after the effective date of the regulations promulgated under subsection (b)(4), if the Secretary of the Treasury makes a determination, which may be based on information contained in the report required under section 6502(c) of the Anti-Money Laundering Act of 2020 or on any other information available to the Secretary, that an entity or class of entities described in subsection (a)(11)(B) has been involved in significant abuse relating to money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or any other financial crime, not later than 90 days after the date on which the Secretary makes the determination, the Secretary shall submit to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives a report that explains the reasons for the determination and any administrative or legislative recommendations to prevent such abuse.

(2) CLASSIFIED ANNEX.—The report required by paragraph (1)—

(A) shall be submitted in unclassified form; and

(B) may include a classified annex.

(j) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to FinCEN for each of the 3 fiscal years beginning on the effective date of the regulations promulgated under subsection (b)(4), such sums as may be necessary to carry out this section, including allocating funds to the States to pay reasonable costs relating to compliance with the requirements of such section.

(Added and amended Pub. L. 116–283, div. F, title LXIV, § 6403(a), title LXV, § 6509(b), Jan. 1, 2021, 134 Stat. 4605, 4633.)

## Editorial Notes

### REFERENCES IN TEXT

The Internal Revenue Code of 1986, referred to in subsec. (a)(7), (11)(B)(xix), (14), is classified generally to Title 26, Internal Revenue Code. Sections 501(a), (c), 508(a), 527(a), (e)(1), 4947(a), and 7701(a) are classified to sections 501(a), (c), 508(a), 527(a), (e)(1), 4947(a), and 7701(a), respectively, of Title 26.

The date of enactment of this section, referred to in subsec. (b)(1)(E)(iii), (5), is the date of enactment of Pub. L. 116–283, which was approved Jan. 1, 2021.

The Anti-Money Laundering Act of 2020, referred to in subsecs. (c)(11)(A) and (i)(1), is div. F of Pub. L. 116–283, Jan. 1, 2021, 134 Stat. 4547. Section 6003 of the Act is set out as a note under section 5311 of this title. Such section 6003 defines terms, including the Bank Secrecy Act, as used in div. F of Pub. L. 116–283. Section 6502(c) of the Act is section 6502(c) of title LXV of div. F of Pub. L. 116–283, Jan. 1, 2021, 134 Stat. 4627, which is not classified to the Code. For complete classification of this Act to the Code, see Short Title of 2021 Amendment note set out under section 5301 of this title and Tables.

### AMENDMENTS

2021—Subsec. (j). Pub. L. 116–283, §6509(b), added subsec. (j).

## Statutory Notes and Related Subsidiaries

### SENSE OF CONGRESS

Pub. L. 116–283, div. F, title LXIV, §6402, Jan. 1, 2021, 134 Stat. 4604, provided that: "It is the sense of Congress that—

"(1) more than 2,000,000 corporations and limited liability companies are being formed under the laws of the States each year;

"(2) most or all States do not require information about the beneficial owners of the corporations, limited liability companies, or other similar entities formed under the laws of the State;

"(3) malign actors seek to conceal their ownership of corporations, limited liability companies, or other similar entities in the United States to facilitate illicit activity, including money laundering, the financing of terrorism, proliferation financing, serious tax fraud, human and drug trafficking, counterfeiting, piracy, securities fraud, financial fraud, and acts of foreign corruption, harming the national security interests of the United States and allies of the United States;

"(4) money launderers and others involved in commercial activity intentionally conduct transactions through corporate structures in order to evade detection, and may layer such structures, much like Russian nesting 'Matryoshka' dolls, across various secretive jurisdictions such that each time an investigator obtains ownership records for a domestic or foreign entity, the newly identified entity is yet another corporate entity, necessitating a repeat of the same process;

"(5) Federal legislation providing for the collection of beneficial ownership information for corporations, limited liability companies, or other similar entities formed under the laws of the States is needed to—

"(A) set a clear, Federal standard for incorporation practices;

"(B) protect vital Unites States national security interests;

"(C) protect interstate and foreign commerce;

"(D) better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity; and

"(E) bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards;

"(6) beneficial ownership information collected under the amendments made by this title is sensitive information and will be directly available only to authorized government authorities, subject to effective safeguards and controls, to—

"(A) facilitate important national security, intelligence, and law enforcement activities; and

"(B) confirm beneficial ownership information provided to financial institutions to facilitate the compliance of the financial institutions with anti-money laundering, countering the financing of terrorism, and customer due diligence requirements under applicable law;

"(7) consistent with applicable law, the Secretary of the Treasury shall—

"(A) maintain the information described in paragraph (1) in a secure, nonpublic database, using information security methods and techniques that are appropriate to protect nonclassified information systems at the highest security level; and

"(B) take all steps, including regular auditing, to ensure that government authorities accessing beneficial ownership information do so only for authorized purposes consistent with this title; and

"(8) in prescribing regulations to provide for the reporting of beneficial ownership information, the Secretary shall, to the greatest extent practicable consistent with the purposes of this title—

"(A) seek to minimize burdens on reporting companies associated with the collection of beneficial ownership information;

"(B) provide clarity to reporting companies concerning the identification of their beneficial owners; and

"(C) collect information in a form and manner that is reasonably designed to generate a database that is highly useful to national security, intelligence, and law enforcement agencies and Federal functional regulators."

[For definition of "Federal functional regulator" as used in section 6402 of Pub. L. 116–283, set out above, see section 6003 of Pub. L. 116–283, set out as a Definitions note under section 5311 of this title.]

### REPORTING REQUIREMENTS FOR FEDERAL CONTRACTORS

Pub. L. 116–283, div. F, title LXIV, §6403(c), Jan. 1, 2021, 134 Stat. 4623, provided that:

"(1) IN GENERAL.—Not later than 2 years after the date of enactment of this Act [Jan. 1, 2021], the Administrator for Federal Procurement Policy shall revise the Federal Acquisition Regulation maintained under section 1303(a)(1) of title 41, United States Code, to require any contractor or subcontractor that is subject to the requirement to disclose beneficial ownership information under section 5336 of title 31, United States Code, as added by subsection (a) of this section, to provide the information required to be disclosed under such section to the Federal Government as part of any bid or proposal for a contract with a value threshold in excess of the simplified acquisition threshold under section 134 of title 41, United States Code.

"(2) APPLICABILITY.—The revision required under paragraph (1) shall not apply to a covered contractor or subcontractor, as defined in section 847(a)(3)] of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92) [10 U.S.C. 4819 note], that is subject to the beneficial ownership disclosure and review requirements under that section."

# SUBCHAPTER III—MONEY LAUNDERING AND RELATED FINANCIAL CRIMES

## § 5340. Definitions

For purposes of this subchapter, the following definitions shall apply:

(1) DEPARTMENT OF THE TREASURY LAW ENFORCEMENT ORGANIZATIONS.—The term "Department of the Treasury law enforcement organizations" has the meaning given to such term in section 9705(o).