No. 24-2118

In The

# United States Court of Appeals
### For The Fourth Circuit

**COMMUNITY ASSOCIATIONS INSTITUTE, et al.,**

*Plaintiffs-Appellants,*

v.

**U.S. DEPARTMENT OF THE TREASURY, et al.,**

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Virginia

_____

**Brief of the Small Business Association of Michigan and the
Chaldean American Chamber of Commerce as *Amici Curiae* in
Support of Plaintiffs-Appellants**

_____

Stephen J. van Stempvoort
D. Andrew Portinga
MILLER JOHNSON
45 Ottawa Avenue SW, Suite 1100
Grand Rapids, MI 49503
(616) 831-1765
vanstempvoorts@millerjohnson.com
*Counsel for Amici Curiae*

# Corporate Disclosure Statement

Under Federal Rule of Appellate Procedure 26.1 and Fourth Circuit Rule 26.1(b), the Small Business Association of Michigan ("SBAM") and the Chaldean American Chamber of Commerce (the "Chaldean Chamber") (collectively, "amici") disclose that:

1.     None of the amici are a publicly held corporation or other publicly held entity.

2.     None of the amici have any parent corporations.

3.     No publicly held corporation or other publicly held entity owns 10% or more of the stock of any of the amici.

4.     No publicly held corporation or other publicly held entity has a direct financial interest in the outcome of the litigation.

5.     This case does not arise out of a bankruptcy proceeding.

6.     This is not a criminal case in which there was an organizational victim.


November 19, 2024                     /s/ Stephen J. van Stempvoort

# Table of Contents

**Page**

Corporate Disclosure Statement..................................................i

Table of Contents ..................................................................ii

Index of Authorities..............................................................iv

Interest of Amici Curiae......................................................... 1

Introduction.......................................................................... 3

Argument............................................................................. 4

The CTA violates the Fourth Amendment. ............................. 4

    A.    The CTA's disclosure requirements are a search
            for purposes of the Fourth Amendment. ................................ 5

            1.    The CTA requires entities and individuals
                     to give up their property. ................................. 5

            2.    The CTA intrudes on entities' and
                     individuals' reasonable expectations of
                     privacy. .......................................................... 7

    B.    The Government failed to demonstrate that any
            exception to the warrant requirement applies. ................... 13

            1.    A nondiscretionary warrantless search is
                     unconstitutional if its primary purpose is to
                     detect evidence of criminal wrongdoing. ................... 14

            2.    The CTA contains no opportunity for
                     precompliance review and is not limited to
                       highly regulated industries......................... 16

    C.    The CTA's suspicionless searches are not
            reasonable. ........................................................... 17

1.  A suspicionless search is reasonable only if an exception to the warrant requirement applies. .......................................................... 17

2.  The Fourth Amendment applies to "reporting requirements" the same way that it does to physical searches.......................................... 18

3.  The Fourth Amendment does not permit suspicionless searches whenever they are nondiscretionary. ........................................... 21

D.  *Shultz* does not rescue the CTA............................................ 22

1.  *Shultz* did not hold that all reporting requirements are excepted from the Fourth Amendment. ................................................... 23

2.  The disclosure regime in *Shultz* is significantly narrower than the disclosure regime under the CTA. ............................... 25

E.  The district court's ruling, if accepted, would significantly alter Fourth Amendment jurisprudence........................................................ 31

Conclusion ............................................................................. 35

Certificate of Compliance........................................................ 36

Certificate of Service ............................................................. 37

# Index of Authorities

**Cases**

*Airbnb, Inc. v. City of New York,*
373 F. Supp. 3d 467 (S.D.N.Y. 2019) ........................... 7, 17, 19, 20, 32

*Ashcroft v. al-Kidd,*
563 U.S. 731 (2011) ........................................................... 27

*Brock v. Emerson Elec. Co., Elec. & Space Div.,*
834 F.2d 994 (11th Cir. 1987) ................................................. 7

*Brown v. Texas,*
443 U.S. 47 (1979) ............................................................ 30

*Byrd v. United States,*
584 U.S. 395 (2018) .................................................... 5, 9, 31

*California Bankers Association v. Shultz,*
416 U.S. 21 (1974) ............... 3, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 35

*Carpenter v. United States,*
585 U.S. 296 (2018) ................................................. 10, 20, 21

*Chandler v. Miller,*
520 U.S. 305 (1997) ...................................................... 13, 23

*City of Indianapolis v. Edmond,*
531 U.S. 32 (2000) ..........................14, 15, 21, 22, 23, 25, 35

*City of Los Angeles v. Patel,*
576 U.S. 409 (2015) ............................... 5, 13, 16, 17, 18, 23

*Ferguson v. City of Charleston,*
532 U.S. 67 (2001) ........................................................... 15

*Free Speech Coalition, Inc. v. Att'y Gen. United States,*
825 F.3d 149 (3d Cir. 2016) ............................... 7, 16, 17, 28

*G. M. Leasing Corp. v. United States,*
429 U.S. 338 (1977) ........................................................... 6

*Hale v. Henkel,*
201 U.S. 43 (1906) ............................................................. 6

*Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.,*
542 U.S. 177 (2004) ......................................................... 30

*Katz v. United States,*
389 U.S. 347 (1967) ....................................................... 5, 7

*Kyllo v. United States,*
533 U.S. 27 (2001) ......................................................... 20

*Marshall v. Barlow's, Inc.,*
436 U.S. 307 (1978) .............................................. 6, 29, 31

*Michigan Dep't of State Police v. Sitz,*
496 U.S. 444 (1990) ......................................................... 14

*Michigan v. Tyler,*
436 U.S. 499 (1978) ......................................................... 15

