# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

———————————

COMMUNITY ASSOCIATIONS INSTITUTE, *et al.*,

Plaintiffs-Appellants,

v.

U.S. DEPARTMENT OF THE TREASURY, *et al.*,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the Eastern District of Virginia

———————————

## BRIEF FOR APPELLEES

———————————

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

ERIK S. SIEBERT
  *United States Attorney*

DANIEL TENNY
MAXWELL A. BALDI
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7264*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2495*

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION.................................................................. 1

STATEMENT OF THE ISSUE.................................................................. 1

STATEMENT OF THE CASE.................................................................. 2

    A.    Statutory Background.............................................................2

    B.    Factual Background and Prior Proceedings .......................................11

SUMMARY OF ARGUMENT .............................................................. 14

STANDARD OF REVIEW ................................................................ 18

ARGUMENT ........................................................................... 14

I.    The CTA Is a Valid Exercise of Congress's Enumerated Powers ............... 19

II.    The CTA Does Not Violate Plaintiffs' Fourth Amendment Rights............. 35

III.    The CTA Does Not Violate Plaintiffs' First Amendment Rights ............... 42

IV.    Equitable Factors Weigh Against a Preliminary Injunction......................... 48

CONCLUSION ......................................................................... 54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** Page(s)

*Americans for Prosperity Found. v. Bonta*,
   594 U.S. 595 (2021) .................................................................44, 47

*Barry v. City of New York*,
   712 F.2d 1554 (2d Cir. 1983) ..................................................36

*Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*,
   459 U.S. 87 (1982) ...................................................................44

*Brown v. Texas*,
   443 U.S. 47 (1979) ...................................................................40

*Buckley v. Valeo*,
   424 U.S. 1 (1976) .....................................................................48

*California Bankers Ass'n v. Shultz*,
   416 U.S. 21 (1974) ..............................................3, 17, 35, 36, 37, 38

*City of Indianapolis v. Edmond*,
   531 U.S. 32 (2000) ...............................................................39, 40

*City of Los Angeles v. Patel*,
   576 U.S. 409 (2015) ................................................................39

*Donovan v. Lone Steer, Inc.*,
   464 U.S. 408 (1984) ............................................................35, 37

*Electric Bond & Share Co. v. Securities & Exch. Comm'n*,
   303 U.S. 419 (1938) ............................................................26, 36

*Farhy v. Commissioner*,
   100 F.4th 223 (D.C. Cir. 2024) ...............................................33

*Firestone v. Yellen*,
   No. 3:24-cv-1034-SI, 2024 WL 4250192 (D. Or. Sept. 20, 2024) ....................34

*Full Value Advisors, LLC v. Securities & Exch. Comm'n*,
   633 F.3d 1101 (D.C. Cir. 2011) ...............................................42

*Gill v. Whitford*,
   585 U.S. 48 (2018) ...................................................................52

ii

*Gonzales v. Raich*,
  545 U.S. 1 (2005) ......................................................19, 20, 21, 27, 28

*Helvering v. Mitchell*,
  303 U.S. 391 (1938) ...............................................................29

*Karstendick, Ex parte*,
  93 U.S. 396 (1876) ............................................................. 32-33

*Kennedy v. Mendoza-Martinez*,
  372 U.S. 144 (1963) ...............................................................30

*Master Printers of Am. v. Donovan*,
  751 F.2d 700 (4th Cir. 1984) ..............................................48

*McCulloch v. Maryland*,
  17 U.S. (4 Wheat.) 316 (1819) .......................................20, 32

*McHenry v. Texas Top Cop Shop, Inc.*, 604 U.S. ----,
  No. 24A653, 2025 WL 272062 (U.S. Jan. 23, 2025) ........................14

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
  559 U.S. 229 (2010) ...............................................................42

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) ..........................................................27, 28

*NAACP v. Alabama ex rel. Patterson*,
  357 U.S. 449 (1958) ..........................................................43, 44

*National Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) ................................................16, 19, 21, 25, 26

*National Small Bus. United v. Yellen*,
  721 F. Supp. 3d 1260 (N.D. Ala. 2024) ............................34

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*,
  434 U.S. 1345 (1977) .........................................................49

*NLRB v. Jones & Laughlin Steel Corp.*,
  301 U.S. 1 (1937) .................................................................19

*Overstreet v. Lexington-Fayette Urban Cty. Gov't*,
  305 F.3d 566 (6th Cir. 2002) ..............................................36

*Pharmaceutical Care Mgmt. Ass'n v. Rowe*,
    429 F.3d 294 (1st Cir. 2005) ........................................................36, 42

*Quince Orchard Valley Citizens Ass'n v. Hodel*,
    872 F.2d 75 (4th Cir. 1989) ...........................................................52

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ...........................................................................43

*Sabri v. United States*,
    541 U.S. 600 (2004) ..............................................................28, 29, 34

*Sharma v. Hirsch*,
    121 F.4th 1033 (4th Cir. 2024) ..................................................45, 46

*Shelton v. Tucker*,
    364 U.S. 479 (1960) .........................................................................44

*Smith v. U.S. Dep't of the Treasury*, --- F. Supp. 3d ----,
    No. 6:24-cv-336, 2025 WL 41924 (E.D. Tex. Jan. 7, 2025) ............14

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) .........................................................................47

*Texas Top Cop Shop, Inc. v. Garland*, --- F. Supp. 3d ---,
    No. 4:24-cv-478, 2024 WL 5049220 (E.D. Tex. Dec. 5, 2024) ........14

*Toll v. Moreno*,
    458 U.S. 1 (1982) .............................................................................29

*Trump v. Hawaii*,
    585 U.S. 667 (2018) .........................................................................52

*Ullman v. United States*,
    350 U.S. 422 (1956) .........................................................................30

*United States v. Arnold*,
    740 F.3d 1032 (5th Cir. 2014) .........................................................43

*United States v. Bollinger*,
    798 F.3d 201 (4th Cir. 2015) ...........................................................31

*United States v. Bynum*,
    604 F.3d 161 (4th Cir. 2010) ...........................................................41

*United States v. Comstock*,
   560 U.S. 126 (2010) ....................................................................16, 20, 29, 32, 33

*United States v. Curtiss-Wright Exp. Corp.*,
   299 U.S. 304 (1936) .................................................................................... 31-32

*United States v. Gibert*,
   677 F.3d 613 (4th Cir. 2012) ..............................................................................20

*United States v. Goodwin*,
   141 F.3d 394 (2d Cir. 1997) ...............................................................................22

*United States v. Lopez*,
   514 U.S. 549 (1995) ...........................................................................20, 21, 22, 27

*United States v. Morrison*,
   529 U.S. 598 & n.4 (2000) .............................................................................21, 27

*United States v. Rose*,
   3 F.4th 722 (4th Cir. 2021) .................................................................................41

*United States v. Sindel*,
   53 F.3d 874 (8th Cir. 1995) ........................................................................... 42-43

*Virginia Soc'y for Human Life, Inc. v. FEC*,
   263 F.3d 379 (4th Cir. 2001), *overruled on other grounds*,
   *The Real Truth About Abortion, Inc. v. FEC*,
   681 F.3d 544 (4th Cir. 2012) ..............................................................................52

*Vitkus v. Blinken*,
   79 F.4th 352 (4th Cir. 2023) ...............................................................................18

*Wickard v. Filburn*,
   317 U.S. 111 (1942) .....................................................................................19, 21

*Wooley v. Maynard*,
   430 U.S. 705 (1977) ...........................................................................................43

**U.S. Constitution:**

Art. I, § 8, cl. 1 ...................................................................................................29

Art. I, § 8, cl. 3 .......................................................................................19, 29, 31

Art. I, § 8, cl. 18 ...............................................................29, 31

Art. II, § 1, cl. 1 .......................................................................31

Art. II, § 3 ................................................................................31

**Statutes:**

Anti-Money Laundering Act of 2020,
   Pub. L. No. 116-283, div. F, 134 Stat. 4547 (2021):
     § 6402(2), 134 Stat. at 4604 ........................................................3
     § 6002(2), 134 Stat. at 4547 ........................................................6
     § 6002(5), 134 Stat. at 4547 .................................................7, 23
     § 6002(5)(B), 134 Stat. at 4547 ................................................33
     § 6002(5)(C), 134 Stat. at 4548 ................................................33
     § 6402(3), 134 Stat. at 4604 ...............................3, 6, 21, 30, 34
     § 6402(3)-(5)(C), 134 Stat. at 4604 .........................................22
     § 6402(4), 134 Stat. at 4604 ......................................................5
     § 6402(5), 134 Stat. at 4604 .........................................17, 31, 32
     § 6402(5)-(6), 134 Stat. at 4604-05 .........................................29
     § 6402(5)(B), 134 Stat. at 4604 ................................................37
     § 6402(5)(C), 134 Stat. at 4604 ................................................31
     § 6402(5)(D), 134 Stat. at 4604 .......................1, 7, 15, 31, 50
     § 6402(5)(E), 134 Stat. at 4604 ...........................6, 7, 30, 51
     § 6402(6)(A), 134 Stat. at 4605 ................................................7
     § 6402(8)(C), 134 Stat. at 4605 .............................7, 30, 33, 34, 36

Corporate Transparency Act,
   Pub. L. No. 116-283, div. F, tit. LXIV,
   134 Stat. 4604 (2021) (codified at 31 U.S.C. § 5336) ........................................1
   31 U.S.C. § 5336(a)(1) ................................................................8
   31 U.S.C. § 5336(a)(2) ................................................................8
   31 U.S.C. § 5336(a)(3)(A) ..........................................................8
   31 U.S.C. § 5336(a)(3)(B) ..........................................................8
   31 U.S.C. § 5336(a)(11) ............................................................15
   31 U.S.C. § 5336(a)(11)(A) .......................................1, 9, 11, 24, 37
   31 U.S.C. § 5336(a)(11)(A)(ii) .................................................24
   31 U.S.C. § 5336(a)(11)(B) ....................................9, 25, 37, 38
   31 U.S.C. § 5336(a)(11)(B)(xix) .............................................9, 47
   31 U.S.C. § 5336(a)(11)(B)(xix)(I) .........................................11

31 U.S.C. § 5336(a)(11)(B)(xxiii) .................................................9, 38
31 U.S.C. § 5336(a)(11)(B)(xxiv) ...............................................10, 38
31 U.S.C. § 5336(b) ....................................................................1, 15
31 U.S.C. § 5336(b)(1)(A) ..................................................................11
31 U.S.C. § 5336(b)(1)(B) ..................................................................24
31 U.S.C. § 5336(b)(1)(D) ...............................................................8, 24
31 U.S.C. § 5336(b)(2)(A) ............................................................8, 9, 37
31 U.S.C. § 5336(b)(5) .......................................................................10
31 U.S.C. § 5336(c)(2)(B)(i)(I) ............................................................10
31 U.S.C. § 5336(c)(2)(B)(i)(II) ...........................................................10
31 U.S.C. § 5336(c)(5)(B) ........................................................7, 30, 33
31 U.S.C. § 5336(h) .......................................................................8, 45
31 U.S.C. § 5336(h)(3)(C) ....................................................................8

