# Case No. 24-2118

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

COMMUNITY ASSOCIATIONS INSTITUTE *et al.*,

*Plaintiffs-Appellants*,

*v.*

U.S. DEPARTMENT OF THE TREASURY *et al.*,

*Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Case No. 1:24-CV-01597-MSN-LRV

## REPLY BRIEF OF APPELLANTS

Brendan P. Bunn
CHADWICK, WASHINGTON
MORIARTY, ELMORE & BUNN, P.C.
3201 Jermantown Road, Suite 600
Fairfax, VA 22030
Tel: (703) 352-1900
bpbunn@chadwickwashington.com

*Counsel for Appellants Canterbury
Crossing Condominium Trust,
Townhouse Green Cooperative Inc.,
Terraces on Memorial Homeowners
Association, Farrcroft Homeowners
Association, Regency at Ashburn Greenbrier
Condominium Association*

Damon W.D. Wright
Clair E. Wischusen
GORDON REES SCULLY
MANSUKHANI LLP
277 S. Washington Street, Ste. 550
Alexandria, VA 22314
(703) 650-7030
dwright@grsm.com
cwischusen@grsm.com

*Counsel for Appellant
Community Associations Institute*

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................1

ARGUMENT ......................................................................................................4

    I.     The District Court Erred in Concluding that Plaintiffs-Appellants Did Not Demonstrate a Likelihood of Success on Their Claim That the CTA Exceeds Congress' Powers........................4

    II.    The District Court Erred in Concluding That Plaintiffs-Appellants Did Not Demonstrate a Likelihood of Success on Their Fourth Amendment Claim. ......................................................11

    III.   The District Court Erred in Concluding that Plaintiffs-Appellants Did Not Demonstrate Likelihood of Success on Their First Amendment Claim. ...........................................................18

    IV.   The District Court Erred in Applying the Irreparable Harm, Public Interest, and Balance of Equities Factors.................................22

CONCLUSION ..................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021)......................................................................*passim*

*Bell v. Wolfish*,
441 U.S. 520 (1979)..................................................................17

*Bond v. U.S.*,
572 U.S. 844 (2014)....................................................................9

*Boy Scouts of Amer. v. Dale*,
530 U.S. 640 (2000)..................................................................19

*Brown v. Texas*,
443 U.S. 47 (1979)....................................................................14

*California Bankers Ass'n v. Shultz*,
416 U.S. 21 (1974)........................................................11, 12, 13

*Carpenter v. United States*,
585 U.S. 296 (2018)..............................................................13, 16

*Centro Tepeyac v. Montgomery County*,
722 F.3d 184 (4th Cir. 2013) ................................................24

*City of Indianapolis v. Edmond*,
531 U.S. 32 (2000)..........................................................12, 14, 17

*City of Los Angeles v. Patel*,
576 U.S. 409 (2015)....................................................2, 14, 15, 17

*CTS Corp. v. Dynamics Corp. of Am.*,
481 U.S. 69 (1987)................................................................7, 10

*Donovan v. Lone Steer, Inc.*,
464 U.S. 408 (1984)..................................................................13

*Elrod v. Burns*,
427 U.S. 347 (1976)..................................................................23

*Gonzales v. Raich*,
    545 U.S. 1 (2005)............................................................................5, 6

*Griffin v. Wisconsin*,
    483 U.S. 868 (1987)...........................................................................16

*Griswold v. Connecticut*,
    381 U.S. 479 (1965)...........................................................................19

*Maryland v. Wirtz*,
    392 U.S. 183 (1968)...........................................................................11

*McCulloch v. Maryland*,
    17 U.S. (4 Wheat.) 316 (1819) .......................................................8, 10

*McHenry v. Texas Top Cop Shop, Inc.*,
    604 U.S. ---, No. 24A653, 2025 WL 272062 (U.S. Jan. 23, 2025).....................3

*NAACP v. Alabama*,
    357 U.S. 449 (1958)......................................................................18, 20

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012)....................................................................*passim*

*Nat'l Small Business United v. Yellen*,
    721 F. Supp. 3d 1260 (N.D. Ala. Mar. 2, 2024)...................................9

*New Jersey v. T.L.O.*,
    469 U.S. 325 (1985)...........................................................................17

*New York v. Burger*,
    482 U.S. 691 (1987)...........................................................................17

*O'Connor v. Ortega*,
    480 U.S. 709 (1987)...........................................................................17

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984)...........................................................................20

*Shelton v. Tucker*,
    364 U.S. 479 (1960)...........................................................................19

*Skinner v. Railway Labor Executives' Ass'n*,
　　489 U.S. 602 (1989)..............................................................16, 17

*Smith v. U.S. Dep't of the Treasury*,
　　--- F. Supp. 3d ---, No. 6:24-cv-336, 2025 WL 41924 (E.D. Tex.
　　Jan. 7, 2025)..............................................................................2, 3