*Naperville Smart Meter Awareness v. City of Naperville,*
900 F.3d 521 (7th Cir. 2018) ........................................... 10

*NSBU v. U.S. Dep't of Treasury,*
No. 24-10736 (11th Cir.) ................................................. 33

*Olmstead v. United States,*
277 U.S. 438 (1928) ...................................................... 7, 32

*Patel v. City of Los Angeles,*
738 F.3d 1058 (9th Cir. 2013) (en banc) ................... 6, 7, 12

*SBAM v. Yellen,*
W.D. Mich. No. 1:24-cv-314 ......................................... 2, 33

# Index of Authorities
(continued)

Page

*Silverthorne Lumber Co. v. United States*,
251 U.S. 385 (1920) ................................................................ 6

*Skinner v. Ry. Lab. Executives' Ass'n*,
489 U.S. 602 (1989) ................................................................ 14

*Smith v. Maryland*,
442 U.S. 735 (1979) ................................................................ 10

*Terry v. Ohio*,
392 U.S. 1 (1968) .................................................................... 26

*United States v. Di Re*,
332 U.S. 581 (1948) ................................................................ 32

*United States v. Edwards*,
498 F.2d 496 (2d Cir. 1974) .................................................. 14

*United States v. Jones*,
565 U.S. 400 (2012) ................................................................ 11

*United States v. McGee*,
736 F.3d 263 (4th Cir. 2013) ................................................ 13

*United States v. Miller*,
425 U.S. 435 (1976) ...................................................... 10, 29, 35

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950) ................................................................ 5

## Statutes

8 U.S.C. § 1324a(b) ................................................................ 34

26 U.S.C. § 6103(i)(1)(A) ...................................................... 12

31 U.S.C. § 5336(a)(3)(A) ...................................................... 8

31 U.S.C. § 5336(a)(5) ............................................................ 15

31 U.S.C. § 5336(b)(1)(A) ................................................... 15

31 U.S.C. § 5336(c)(2)(B)(ii) ......................................... 12, 16

31 U.S.C. § 5336 note (6) ................................................. 15

52 U.S.C. § 30104(a) ....................................................... 34

**Other Authorities**

Beneficial Ownership Information Reporting Requirements
for Financial Crimes Enforcement Network (FinCEN),
87 Fed. Reg. 59498, 59573 (Jan. 1, 2024), available at
https://www.federalregister.gov/d/2022-21020/p-958 ......................... 2

Electronic Frontier Foundation, *Newly Public FISC Opinion
is The Best Evidence For Why Congress Must End Section
702* (May 23, 2023), available at https://www.eff.org/
deeplinks/2023/05/newly-public-fisc-opinion-best-
evidence-why-congress -must-end-section-702 ................................. 33

Fed. R. App. P. 29(a)(4)(E) ........................................... 1

FinCEN FAQ D.4, available at https://www.fincen.gov/boi-
faqs#D_4 ................................................................. 8

U.S. Const., amend. IV ................................................. 21

## Interest of Amici Curiae[1]

The Small Business Association of Michigan ("SBAM") is a statewide organization for small business owners in Michigan, with over 32,000 members. SBAM's mission is the success of Michigan's small businesses, and it frequently advocates on public policy issues affecting small business owners.

The Chaldean American Chamber of Commerce (the "Chaldean Chamber") advocates and promotes small businesses and economic opportunities, particularly for businesses and individuals who are affiliated with the Chaldean American community. Chaldeans are Aramaic-speaking, Eastern Rite Catholics indigenous to Iraq. More than 4,000 businesses are members of the Chaldean Chamber.

Amici's interest in this case arises from their concerns regarding the Corporate Transparency Act's impact on small businesses. The CTA requires millions of law-abiding Americans, including SBAM's and the

_____

[1] No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund this brief, and no person other than amici curiae and their members contributed money to fund this brief. *See* Fed. R. App. P. 29(a)(4)(E). All parties have consented to the filing of this brief.

Chaldean Chamber's members, to report sensitive, private information to law enforcement without any suspicion of wrongdoing.

The CTA will substantially impact amici's members. FinCEN estimates that each reporting company's cost of filing the initial beneficiary ownership interest report will range from $85.14 to $2,614.87.[2] Based on those estimates, the total cost of compliance for SBAM's 32,000 members will be between roughly $2.5 million and $78.4 million, and the total cost of compliance for the Chaldean Chamber's 4,000 members will be between approximately $340,000 and $10.5 million. On a national scale, FinCEN estimates that the cost of compliance will be about $21.7 billion in 2024 and around $3.3 billion each year afterward.[3]

Because of these and other concerns, amici and other plaintiffs filed a constitutional challenge to the CTA in the U.S. District Court for the Western District of Michigan, which remains pending (*SBAM v. Yellen*, No. 24-cv-00314).

---

[2] *See* Beneficial Ownership Information Reporting Requirements for Financial Crimes Enforcement Network (FinCEN), 87 Fed. Reg. 59498, 59573 (Jan. 1, 2024), available at https://www.federalregister.gov/d/2022-21020/p-958.
[3] *See id.*

**<u>Introduction</u>**

The Corporate Transparency Act ("CTA") compels millions of individuals and entities to divulge their private information to the Financial Crimes Enforcement Network ("FinCEN") so that law enforcement officers can rummage through it for evidence of criminal activity. Neither the Government nor the district court disputes that the CTA's disclosure obligations are a Fourth Amendment search. Nevertheless, the district court appears to have either ignored the Fourth Amendment's warrant requirement or created a new exception to it.