Currency and Foreign Reporting Act of 1970,
  Pub. L. No. 91-508, sec. 121, 84 Stat. 1114 (1970) ...............................2

8 U.S.C. § 1324a .............................................................................26

12 U.S.C. § 1829b ..............................................................................2

12 U.S.C. §§ 1951-1960 .......................................................................2

18 U.S.C. § 1001 ................................................................................2

18 U.S.C. § 1341 ................................................................................2

18 U.S.C. § 1343 ................................................................................2

18 U.S.C. § 1956 ................................................................................2

18 U.S.C. § 1957 ................................................................................2

18 U.S.C. § 2339C ..............................................................................2

26 U.S.C. § 501(c) .......................................................................11, 47

26 U.S.C. § 528 .................................................................................12

26 U.S.C. § 528(c) .............................................................................23

26 U.S.C. § 528(c)(1)(A) .....................................................................46

26 U.S.C. § 528(d) ...............................................................46

26 U.S.C. § 6012 ..................................................................26

26 U.S.C. § 7201 ....................................................................2

28 U.S.C. § 1292(a)(1) ...........................................................1

28 U.S.C. § 1331 ....................................................................1

31 U.S.C. § 310(b)(2)(C)(i) ....................................................3

31 U.S.C. § 5311 *et seq.* ..................................................3, 26

31 U.S.C. §§ 5311-5314 .........................................................2

31 U.S.C. § 5311(1) .........................................................35, 36

31 U.S.C. § 5313 ..................................................................35

31 U.S.C. §§ 5316-5336 .........................................................2

52 U.S.C. § 30104 ................................................................26

Del. Code Ann. tit. 8, § 122(4) (West) ..................................23

Del. Code Ann. tit. 8, § 122(13) (West) ................................23

Mass. Gen. Laws Ann., ch. 156D, § 16.22 (West) ................41

Mich. Comp. Laws Ann. 450.2911 (West) .........................41-42

Va. Code Ann. § 13.1-936 (West) .........................................41

**Regulations:**

31 C.F.R. § 1010.312 .............................................................35

31 C.F.R. § 1010.380 .............................................................10

31 C.F.R. § 1010.380(a)(1)(i)(A) ...........................................11

31 C.F.R. § 1010.380(a)(1)(i)(B) ...........................................11

31 C.F.R. § 1010.380(a)(1)(iii) ..............................................................10

**Rules:**

Fed. R. App. P. 4(a)(1)(B) .....................................................................1

Fed. R. Civ. P. 65(d)(1)(B)-(C) ............................................................53

**Legislative Material:**

H.R. Rep. No. 116-227 (2019) ......................................................3, 4, 15

**Other Authorities:**

*Beneficial Ownership Information Reporting Deadline Extension*,
  88 Fed. Reg. 83,499 (Nov. 30, 2023) .............................................10,,

*Beneficial Ownership Information Reporting Requirements*,
  87 Fed. Reg. 59,498 (Sept. 30, 2022) .........2, 4, 5, 6, 8, 10, 33-34, 34, 49, 50, 51

Cmty. Ass'ns Inst., *Community Associations Institute (CAI)
  Introduces 2024 President and Board of Trustees* (Feb. 6, 2024),
  https://perma.cc/W48E-FRKX ...........................................................12

Steven M. D'Antuono, Acting Deputy Assistant Director,
  Criminal Investigative Div., Fed. Bureau of Investigation,
  *Combatting Illicit Financing by Anonymous Shell Companies:
  Statement Before the Senate Banking, Housing, and Urban
  Affairs Committee* (May 21, 2019),
  https://perma.cc/Y9TN-G4UV ............................................................4

Order, *National Small Bus. United v. U.S. Dep't of the Treasury*,
  No. 24-10736 (11th Cir. Apr. 22, 2024) ...........................................34

U.S. Dep't of the Treasury,
  *National Money Laundering Risk Assessment* (2018) .........................2

U.S. Dep't of the Treasury, *National Strategy for Combating
  Terrorist and Other Illicit Financing* (2020),
  https://perma.cc/C48C-AGBC ......................................................5, 33

11A Charles Alan Wright & Arthur R. Miller,
  *Federal Practice and Procedure* § 2955 (3d ed.),
  Westlaw (database updated June 2024) .............................................................53

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331 in this constitutional challenge to an Act of Congress. JA13. The district court denied plaintiffs' motion for a preliminary injunction on October 24, 2024. JA131. Plaintiffs filed a timely notice of appeal on November 4, 2024. JA151; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit). This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

The Corporate Transparency Act, Pub. L. No. 116-283, div. F, tit. LXIV, 134 Stat. 4604 (2021) (CTA) (codified at 31 U.S.C. § 5336), generally requires certain "corporation[s], limited liability compan[ies], [and] other similar entit[ies]" to report minimal identifying information about their owners to the Department of the Treasury's Financial Crimes Enforcement Network (FinCEN). 31 U.S.C. § 5336(a)(11)(A), (b). Congress determined that these reporting requirements are "needed" to "better enable critical national security, intelligence, and law enforcement efforts" to counter financial crime. § 6402(5)(D), 134 Stat. at 4604. The questions presented are whether the CTA is a valid exercise of Congress's enumerated powers, and whether it is consistent with plaintiffs' First and Fourth Amendment rights.

## STATEMENT OF THE CASE

### A.     Statutory Background

This case arises from the federal government's efforts to combat money laundering, terrorist financing, and other harmful economic activities.

**1.** Federal law has long prohibited money laundering, *see* 18 U.S.C. §§ 1956, 1957, providing financing for terrorism, *see id*. § 2339C, evading taxes, *see* 26 U.S.C. § 7201, and other harmful economic activities, *see, e.g.*, 18 U.S.C. §§ 1001, 1341, 1343 (prohibiting false statements and various forms of fraud).  According to one estimate, "domestic financial crime, excluding tax evasion, generates approximately $300 billion of proceeds" each year. *Beneficial Ownership Information Reporting Requirements*, 87 Fed. Reg. 59,498, 59,579 (Sept. 30, 2022) (citing U.S. Dep't of the Treasury, *National Money Laundering Risk Assessment* 2 (2018)).

Because financial crime is complex, easily concealed, and facilitated by an interconnected financial system, Congress has adopted various measures to aid enforcement.  The Bank Secrecy Act,[1] for example, requires that banks keep records regarding account owners and submit reports regarding certain

---

[1] Parts of the Currency and Foreign Reporting Act of 1970, Pub. L. No. 91-508, sec. 121, 84 Stat. 1114 (1970), its amendments, and other statutes, are referred to as the Bank Secrecy Act, codified at 12 U.S.C. § 1829b, 12 U.S.C. §§ 1951-1960, and 31 U.S.C. §§ 5311-5314 and §§ 5316-5336.

transactions.  *See* 31 U.S.C. § 5311 *et seq.*  Congress determined that these

records would "have a high degree of usefulness in criminal, tax, or regulatory

investigations or proceedings," *California Bankers Association v. Shultz*, 416

U.S. 21, 26 (1974) (quotation marks omitted), and it directed the Department of

the Treasury's Financial Crimes Enforcement Network to use the reported

information to "identify possible criminal activity to appropriate Federal, State,

local, Tribal, and foreign law enforcement agencies," 31 U.S.C.

§ 310(b)(2)(C)(i).

Despite these efforts, there remained a significant gap in the

government's ability to detect and prosecute financial crime.  Under state law,

"corporations, limited liability companies, [and] other similar entities" are

generally not required to report "information about the[ir] beneficial owners."

Anti-Money Laundering Act of 2020, Pub. L. No. 116-283, div. F, § 6402(2),

134 Stat. 4547, 4604 (2021).  "A person forming a corporation or limited

liability company within the United States" thus "typically provides less

information at the time of incorporation than is needed to obtain a bank

account or driver's license."  H.R. Rep. No. 116-227, at 2 (2019).  That enables

"malign actors" to "conceal their ownership of corporations" and then use

those anonymous corporations to engage in "money laundering," "the

financing of terrorism," and "serious tax fraud."  § 6402(3), 134 Stat. at 4604.

Congress and the Executive Branch have identified "[t]his lack of transparency" as "a primary obstacle to tackling financial crime in the modern era." H.R. Rep. No. 116-227, at 10. When investigators trace illicit funds to a corporation, they often cannot identify the corporation's owners from available sources because ownership records "do not exist." 87 Fed. Reg. at 59,504. Instead, investigators must pursue "human source information, grand jury subpoenas, surveillance operations, witness interviews, search warrants, and foreign legal assistance requests to get behind the outward facing structure of the[] shell companies."[2] *Id.* (quotation marks omitted). The "strategic use" of such companies by criminals thus "makes investigations exponentially more difficult and laborious." *Id.* at 59,505 (quoting Steven M. D'Antuono, Acting Deputy Assistant Director, Criminal Investigative Div., Fed. Bureau of Investigation, *Combatting Illicit Financing by Anonymous Shell Companies: Statement Before the Senate Banking, Housing, and Urban Affairs Committee* (May 21, 2019), https://perma.cc/Y9TN-G4UV). And because criminals may "layer" multiple shell companies "like Russian nesting 'Matryoshka' dolls,"

---

[2] "Shell companies" are entities "that have no physical presence beyond a mailing address, generate little to no independent economic value, and generally are created without disclosing their beneficial owners." 87 Fed. Reg. at 59,501 (footnote omitted). Thus, shell companies "can be used to conduct financial transactions while concealing [the] true beneficial owners' involvement." *Id.*

even the most thorough investigation may not yield results.  § 6402(4), 134 Stat. at 4604.

While shell companies have legitimate uses, criminals also routinely use them to exploit this enforcement gap.  Federal prosecutors report that "large-scale schemes that generate substantial proceeds for perpetrators and smaller white-collar cases alike routinely involve shell companies."  87 Fed. Reg. at 59,503 (quoting U.S. Dep't of the Treasury, *National Strategy for Combating Terrorist and Other Illicit Financing* 14 (2020), https://perma.cc/C48C-AGBC).  Likewise, drug traffickers "commonly use shell and front companies to commingle illicit drug proceeds with legitimate revenue of front companies, thereby enabling the [drug traffickers] to launder their drug proceeds."  *Id.* And more broadly, the absence of company-ownership information in the United States undermines the federal government's longstanding diplomatic efforts to combat cross-border financial crime by "mak[ing] the United States a jurisdiction of choice for those wishing to create shell companies" and a "weak link in the integrity of the global financial system."  *Id*. at 59,506.

In addition to facilitating domestic crime, the absence of company-ownership information threatens U.S. national-security and foreign-policy interests.  For instance, "Russian elites, state-owned enterprises, and organized crime, as well as the Government of the Russian Federation have attempted to

use U.S. and non-U.S. shell companies to evade sanctions." 87 Fed. Reg. at 59,498. The Government of Iran has likewise deployed shell companies "to obfuscate the source of funds and hide its involvement in efforts to generate revenue." *Id.* at 59,502.