*Texas Top Cop Shop, Inc. v. Garland*,
　　--- F. Supp. 3d ---, No. 4:24-cv-478, 2024 WL 5049220 (E.D. Tex.
　　Dec. 5, 2024)..........................................................................2, 3, 6

*U.S. v. Comstock*,
　　560 U.S. 126 (2010).......................................................................8

*United States v. Bynum*,
　　604 F.3d 161 (4th Cir. 2010) .......................................................15

*United States v. Curtiss-Wright Exp. Corp.*,
　　299 U.S. 304 (1936).......................................................................9

*United States v. Lopez*,
　　514 U.S. 549 (1995).................................................................3, 7, 10

*Wickard v. Filburn*,
　　317 U.S. 111 (1942).....................................................................5, 6

*Wooley v. Maynard*,
　　430 U.S. 705 (1977).....................................................................18

**Constitutions**

U.S. Const. art. I, § 8..............................................................................9

**Statutes**

31 U.S.C. § 5336(a)(11)..........................................................................5

31 U.S.C. § 5336(b)(1)(D)......................................................................21

31 U.S.C. § 5336(b)(2)(A)......................................................................16

31 U.S.C. § 5336(b)(2)(C)......................................................................17

31 U.S.C. § 5336(c)(2)(B) .................................................................12, 16

31 U.S.C. § 5336(h) ............................................................................................21

**Other Authorities**

31 C.F.R § 1010.380(a)(2) ...................................................................................21

87 Fed. Reg. 59498 .............................................................................................12

87 Fed. Reg. 59504 .............................................................................................12

# INTRODUCTION

Appellants—Community Associations Institute ("CAI"), an international membership organization representing community associations, and several individual community associations—recognize the legitimate aim of the Corporate Transparency Act ("CTA") in combating financial crimes through greater transparency. Yet, as applied to community associations, the CTA is ill-suited and imposes burdensome and unjustified obligations on nonprofit, volunteer-led organizations that bear no resemblance to the anonymous shell entities the statute was designed to target.

Despite these significant burdens, the Government's brief (and those of amici) largely disregards the CTA's sweeping impact on community associations and the volunteers who serve them. Instead, they downplay the very real and detrimental consequences of requiring local, state-regulated associations to comply with a complex federal reporting regime under the constant threat of civil and criminal penalties. Such penalties, in fact, collide with the longstanding federal policy embodied in the Volunteer Protection Act, which seeks to encourage volunteerism by limiting liability exposure. That overreach threatens to disrupt community governance, deter volunteer participation, and undermine homeownership for millions of Americans—an outcome that serves no meaningful anti–money laundering purpose and exceeds constitutional bounds.

Accordingly, the district court erred in denying preliminary injunctive relief by upholding the CTA against community associations. Its ruling conflicts with Supreme Court precedent, most notably *Nat'l Fed'n of Indep. Bus. ("NFIB") v. Sebelius*, 567 U.S. 519 (2012) (opinion of Roberts, C.J.), which confirms that Congress lacks power to regulate inactivity or conscript those outside interstate commerce into federal mandates, as well as First and Fourth Amendment protections recognized in *City of Los Angeles v. Patel*, 576 U.S. 409 (2015), and *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021).

Since Appellants filed their opening brief, two other federal courts—relying on the same arguments raised here—have held that the CTA exceeds Congress's enumerated powers. In *Texas Top Cop Shop, Inc. v. Garland*, --- F. Supp. 3d ---, No. 4:24-cv-478, 2024 WL 5049220, at *22 (E.D. Tex. Dec. 5, 2024), the court concluded that the CTA "does not regulate a pre-existing activity, but instead compels a new one," echoing *Sebelius* and holding that the mere "anonymous corporate existence and operation" does not place an entity within the scope of Congress's commerce authority. Likewise, in *Smith v. U.S. Dep't of the Treasury*, --- F. Supp. 3d ---, No. 6:24-cv-336, 2025 WL 41924, at *9-10 (E.D. Tex. Jan. 7, 2025), the court noted that "forming or owning an entity under state law does not alone have a self-evident substantial effect on interstate commerce" and reasoned

that if Congress can regulate an entity "simply because it exists, then it can regulate anything—or anyone—at all."

Both courts emphasized that the CTA lacks any jurisdictional hook to limit its reach, applying instead to countless private companies with no "explicit connection with or effect on interstate commerce." *Smith*, 2025 WL 41924, at *8 (quoting *United States v. Lopez*, 514 U.S. 549, 562 (1995)); *Texas Top Cop*, 2024 WL 5049220, at *19. Although the Government obtained stays of the nationwide relief in both cases, [1] those decisions strongly support the CTA's likely unconstitutionality here.