Neither of these options is available. Even when the Supreme Court has allowed uniform, nondiscretionary, warrantless searches, it has never approved any suspicionless search in which the primary purpose is to obtain evidence in support of a criminal investigation. And, contrary to the district court's ruling, *California Bankers Association v. Shultz*, <u>416 U.S. 21</u> (1974), is not a stand-alone exception to the warrant requirement, much less one that applies to all statutory reporting schemes regardless of their particular characteristics.

The implications of the district court's holding are significant. If the CTA's mandatory, suspicionless searches are acceptable under the

Fourth Amendment, then governments may compel the involuntary disclosure of private information from every citizen in the United States for criminal investigation purposes without suspicion merely by characterizing the disclosure as a "reporting requirement." The CTA is an improper attempt to fundamentally change the way in which the government collects information about American citizens. The district court's order should be reversed.

## Argument

**The CTA violates the Fourth Amendment.**

Although the Government does not dispute that the CTA's compelled disclosures are "searches" under the Fourth Amendment, it contends that American citizens have only a "modest" privacy interest in the information that the CTA forces them to disclose. The Government then argues that this privacy interest is outweighed by the "compelling need" to force citizens to disclose their private information in order to allow the Government to address criminal threats and protect national security. (Gov't Br., RE 35, PageID.300, 301). That approach—which the district court appears to have adopted—bears no resemblance to ordinary Fourth Amendment analysis.

**A.    The CTA's disclosure requirements are a search for purposes of the Fourth Amendment.**

The Fourth Amendment "is not confined literally to searches and seizures as such, but extends as well to the orderly taking under compulsion of process," including disclosures that are compelled by statute or regulation. *United States v. Morton Salt Co.*, 338 U.S. 632, 651–52 (1950); *see also City of Los Angeles v. Patel*, 576 U.S. 409, 412 (2015).

In determining whether a Fourth Amendment search has occurred, courts apply either a property-based test or the "reasonable expectation of privacy" test. *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring); *see also Byrd v. United States*, 584 U.S. 395, 403–04 (2018). The Government's notion that American citizens have only "modest" expectations of privacy in their corporate information both (1) ignores the property-based test and (2) fails to recognize that the Government's professed need for information is not an exception to the warrant requirement.

**1.    The CTA requires entities and individuals to give up their property.**

Under the Fourth Amendment's property-based test, the CTA effects a Fourth Amendment search because it mandates the disclosure

of information that belongs to the reporting entities or their beneficial owners. Compelling disclosure of a private entity's corporate records is a search and seizure of that entity's and its owners' "papers" or "effects." *See Patel v. City of Los Angeles*, 738 F.3d 1058, 1062 (9th Cir. 2013) (en banc).

The CTA compels entities to disclose the identity of individuals who have "substantial control" over them—that is, to reveal the internal power dynamics of those entities. That corporate information belongs to those entities and individuals. *Hale v. Henkel*, 201 U.S. 43, 76 (1906) (corporate records are "papers" for purposes of the Fourth Amendment). And both individuals and corporate entities possess robust Fourth Amendment rights over their property and records. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920); *accord G. M. Leasing Corp. v. United States*, 429 U.S. 338, 353 (1977). "To hold otherwise would belie the origin of that Amendment," which derived its core protections from the colonists' experience with British harassment of "merchants and businessmen . . ." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 311–12 (1978).

It makes no difference that law enforcement agents do not physically arrive on reporting entities' premises and take photographs of

corporate ledgers. *See Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 482–83 (S.D.N.Y. 2019) (collecting cases). The Fourth Amendment cannot be sidestepped by forcing entities and individuals to transcribe the most salient portions of their "papers" into a database, so long as the Government leaves the physical documents in the entity's possession. *Brock v. Emerson Elec. Co., Elec. & Space Div.*, 834 F.2d 994, 996 (11th Cir. 1987); *see also Olmstead v. United States*, 277 U.S. 438, 474-75 (1928) (Brandeis, J., dissenting).

### 2. The CTA intrudes on entities' and individuals' reasonable expectations of privacy.

#### a. The CTA requires disclosure of private information.

The CTA's required disclosures are a Fourth Amendment search under *Katz*, as well. Corporate entities have a reasonable expectation that their internal affairs will remain private. *See Patel*, 738 F.3d at 1062. In fact, a privacy interest "normally attaches to commercial information." *Brock*, 834 F.2d at 996. "[A]n individual in a business office," just like "a person in a telephone booth," is entitled to assume that his or her private conversations and decisions "will not be broadcast to the world." *Katz*, 389 U.S. at 352; *see also Free Speech Coalition, Inc. v. Att'y Gen. United States*, 825 F.3d 149, 168 (3d Cir. 2016).

Disclosing whether someone exercises "substantial control" over a corporate entity reveals information internal, and private, to that entity. A corporate entity's "arrangements," "understandings," "relationships," and other "direct" and "indirect" decision-making mechanisms for running the organization, 31 U.S.C. § 5336(a)(3)(A), are not aired publicly in the normal course of the entity's affairs. They happen *within* that corporate entity—privately—and their disclosure under the CTA requires the entity to reveal important and otherwise non-public information about its operations.

The CTA's definitions of "ownership" and "substantial control" require disclosures that extend far beyond existing ownership interests. For example, the CTA requires disclosure of contingent future ownership interests, such as option agreements, warrants, or convertible notes. (FinCEN FAQ D.4, available at https://www.fincen.gov/boi-faqs#D_4). None of that information is publicly available. And there are many reasons why an entity might wish to keep this information private. Public knowledge that a particular venture is (or is not) backed by either a famous or an infamous public figure, for example, might affect the company's ability to enter into certain contracts or arrangements. Or the

entity might be concerned that a particular individual's involvement, if known, could invite political retaliation or increased (and perhaps unjustified) scrutiny from law enforcement.