For similar reasons, criminals can use the government's lack of information about the ownership of corporations to obscure their income and assets and thus perpetrate "serious tax fraud." § 6402(3), 134 Stat. at 4604. Indeed, a "[Department of the] Treasury study based on a statistically significant sample of adjudicated [Internal Revenue Service] cases from 2016-2019 found [that] legal entities were used in a substantial proportion of the reviewed cases to perpetrate tax evasion and fraud." 87 Fed. Reg. at 59,503 (quotation marks omitted). Because it did not collect ownership information, the United States had fallen out of "compliance with international anti-money laundering and countering the financing of terrorism standards." § 6402(5)(E), 134 Stat. at 4604; 87 Fed. Reg. at 59,506.

**2.** To address this enforcement gap, Congress enacted beneficial ownership reporting requirements. The Anti-Money Laundering Act of 2020 adopts various provisions designed to "modernize" federal "anti-money laundering and countering the financing of terrorism laws." § 6002(2), 134 Stat. at 4547. Among those provisions is the Corporate Transparency Act,

which "establish[es] uniform beneficial ownership information reporting requirements."  § 6002(5), 134 Stat. at 4547.

In enacted findings accompanying the CTA, Congress determined that "the collection of beneficial ownership information" is "needed" to "protect interstate and foreign commerce" and to "better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity."  § 6402(5)(D), 134 Stat. at 4604.  Congress further determined that the reporting requirements would "facilitate important national security, intelligence, and law enforcement activities," § 6402(6)(A), 134 Stat. at 4605; assist in improving "tax administration," 31 U.S.C. § 5336(c)(5)(B); and "bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards," § 6402(5)(E), 134 Stat. at 4604.  And Congress described the reported information as "highly useful to national security, intelligence, and law enforcement agencies and Federal functional regulators."  § 6402(8)(C), 134 Stat. at 4605.

The CTA accordingly requires that certain businesses report information about their beneficial owners and applicants to FinCEN.  A "beneficial owner" is "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise[] (i) exercises substantial control over

7

the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity." 31 U.S.C. § 5336(a)(3)(A). *But see id.* § 5336(a)(3)(B) (establishing certain exceptions). And an "applicant" is an individual who files documents to create or register the corporate entity to do business in the United States. *Id.* § 5336(a)(2). For each applicant and beneficial owner, a covered business must report the individual's legal name, date of birth, residential or business address, and driver's license number or other "unique identifying number." *Id.* § 5336(a)(1), (b)(2)(A). FinCEN estimated that a typical, simple company would spend about 90 minutes (or the equivalent of about $85's worth of time) to complete and file the statute's required report, which may be filed for free. 87 Fed. Reg. at 59,573, 59,589.

In addition to providing that covered businesses file reports when they first become subject to the CTA, the statute also requires that those businesses submit updated reports when ownership information changes. In particular, when "there is a change with respect to any" ownership information, a covered business must "submit to FinCEN a report that updates the information relating to the change." 31 U.S.C. § 5336(b)(1)(D). A person who willfully violates either the initial or ongoing reporting requirements may be subject to civil and criminal penalties. *Id.* § 5336(h). *But see id.* § 5336(h)(3)(C) (providing certain safe harbors).

These requirements apply to "reporting compan[ies]." 31 U.S.C.
§ 5336(b)(1)(A). That term generally includes any "corporation, limited
liability company, or other similar entity that is" either "created by the filing of
a document with a secretary of state or a similar office under the law of a State
or Indian Tribe," or "formed under the law of a foreign country and registered
to do business in the United States by the filing of a document with a secretary
of state or a similar office under the laws of a State or Indian Tribe." *Id.*
§ 5336(a)(11)(A).

Congress exempted from the reporting requirements various categories
of businesses whose information would not significantly facilitate the detection
and prosecution of financial crime. The CTA excludes banks, public
accounting firms, and other businesses already subject to reporting or
recordkeeping requirements. 31 U.S.C. § 5336(a)(11)(B). It excludes certain
domestically owned entities no longer engaged in business, which the statute
generally defines in terms of whether an entity is "not engaged in active
business" or "otherwise hold[ing] any kind or type of assets." *Id.*
§ 5336(a)(11)(B)(xxiii). It also excludes certain trusts, political organizations,
and non-profits. *Id.* § 5336(a)(11)(B)(xix). And it allows the government to
exempt any other "entity or class of entities" for which "requiring beneficial
ownership information" would not "serve the public interest" and "would not

be highly useful" in "efforts to detect, prevent, or prosecute money laundering, the financing of terrorism … or other crimes." *Id.* § 5336(a)(11)(B)(xxiv).

Consistent with Congress's purposes, the CTA generally contemplates that reported information be used to facilitate the investigation and prosecution of financial crimes. For example, FinCEN may share ownership information with federal agencies "engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity." 31 U.S.C. § 5336(c)(2)(B)(i)(I). FinCEN may share the same information with state and local law-enforcement agencies when a court "authorize[s] the law enforcement agency to seek the information in a criminal or civil investigation." *Id.* § 5336(c)(2)(B)(i)(II).

The CTA directs FinCEN to implement certain aspects of the statute by regulation, *see* 31 U.S.C. § 5336(b)(5), and FinCEN accordingly issued a final rule implementing the CTA's reporting requirements in September 2022, *see* 87 Fed. Reg. 59,498 (codified at 31 C.F.R. § 1010.380, as amended by *Beneficial Ownership Information Reporting Deadline Extension*, 88 Fed. Reg. 83,499 (Nov. 30, 2023)). Relevant here, the rule established deadlines for covered entities to comply with the statute. For businesses created or registered before 2024, the rule required compliance by January 1, 2025. 31 C.F.R. § 1010.380(a)(1)(iii). For businesses created or registered during 2024,

the rule required compliance within 90 days of their formation. *Id.*

§ 1010.380(a)(1)(i)(A). And for businesses created or registered after 2024,

the rule required compliance within 30 days of their formation. *Id.*

§ 1010.380(a)(1)(i)(B).

### B.    Factual Background and Prior Proceedings

**1.**  Plaintiffs are Community Associations Institute, a nonprofit

organization that assists and represents community associations, as well as five

individual community associations. JA13-15. Volunteer homeowners make

up the boards of these associations, whose primary function is handling various

management tasks like budgeting, collecting dues from homeowners, managing

property maintenance, and enforcing rules. Br. 5; JA19.

Not all community associations are subject to the CTA's reporting

requirements. Many community associations are unincorporated and thus may

not be considered "reporting compan[ies]" subject to the CTA. 31 U.S.C.

§ 5336 (a)(11)(A), (b)(1)(A). And some community associations are exempted

from the CTA's reporting requirements because they qualify as tax exempt

under 26 U.S.C. § 501(c). *See id.* § 5336(a)(11)(B)(xix)(I). Absent such an

exemption, however, community associations meeting the definition of

"reporting company" are subject to the CTA's reporting requirements. That

potentially includes the five plaintiff community associations in this case, four

of which qualify as "homeowners associations" under 26 U.S.C. § 528 (JA14-15), and one of which is not tax-exempt at all (JA14).

Seeking to exclude all community associations from the CTA's reporting requirements, Community Associations Institute—which is itself exempt from the CTA's reporting requirements as a "nonprofit 501(c)(6) organization," *see* Cmty. Ass'ns Inst., *Community Associations Institute (CAI) Introduces 2024 President and Board of Trustees* (Feb. 6, 2024), https://perma.cc/W48E-FRKX —sent a letter in December 2023 to the Department of the Treasury requesting that it "exempt community associations from the Corporate Transparency Act and Anti-Money Laundering Act of 2021." JA86. FinCEN responded in July 2024 that it would consider that request but that in the meantime, absent some other express exemption, community associations meeting the definition of "reporting company" are subject to the CTA's reporting requirements. JA89.

**2.** On September 10, 2024, plaintiffs filed suit challenging the CTA both facially and as applied. Relevant here, plaintiffs claim that the CTA is beyond Congress's power to enact and that it also violates their First and Fourth Amendment rights. JA36, JA38, JA40.

**3.** The district court denied plaintiffs' motion for a preliminary injunction. JA131. As relevant here, it held that the CTA falls within Congress's commerce power because it regulates the ongoing conduct of

corporations, the aggregate of which has a substantial effect on commerce. JA144-145. The district court also rejected plaintiffs' First Amendment argument because the reporting requirements "are neither an unjustified nor unduly burdensome way" to "strengthen the government's ability to detect and prosecute financial crime." JA146 (quotation marks omitted). Although plaintiffs had asserted that some individuals would resign from their positions rather than disclose their personal identifying information, the district court concluded that plaintiffs' "speculations about *potential* resignations are insufficient to demonstrate a likelihood of success on the merits." JA146. The court further recognized that, even if plaintiffs' First Amendment rights are implicated, "the Government likely has met its burden of proving" that the CTA "serves a legitimate government purpose and that any infringement of Plaintiffs' freedom of association is justified." JA146. The court also declined to hold that the CTA violates plaintiffs' Fourth Amendment rights because "the CTA likely falls within the category of reasonable reporting requirements that courts have long understood as constitutional." JA147 (quotation marks omitted). Lastly, the district court found that plaintiffs "failed to offer nonspeculative evidence about potential resignations" and thus could not show irreparable harm. JA148.

**4.** Over a week later, plaintiffs appealed the district court's denial of the preliminary injunction. Plaintiffs moved to expedite briefing and argument in this case, which this Court denied on November 22, 2024. The U.S. District Court for the Eastern District of Texas subsequently issued a preliminary injunction prohibiting the government from enforcing the CTA on a nationwide basis. *See Texas Top Cop Shop, Inc. v. Garland*, --- F. Supp. 3d ---, No. 4:24-cv-478, 2024 WL 5049220 (E.D. Tex. Dec. 5, 2024), (entering injunction). On January 23, 2025, the Supreme Court granted the government's application requesting a stay of the nationwide injunction issued in *Texas Top Cop Shop*. *See McHenry v. Texas Top Cop Shop, Inc.*, 604 U.S. ----, No. 24A653, 2025 WL 272062, at *1 (U.S. Jan. 23, 2025). Meanwhile, before the Supreme Court ruled, another district court in the Eastern District of Texas stayed the effective date of FinCEN's Reporting Rule. *Smith v. U.S. Dep't of the Treasury*, --- F. Supp. 3d ----, No. 6:24-cv-336, 2025 WL 41924, at *14 (E.D. Tex. Jan. 7, 2025). The government has appealed and filed a motion for a stay.

## SUMMARY OF ARGUMENT

The district court correctly denied plaintiffs' motion to preliminarily enjoin the CTA's enforcement.