Further, Appellants do not seek a broad nationwide injunction prohibiting enforcement of the CTA against all affected entities. Appellants instead seek an injunction for community associations, also known as condominium associations, house cooperatives, and homeowners associations, which are run by unpaid volunteer board members who pose no threat to national security and should not be subject to potential civil and criminal penalties. Any purported harm from postponing enforcement against community associations pales in comparison to the profound burdens and constitutional injuries inflicted on community associations and their volunteer board members. Indeed, compliance with this intrusive federal

---

[1] *See McHenry v. Texas Top Cop Shop, Inc.*, 604 U.S. ---, No. 24A653, 2025 WL 272062, at *1 (U.S. Jan. 23, 2025); *Smith v. U.S. Dep't of the Treasury*, No. 6:24-cv-336 (E.D. Tex. Feb. 17, 2025), Dkt. No. 39.

scheme is likely to magnify volunteer fears and trigger mass resignations, leave many boards improperly constituted, and ultimately force numerous associations into receivership. JA 55 ¶ 24, JA60 ¶ 21, JA63 ¶ 14, JA66 ¶¶ 15–16, JA69 ¶¶ 17, 19, JA70 ¶ 20, JA75 ¶¶ 37–38. By neglecting these substantial harms, the Government's brief misrepresents the crippling impact on volunteer boards and the associations they serve, and disregards how imposing federal mandates on purely local, nonprofit entities inflicts irreparable harm by any measure.

This Court should therefore reverse the order below, hold that the district court erred in denying preliminary injunctive relief to community associations, and enjoin enforcement of the CTA pending a final resolution on the merits.

## ARGUMENT

### I. The District Court Erred in Concluding that Plaintiffs-Appellants Did Not Demonstrate a Likelihood of Success on Their Claim That the CTA Exceeds Congress' Powers.

The Government's principal defense under the Commerce Clause is that the CTA "regulates an economic activity" because it applies to entities "authorized to engage in various economic transactions" and addresses their "anonymous ownership and operation." Gov't Br. at 21, 23. This argument stretches the Commerce Clause well beyond its historically accepted boundaries. *See Sebelius*, 567 U.S. at 551–52 (explaining that Congress's power presupposes the existence of an activity rather than the power to create it). No Supreme Court decision supports

the notion that mere corporate existence, absent ongoing economic activity, can be forcibly regulated as a matter of interstate commerce.

The Supreme Court has delineated three broad categories of legislative authority under the Commerce Clause: regulating the channels of interstate commerce, regulating instrumentalities of interstate commerce (and persons or things in interstate commerce), and regulating activities that substantially affect interstate commerce. *Gonzales v. Raich*, 545 U.S. 1, 16–17 (2005). The CTA fits none of these. It neither regulates actual interstate channels nor targets any identifiable movement of goods or persons across state lines. Instead, it compels corporate entities to disclose personal information solely because they exist under state law. *See* 31 U.S.C. § 5336(a)(11) (defining a "reporting company" as a corporation, limited liability company, or similar entity formed under state law). The Government's attempt to label such bare existence an "economic activity" breaks with fundamental Commerce Clause precedent. *See Sebelius*, 567 U.S. at 550 (explaining that "the power to *regulate* commerce presupposes the existence of commercial activity to be regulated") (emphasis in original).

The Government relies heavily on the aggregate effects cases, *Wickard v. Filburn*, 317 U.S. 111 (1942) and *Gonzales v. Raich*, 545 U.S. 1 (2005), in arguing that "the anonymous ownership and operations of businesses" has a substantial effect on interstate commerce. Gov't Br. at 20–21. Both are inapposite because,

unlike those cases, the CTA does not regulate an activity at all. The plaintiffs in *Wickard* and *Raich* were at least actively involved in the production or acquisition of commodities, wheat and marijuana, and the Government could regulate those activities because of their effect on commerce. *Wickard*, 317 U.S. at 114–15, 127–28; *Raich*, 545 U.S. at 19. Here, the CTA's trigger is not commodity production or another economic activity, but simply having been formed as a state-law entity. That sort of passive corporate status is no "activity" at all. "It is akin to a person simply being alive in their natural state, indistinguishable from an individual choosing to refrain from purchasing health insurance. And the regulation of this natural state of being seems to be exactly what the Supreme Court rejected in *NFIB v. Sebelius*." *Texas Top Cop,* 2024 WL 5049220, at *21 (citing *Sebelius*, 567 U.S. at 552).

Nor can the Government transform the CTA into a legitimate regulation of "active" corporate conduct by pointing to the Anti-Money Laundering Act's broader purposes or by highlighting the possibility that many entities do, at some point, transact business. *See* Gov't Br. at 22–23. Merely presupposing that most corporate entities might eventually engage in commerce is not enough. *See Sebelius,* 567 U.S. at 557 (rejecting as "unprecedented" the notion that legislative power can attach simply because some future activity may predictably occur). To uphold the CTA, the Court would have to adopt the Government's view that entity formation or the mere capacity to engage in commerce triggers full-scale federal regulation. Such

reasoning "would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." *Lopez v. U.S.*, 514 U.S. 549, 557 (1995) (quotation omitted). While money laundering and financial crimes implicate important concerns, no recognized Commerce Clause principle grants Congress authority to regulate all state-incorporated entities simply because some subset might facilitate criminal behavior. *See Lopez*, 514 U.S. at 566 ("The Constitution … withhold[s] from Congress a plenary police power").