The Government's notion that American citizens have only "modest" expectations of privacy in their corporate records fails to appreciate that small business owners are not obligated to share this information with anyone outside the company. "One of the main rights attaching to property is the right to exclude others, and, in the main, one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude." *Byrd*, 584 U.S. at 405 (internal quotation marks and citation omitted).

*Byrd* held that even an unauthorized driver of a rental car has a reasonable expectation of privacy in the vehicle by virtue of his ability to exclude carjackers from the vehicle. *Id.* at 407. A corporate entity possesses the far more potent ability to exclude all individuals who are outside the company from being privy to its internal dynamics.

### b. The third-party doctrine does not apply.

To the extent that the district court believed that the plaintiffs' expectations of privacy are diluted because some of the relevant

information may be shared with parties other than the Government, that is incorrect. If someone has voluntarily exposed private information to a third party, then the Government may ordinarily obtain that information from the third party. *Carpenter v. United States*, 585 U.S. 296, 314 (2018). The paradigmatic cases involve law enforcement agents attempting to obtain data *from third parties*, such as banks or telecommunications companies, about target individuals who have voluntarily disclosed data to those third parties. *See United States v. Miller*, 425 U.S. 435, 443 (1976); *Smith v. Maryland*, 442 U.S. 735, 737 (1979).

That is not this case. The CTA compels disclosure of information not from third parties but directly from the target individual or entity itself. On its own terms, the third-party doctrine does not apply. *See Naperville Smart Meter Awareness v. City of Naperville*, 900 F.3d 521, 527 (7th Cir. 2018) (doctrine did not apply when "[t]here is no third party involved . . .").

### c.   The information required under the CTA is not already disclosed elsewhere.

The district court may have also reasoned that there is a minimal expectation of privacy in the information required under the CTA because the CTA compels disclosure only of information that is already

known to the Government. But there is "no case" supporting "the argument that what would otherwise be an unconstitutional search is not such where it produces only public information." *United States v. Jones*, 565 U.S. 400, 409 (2012). For example, the Government cannot obtain a business's bank records through a warrantless search of the business's filing cabinets simply because the Government could also obtain the same records from the company's bank. The Government must instead invoke the third-party doctrine and obtain the records from the bank.

Likewise, it is improper for the CTA to compel information directly from the plaintiffs even if similar information could be obtained from third parties. Regardless of whether some of the relevant information is disclosed to third parties, the plaintiffs still possess a reasonable expectation of privacy in that information vis-à-vis the Government.

Nor is it true that all of the information that the CTA demands is already disclosed elsewhere. The Government may be able to obtain from other sources (1) a publicly available list of all of the corporate entities registered in a particular state and (2) a list of all passport numbers that have been issued to any U.S. citizen. But the CTA compels self-reporting of the *relationship* between those two categories of information. And that

is the whole point of the CTA. As the Government has insisted, without the CTA, federal law enforcement agencies will be unable to close the gap and will be unable to link specific individuals to specific entities. (Gov't Br., RE 35, PageID.268). That alone demonstrates both that the relevant information has not actually been disclosed to any third party and that the plaintiffs reasonably expect it to remain private. *See Patel*, 738 F.3d at 1061 ("[I]f the records were publicly accessible, the police of course would not need to rely on [the ordinance] to gain access to them.").

Tax returns do not reveal all individuals who may have "substantial control" over an entity, either. Some of those individuals may not have a formal economic interest in the entity. In other cases, a corporation's shareholders may be comprised of other corporations, such that its tax filings do not disclose the identity of individuals. In no event, moreover, does an entity expect that its records or ownership information will be provided to foreign intelligence services without court oversight, as the CTA permits. 31 U.S.C. § 5336(c)(2)(B)(ii). In fact, even federal prosecutors ordinarily may not obtain tax return information from the IRS for use in criminal investigations unless they first obtain a court order from a federal judge. *See* 26 U.S.C. § 6103(i)(1)(A).

**B.    The Government failed to demonstrate that any exception to the warrant requirement applies.**

Neither the district court nor the Government identified any authority that allows the Government to override an individual's property interest or expectation of privacy without pointing to an exception to the warrant requirement.

That failure is all the more remarkable because the precedent on this point is not in doubt. "[S]earches conducted outside the judicial process, without prior approval by a judge or a magistrate judge, are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Patel*, 576 U.S. at 419–20 (cleaned up). "This rule applies to commercial premises as well as to homes." *Id.* (quotation omitted). "The government bears the burden of proof" to establish that one of the exceptions to the warrant requirement applies. *United States v. McGee*, 736 F.3d 263, 269 (4th Cir. 2013).

The only exception upon which the Government relies is the "special needs" exception (otherwise known as the administrative search exception). This exception is "closely guarded." *Chandler v. Miller*, 520 U.S. 305, 309 (1997). It does not apply here.

1. **A nondiscretionary warrantless search is unconstitutional if its primary purpose is to detect evidence of criminal wrongdoing.**

The administrative search doctrine applies only when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 619 (1989). Suspicionless airline security searches and DUI checkpoints are the prime examples. *See United States v. Edwards*, 498 F.2d 496, 500 (2d Cir. 1974); *see also Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 450 (1990).

The purpose behind the search is key. Even if a checkpoint program is operated in a uniform and nondiscretionary manner, the Supreme Court has "never approved a checkpoint program whose primary purpose [is] to detect evidence of ordinary criminal wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 41 (2000).

The sole justification for the CTA is the "normal need for law enforcement": namely, to obtain information helpful for criminal prosecution. The CTA was intended to fill "a significant gap . . . in the government's ability to detect and prosecute financial crime." (Gov't Br., RE 35, PageID.268). The disclosure must be made directly to the

"Financial Crimes Enforcement Network." 31 U.S.C. § 5336(a)(5), (b)(1)(A). And the purpose of collecting individuals' "sensitive" data under the CTA is solely to build a financial-intelligence database that law enforcement agencies may access to aid their criminal investigations. 31 U.S.C. § 5336 note (6).