The district court properly concluded that plaintiffs could not establish a likelihood of success on the merits. Congress enacted the CTA to combat money laundering, terrorist financing, and other harmful economic activities. For decades, criminals evaded prohibitions on those activities by using anonymous shell corporations to conduct illicit transactions. This "lack of transparency" represents "a primary obstacle to tackling financial crime." H.R. Rep. No. 116-227, at 10. To remove that obstacle, the CTA generally requires "corporation[s], limited liability compan[ies], [and] other similar entit[ies]" to report certain information about their owners to the Department of the Treasury's Financial Crimes Enforcement Network. 31 U.S.C. § 5336(a)(11), (b). Congress determined that these reporting requirements are "needed" to "better enable critical national security, intelligence, and law enforcement efforts" to counter financial crime. Anti-Money Laundering Act of 2020, Pub. L. No. 116-283, div. F, § 6402(5)(D), 134 Stat. 4547, 4604 (2021). The CTA's corporate ownership reporting requirements fall within Congress's enumerated powers and comport with the First and Fourth Amendments.

**I.** The reporting requirements are authorized by Congress's commerce and necessary and proper powers. The requirements play an important part in the government's efforts to prevent, detect, and prosecute crimes such as money laundering, tax fraud, and the financing of terrorism. They therefore fit

comfortably within Congress's authority under the Commerce Clause to regulate economic activities (here, the anonymous operation of business entities) that substantially affect interstate commerce. That the CTA regulates entities engaged in commercial activity is confirmed by plaintiffs themselves, who acknowledge that they regularly engage in economic activities. JA96.

Plaintiffs' contrary argument rests on two mistaken premises. First, although plaintiffs construe the CTA as addressing the isolated act of filing incorporation papers, the statute in fact imposes ongoing reporting requirements in order to prevent the anonymous operation of commercial entities. Second, although plaintiffs urge that the law mirrors the regulation compelling economic activity that was at issue in *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012), the CTA regulates a class of entities that is defined by its authority and propensity to engage in commerce.

Because the CTA is "rationally related to the implementation" of valid prohibitions on harmful economic activities, even if it were not justified under the Commerce Clause itself, it would fall well within Congress's authority under the Necessary and Proper Clause. *United States v. Comstock*, 560 U.S. 126, 134 (2010). Congress reasonably determined that "the collection of beneficial ownership information" effectuates a number of the federal government's enumerated powers, including the powers to regulate interstate and foreign

16

commerce, to lay and collect taxes, and to oversee foreign affairs. § 6402(5), 134 Stat. at 4604. Plaintiffs provide no persuasive basis for disregarding that legislative judgment.

**II.** The district court also appropriately recognized that plaintiffs' Fourth Amendment claim is meritless. Reasonable reporting requirements raise no Fourth Amendment concern. *See California Bankers Ass'n v. Shultz*, 416 U.S. 21, 59-68 (1974). And the CTA advances particularly important government interests, including combatting serious crime and safeguarding national security. At the same time, plaintiffs come nowhere near establishing that the limited ownership information at issue here implicates any protected privacy interest—let alone an interest sufficient to overcome government interests of the highest order. Any intrusion on a privacy interest would be especially minimal because the CTA establishes detailed safeguards restricting the use and disclosure of reported information.

**III.** The district court also correctly concluded that plaintiffs are unlikely to succeed on their First Amendment challenge. There are thousands of state and federal reporting requirements, including the requirement that most individuals and corporations file a tax return. Such requirements trigger no significant First Amendment scrutiny.

There is no basis for distinguishing the CTA from the many state and federal requirements that have long been regarded as constitutional. Plaintiffs invoke the doctrine of compelled speech, but that doctrine applies to a requirement that people advance ideological positions with which they disagree, not the routine disclosure of factual information. And plaintiffs do not advance their argument by invoking cases involving disclosure requirements regarding membership in an organization, as plaintiffs here do not complain about the burden of being publicly associated with the organizations of which they are beneficial owners but instead have other complaints that bear no relation to any First Amendment interest.

**IV.** Because plaintiffs failed to demonstrate a likelihood of success on the merits, they are not entitled to a preliminary injunction. As the district court observed, the remaining factors confirm that an injunction is inappropriate. The CTA imposes reporting requirements that Congress found necessary to fight financial crime and protect national security. By comparison, plaintiffs present no evidence demonstrating that those requirements entail any irreparable harm. The absence of any meaningful harm to plaintiffs is underscored by their lack of diligence in prosecuting this suit.

## STANDARD OF REVIEW

The district court's decision to deny a preliminary injunction is reviewed "for an abuse of discretion." *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023).

## ARGUMENT

## I.     The CTA Is a Valid Exercise of Congress's Enumerated Powers

The district court correctly concluded that the CTA is authorized by Congress's commerce and necessary and proper powers. The law regulates commercial entities and forms an important part of a regulatory scheme that lies within Congress's authority.

**1.** The Constitution grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. "[T]he power to regulate commerce is the power to enact 'all appropriate legislation' for its 'protection or advancement'; to adopt measures 'to promote its growth and insure its safety'; 'to foster, protect, control and restrain.'" *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 36-37 (1937) (citations omitted). It is thus "well established" that "Congress has broad authority" under the Commerce Clause. *National Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 549 (2012) (opinion of Roberts, C.J.).

It is also well-established that "[t]he commerce power is not confined in its exercise to the regulation of commerce" itself. *Wickard v. Filburn*, 317 U.S. 111, 124 (1942) (quotation marks omitted). Congress can "regulate activities that substantially affect interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005). And "[w]hen Congress decides that the 'total incidence' of a practice

poses a threat to a national market, it may regulate the entire class." *Id.* at 17
(quotation marks omitted). This power comes from the Commerce Clause as well
as the Necessary and Proper Clause, which provides Congress broad power to
enact laws that are "'convenient, or useful' or 'conducive'" to specific federal
authority. *United States v. Comstock*, 560 U.S. 126, 133-34 (2010) (quoting
*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 413, 418 (1819)). Thus,
Congress can "regulate purely local activities that are part of an economic 'class of
activities' that have a substantial effect on interstate commerce." *Raich*, 545 U.S.
at 17. A reviewing court "need not determine whether [the regulated] activities,
taken in the aggregate, substantially affect interstate commerce in fact, but only
whether a 'rational basis' exists for so concluding." *Id.* at 22 (quoting *United
States v. Lopez*, 514 U.S. 549, 557 (1995)); *see also Comstock*, 560 U.S. at 134
(directing courts to examine whether a provision is rationally related to
implementing an enumerated power).

The proper standard for assessing whether a law falls within Congress's
commerce power is thus not whether the law regulates commercial activity itself,
but "whether the statute relates to an activity that has something to do with
'commerce' or any sort of economic enterprise, however broadly one might
define those terms." *United States v. Gibert*, 677 F.3d 613, 624 (4th Cir. 2012)
(quotation marks omitted). In assessing the breadth of Congress's authority, the

Supreme Court has distinguished between laws with an "apparent commercial character," *United States v. Morrison*, 529 U.S. 598, 611 & n.4 (2000)—such as regulations addressing the intrastate farming of wheat, *Wickard*, 317 U.S. at 127-29, and the intrastate manufacture and possession of marijuana for personal use, *Raich*, 545 U.S. at 15—and laws that have "nothing to do with 'commerce' or any sort of economic enterprise," *Lopez*, 514 U.S. at 561—such as prohibitions on possessing firearms in school zones and on gender-motivated violence, *id.*; *Morrison*, 529 U.S. at 613. The Court has also drawn a distinction between regulations of commercial activity and regulations that would address inactivity by requiring individuals to engage in commercial transactions in which they would prefer not to engage. *NFIB*, 567 U.S. at 553 (opinion of Roberts, C.J.); *id.* at 652 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting).

**2. a.** As the district court recognized (JA144-145), these principles amply support the CTA. The statute, by requiring certain entities to report limited commercial information, regulates an economic activity: the anonymous ownership and operation of businesses and similar entities. That class of activities, in the aggregate, substantially affects interstate commerce by facilitating "illicit activity" such as "money laundering," "human and drug trafficking," and "securities fraud." § 6402(3), 134 Stat. at 4604.

Underscoring the CTA's constitutionality, Congress made "formal findings" describing the regulated activity's effects on interstate commerce. *Lopez*, 514 U.S. at 562-63. In the statute, Congress found that "malign actors seek to conceal their ownership" of corporations and similar entities; that "money launderers and others involved in commercial activity intentionally conduct transactions through corporate structures in order to evade detection"; and that "legislation providing for the collection of beneficial ownership information ... is needed to ... protect interstate and foreign commerce." § 6402(3)-(5)(C), 134 Stat. 4604. Although such findings are "not required," they reinforce "the legislative judgment that the activity in question substantially affect[s] interstate commerce." *Lopez*, 514 U.S. at 562-63.

Further confirming the CTA's constitutionality, the statute represents an "essential part of a larger regulation of economic activity." *Lopez*, 514 U.S. at 561. The CTA forms part of the Anti-Money Laundering Act, a statute that (as its name suggests) establishes a regulatory framework for countering money laundering. "Money laundering is a quintessential economic activity. Indeed, it is difficult to imagine a more obviously commercial activity than engaging in financial transactions involving the profits of unlawful activity." *United States v. Goodwin*, 141 F.3d 394, 399 (2d Cir. 1997). The CTA's reporting requirements facilitate Congress's broader efforts to counter money laundering by enabling investigators

to trace the flow of illicit funds and by discouraging the use of shell corporations to conceal transactions.  *See* § 6002(5), 134 Stat. at 4547.  The district court properly relied on this principle when it recognized that "a Commerce power that allows Congress to regulate the production of wheat or marijuana for home consumption" likely also authorizes "modest reporting requirements that help prevent the interstate and international commercial crimes of money laundering and terror financing."  JA145.

**b.**  By regulating ongoing, anonymous corporate conduct, the CTA regulates economic activity.  The statute imposes reporting requirements on corporations, which are entities authorized to engage in various economic transactions, such as "[m]ak[ing] contracts," "borrow[ing] money," "incur[ring] liabilities," and transferring "real or personal property."  Del. Code Ann. tit. 8, § 122(4), (13) (West).

That the CTA regulates commercial activity is illustrated by plaintiffs themselves.  Plaintiffs assert (Br. 10) that the majority of community associations subject to the CTA fall within the requirements of 26 U.S.C. § 528(c), which defines a "homeowners association" in part as an entity that meets certain income and expenditure requirements.  In fact, plaintiffs do not identify a single noncommercial entity subject to the CTA's reporting requirements.

Plaintiffs' contrary argument rests primarily on their misunderstanding of the CTA as regulating "entity formation" and not "any activity." Br. 25. But the CTA does not regulate the act of incorporation. Rather, it is a reporting requirement applicable to "corporation[s]" and "similar entit[ies]" authorized to do business in the United States, without regard to where, when, or how those businesses are incorporated. 31 U.S.C. § 5336(a)(11)(A). For example, businesses that were incorporated years ago are subject to the reporting requirement for at least as long as they remain operational. *See id.* § 5336(b)(1)(B). Requiring a decades-old business to report its ownership after the CTA takes effect bears no resemblance to regulating the act of incorporation.