The Government further argues that the CTA is part of a comprehensive scheme addressing interstate and foreign crimes—namely money laundering and terrorism financing. Gov't Br. at 22–23. But the Supreme Court has never upheld a regulation of pure inactivity on the theory that it is an "essential part of a larger regulation of economic activity." *Lopez,* 514 U.S. at 561. Where the underlying conduct is not itself an economic activity (or any activity at all), labeling it "essential" to a broader scheme cannot salvage the law. *Sebelius*, 567 U.S. at 560. An entity's voluntary choice to incorporate does not, by itself, initiate commerce susceptible to federal control. *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987) (reaffirming that "no principle of corporation law ... is more firmly established than a State's authority to regulate domestic corporations").

The Government's attempt to invoke the Necessary and Proper Clause does not save the CTA. Gov't Br. at 20. That Clause "does not license the exercise of any

'great substantive and independent power' beyond those specifically enumerated."
*Sebelius*, 567 U.S. at 559 (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 411 (1819)). When Congress exercises the Necessary and Proper power, it must rest on a valid enumerated authority. *U.S. v. Comstock*, 560 U.S. 126, 134 (2010). The CTA does not derive from an existing authority to regulate these entities. It instead presupposes that Congress possesses some free-floating power to legislate over all newly formed or existing corporations, simply because some portion might engage in wrongdoing. In *Sebelius*, the Supreme Court rejected a similar argument, holding that the Necessary and Proper Clause does not allow Congress to "reach beyond the natural limit of its authority and draw within its regulatory scope those who otherwise would be outside of it." 567 U.S. at 560.

Nor can the CTA plausibly be defended by referencing other federal powers such as the power to "lay and collect Taxes," the power to "regulate Commerce with foreign Nations," or any vague "national security" or "foreign affairs" authority. See Gov't Br. at 29. While Congress's broad power to collect taxes allows it to impose reporting requirements integral to an actual tax or fee arrangement, the CTA is not designed to facilitate revenue collection. Its entire thrust is to gather ownership information for law enforcement ends that extend well beyond tax administration. The Government cites to powers "useful" or "convenient" in gathering data, but no enumerated power "permit[s] Congress to bring its taxing power to bear just by

8

collecting 'useful' data" unrelated to the payment of revenue. *Nat'l Small Business United v. Yellen*, 721 F. Supp. 3d 1260, 1289 (N.D. Ala. Mar. 2, 2024) (quoting *Sebelius*, 567 U.S. at 560). Stretching federal authority this far would justify "any law that provided for the collection of information useful for tax administration and provided tax officials with access." *Id.*

The Government's reliance on foreign affairs and national security powers likewise fails. Congress can only regulate domestic entities under its foreign affairs powers if the legislation genuinely addresses international concerns within a recognized constitutional authority, such as making treaties or punishing offenses against the Law of Nations. *See* U.S. Const. art. I, § 8; *Bond v. U.S.*, 572 U.S. 844, 855 (2014) (declining to read a treaty-implementation statute to intrude upon purely local conduct). The CTA does not rest on any treaty or explicit foreign commerce regulation. Instead, it targets entities that form under state law and remain purely local in operation, thereby exceeding any foreign or national security power. *See United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 315–16 (1936) (distinguishing between broad foreign affairs prerogatives and powers over purely internal matters).

In any event, the Government never identifies an enumerated power to which the CTA is merely "incidental." *McCulloch*, 17 U.S. at 418. A law that forces "a new activity" on community associations, and millions of other local entities solely

9

because they could conceivably engage in future economic transactions, cannot be justified as "necessary and proper" to effectuate enumerated ends. *Sebelius*, 567 U.S. at 560. If Congress may reach all intrastate entities on that rationale, then the "enumerated powers" scheme collapses into a federal police power. *Lopez*, 514 U.S. at 566-67. Because States historically preside over corporate formation and intrastate governance, the CTA's intrusion on sovereign state functions confirms that it lacks any valid anchor in the Commerce Clause, the Taxing Clause, or foreign affairs. *See CTS Corp.*, 481 U.S. at 89 (observing that "state regulation of corporate governance is regulation of entities whose very existence and attributes are a product of state law").

The Government further characterizes Appellants' challenge solely as a "facial challenge," invoking a supposed burden to show that the CTA lacks any legitimate constitutional application. Gov't Br. at 27–28. That characterization is incorrect. Appellants challenged the constitutionality of the CTA both facially and as applied. JA at ¶ 184. In any event, a law that compels otherwise inactive state-chartered entities to submit personal information, irrespective of any commerce, rests on no enumerated power and therefore has no legitimate application. Put differently, the CTA's universal application to newly formed and long-established local entities—many of which operate purely intrastate—underscores that the statute sweeps beyond any recognized domain of federal authority. *See Maryland v. Wirtz*,

392 U.S. 183, 196 (1968) ("[T]he power to regulate commerce, though broad indeed, has limits."). Appellants' challenge focuses on precisely this absence of any legitimate federal hook, and the CTA's massive reach confirms that it is not a narrow or targeted measure that only applies to those truly engaged in interstate transactions.