Because the express purpose of the CTA is to assist ordinary criminal law enforcement, the "special needs" doctrine does not apply. *Ferguson v. City of Charleston*, 532 U.S. 67, 80 (2001). Whenever a statute authorizes searches "primarily for the ordinary enterprise of investigating crimes," then either a warrant or—at minimum—individualized suspicion is necessary. *Edmond*, 531 U.S. at 44.

Even if a search begins as an administrative search, once officers begin to "search[ ] for evidence of crime," they need a warrant. *Michigan v. Tyler*, 436 U.S. 499, 512 (1978). Under the CTA, however, there is no administrative search; officers are searching for evidence of crime from the beginning.

**2. The CTA contains no opportunity for precompliance review and is not limited to highly regulated industries.**

The CTA lacks the other hallmarks of an administrative search, as well. "[I]n order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Patel*, 576 U.S. at 420. The CTA not only compels disclosure without any court oversight, but it then allows FinCEN to share that coerced information with virtually any law enforcement agency that asks for it, including foreign governments and intelligence services—all without court oversight or neutral review. 31 U.S.C. § 5336(c)(2)(B)(ii).

Moreover, when applied to searches of corporate records or property, the administrative search doctrine applies only to certain "pervasively regulated" industries. *Id.* at 424. An industry is pervasively regulated if it has "such a history of government oversight that no reasonable expectation of privacy could exist." *Free Speech Coalition*, 825 F.3d at 169. The Supreme Court has applied this "narrow exception" to only four industries: "liquor sales"; "firearms dealing"; "mining"; and

"running an automobile junkyard." *Patel*, <u>576 U.S. at 424</u>. The CTA, by contrast, is not limited to any industry—pervasively regulated or not.

### C. The CTA's suspicionless searches are not reasonable.

#### 1. A suspicionless search is reasonable only if an exception to the warrant requirement applies.

If the Government fails to prove that an exception applies, a warrantless search is unconstitutional. The Fourth Amendment analysis stops there. *See, e.g.*, *Patel*, <u>576 U.S. at 423</u> (facially invalidating hotel-registry-disclosure ordinance where government could not demonstrate that administrative search exception applied); *Free Speech Coalition*, <u>825 F.3d at 171</u>, <u>173</u> (invalidating federal statute authorizing suspicionless searches of pornography producers' business records where Government could not demonstrate that administrative search exception applied); *Airbnb*, <u>373 F. Supp. 3d at 495</u> (invalidating short-term rental disclosure ordinance where municipality could not demonstrate that the administrative search exception applied).

The CTA does not fit any recognized exception to the warrant requirement. It was therefore improper for the district court to conclude that the CTA's searches are "reasonable" under the Fourth Amendment.

## 2. The Fourth Amendment applies to "reporting requirements" the same way that it does to physical searches.

The district court appears to have ruled that searches authorized by "statutory reporting schemes" are governed by a different version of the Fourth Amendment than physical searches are. But the Fourth Amendment does not distinguish between the forcible disclosure of electronic data and the forcible disclosure of the same information in physical form.

Under *Patel*, Congress could not compel every natural person in America to compile a list of every entity over which they have "substantial control" and make it available to law enforcement officers whenever they asked for it. *See Patel*, 576 U.S. at 420–21. The district court does not explain why the Fourth Amendment nevertheless allows Congress to compel every natural person in the country to mail that same list directly to the FBI's local field office so that FBI agents can review it to determine whether those persons were committing crimes.

And if those sorts of physical disclosures would violate the Fourth Amendment, then it is not clear why the CTA—which requires the disclosure of the same information, but merely in electronic form—would

not also violate the Fourth Amendment. The information obtained is identical; whether it is disclosed electronically or in hard copy should not matter. *See Airbnb*, 373 F. Supp. 3d at 495.

The district court's reasoning is even more troubling because it permits the Government to use a statutory reporting scheme as a means of circumventing traditional Fourth Amendment protections. FinCEN's then-Director testified to Congress that the CTA would be helpful for law enforcement because it would eliminate investigators' need to comply with the ordinary tools of investigation—like "grand jury subpoenas" and "search warrants"—to obtain beneficial ownership information. *Id*. at 59504. According to the Director, complying with these requirements "takes an enormous amount of time" and "wastes resources." *Id*. Grand jury subpoenas, for example, were insufficient because they "require an underlying grand jury investigation into a possible violation of law." *Id*. The CTA was designed to make ownership information "immediately available to law enforcement, intelligence, or national security agencies" without the hassle of a warrant or judicial oversight. *Id*. at 59505. The district court's ruling rewards the CTA's end-run around the Constitution.

To the extent that the district court believed that a reporting requirement imposes minimal burden on those who are required to upload the information, the burden of compliance is not the relevant inquiry. Even if technology allows a search to be conducted with little to no effort from the target individual, it still violates the Fourth Amendment if there is an excessive degree of government intrusion into property or privacy interests.

That is why searches of cell-site data and thermal imaging are unconstitutional, even though those searches do not require the targeted individuals to engage in any effort. *See, e.g.*, *Carpenter*, 585 U.S. at 313 (cell-site data); *Kyllo v. United States*, 533 U.S. 27, 35 (2001) (thermal imaging). The relevant question is not whether the search requires effort by the individual being searched; it is whether the search intrudes upon the person's property or privacy interests. *Carpenter*, 585 U.S. at 313; *see also Airbnb*, 373 F. Supp. 3d at 495. The Fourth Amendment applies the same way to suspicionless searches that compel disclosure of data in electronic format as it does to suspicionless searches that compel disclosure (or retention) of the same information in hard copy.