The same understanding is confirmed by other statutory provisions that plaintiffs ignore. Businesses that are subject to the CTA must report changes in ownership—plainly an economic activity—on an ongoing basis, no matter whether they take any new action relating to incorporation. *See* 31 U.S.C. § 5336(b)(1)(D). And some businesses covered by the CTA never incorporate in the United States at all: a business incorporated in a foreign country is subject to the CTA if it is "registered to do business in the United States." *Id.* § 5336(a)(11)(A)(ii). Conversely, the reporting requirements generally do not extend to various categories of businesses—such as banks, insurers, and certain utilities—that are incorporated but are subject to other federal reporting requirements or are

otherwise less likely to be used for the financial crimes the CTA targets.  *See id.* § 5336(a)(11)(B).

In short, the fact that the "CTA's reporting requirement may be *triggered* by corporate entity formation" does not mean it is "*regulating* corporate entity formation."  JA144.  The Act reduces anonymous transactions by requiring entities with the propensity to engage in commerce to identify the individuals behind the corporate form.  Congress's decision to identify those entities in an administrable way, in terms of the incorporation or registration that is a prerequisite to engaging in commercial transactions, does not transform the CTA into a regulation of incorporation or registration.  The statute's reference to those activities serves only to limit its scope to the particular class of entities whose defining feature is their propensity to engage in commerce.

**c.**  Plaintiffs accordingly err in seeking (Br. 27-28) to compare Congress's regulatory approach here with in the statute at issue in *NFIB*, 567 U.S. 519.  The Supreme Court's Commerce Clause analysis in *NFIB* emphasized that the insurance requirement "primarily affects healthy, often young adults who are less likely to need significant health care," and thus targets "a class whose commercial inactivity rather than activity is its defining feature."  *Id.* at 556 (opinion of Roberts, C.J.); *see also id.* at 652-53 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting) ("If Congress can reach out and

command even those furthest removed from an interstate market to participate in the market, then the Commerce Clause becomes a font of unlimited power."). Here, by contrast, the CTA regulates a class of entities that, by its nature, engages in commerce.

While laws requiring individuals to engage in commerce are unprecedented and "extraordinary," *NFIB*, 567 U.S. at 560 (opinion of Roberts, C.J.), "[r]egulation[s] requiring the submission of information" are a "familiar category" of federal legislation, *Electric Bond & Share Co. v. Securities & Exch. Comm'n*, 303 U.S. 419, 437 (1938); *see also id.* at 441-42 (upholding such a requirement against a Commerce Clause challenge). The CTA falls within that familiar category as it continues a long congressional practice of imposing reporting requirements. Examples include laws requiring taxpayers to file tax returns, 26 U.S.C. § 6012; banks to report information about certain transactions, *see* 31 U.S.C. § 5311 *et seq.*; employers to collect and make available information about new employees' eligibility to work, *see* 8 U.S.C. § 1324a; and political campaigns to report contributions and expenditures, *see* 52 U.S.C. § 30104.

Plaintiffs are also wrong to suggest that the CTA bears any resemblance to the regulations at issue in *Lopez* and *Morrison*. In *Lopez*, the Supreme Court observed that the challenged provision "ha[d] nothing to do with 'commerce' or

26

any sort of economic enterprise."  514 U.S. at 561.  And in *Morrison*, the Court reasoned that "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity."  529 U.S. at 613.  To connect those laws with commerce, the Court would have needed "to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States."  *Lopez*, 514 U.S. at 567.  No such series of inferences is necessary here—it is hardly a jump to say that a law regulating corporate activity in order to curb financial crimes is connected to commerce.  And unlike this case, neither *Lopez* nor *Morrison* "involved the power of Congress to exert control over intrastate activities in connection with a more comprehensive scheme of regulation; *Lopez* expressly disclaimed that it was such a case, and *Morrison* did not even discuss the possibility that it was."  *Raich*, 545 U.S. at 39 (Scalia, J., concurring in the judgment) (citation omitted).

**d.**  Plaintiffs' arguments regarding Congress's authority to enact the CTA do not rely on plaintiffs' particular circumstances, but rather contend that Congress lacked authority to apply the CTA to any entity.  Plaintiffs' decision to litigate this case as a facial challenge "comes at a cost."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).  A "plaintiff cannot succeed on a facial challenge unless he establishes that no set of circumstances exists under which the law would be valid,

or he shows that the law lacks a plainly legitimate sweep." *Id.* (cleaned up); *Sabri v. United States*, 541 U.S. 600, 604, 609 (2004) (applying this test to an enumerated-powers challenge). The Supreme Court has imposed this "very high bar" because "facial challenges threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways." *NetChoice*, 603 U.S. at 723 (quotation marks omitted). Here, not only have plaintiffs failed to establish that the statute is unconstitutional as applied to them, but they have also neglected to offer any concrete example of the factual circumstance upon which their argument appears to be premised, namely the statute's application to a corporation (or similar entity) with no substantial connection to commerce.

Plaintiffs' facial challenge thus fails without regard to whether the statute would be constitutional as applied to such hypothetical entities—though the Supreme Court's case law makes clear that it would, *see Raich*, 545 U.S. at 17 (noting that courts have "never required Congress to legislate with scientific exactitude"). Reliance on the hypothetical possibility that the law *could* apply to a corporation with no connection to commerce is the kind of "speculation about the law's coverage and its future enforcement" that the Supreme Court has warned against. *NetChoice*, 603 U.S. at 723 (quotation marks omitted). As the Court has

explained, "laws should not be invalidated by reference to hypothetical cases." *Sabri*, 541 U.S. at 608 (quotation marks omitted).

**3.** Because the CTA is "rationally related to the implementation" of valid prohibitions on harmful economic activities, even if it were not justified under the Commerce Clause itself, it would fall well within Congress's authority under the Necessary and Proper Clause. *Comstock*, 560 U.S. at 134.

**a.** The CTA's reporting requirements effectuate various other enumerated powers, such as Congress's power to "lay and collect Taxes," U.S. Const. art. I, § 8, cl. 1; promote national security and international relations, *see Toll v. Moreno*, 458 U.S. 1, 10 (1982); and "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes," U.S. Const. art. I, § 8, cl. 3; as well as the Executive's law-enforcement and foreign-affairs powers, *see id.* cl. 18. § 6402(5)-(6), 134 Stat. at 4604-05. These powers should not be considered in isolation, as the Necessary and Proper Clause does not require a direct connection between a statute and "a single specific enumerated power." *Comstock*, 560 U.S. at 147.

As part of the authority to "lay and collect Taxes," U.S. Const. art. I, § 8, cl. 1, Congress may enact legislation designed to facilitate tax collection, *see Helvering v. Mitchell*, 303 U.S. 391, 399 (1938). Here, Congress determined that the lack of ownership information allows criminals to obscure their income and

assets and thus "facilitate[s] ... serious tax fraud." § 6402(3), 134 Stat. at 4604.

Congress therefore found that the reporting requirements would be "highly useful"

in enabling investigators to detect financial crimes such as tax fraud, *see*

§ 6402(8)(C), 134 Stat. at 4605, and in improving "tax administration" generally,

31 U.S.C. § 5336(c)(5)(B).

In addition to facilitating tax collection, the CTA also aids the enforcement

of prohibitions designed to advance U.S. foreign-policy objectives and protect

national-security interests.  As the Supreme Court has explained, "Congress has

broad power under the Necessary and Proper Clause to enact legislation for the

regulation of foreign affairs," *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160

(1963), as well as national-security policy, *Ullman v. United States*, 350 U.S. 422,

436 (1956).  In this case, Congress found that the absence of ownership reporting

requirements facilitates "the financing of terrorism," "piracy," and "proliferation

financing" (that is, financing for the spread of nuclear, chemical, and biological

weapons), and thus "harm[s] the national security interests of the United States."

§ 6402(3), 134 Stat. at 4604.  Congress also found that new reporting requirements

were needed to "bring the United States into compliance with international anti-

money laundering and countering the financing of terrorism standards."

§ 6402(5)(E), 134 Stat. at 4604.

For similar reasons, the CTA also effectuates Congress's power "[t]o regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3. Federal prohibitions on terrorist financing and other financial crimes rest in part on the legislature's authority to restrict harmful forms of foreign commerce. *See United States v. Bollinger*, 798 F.3d 201 (4th Cir. 2015) (applying a more lenient standard for assessing whether a statute falls within Congress's foreign commerce power). Congress accordingly recognized that the CTA is "needed" to "protect ... foreign commerce." § 6402(5)(C), 134 Stat. at 4604.

Finally, the Necessary and Proper Clause empowers Congress to carry into execution not only its own powers, but also "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18. Congress found that collecting ownership information would "better enable critical national security, intelligence, and law enforcement efforts to counter" such "illicit activity." § 6402(5)(D), 134 Stat. at 4604. The CTA thus effectuates the President's "executive Power," U.S. Const. art. II, § 1, cl. 1, and his duty to "take Care that the Laws be faithfully executed," *id*. § 3, by facilitating "law enforcement efforts," § 6402(5), 134 Stat. at 4604. The Act also facilitates the President's powers over foreign policy and national security, *see, e.g.*, *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S.

304, 319 (1936), by enabling the gathering of "intelligence," the protection of

"national security," and the prevention of "terrorism," § 6402(5), 134 Stat. at 4604.

**b.** Plaintiffs provide only cursory arguments against Congress's authority to

enact the CTA under the Necessary and Proper Clause.  As to the foreign

commerce and tax powers, plaintiffs state—without any explanation—that the

CTA is not "necessary or proper" to serve these aims.  Br. 30 (quotation marks

omitted).  And plaintiffs offer a narrow view of the tax power as "limited to

requiring an individual to pay money into the Federal Treasury, and no more."  Br.

31 (quotation marks omitted)

But as the Supreme Court has recognized, the Necessary and Proper Clause

vests Congress with "broad authority" to enact legislation.  *Comstock*, 560 U.S. at

133-34.  If "the end be legitimate," "all means which are appropriate, which are

plainly adapted to that end, which are not prohibited, but consist[ent] with the letter

and spirit of the constitution, are constitutional."  *McCulloch*, 17 U.S. (4 Wheat.) at

421.  Under this standard, Congress has various implied powers which allow it to

enact legislation that is "'convenient, or useful' or 'conducive' to the authority's

'beneficial exercise.'"  *Comstock*, 560 U.S. at 133-34 (quoting *McCulloch*, 17 U.S.

(4 Wheat.) at 413, 418).  The Court has thus sustained under the Necessary and

Proper Clause many significant exercises of federal authority, including the

formation of the federal prison system, *see Ex parte Karstendick*, 93 U.S. 396, 400

(1876), and the enactment of a substantial portion of the federal penal code, *see Comstock*, 560 U.S. at 136 (identifying numerous criminal prohibitions authorized by the Necessary and Proper Clause).  Plaintiffs' narrow view of Congress's implied powers (particularly Congress's tax power), if accepted, would call into question all of these well-accepted congressional acts—including "dozens of provisions across the Internal Revenue Code that require taxpayers and other third parties to file certain information returns .... even if no taxes are owed in connection with the requisite information." *Farhy v. Commissoner*, 100 F.4th 223, 228 (D.C. Cir. 2024).