## II.    The District Court Erred in Concluding That Plaintiffs-Appellants Did Not Demonstrate a Likelihood of Success on Their Fourth Amendment Claim.

The Government argues the CTA imposes nothing more than a routine "reporting requirement" akin to longstanding financial or tax reporting, which it says presents no Fourth Amendment concerns. *See* Gov't Br. at 35–36. But that argument—relying heavily on *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974)—minimizes the CTA's requirements, overstates the scope of *Schultz*, and ignores longstanding precedent.

The Government repeatedly equates the CTA with the statute in *Shultz*, contending it "requires only limited and specific identification information," Gov't Br. at 39, but that gloss ignores the reality that the CTA was specifically designed to collect ownership information for ordinary criminal investigations. *Shultz*, by contrast, upheld a narrow law requiring banks—a highly regulated business sector that routinely handles "abnormally large transactions"—to file transaction reports. 416 U.S. at 37, 67. The CTA is far more sweeping: it covers millions of small, nonprofit, and volunteer-run organizations (including community associations) that

are neither in the banking business nor have any "abnormal" financial activity akin to large currency transactions.

The CTA's driving force—and admitted congressional purpose—is to create a nationwide law-enforcement database to expedite investigations of potential money laundering, terrorism financing, and other crimes. 31 U.S.C. § 5336(c)(2)(B). In fact, the agency's former Director testified that the CTA is intended to obviate "grand jury subpoenas" and "search warrants" in criminal probes because constitutional processes "waste[] resources." 87 Fed. Reg. 59498, 59504. That is policing efficiency, not a traditional regulatory scheme. Laws "primarily for the ordinary enterprise of investigating crimes" trigger the Fourth Amendment's bedrock requirements of a warrant or, at least, some level of individualized suspicion. *City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000).

Contrary to the Government's suggestion (Gov't Br. at 35–37, 39–40), it is not dispositive that the CTA nominally takes the form of a "reporting" statute. *Shultz* itself recognized that while "reporting requirements are by no means per se violations of the Fourth Amendment," such laws must be (1) "limited in nature" and (2) "sufficiently related to a tenable congressional determination as to improper use of transactions of that type in interstate commerce." 416 U.S. at 59–60, 67.

Here, by contrast, the CTA mandates suspicionless disclosure of personal, identifying information for volunteer board members of local community

associations—nonprofit organizations that are *not* related to any improper transactions. And the CTA's express purpose is entirely focused on detecting and prosecuting crimes. As the Supreme Court has cautioned, "a central concern" of the Fourth Amendment is shielding individuals from "a too permeating police surveillance." *Carpenter v. United States*, 585 U.S. 296, 305 (2018). That is exactly what the CTA attempts to accomplish through a broad, ongoing information sweep—no individualized suspicion required—and direct, warrantless access for law enforcement.

The Government cites *Donovan v. Lone Steer, Inc.*, 464 U.S. 408 (1984), to argue that a "reporting" requirement involving no "non-consensual entries" is "more readily satisfied" under the Fourth Amendment. Gov't Br. at 35–36. But *Lone Steer* concerned a discrete, routine administrative subpoena issued as part of the Fair Labor Standards Act's enforcement scheme—an inspection of business documents necessary to ensure compliance with wages and hours regulations. 464 U.S. at 409–11, 414. That was a prototypical administrative inspection regime where the government had to demonstrate regulatory authority over the business activity. It was not a blanket, suspicionless search designed principally to gather potential evidence for criminal investigations. *See City of Los Angeles v. Patel*, 576 U.S. 409, 420 (2015) (contrasting permissible administrative inquiries from ones primarily designed for criminal investigations).

By contrast, the CTA stands "primarily for the ordinary enterprise of investigating crimes," *Edmond*, 531 U.S. at 44, with no analogous administrative or regulatory purpose. The CTA is also far more coercive: it carries potential criminal liability for nonprofits and their volunteer board members that fail to submit personal identification information *to law enforcement* solely to facilitate criminal investigations. That is not a routine administrative demand for documents in an otherwise closely supervised industry.

The Government argues that *Brown v. Texas*, 443 U.S. 47 (1979), *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000), and *Patel* are irrelevant because they involve physical seizures or on-site inspections, whereas the CTA merely compels uploading data. Gov't Br. at 39–40. That framing is too narrow. *Brown* and *Edmond* struck down suspicionless searches/seizures whose "primary purpose" was "crime control" and/or "prevention of crime." 531 U.S. at 41–43; 443 U.S. at 52. And *Patel* invalidated an ordinance that required hotels, on demand, to give police officers direct access to guest registries—no warrant, no subpoena, and no suspicion. 576 U.S. at 413, 419–20. Although *Patel* involved a physical inspection, the Supreme Court's holding turned on the Fourth Amendment's prohibition on suspicionless, warrantless demands to surrender private records for law enforcement's general investigations. *Id.* at 419–23.