3. **The Fourth Amendment does not permit suspicionless searches whenever they are nondiscretionary.**

To the extent that the district court approved of the CTA because its searches are nondiscretionary, that approach is wrong, too. The prevention of arbitrary and discretionary searches was one reason why the Framers adopted the Fourth Amendment. *Carpenter*, <u>585 U.S. at 305</u>. But an equally "central aim of the Framers was to place obstacles in the way of a too permeating police surveillance." *Id.* (internal quotation marks and citation omitted).

The district court's ruling fails to acknowledge this second objective of the Fourth Amendment. The Fourth Amendment protects against *unreasonable* intrusions, not merely against *discretionary* intrusions. <u>U.S. Const., amend. IV</u>. A search that would be unreasonably intrusive when applied to a particular individual is not somehow transformed into a reasonable, Fourth-Amendment-compliant search merely because that same level of intrusion is applied to everyone. *Carpenter*, <u>585 U.S. at 305</u>.

That is why it did not matter in *Edmond* that "the officers have no discretion to stop any vehicle out of sequence." *Edmond*, <u>531 U.S. at 35</u>. What made the searches unreasonable was not that they were subject to

abuse on a case-by-case basis but that they were suspicionless searches whose primary purpose was crime control: "[W]hat principally distinguishes these checkpoints from those we have previously approved is their primary purpose." *Id.* at 40. The Court refused "to recognize exceptions to the general rule of individualized suspicion where governmental authorities primarily pursue their general crime control ends." *Id.* at 43.

As *Edmond* makes clear, it is not enough for a search to be discretionless or universally applied; there is no Big Brother exception to the Fourth Amendment. Even if a search is universal, it is still unreasonable if it is suspicionless and if its primary purpose is general crime control. *Id.*; *see also id.* at 56 (Thomas, J., dissenting) ("I rather doubt that the Framers of the Fourth Amendment would have considered 'reasonable' a program of indiscriminate stops of individuals not suspected of wrongdoing.").

### D. *Shultz* does not rescue the CTA.

The narrow holding in *Shultz* does not support the district court's sweeping interpretation of it, either.

**1. *Shultz* did not hold that all reporting requirements are excepted from the Fourth Amendment.**

*Shultz* is not a "specifically established" or "well-delineated" exception to the warrant requirement. *Patel*, <u>576 U.S. at 419</u>. The district court did not identify any case holding that *Shultz* sets the Fourth Amendment standard for all statutory "reporting requirements." Cases like *Edmond*, for example, do not include *Shultz* as one of the "limited circumstances in which the usual rule" requiring individualized suspicion does not apply. *See Edmond*, <u>531 U.S. at 37</u>. And the Supreme Court has repeatedly stated that the exceptions to the warrant requirement must be narrowly construed. *See, e.g.*, *Chandler*, <u>520 U.S. at 309</u>.

The notion that *Shultz* was intended to apply to all statutory reporting schemes also contradicts *Shultz* itself. The majority opinion in *Shultz* upheld only the narrow regulations that had been adopted in order to implement the Bank Secrecy Act; it declined to opine on the constitutionality of the statutory language itself, which allowed the Secretary of the Treasury to impose much broader reporting requirements than he had chosen to impose under the regulations.

*Shultz*, [416 U.S. at 63-64](). Two of the six-justice majority in *Shultz*—Justices Powell and Blackmun—joined a concurrence observing that, although they agreed that the regulations as issued did not violate the Fourth Amendment, "[a] significant extension of the regulations' reporting requirements . . . would pose substantial and difficult constitutional questions" for them. *Shultz*, [416 U.S. at 78]() (Powell, J., and Blackmun, J., concurring).

Holding that *Shultz* applies to all statutory reporting requirements is also inconsistent with much of the Supreme Court's subsequent Fourth Amendment jurisprudence. The district court's ruling improperly reads *Shultz* as eliminating not only all of the ordinary Fourth Amendment protections (including individualized suspicion and a warrant) but also all of the protections that would apply to an administrative search (including precompliance review, a non-law-enforcement purpose, and application only to pervasively regulated industries). Under the district court's analysis, Congress can sidestep the Fourth Amendment and provide law enforcement officers with suspicionless access to private information as long as it enacts a discretionless reporting regime instead of a spot-check inspection regime.

That is the same kind of reasoning that the court rejected in *Edmond*. The court in *Edmond* recognized that, if it permitted discretionless traffic stops for criminal-law enforcement purposes, then there would be nothing to stop officers from subjecting innocent citizens to suspicionless stops as "a routine part of American life," as long as the stops were universal or otherwise without discretion. *Edmond*, 531 U.S. at 42. The district court is allowing the same thing here, enabling the Government to extract private information from innocent citizens without suspicion of wrongdoing, as long as the searches are universal. That holding interprets *Shultz* as enabling an outcome that the Supreme Court has repeatedly refused to allow.

> **2.  The disclosure regime in *Shultz* is significantly narrower than the disclosure regime under the CTA.**

The district court's reliance on *Shultz* is also misplaced because the reporting requirements in *Shultz* were much narrower than those imposed by the CTA.

> **a.  The CTA imposes searches without any indicia of suspicious activity.**

Unlike the CTA, the regulations at issue in *Shultz* compelled disclosure only when there was already a level of individualized

suspicion. Under the regulations, banks were required to disclose information only about certain specific, "abnormally large" transactions: namely, transfers of at least $10,000 in currency. *Shultz*, <u>416 U.S. at 67</u>; *see also id*. at 41 n.14. In fact, the regulations exempted banks from disclosing even those large-currency transfers when they involved "established customer[s]" who maintained accounts consistent with "customary" industry practices. *Id*. at 39.