Congress's considerable legislative findings enacted as part of the CTA overwhelmingly demonstrate that the law is useful to executing various enumerated powers.  *See* § 6002(5)(B), (C), 134 Stat. at 4547-48.  As reflected in the statute itself, Congress concluded that the CTA's reporting requirements would be "highly useful" to collecting taxes because they will reduce the anonymous transactions often used to conceal tax evasion.  *See* § 6402(8)(C), 134 Stat. at 4605; 31 U.S.C. § 5336(c)(5)(B).  This is not just Congress's say-so—a 2020 study by the Department of the Treasury examined IRS cases from 2016-2019 and found that "legal entities were used in a substantial proportion of the reviewed cases to perpetrate tax evasion and fraud."  U.S. Dep't of the Treasury, *National Strategy for Combating Terrorist and Other Illicit Financing*, *supra*, p. 5; 87 Fed. Reg. at

59,503.  Congress's determination is subject to "review for means-ends rationality," *Sabri*, 541 U.S. at 605, and plaintiffs fail to meaningfully dispute or provide any evidence that would call into question those legislative findings. Congress also found that the CTA's reporting requirements serve various national-security and foreign-policy interests such as combatting the financing of terrorism and the spread of nuclear, chemical, and biological weapons.  § 6402(3), (8)(C), 134 Stat. at 4604-05.  These findings are, again, supported by an extensive factual record as FinCEN has catalogued scenarios in which the absence of beneficial ownership information endangered national-security and foreign-policy objectives. *See* 87 Fed. Reg. at 59,498-504.

Plaintiffs similarly fail to advance their argument by citing a Northern District of Alabama decision concluding that the CTA lies beyond Congress's enumerated powers.  Br. 31 (citing *National Small Bus. United v. Yellen*, 721 F. Supp. 3d 1260, 1266 (N.D. Ala. 2024)).  The government has appealed that decision, and the Eleventh Circuit expedited briefing and argument.  *See* Order, *National Small Bus. United v. U.S. Dep't of the Treasury*, No. 24-10736 (11th Cir. Apr. 22, 2024).  For the reasons given in this brief and in the multiple district court decisions rejecting motions to preliminarily enjoin the CTA, *Firestone v. Yellen*, No. 3:24-cv-1034-SI, 2024 WL 4250192 (D. Or. Sept. 20, 2024); JA133, the Northern District of Alabama decision is incorrect.

## II. The CTA Does Not Violate Plaintiffs' Fourth Amendment Rights.

The district court was also correct in concluding that plaintiffs' Fourth Amendment claim is unlikely to succeed.

**1.** Supreme Court precedent reflects that reporting requirements rarely if ever present Fourth Amendment problems. In *California Bankers Ass'n v. Shultz*, the Court upheld a statute requiring banks to report transactions over a specified dollar amount to the government. 416 U.S. 21, 67 (1974); *see* 31 U.S.C. § 5313. For each covered transaction, a bank must disclose the "name," "address," and "social security or taxpayer identification number" of "the individual presenting [the] transaction." 31 C.F.R. § 1010.312. Congress explained that this information would be "highly useful" in "criminal, tax, or regulatory investigations." 31 U.S.C. § 5311(1). Because the relevant "information is sufficiently described and limited in nature, and sufficiently related to a tenable congressional determination as to improper use of transactions of that type," the Court concluded that the reporting requirements were reasonable and therefore sustained them under the Fourth Amendment. *Shultz*, 416 U.S. at 67. That conclusion is consistent with the principle that when the government merely requires regulated entities to divulge certain records without allowing "non-consensual entries into areas not open to the public," the Fourth Amendment is more readily satisfied. *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 414 (1984).

Consistent with these precedents, courts routinely reject Fourth Amendment challenges to reporting requirements. States and the federal government have implemented "thousands" of such requirements. *Pharmaceutical Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005). The government has found no case from this or any other circuit casting doubt on the constitutionality of such requirements, and plaintiffs have identified none. *See, e.g.*, *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 576-77 (6th Cir. 2002) (recognizing that a public employee was unlikely to succeed on a Fourth Amendment challenge to financial disclosure requirements); *Barry v. City of New York*, 712 F.2d 1554, 1564 (2d Cir. 1983) (similar). As the Supreme Court has explained, "reporting requirements are by no means per se violations of the Fourth Amendment," and "a contrary holding might well fly in the face of the settled … history of self-assessment of individual and corporate income taxes in the United States." *Shultz*, 416 U.S. at 59-60; *see also Electric Bond*, 303 U.S. at 437 (noting that reporting regulations are common).

The CTA fits neatly within the category of reasonable reporting requirements that raise no Fourth Amendment concern. Like the statute in *Shultz*, the CTA requires covered entities to disclose information that Congress identified as "highly useful" to combatting serious crimes. § 6402(8)(C), 134 Stat. at 4605; 31 U.S.C. § 5311(1). And as highlighted previously, Congress found that the

particular reporting requirements at issue here were "needed" to "protect vital Unite[d] States national security interests." § 6402(5)(B), 134 Stat. at 4604. The CTA therefore serves strong government interests. The government has a "legitimate right" to ensure that "corporate behavior is consistent with the law and the public interest." *Shultz*, 416 U.S. at 66 (quotation marks omitted).

The CTA also does not disturb any interest that the Fourth Amendment protects. The law does not allow "non-consensual entr[y] into areas not open to the public." *Lone Steer*, 464 U.S. at 414. Instead, it requires only that a business identify its applicants and owners in reports to FinCEN. 31 U.S.C. § 5336(b)(2)(A). That identifying information is markedly similar to the information that *Shultz* recognized as "sufficiently described and limited in nature." 416 U.S. at 67. And the CTA's reporting requirements do not extend to businesses that are already subject to other federal reporting requirements or that lack authority to conduct commercial transactions in their own name. *See* 31 U.S.C. § 5336(a)(11)(A), (B). By limiting who must report and what information must be reported, Congress tailored the CTA to mandate only those disclosures necessary to enable the detection and prosecution of harmful economic activities.

Plaintiffs try to cast *Shultz* as narrowly applying only to banks, pointing to the Supreme Court's reliance on Congress's specific findings that reports from banks, which handle "abnormally large transactions," have a "high degree of

usefulness in criminal, tax, or regulatory investigations." Br. 36-37 (quoting

*Shultz*, 416 U.S. at 37, 67). But Congress made those same findings with respect

to the CTA. *See supra* pp. 6-7, 36. The problem Congress identified—anonymous

transactions that can shield the individuals involved in criminal activity—is a

general one, and Congress was not compelled to make specific findings for each

individual category of businesses any more than it was required to identify which

particular banks were handling transactions connected to criminal activity.

Congress did, however, tailor the CTA by excluding various types of entities from

the Act's reporting requirements where it deemed reporting not to be necessary.

31 U.S.C. § 5336(a)(11)(B) (excluding charities, political organizations, and other

entities already subject to federal reporting requirements); *id*.

§ 5336(a)(11)(B)(xxiii) (excluding domestically owned entities "not engaged in

active business" or "otherwise hold[ing] any kind or type of assets"); *id*.

§ 5336(a)(11)(B)(xxiv) (allowing exemptions for any other "entity or class of

entities" for which "requiring beneficial ownership information" would not "serve

the public interest" or be "highly useful" in "efforts to detect, prevent, or prosecute

money laundering, the financing of terrorism … or other crimes"). Indeed,

plaintiffs in this case have sought an exemption from the CTA—a request that

FinCEN is still considering in part because it is investigating the importance of

collecting such information from covered community associations.

**2.** Plaintiffs' attempt to cast the CTA as a "suspicionless search and seizure" (Br. 33) highlights the absence of any precedent invalidating a reporting requirement of this kind under the Fourth Amendment. Unable to identify any such cases, plaintiffs rely on cases involving physical searches, in-person confrontations, or other interactions far afield from a reporting requirement.

Plaintiffs wrongly assert, for example, that the CTA "mirrors the unconstitutional reporting regime in [*City of Los Angeles v.*] *Patel*, 576 U.S. [409 (2015)]." Br. 40. That case did not involve a reporting requirement. Rather, the Supreme Court identified as inconsistent with the Fourth Amendment a municipal ordinance empowering police officers to enter hotels and inspect their guest registers at any time of the day or night, as often as they liked. *Patel*, 576 U.S. at 413, 421. *Patel*'s holding, which the Court described as "narrow," focused on the physical nature of the searches, the risk that they could "be used as a pretext to harass hotel operators and their guests," and the fact that the law did not limit what guest data could be collected and thus could be used to reveal intimate information. *Id.* at 421-23. Those concerns are absent here, where the CTA requires only limited and specific identification information, avoids any physical intrusion, and applies in the same manner to all regulated entities.

Plaintiffs' characterization of the CTA as "the functional equivalent of the checkpoint in *City of Indianapolis v. Edmond*," 531 U.S. 32 (2000), or the statute

in *Brown v. Texas*, 443 U.S. 47 (1979), fare no better.  Br. 39, 41.  Both *Edmond* and *Brown* concerned physical seizures that lacked any individualized suspicion. *Edmond*, 531 U.S. at 40; *Brown*, 443 U.S. at 50-53.  Those decisions have no bearing on commonplace reporting requirements, especially ones like the CTA that request minimal information.  *See Brown*, 443 U.S. at 51 (noting a "central concern" of "the unfettered discretion of officers in the field").  Indeed, the *Edmond* Court even acknowledged that government acts involving minimal intrusion may not require individualized suspicion.  *See Edmond*, 531 U.S. at 40 (recognizing that dog sniffs of personal items at an airport raise no Fourth Amendment concern).

Plaintiffs' effort to shoehorn this case into inapposite Fourth Amendment doctrines leads to the untenable proposition (Br. 47) that routine reporting requirements must be justified by some level of individualized suspicion.  That argument, if accepted, would hold Congress to an impossible standard of having to opine on every single kind of entity when enacting a reporting requirement.  But as *Shultz* and various other state and federal reporting requirements demonstrate, no such specific finding of individualized suspicion is required for reasonable reporting requirements like the CTA that serve regulatory interests and request only specific and minimal information.

Moreover, to succeed on their Fourth Amendment challenge, plaintiffs bear the burden of showing that they have an objectively reasonable expectation of privacy over the information that the Act compels. *See United States v. Rose*, 3 F.4th 722, 727 (4th Cir. 2021). Plaintiffs, however, make no such arguments in their brief. Br. 32-43. And their declarations at best reflect only a subjective privacy interest over the requested information.

Indeed, it is difficult to imagine how plaintiffs could assert a reasonable expectation of privacy in this case. Plaintiffs have expressed no concern about identifying themselves with their community associations, and the CTA seeks only minimal information about individuals, all of which can be found on a driver's license. Many individuals have presumably already provided this information to their respective states when applying for a driver's license, and perhaps to the federal government as well through tax returns. Plaintiffs never suggest that this information has otherwise been kept completely private. *See United States v. Bynum*, 604 F.3d 161, 164 (4th Cir. 2010) (no reasonable expectation of privacy over personal information already shared with internet and phone companies). In fact, much of the information plaintiffs contest reporting under the CTA is already compelled by state law. Va. Code Ann. § 13.1-936 (West) (requiring corporations to share the names and post office addresses of its directors and principal officers); Mass. Gen. Laws Ann., ch. 156D, § 16.22 (West) (same); Mich. Comp. Laws Ann.