There is no Fourth Amendment distinction between an officer showing up unannounced to seize a hotel's guest registry *versus* the government compelling associations to upload volunteer board members' identifying information under threat of criminal penalty. *See id.* at 419 ("[A]bsent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker.") (citation omitted). Nothing in the CTA offers *any* precompliance review: community associations either report or face a potential two-year prison sentence.

The Government suggests that community board members have no reasonable expectation of privacy in the CTA's compelled disclosures because many individuals have presumably provided this information with state and federal authorities in applying for a driver's license or filing tax returns. Gov't Br. at 41 (citing, *United States v. Bynum*, 604 F.3d 161 (4th Cir. 2010)). But that conflates typical state corporate filings—which often require only a mailing address and the names of officers—with the CTA's far more intrusive requirement that organizations collect and deliver to FinCEN (1) the individual's full legal name, (2) date of birth, (3) current residential address, (4) a unique identification number from an acceptable ID document, and (5) an image of that document. 31 U.S.C. § 5336(b)(2)(A).

Likewise, many states—including those in which Appellant community associations operate—do *not* require volunteers and board members to upload government-issued identification cards or personal data to an open-access law enforcement database. Gov't Br. at 41–42 (citing selective examples from certain state filing statutes). Indeed, unlike a minimal corporate filing accessible to the public for compliance with corporate law, the CTA funnels these personal details into a federal repository for the explicit purpose of facilitating potential criminal investigations and prosecutions. *See* 31 U.S.C. § 5336(c)(2)(B). That is precisely the type of "too permeating police surveillance" that the Fourth Amendment forbids without a warrant or at least individualized suspicion. *Carpenter*, 138 S. Ct. at 2214.

Finally, the Government's fallback contention is that, even if the CTA amounts to a search, it is justified by the "special needs" of national security and foreign policy. Gov't Br. at 37. But *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989), restricts "special needs" to those circumstances that are "beyond the normal need for law enforcement" and that make the warrant and probable-cause requirements "impracticable." (cleaned up). In *Skinner*, the Court emphasized that such "special needs" include situations like searches of a probationer's home, *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987); searches of certain highly regulated business premises, *New York v. Burger*, 482 U.S. 691, 699–703 (1987); work-related searches of government employees' desks or offices,

*O'Connor v. Ortega*, 480 U.S. 709, 721–25 (1987); searches of students' property by school officials, *New Jersey v. T.L.O.*, 469 U.S. 325, 337–42 (1985); and body-cavity searches of prison inmates, *Bell v. Wolfish*, 441 U.S. 520, 558–60 (1979). Each of those contexts is fundamentally different from ordinary criminal investigations. By contrast, the CTA's overarching purpose is to facilitate investigations and prosecutions of alleged criminal activity—"the normal need for law enforcement"—which removes it from the narrow "special needs" category. *Skinner*, 489 U.S. at 619.

Indeed, the CTA's "primary purpose," is exactly "the normal need for law enforcement." *Patel*, 576 U.S. at 420; *Edmond*, 531 U.S. at 42. It aims to collect evidence on potentially every volunteer board member to aid "the ordinary enterprise of investigating crimes." *Edmond*, 531 U.S. at 44. That law-enforcement-driven rationale places the CTA squarely outside the "special needs" line of cases. The Government's repeated emphasis on national security or "foreign policy" does not override the plain text and design of the CTA, which is meant to expedite money-laundering, terrorism, and criminal investigations against domestic corporations and LLCs—*i.e.*, standard crime control. *See* 31 U.S.C. § 5336(b)(2)(C).

## III. The District Court Erred in Concluding that Plaintiffs-Appellants Did Not Demonstrate Likelihood of Success on Their First Amendment Claim.

The Government argues that typical "reporting requirements" do not implicate the First Amendment, citing inapposite examples such as corporate tax returns, accident reports, and product labeling laws. Gov't Br. 42. But Appellants do not claim that *every* disclosure mandate triggers strict or exacting scrutiny. Instead, Appellants, consistent with longstanding precedent, argue that the CTA implicates the First Amendment by "compel[ling] disclosure" in a manner that risks "discouraging the exercise of constitutionally protected political rights." *NAACP v. Alabama*, 357 U.S. 449, 461 (1958) (cleaned up). That is precisely what happens here, where volunteer board members face looming civil and criminal penalties for noncompliance, causing a predictable "chilling effect" and deterring people from associating in community organizations.