The Bank Secrecy Act regulations therefore were triggered under circumstances that—like in a valid *Terry* stop—give rise to at least a reasonable suspicion of illegality. Just as the officers in *Terry* had reasonable suspicion that the suspects' abnormal activity (walking back and forth in front of a store) was a marker of potential criminality, so the anomalous behavior of a brand-new banking customer transferring at least $10,000 in currency gives the Government enough suspicion to conduct a limited search that is no more than sufficient to allay the suspicion. *Terry v. Ohio*, <u>392 U.S. 1, 22-23</u> (1968). By linking the searches to specific transactions, *Shultz* approved searches that were tied to specific, suspicious circumstances, just like in *Terry*. That is consistent with the general rule that searches and seizures may be effected even for

"general crime control purposes" as long as they are based upon "some quantum of individualized suspicion." *Ashcroft v. al-Kidd*, <u>563 U.S. 731, 737</u>–38 (2011).

The CTA, by contrast, creates a database of everyone's information without any antecedent suspicion. The mere creation of an entity is not "abnormal" or suspicious. Entities are routinely created for legal reasons. Because *Shultz* involved the constitutionality of searches that *were* supported by some indicia of suspicion, it does not control the constitutionality of searches under the CTA, which are not.

### b. *Shultz* involved pervasively regulated entities.

*Shultz* also involved disclosure obligations that were imposed upon entities—banks—that are highly regulated. *Shultz* is therefore best understood as a particular species of administrative search that allows the Government to require already-heavily regulated entities to disclose objectively suspicious transactions, not as providing permission for the Government to impose suspicionless disclosure obligations on every individual and entity in the country.

Not only did *Shultz* adopt a test that is a close cousin of the administrative search analysis, but *Shultz* also took pains to emphasize

that (1) the reporting requirements applied only to banks, not to individual depositors, and (2) banks had been required to furnish these reports for the previous two decades under prior regulatory regimes. *Shultz*, 416 U.S. at 38 & n.12. In other words, the Bank Secrecy Act's reporting requirements applied solely to financial entities that were already pervasively regulated and had already been subject to very similar reporting requirements under other regimes for more than twenty years. That is a hallmark of the administrative search exception. *See Free Speech Coalition*, 825 F.3d at 169–70. It also means that the scope of the Bank Secrecy Act's compelled disclosures is far more limited than the scope of the compelled disclosures under the CTA, which apply to almost every small business in every industry in the country.

### c. *Shultz* never addressed the claims of individual depositors.

*Shultz* also never addressed the Fourth Amendment claims of the individual depositors—that is, the persons whose information was required to be disclosed. Those claims were rejected for lack of standing. *See Shultz*, 416 U.S. at 68-69. And when the court reviewed the depositors' Fourth Amendment challenges to the Bank Secrecy Act on the

merits in *Miller*, the court rejected those challenges under the third-party doctrine. *Miller*, 425 U.S. at 443.

Here, by contrast, the third-party doctrine does not apply. Having never reached the merits of the individual plaintiffs' claims, *Shultz* does not control their analysis. And, unlike financial institutions, the plaintiffs' Fourth Amendment claims are not screened through the rule that "[t]he businessman in a regulated industry in effect consents to the restrictions placed upon him." *Marshall*, 436 U.S. at 313.

### d.    Even under *Shultz*, the CTA fails.

Even if *Shultz*'s test were relevant, the CTA still does not survive.

*Shultz* allowed the compelled disclosure only of information that is "limited in nature, and sufficiently related to a tenable congressional determination as to improper use of transactions of that type in interstate commerce." *Shultz*, 416 U.S. at 67. But exposing the identity of individuals who can control a company or own convertible notes or other interests in it is an intrusive inquiry, not a "limited" one. The Government fails to explain why, if the information compelled by the CTA is so minimal, the Government also desperately needs it to fill the "gap" in its law enforcement efforts. The Government is arguing both that

the information is crucially important and that it has no real value. That is not a winning approach.

And in any event, an officer's demand for mere identifying information—a name—cannot be obtained for criminal investigation purposes absent individualized suspicion. *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.*, 542 U.S. 177, 186–87 (2004); *Brown v. Texas*, 443 U.S. 47, 49 (1979). Compelled self-identification on its own triggers Fourth Amendment protection, even apart from ownership information.

Nor is it merely a de minimis intrusion for every small business owner across the country to be subject to a costly and ongoing reporting requirement, under which their private business information may be provided to foreign intelligence agencies. Paying anywhere between $85 to $2,600 in order to hand over information to government actors so that they can prosecute you with it or share it with foreign intelligence services is not the sort of "limited" intrusion that *Shultz* had in mind.

The second part of *Shultz*'s test does not apply to the CTA, either. *Shultz* opined that there must be "a tenable congressional determination as to improper use of transactions of that type in interstate commerce." *See Shultz*, 416 U.S. at 67. But the CTA is not tied to any "transactions"

of any type, suspicious or otherwise. The CTA regulates every small business in America, simply because they exist, not because of anything they do. Unlike the Bank Secrecy Act, the CTA is not targeted at obtaining more information about particular suspicious activity in order to allay the Government's legitimate concerns about that activity. Instead, the CTA is intended to create a haystack so that the Government can search through it for anything that might look like a needle. That is the same sort of rummaging that has been anathema to the Fourth Amendment since its adoption. *See Byrd*, 584 U.S. at 403; *Marshall*, 436 U.S. at 311–12.