450.2911 (West) (similar).  A reporting requirement for this type of information to the government raises no Fourth Amendment concern.

## III.    The CTA Does Not Violate Plaintiffs' First Amendment Rights

The district court also correctly concluded that the CTA does not unconstitutionally chill or threaten plaintiffs' First Amendment free speech rights.

**1.**  Reporting requirements like the CTA generally do not raise First Amendment concerns, and thus have received a relaxed standard of review.  States and the federal government "routine[ly]" require the disclosure "of economically significant information designed to forward ordinary regulatory purposes."  *Rowe*, 429 F.3d at 316; *see also Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249-50 (2010) (limited First Amendment scrutiny for disclosure requirements).  Indeed, "[t]here are literally thousands of similar regulations on the books—such as product labeling laws, environmental spill reporting, accident reports by common carriers, SEC reporting as to corporate losses and (most obviously) the requirement to file tax returns."  *Rowe*, 429 F.3d at 316.  Courts generally treat these requirements as either not implicating the First Amendment at all or as triggering, and satisfying, rational-basis review.  *See, e.g.*, *Full Value Advisors, LLC v. Securities & Exch. Comm'n*, 633 F.3d 1101, 1109 (D.C. Cir. 2011) (SEC disclosures); *United States v. Sindel*, 53 F.3d 874, 877-78 (8th Cir.

1995) (IRS reporting requirements); *United States v. Arnold*, 740 F.3d 1032, 1035

(5th Cir. 2014) (sex offender reporting requirements).

Plaintiffs conflate, and misunderstand, two doctrines that constitute

exceptions to this general rule, neither of which is applicable here. The first is the

compelled-speech doctrine, which recognizes limitations on the circumstances in

which the government can compel speech, grounded in the principle that the

government may not "constitutionally require an individual to participate in the

dissemination of an ideological message." *Wooley v. Maynard*, 430 U.S. 705, 713

(1977). Routine disclosure requirements do not require individuals to take

ideological positions or to make any public statement, and thus do not implicate

the compelled-speech doctrine. Such a simple act is "simply not the same as

forcing a student to pledge allegiance, or forcing a Jehovah's Witness to display [a

particular motto on his license plate], and it trivializes the freedom protected in

[those circumstances] to suggest that it is." *Rumsfeld v. Forum for Acad. &*

*Institutional Rights, Inc.*, 547 U.S. 47, 61-62 (2006).

Second, when a compelled disclosure has "the practical effect 'of

discouraging' the exercise of constitutionally protected political rights," it may

trigger heightened First Amendment scrutiny. *NAACP v. Alabama ex rel.*

*Patterson* , 357 U.S. 449, 461 (1958). Plaintiffs rely here on cases in which a

disclosure requirement intruded on freedom of association. In *NAACP*, for

instance, a state law compelled a political advocacy group to reveal the identities of "its rank-and-file members." *Id*. at 460. The group "made an uncontroverted showing" that such disclosures would expose its members "to economic reprisal," "threat[s] of physical coercion," "and other manifestations of public hostility." *Id.* at 462. In *Americans for Prosperity Foundation v. Bonta*, likewise, a state law directed charitable organizations to disclose "the identities of their major donors." 594 U.S. 595, 600-01 (2021). Those disclosures had led to "threats and harassment in the past," and "donors were likely to face similar retaliation in the future if their affiliations became publicly known." *Id.* at 604. Because the laws in both cases created "a risk of reprisals" and thus had a "deterrent effect" on protected activity, the Supreme Court subjected them to heightened scrutiny. *Id.* at 607 (quotation marks omitted).

The Supreme Court has only applied exacting scrutiny to laws compelling disclosure when disclosure would reveal the "affiliation with groups engaged in advocacy." *NAACP*, 357 U.S. at 462; *Bonta*, 594 U.S. at 606; *see also Shelton v. Tucker*, 364 U.S. 479 (1960) (requirement that teachers file affidavits giving names and addresses of organizations to which they belonged or contributed); *Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U.S. 87 (1982) (disclosure of contributors to political campaigns). That is not the sort of disclosure plaintiffs complain of here. They do not allege that association with community associations

44

is itself sufficiently sensitive such that people will decline to take leadership positions in community associations if their relationship to the association must be disclosed. Instead, their allegations of chilling stem from the burden of complying with the reporting requirement, speculation that their personal information will be misused for reasons having nothing to do with their association, or concerns that they will be punished for making errors (notwithstanding the limitation in the penalty provisions to willful violations, 31 U.S.C. § 5336(h))—all of which are unrelated to their association with community associations. *See* Br. 45; JA54, JA59, JA63, JA66, JA69, JA75. If plaintiffs' theory were correct, every requirement imposed on officers or owners of a corporate entity would be subject to exacting scrutiny, regardless of whether it has any connection to speech or association. Indeed, much of the information required by the CTA must be disclosed on a corporate tax return, and there is no plausible argument that the requirement that corporations file a tax return is subject to exacting scrutiny under the First Amendment.

This Court has recently made clear that not every disclosure requirement is subject to exacting scrutiny. In *Sharma v. Hirsch*, this Court rejected a challenge to North Carolina's felony-disclosure requirement for candidates running for federal office. 121 F.4th 1033, 1041-42 (4th Cir. 2024). The Court described the disclosure of a prior felony conviction as "relatively innocuous" because it did "not

cover candidates' personal beliefs, policy preferences, or political affiliations," and left the plaintiff "free to speak as he pleases and on any topic he selects." *Id.* In declining to apply exacting scrutiny to the law, this Court recognized that *Bonta* requires exacting scrutiny for laws that "compromise[] political expression," not laws that "require[] disclosure of a simple historical fact illustrative of nonpolitical activity." *Id.* This case is, if anything, more straightforward than *Sharma*. Here, there is no public disclosure at all, the information is even less sensitive than the fact of a prior felony conviction, and it is imposed not as a condition of political candidacy or other form of expression but merely as part of operating a corporate entity.

Plaintiffs are a case in point. As condominium and homeowner's associations, plaintiffs primarily engage in non-expressive activities—maintaining properties, collecting dues, and enforcing rules. 26 U.S.C. § 528(c)(1)(A), (d). Indeed, plaintiffs' own declarations and briefing describe the primary purposes of these organizations as property and community maintenance. JA53, JA58, JA61, JA16, JA68; Br. 5. None of these declarations claim a particularly strong advocacy role; at best, they claim some minimal level of communication with local officials on matters such as zoning, traffic, or trail maintenance.[3] JA51, JA58,

---

[3] Although plaintiff Community Associations Institute advocates on behalf of community associations, it is already exempted from the CTA, which expressly

*Continued on next page.*

JA63, JA66.  And as noted above, plaintiffs do not assert that they are chilled by

fear of disclosure of their association with the community organizations, but rather

just claim that the reporting requirement is burdensome.  The application of a

generally applicable law to entities that engage in some protected activity does not

give rise to heightened First Amendment scrutiny.  *See, e.g.*, *Sorrell v. IMS Health*

*Inc.*, 564 U.S. 552, 567 (2011) ("[T]he First Amendment does not prevent

restrictions directed at commerce or conduct from imposing incidental burdens on

speech.").

**2.**  The CTA could in any event withstand any plausibly relevant standard of

First Amendment scrutiny.  By aiming to combat financial crimes and protect

national security interests, *see supra* pp. 6-7, the CTA serves important

government interests.  *Bonta*, 594 U.S. at 612 (recognizing that the government

"has an important interest in preventing wrongdoing").  And the Act is narrowly

tailored by requiring companies to report only minimal identifying information

regarding its beneficial owners and applicants.

Plaintiffs, on the other hand, have failed to show that the Act substantially

burdens their First Amendment rights.  Although plaintiffs assert that their

members are subjectively concerned about the burdens associated with the law, the

---

excludes advocacy organizations like many charities and political organizations.
31 U.S.C. § 5336(a)(11)(B)(xix); 26 U.S.C. § 501(c); *see also supra* p. 12.

small amount of information required and the limitations on its use make the objective burden quite minimal. Indeed, their evidence does not rise to the level of "economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility" necessary to show a substantial First Amendment burden. *Buckley v. Valeo*, 424 U.S. 1, 69-72, 72 n.88 (1976) (quotation marks omitted); *see also Master Printers of Am. v. Donovan*, 751 F.2d 700, 704, 706 (4th Cir. 1984) (holding that disclosure and reporting requirements did not "substantially burden [the plaintiff's] rights of speech and association" where the association failed to provide sufficient evidence of a "'deterrent effect' under *Buckley* and *NAACP*"). And as noted above, under plaintiffs' legal theory, similar First Amendment challenges could be leveled against the requirement to file a tax return or comply with any number of other requirements imposed on corporations that might be deemed burdensome and thus indirectly affect the ability to associate or engage in expressive activity.

## IV. The Equitable Factors Confirm That Plaintiffs Are Not Entitled to a Preliminary Injunction

Plaintiffs' argument with respect to the equities (Br. 50-53) rests on the premise that their constitutional claims are likely to succeed. For the reasons given above, those claims lack merit, and plaintiffs' equitable argument therefore fails. Even if the Court were to conclude that plaintiffs had demonstrated a likelihood of

success, the district court appropriately recognized that the equities would weigh heavily against a preliminary injunction.

**1.** The government has identified substantial harms associated with prohibiting enforcement of the CTA's reporting requirements. A sovereign "suffers a form of irreparable injury" whenever it is "enjoined by a court from effectuating statutes enacted by representatives of its people." *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers). That injury is especially significant here, where the CTA reflects a bipartisan effort by Congress to "combat money laundering, the financing of terrorism, tax fraud, and other serious crimes that affect the national economy or national security." Plaintiffs' arguments to the contrary "ignore[] the public interest … in the effective enforcement of federal law." JA149.

FinCEN has provided specific examples to illustrate the threat that the use of "shell or front companies" poses to "national security" when they are used to engage in anonymous transactions that are shielded from law enforcement. 87 Fed. Reg. at 59,498. For instance, the "Iranian government" has used "shell companies" "to obfuscate the source of [its] funds and hide its involvement in efforts to generate revenue." *Id.* at 59,502. In one case, "the Department of Justice charged 10 Iranian nationals with running a nearly 20-year-long scheme to evade U.S. sanctions on the Government of Iran by disguising more than $300 million

worth of transactions—including the purchase of two $25 million oil tankers—on

Iran's behalf through front companies in California" and other jurisdictions.  *Id.* at

59,503.  Such "sanctions evasion" poses "a significant threat to the national

security of the United States and its partners."  *Id.* at 59,498.