The Government conflates *ideological* compelled-speech doctrine (*e.g.*, forcing someone to recite a slogan or pledge) with *membership* or *affiliation* disclosure cases. *See* Gov't Br. 43–44. But these are two separate—but equally important—lines of First Amendment jurisprudence. *Compare Wooley v. Maynard*, 430 U.S. 705, 713 (1977) (enjoining statute making it a crime to obscure words "Live Free or Die" on license plates), with *NAACP v. Alabama*, 357 U.S. at 460–62 (order requiring NAACP to produce organizational records was substantial restraint

upon freedom of association). Nothing in the law confines unconstitutional "compelled speech" strictly to "public" or "ideological" messages. *See Shelton v. Tucker*, 364 U.S. 479, 485–87 (1960) (invalidating a state law compelling teachers to disclose organizational affiliations to a government agency). As the Supreme Court has observed, "[o]ur cases have said that disclosure requirements can chill association '[e]ven if there [is] no disclosure to the general public.'" *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 616–17 (2021) (quoting *Shelton*, 364 U.S. at 486).

The Government next insists that community associations engage in "non-expressive" conduct akin to "property and community maintenance" (Gov't Br. 46) and thus have less First Amendment protection.  That is both factually and legally incorrect. As the Supreme Court has held, the right of association "is not reserved for advocacy groups" alone. *Boy Scouts of Amer. v. Dale*, 530 U.S. 640, 648 (2000); *see also Griswold v. Connecticut*, 381 U.S. 479, 483 (1965) (First Amendment covers "forms of 'association' that are not political in the customary sense but pertain to the social, legal, and economic benefit of the members."). By definition, *community* associations are civic-minded organizations that collect and disseminate information, appear before municipal and local boards on zoning and safety issues, and advocate with local or state government on matters affecting their community. JA53 ¶ 11; JA58 ¶ 12; JA63 ¶ 12. This is expressive activity.

The Government's argument suggests that only overtly political or heavily "controversial" advocacy would qualify for First Amendment protection. Gov't Br. 44–46. That is not the law. Nor do controlling precedents require an organization to prove *some threshold amount* of advocacy. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) (recognizing that First Amendment associational rights cover groups formed for a "wide variety" of social, civic, charitable, and other ends, not only political advocacy). At bottom, community associations do far more than simply mow grass. They organize and collectively speak, precisely the sort of expressive conduct the First Amendment protects.

The Government downplays Appellants' sworn testimony that board members will resign or refrain from serving due to the CTA's burdens and penalties, labeling it mere "speculation." But the Supreme Court instructs that "the risk of a chilling effect" is enough to trigger exacting scrutiny. *Bonta*, 594 U.S. at 618–19. Proof of actual resignations is not mandatory to establish a burden on the right to associate. *See NAACP*, 357 U.S. at 462–63 (finding it sufficient that compelled disclosure "*may* induce members to withdraw from the Association and dissuade others from joining it") (emphasis added).

Contrary to the Government's suggestions, the deterrence here is neither hypothetical nor minimal. Board members—already unpaid volunteers—must continually update the association's beneficial-ownership information "within thirty

days" of any board change or face criminal penalties. *See* 31 U.S.C. § 5336(b)(1)(D), (h); 31 C.F.R § 1010.380(a)(2). Even a single misstep or oversight could lead to significant fines or imprisonment. Community associations have frequent board turnover, no full-time staff, and volunteer-run recordkeeping. JA53 ¶ 15; JA58 ¶¶ 13, 19; JA66 ¶ 11. These are exactly the types of liability concerns Congress identified decades ago in the Volunteer Protection Act, seeking to avoid deterring well-meaning individuals from serving nonprofits. This is precisely the sort of risk likely to chill participation.

The Government contends that the CTA targets only "willful" violations. Gov't Br. 45. But that does little to assuage the legitimate fear that even inadvertent errors may end up enforced or prosecuted given the CTA's broad "beneficial ownership" definitions and harsh penalties. The subjective concern of volunteers that they might be *wrongly* deemed "willful" is itself chilling. *See Bonta*, 594 U.S. at 616–617 (collecting cases requiring no actual enforcement action to prove "possible deterrent effect").

The Government likens the CTA to routine "tax return filing" or "SEC disclosures" (Gov't Br. 42–43). But those laws do not systematically conscript hundreds of thousands of volunteer-run nonprofits that *are not engaged in any commercial activity* akin to large-scale securities trading or for-profit corporate filings. Indeed, the average community association has far less in common with a

Fortune 500 corporation subject to the SEC than it does with a nonprofit housing cooperative or charity. Moreover, in *Bonta*, the Supreme Court explicitly struck down a nonprofit disclosure scheme because it cast a "dragnet" for "sensitive" data without tailoring. 594 U.S. at 614–15. The CTA likewise dragoons *every* community association board member's personal identifiers into a federal law-enforcement database, with the same mismatch between the Government's interest and the forced disclosure.

Even if this Court were to treat the CTA as "some form" of legitimate government oversight, the CTA cannot survive exacting scrutiny, which requires a "substantial relation between the disclosure requirement and a sufficiently important government interest" plus narrow tailoring. *Id.* at 607, 611. The Government does not explain how forcing millions of volunteer board members to provide their personal data (including photo IDs) meaningfully advances any anti–money-laundering or anti-terrorism goal, especially when there is no legislative finding—and no record evidence—showing that community associations pose a money-laundering or terrorism financing risk.