### E.    The district court's ruling, if accepted, would significantly alter Fourth Amendment jurisprudence.

The district court did not attempt to reconcile *Shultz* with any of the Supreme Court's subsequent Fourth Amendment jurisprudence. Instead, under the district court's analysis, as long as the Government characterizes a search as a "reporting requirement," it can forcibly compel disclosure of information for criminal investigation purposes whenever Congress determines that this information would be useful to look through in order to determine whether ordinary, unsuspicious citizens were committing crimes.

That is a drastic revision of the Fourth Amendment. It does not help the Government for it to argue that the compelled disclosures are relatively "limited." That approach is like saying that, if the police break into a filing cabinet without a warrant, they do not violate the Fourth Amendment as long as they take out only the one or two pieces of paper that they want. That has never been the rule. Criminal investigators do not have the right to obtain just a little bit of private information in violation of the Fourth Amendment, as long as they leave most of it behind.

If the district court's approach is adopted, it would allow law enforcement officers to fundamentally alter their investigative tactics in a way that the Fourth Amendment has never allowed. *See Airbnb*, 373 F. Supp. 3d at 491, 495 (noting implications of such a regime). That sort of investigatory regime would be permissible only under a far different conception of the Fourth Amendment than the one that the Framers adopted. *United States v. Di Re*, 332 U.S. 581, 595 (1948); *see also Olmstead*, 277 U.S. at 478 (Brandeis, J., dissenting). And the pace of technological advancement simply raises the stakes. As one trial court observed, if it becomes even easier to collect DNA samples in the near

future than it already is, then the Government's position might allow it to collect that information under the CTA for law enforcement purposes, too. (*SBAM v. Yellen*, W.D. Mich. No. 1:24-cv-314, RE 25, PageID.650-651).

Unfortunately, there is a real possibility that the information collected about innocent citizens may be abused by the agencies that collect it. *See* Brief of Project for Privacy and Surveillance Accountability as Amicus Curiae Supporting Appellee at 11, *NSBU v. U.S. Dep't of Treasury*, No. 24-10736 (11th Cir.); Electronic Frontier Foundation, *Newly Public FISC Opinion is The Best Evidence For Why Congress Must End Section 702* (May 23, 2023), available at https://www.eff.org/deeplinks/2023/05/newly-public-fisc-opinion-best-evidence-why-congress-must-end-section-702 (noting that the FBI illegally accessed a government database "more than 278,000 times"). That the CTA enables American citizens' private information to be shared with foreign law enforcement and intelligence agencies merely exacerbates the problem.

The Government, for its part, trots out its own parade of horribles, suggesting that—if longstanding Fourth Amendment jurisprudence is followed—then the constitutionality of a host of other reporting

requirements likewise will be jeopardized. That is incorrect. None of the reporting regimes that the Government cites has the primary purpose of achieving general crime control. (Gov't Br., RE 35, PageID.299).

For example, 8 U.S.C. § 1324a(b) is an immigration statute that requires certain employers to retain documentation to verify that an employee "is not an unauthorized alien," and to "make it available for inspection." *Id.* §§ 1324a(b)(1)(A) and (b)(3). The statute's primary purpose is to ensure compliance with immigration and employment laws, not to root out criminals. Campaign finance reporting requirements likewise fit comfortably within the administrative search exception. 52 U.S.C. § 30104(a) requires political committees to file reports of receipts and disbursements, and § 30107(a)(9) gives the FEC the power to report apparent violations to law enforcement. These requirements apply to heavily regulated entities and are principally designed to ensure fair and transparent elections, not to catch criminals. Tax returns likewise fall within the administrative search exception because they serve the administrative purpose of accurately assessing taxes. Ruling against the CTA will neither imperil routine administrative searches nor upend the

Government's ability to obtain banking information under *Shultz* and *Miller*.

The line drawn by *Edmond* is not controversial. If the Government is conducting a suspicionless search for the primary purpose of general crime control, then it needs either a warrant or a recognized exception to the warrant requirement. *Edmond*, 531 U.S. at 43. The CTA falls on the wrong side of the line.

## Conclusion

The district court's order should be reversed.

Dated: November 19, 2024                /s/ Stephen J. van Stempvoort
                                        Stephen J. van Stempvoort
                                        D. Andrew Portinga
                                        Miller Johnson
                                        45 Ottawa Avenue, SW – Suite 1100
                                        Grand Rapids, MI  49503
                                        (616) 831-1700
                                        vanstempvoorts@millerjohnson.com

## Certificate of Compliance

This document complies with the type-volume limit of <u>Fed. R. App. P. 29(a)(5)</u> because, excluding the parties of the document exempted by <u>Fed. R. App. P. 32(f)</u>, this document contains 6,498 words according to the word count function of Microsoft Word.

This document complies with the typeface requirements of <u>Fed. R. App. P. 32(a)(5)</u> and the type-style requirements of <u>Fed. R. App. P. 32(a)(6)</u> because this document has been prepared using Microsoft Word in 14-point Century Schoolbook font.

Dated: November 19, 2024       */s/Stephen J. van Stempvoort*
Stephen J. van Stempvoort
Miller Johnson
45 Ottawa Avenue, SW – Suite 1100
Grand Rapids, MI 49503
(616) 831-1700
vanstempvoorts@millerjohnson.com

**Certificate of Service**

I hereby certify that on November 19, 2024, a true and accurate copy of the foregoing brief was electronically filed with the Court using the CM/ECF system. Service on counsel for all parties will be accomplished through the Court's electronic filing system.

Dated: November 19, 2024

/s/ *Stephen J. van Stempvoort*
Stephen J. van Stempvoort (P79828)
Miller Johnson
45 Ottawa Avenue, SW – Suite 1100
Grand Rapids, MI  49503
(616) 831-1700
vanstempvoorts@millerjohnson.com

MJ_DMS 38424787v3