In addition, the CTA facilitates the prevention, detection, and prosecution of

financial crimes.  Congress found that the statute's reporting requirements are

"needed" "to counter money laundering ... and other illicit activity."  § 6402(5)(D),

134 Stat. at 4604.  FinCEN has similarly observed that "a lack of uniform

beneficial ownership information reporting requirements ... hinders the ability

of ... law enforcement to swiftly investigate ... entities created and used to hide

ownership for illicit purposes."  87 Fed. Reg. at 59,498.

Again, FinCEN has provided specific examples that illustrate how criminals

use shell companies to conceal their crimes.  *See* 87 Fed. Reg. at 59,499.  In one

case, a group of individuals stole "$24 million of COVID-19 relief money by using

synthetic identities and shell companies they had created years earlier to commit

other bank fraud."  *Id.*  In another, the government "investigated the alleged

misappropriation of more than $4.5 billion in funds" that "were allegedly

laundered through a series of complex transactions and shell companies with bank

accounts located in the United States and abroad."  *Id.* at 59,503.

A preliminary injunction would also impair the United States' foreign-policy interests. The United States is a founding member of the Financial Action Task Force, "the international standard-setting body" for efforts to counter money laundering and the financing of terrorism. 87 Fed. Reg. at 59,513. In 2016, the task force identified "the lack of [beneficial ownership information] reporting requirements" as "one of the fundamental gaps" in the United States' anti-money laundering regime. *Id*. at 59,501. In adopting the CTA, Congress sought to "bring the United States into compliance" with the task force's standards. § 6402(5)(E), 134 Stat. at 4604. Plaintiffs' requested injunction would undermine that effort.

**2.** On the other side of the ledger, plaintiffs have failed to demonstrate that they will suffer irreparable harm in the absence of an injunction—much less harm sufficient to justify enjoining an Act of Congress. Plaintiffs' evidence of harm amounts to a few declarations by individual board members of community associations about potentially resigning from the board in light of the law's requirements. Even if a few board members have subjectively strong reactions to the law, nothing in the statute itself compels any board member to resign. And although the declarations speculate that other board members might resign, the district court properly dismissed those concerns as speculative. JA148.

The imbalance of harms is underscored by plaintiffs' lack of diligence in prosecuting this case. Although Congress adopted the CTA in January 2021,

plaintiffs waited nearly three years before requesting an exemption from the Act's reporting requirements, and another nine months before initiating this litigation in September 2024. *See* JA12. That long delay "indicate[s] an absence of the kind of irreparable harm required to support a preliminary injunction." *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (quotation marks omitted).

**3.** Plaintiffs' request that this Court enjoin the CTA's enforcement as to "community associations" (Br. 22, 54), without defining exactly who or what those associations may be, undermines fundamental Article III and equitable principles. Injunctions should not be "broader than necessary to afford full relief to [the plaintiff]." *Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001), *overruled on other grounds*, *The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012). Article III authorizes courts to entertain suits only by a plaintiff who has suffered a concrete injury, and to grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (quotation marks omitted). And "courts of equity" historically "did not provide relief beyond the parties to the case." *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring).

Extending relief to all community associations also violates the rule that "[e]very order granting an injunction" must "state its terms specifically" and

"describe in reasonable detail … the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1)(B)-(C).  That rule exists to ensure that "an ordinary person reading the court's order [can] ascertain from the document itself exactly what conduct is proscribed."  11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2955 (3d ed.), Westlaw (database updated June 2024).  Because plaintiffs have not identified all of the community associations they seek an injunction for, the government would have no way to know whom an injunction protecting those groups or individuals covers.

Thus, even if plaintiffs prevail on the merits in this Court, their request for an injunction should be narrowed to only those groups and individuals identified in their complaint, or at a minimum remanded so that the district court can assess the appropriate scope of relief in the first instance.

## CONCLUSION

For the foregoing reasons, the district court's denial of the preliminary injunction should be affirmed.

Respectfully submitted,

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*[4]

ERIK S. SIEBERT
  *United States Attorney*

DANIEL TENNY
MAXWELL A. BALDI

  *s/ Sophia Shams*
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7264*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2495*
  *sophia.shams@usdoj.gov*

JANUARY 2025

---

[4] The Acting Assistant Attorney General is recused in this case.

54

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,745 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

*s/ Sophia Shams*
Sophia Shams

**CERTIFICATE OF SERVICE**

I hereby certify that on February 7, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Sophia Shams*
Sophia Shams

# ADDENDUM

# TABLE OF CONTENTS

31 U.S.C. § 5336 (excerpts)........................................................................A1

**31 U.S.C. § 5336**

**§ 5336. Beneficial ownership information reporting requirements**

**(a) Definitions.**--In this section:

. . . .

(2) **Applicant.**--The term "applicant" means any individual who--

(A) files an application to form a corporation, limited liability company, or other similar entity under the laws of a State or Indian Tribe; or

(B) registers or files an application to register a corporation, limited liability company, or other similar entity formed under the laws of a foreign country to do business in the United States by filing a document with the secretary of state or similar office under the laws of a State or Indian Tribe.

(3) **Beneficial owner.**--The term "beneficial owner"--

(A) means, with respect to an entity, an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise--

(i) exercises substantial control over the entity; or

(ii) owns or controls not less than 25 percent of the ownership interests of the entity; and

. . . .

(11) **Reporting company.**--The term "reporting company"--

(A) means a corporation, limited liability company, or other similar entity that is--

(i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or

(ii) formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe; and

(B) does not include--

(xix) any--

**(I)** organization that is described in section 501(c) of the Internal Revenue Code of 1986 (determined without regard to section 508(a) of such Code) and exempt from tax under section 501(a) of such Code, except that in the case of any such organization that loses an exemption from tax, such organization shall be considered to be continued to be described in this subclause for the 180-day period beginning on the date of the loss of such tax-exempt status;

**(II)** political organization (as defined in section 527(e)(1) of such Code) that is exempt from tax under section 527(a) of such Code; or

**(III)** trust described in paragraph (1) or (2) of section 4947(a) of such Code;

. . . .

**(xxiii)** any corporation, limited liability company, or other similar entity--

**(I)** in existence for over 1 year;

**(II)** that is not engaged in active business;

**(III)** that is not owned, directly or indirectly, by a foreign person;

**(IV)** that has not, in the preceding 12-month period, experienced a change in ownership or sent or received funds in an amount greater than $1,000 (including all funds sent to or received from any source through a financial account or accounts in which the entity, or an affiliate of the entity, maintains an interest); and

**(V)** that does not otherwise hold any kind or type of assets, including an ownership interest in any corporation, limited liability company, or other similar entity;

**(xxiv)** any entity or class of entities that the Secretary of the Treasury, with the written concurrence of the Attorney General and the Secretary of Homeland Security, has, by regulation, determined should be exempt from the requirements of subsection (b) because requiring beneficial ownership information from the entity or class of entities--

**(I)** would not serve the public interest; and

**(II)** would not be highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes.

. . . .

**(b) Beneficial ownership information reporting.**--

**(1) Reporting.**—

> **(A) In general.--**In accordance with regulations prescribed by the Secretary of the Treasury, each reporting company shall submit to FinCEN a report that contains the information described in paragraph (2).

> **(B) Reporting of existing entities.**--In accordance with regulations prescribed by the Secretary of the Treasury, any reporting company that has been formed or registered before the effective date of the regulations prescribed under this subsection shall, in a timely manner, and not later than 2 years after the effective date of the regulations prescribed under this subsection, submit to FinCEN a report that contains the information described in paragraph (2).

> **(C) Reporting at time of formation or registration.**--In accordance with regulations prescribed by the Secretary of the Treasury, any reporting company that has been formed or registered after the effective date of the regulations promulgated under this subsection shall, at the time of formation or registration, submit to FinCEN a report that contains the information described in paragraph (2).

> **(D) Updated reporting for changes in beneficial ownership.**--In accordance with regulations prescribed by the Secretary of the Treasury, a reporting company shall, in a timely manner, and not later than 1 year after the date on which there is a change with respect to any information described in paragraph (2), submit to FinCEN a report that updates the information relating to the change.

. . . .

**(2) Required information.**--

> **(A) In general.**--In accordance with regulations prescribed by the Secretary of the Treasury, a report delivered under paragraph (1) shall, except as provided in subparagraph (B), identify each beneficial owner of the applicable reporting company and each applicant with respect to that reporting company by--

> > **(i)** full legal name;

> > **(ii)** date of birth;

> > **(iii)** current, as of the date on which the report is delivered, residential or business street address; and

**(iv)(I)** unique identifying number from an acceptable identification document; or

**(II)** FinCEN identifier in accordance with requirements in paragraph (3).

. . . .

**(c) Retention and disclosure of beneficial ownership information by FinCEN.--**

**(1) Retention of information.**--Beneficial ownership information required under subsection (b) relating to each reporting company shall be maintained by FinCEN for not fewer than 5 years after the date on which the reporting company terminates.

**(2) Disclosure.--**

. . . .

**(B) Scope of disclosure by FinCEN.**--FinCEN may disclose beneficial ownership information reported pursuant to this section only upon receipt of--

**(i)** a request, through appropriate protocols--

**(I)** from a Federal agency engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity; or

**(II)** from a State, local, or Tribal law enforcement agency, if a court of competent jurisdiction, including any officer of such a court, has authorized the law enforcement agency to seek the information in a criminal or civil investigation;

**(ii)** a request from a Federal agency on behalf of a law enforcement agency, prosecutor, or judge of another country, including a foreign central authority or competent authority (or like designation), under an international treaty, agreement, convention, or official request made by law enforcement, judicial, or prosecutorial authorities in trusted foreign countries when no treaty, agreement, or convention is available--

**(I)** issued in response to a request for assistance in an investigation or prosecution by such foreign country; and

**(II)** that—

**(aa)** requires compliance with the disclosure and use provisions of the treaty, agreement, or convention, publicly disclosing any beneficial ownership information received; or

**(bb)** limits the use of the information for any purpose other than the authorized investigation or national security or intelligence activity;

**(iii)** a request made by a financial institution subject to customer due diligence requirements, with the consent of the reporting company, to facilitate the compliance of the financial institution with customer due diligence requirements under applicable law; or

**(iv)** a request made by a Federal functional regulator or other appropriate regulatory agency consistent with the requirements of subparagraph (C).

**(C) Form and manner of disclosure to financial institutions and regulatory agencies.**--The Secretary of the Treasury shall, by regulation, prescribe the form and manner in which information shall be provided to a financial institution under subparagraph (B)(iii), which regulation shall include that the information shall also be available to a Federal functional regulator or other appropriate regulatory agency, as determined by the Secretary, if the agency--

**(i)** is authorized by law to assess, supervise, enforce, or otherwise determine the compliance of the financial institution with the requirements described in that subparagraph;

**(ii)** uses the information solely for the purpose of conducting the assessment, supervision, or authorized investigation or activity described in clause (i); and

**(iii)** enters into an agreement with the Secretary providing for appropriate protocols governing the safekeeping of the information.

. . . .