## IV. The District Court Erred in Applying the Irreparable Harm, Public Interest, and Balance of Equities Factors.

The Government's position—that even if Plaintiffs ultimately prevail on the constitutional claim, they should endure the CTA's full force in the meantime—sidesteps the reality that enforcing a likely unconstitutional reporting regime

imposes serious, immediate harm on community associations and their volunteer members. As even temporary deprivations of constitutional rights constitute irreparable injury, *see Elrod v. Burns*, 427 U.S. 347, 373 (1976), the CTA inflicts just such an injury on community associations every day it remains in force. These associations are run by volunteers—neighbors—whose board membership turns over frequently. JA72 ¶ 8; JA66 ¶ 11. Each change requires another CTA filing, at the risk of civil and criminal penalties for even an inadvertent omission. Faced with that threat, and echoing the very concerns that prompted the Volunteer Protection Act, community association board members are resigning or declaring they no longer wish to serve. JA54 ¶ 20; JA63 ¶ 14; JA66 ¶ 15; JA75 ¶ 37 (80% of surveyed board members anticipate resignations and 88% believe the CTA will deter new volunteers). The district court's suggestion that such fears are merely "tentative" statements (JA148) overlooks unrebutted evidence that large-scale volunteer departures will leave many boards improperly constituted under state law or even forced into receivership. Nor is the harm reversible: once board members abandon their posts, the operational stability and community goodwill that volunteer service fosters are permanently disrupted. JA55 ¶ 24; JA60 ¶ 21; JA70 ¶¶ 20–21; JA75 ¶ 38.

Merely preserving the *status quo* through injunctive relief would not meaningfully harm the Government. Preventing enforcement of the CTA against volunteer-run community associations while this case proceeds would simply

maintain existing operations and practices. Indeed, this Court has emphasized that the Government is in no way harmed by issuance of a preliminary injunction which prevents it from enforcing a likely unconstitutional statute. *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013). By contrast, permitting enforcement will cause real, immediate harm to community associations, as the record confirms. JA56 ¶ 28; JA60 ¶¶ 21-22; JA70 ¶¶ 20–21; JA75 ¶ 38. The Government's assertion that it suffers irreparable injury by being enjoined from "effectuating" a federal statute, *see* Gov't Br. at 49, ignores that Congress never found a money-laundering or terrorism-financing nexus for volunteer-run community associations, and the Government has yet to offer any such evidence.

The Government's invocation of "the effective enforcement of federal law" (Gov't Br. at 49) therefore rings hollow, especially given that the CTA's text, structure, and legislative findings focus on shell companies and other business entities used to hide illicit activity—not local community associations composed of volunteer neighbors. Amici who similarly downplay the CTA's impact on community associations ignore these unique circumstances and the comprehensive survey data showing widespread and imminent departures from volunteer boards. JA70 ¶¶ 34–38. That harm cannot be undone simply by allowing board members to "return" at some later date, any more than a forest clear-cut today can be restored overnight. The district court's contrary view stems from its erroneous conclusion

that Plaintiffs are unlikely to succeed on the merits. Once that premise is removed, the record unequivocally shows irreparable harm, a strong balance of equities favoring an injunction, and a public interest served by preserving constitutional rights—particularly where there is no demonstrable law-enforcement purpose in subjecting volunteer neighbors to potential criminal liability for making a filing error.

## CONCLUSION

Appellants respectfully request that this Court reverse the district court's decision and remand with instructions to immediately enter a preliminary injunction to halt enforcement of the CTA's reporting requirements against community associations.

February 28, 2025

Respectfully submitted,

/s/ Brendan P. Bunn
Brendan P. Bunn
CHADWICK, WASHINGTON
MORIARTY, ELMORE & BUNN, P.C.
3201 Jermantown Road, Suite 600
Fairfax, VA 22030
Tel: (703) 352-1900
bpbunn@chadwickwashington.com

*Counsel for Appellants, Canterbury
Crossing Condominium Trust,
Townhouse Green Cooperative Inc.,
Terraces on Memorial Homeowners
Association, Farrcroft Homeowners
Association, Regency at Ashburn
Greenbrier Condominium Association*

/s/ Clair E. Wischusen
Damon W.D. Wright
Clair E. Wischusen
GORDON REES SCULLY
MANSUKHANI LLP
277 S. Washington Street, Ste. 550
Alexandria, VA 22314
Tel: (703) 650-7030
dwright@grsm.com
cwischusen@grsm.com

*Counsel for Appellant,
Community Associations Institute*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations because it contains 5,531 words (as determined by the Microsoft Word system used to prepare it), excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface and type-style requirements because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point, Times New Roman font.

*/s/ Clair E. Wischusen*
Clair E. Wischusen

**CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2025, this brief was filed with the Clerk of the Court through the appellate CM/ECF system, which will accomplish service by sending notification to all registered counsel of record.

*/s/ Clair E. Wischusen*
Clair E. Wischusen